UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| TRUSSELL GEORGE, by and through His Guardian Ad Litem, LETITICA WALKER, | * * * * | |
| PLAINTIFF | * * * | |
| VS. | * * * | CIVIL ACTION NO. 3:14-00338 JWD-RLB |
| LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, *et al.*, | * * * * | |
| DEFENDANTS. | * * | |

**PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS**

1. Plaintiff, Trussell George, Jr., is a person with a mental illness who has been found Not Guilty by Reason of Insanity (NGRI) of a criminal offense. Mr. George has been diagnosed with Schizophrenia and Mild Mental Retardation.[1]

2. Mr. George is a qualified individual with a disability within the meaning of Section 504 of the Rehabilitation Act.[2]

3. On December 15, 2008, following a finding that Mr. George was NGRI to a charge of possession of a firearm by a felon, the court ordered that he be conditionally released pursuant

---

[1] Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 1); Pl.'s Ex. 2 at 95; Pl.'s Ex. 8 at 304:2–6, 324:8–17. Unless otherwise noted, pin cites to pages in Plaintiffs' Exhibits are to the Bates number.
[2] 29 U.S.C. § 794(a); 29 U.S.C. § 705 (20).

to La. C. Crim. P. art. 657.1, for a period of five years, provided he receive adequate outpatient treatment, supervision, and monitoring.[3]

  4.  In ordering Mr. George's conditional release, the court established, among other things, the following conditions:

> a) That he reside at Progressive Group Home, 1334 Frances Harriet Drive, Baton Rouge, Louisiana.
>
> b) That he attend the local mental health clinic in Baton Rouge, Louisiana, and follow the treatment recommendations prescribed by his treating physician, as well as comply and cooperate with sessions of counseling and/or treatment, oral and/or injectable medications as ordered by the attending physician.
>
> c) That he report to the local probation office within twenty-four (24) hours of release from jail, excluding non-business days.
>
> d) That he be subject to the outpatient tracking/monitoring services to be provided by the Community Forensic Services Program of the Department of Health and Hospitals.
>
> e) That he sign all consent for release of information forms, and that agencies involved in his medical/psychiatric care report on a regular basis to the District Forensic Coordinator or State Probation Officer, who were authorized to have access to progress notes, attendance sheets, medication order sheets, and pertinent medical, psychiatric, psychological, and neurological consultations.
>
> f) That he refrain from the consumption of alcohol and all illicit drugs and from frequenting places where alcohol/illicit drug sales and consumption occur.
>
> g) That the Aftercare Provider notify the District Forensic Coordinator and/or State Probation Officer of any positive drug screens or problems related to treatment and/or behavior problems.[4]

---

[3] Pl.'s Ex. 1 at 11:21–25; Pl.'s Ex. 2 at 91–92; Pl.'s Ex. 3 at 119:5–14; Pl.'s Ex. 4 at 199–200.
[4] Pl.'s Ex. 2 at 91–94; Pl.'s Ex. 3 at 119:5–14; Pl.'s Ex. 4 at 199–200.

5. Following the court's finding that he was NGRI, Mr. George was placed in the community on conditional release.[5]

6. From December 2008 to May 2014, as required by his conditional release, Mr. George resided in group homes operated by Progressive Health Care Providers (PHP), located in Baton Rouge, Louisiana.[6]

7. The group homes Mr. George resided in are Intermediate Care Facilities for People with Developmental Disabilities ("ICF-DD"). [7]

8. ICF-DD is one of a number of residential services options operated under the auspices of DHH. As is typical of many group homes, approximately six other individuals, all of whom have a developmental disability and many of whom have mental illnesses, resided in the PHP facilities with Mr. George.[8]

9. According to the Behavioral Support Plan created by PHP, Mr. George's mental illness caused him on some occasions to engage in verbal aggression and non-compliance within both the group home and the day program he attended during the week. His Behavioral Support Plan noted that occasionally, when Mr. George's medication was not correct, he engaged in outbursts and "threatening" episodes.[9]

10. While living in the group homes, Mr. George was under the supervision of the Division of Probation and Parole of the Louisiana Department of Public Safety and Corrections

---

[5] Pl.'s Ex. 4 at 200.
[6] Pl.'s Ex. 2 at 95–104.
[7] Pl.'s Ex. 1 at 10:6–10, 34:1–25; Pl.'s Ex. 2 at 95.
[8] Pl.'s Ex. 3 at 126:8–25, 127:1–16; La. R.S. §§ 28:451.1–455.2.
[9] Pl.'s Ex. 9 at 454-456.

and Community Forensic Services (CFS) of the Louisiana Department of Health and Hospitals, having been found NGRI to the charge of possession of a weapon by a felon.[10]

11. Defendant Louisiana Department of Public Safety and Corrections (LDPSC) is the state agency responsible for monitoring and providing services to persons placed on conditional release or probation. The Division of Probation and Parole, which supervises Mr. George's conditional release, is located within the Department.[11]

12. The LDPSC receives federal financial assistance and is a public entity as defined by 42 U.S.C. § 12131(1) (B).[12]

13. With respect to individuals placed on conditional release pursuant to La. Code Crim. P. art. 657, the Division of Probation and Parole ensures that the general and special conditions of the ordered supervision are followed for each supervisee. Its employees make personal contact with the supervisees pursuant to the to the Division of Probation and Parole's policies and when otherwise necessary. The agency is responsible for monitoring supervisees for compliance with conditions, addressing any issues required by the courts, consulting with the forensic coordinator, drug testing supervisees, and arresting supervisees.[13]

14. Defendant James M. LeBlanc is Secretary of the LDPSC. Pursuant to La. R.S. § 36:403, he is responsible for the administration, control, and operation of the functions, programs, and affairs of the Department. He is also responsible for, among other things, operating a probation and parole system, in accordance with the law.[14]

---

[10] Pl.'s Ex. 4, at 200 (Ex. 1 to Tubbs Dep.).
[11] Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 5); Pl.'s Ex. 6 at 233, Resp. to Interrog. No. 2.
[12] Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 5); 42 U.S.C. § 12131(1) (B); 29 U.S.C. § 794(a)-(b).
[13] Pl.'s Ex. 6 at 234 (Resp. to Interrog. No. 3).
[14] La. R.S. § 36:401(B)(3); Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 6).

15. Defendant Whalen Gibbs is the Assistant Secretary of the LDPSC. As such, he directs the operations of the Louisiana Division of Probation and Parole. Pursuant to La. R.S. § 15:574.11(A), the Division of Probation and Parole provides for the investigation and supervision of adjudicated adult offenders. Also, pursuant to La. Code Crim. P. art. 658(B)(1), the division is charged with supervising individuals who have been placed on conditional release following a finding of NGRI.[15]

16. Defendant Gerald Starks is the Director of the Louisiana Division of Probation and Parole. As such, he assists in the administration, development, and implementation of policies of the Division of Probation and Parole.[16]

17. Defendant Scott Tubbs is an employee of the Louisiana Division of Probation and Parole, acting under the direction and supervision of Defendants LeBlanc, Gibbs, and Starks.[17]

18. Mr. Tubbs was responsible for monitoring the conditional release of, or providing care, services, or treatment to, Mr. George.[18]

19. Mr. Tubbs's contacts with Mr. George included field contacts, court hearings, and arrests.[19]

20. Mr. Tubbs was a key decision-maker in the arrest and incarceration of Mr. George in 2013 and 2014.[20]

---

[15] Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 7).
[16] (*Id.* ¶ 8.)
[17] (*Id.* ¶ 9.); Pl.'s Ex. 3 at 113:1–3
[18] Pl.'s Ex. 6 at 234 (Resp. to Interrog. No. 4); Pls. Ex. 3 at 113:17–23.
[19] Pl.'s Ex. 6 at 235 (Resp. to Interrog. No. 5); Pls. Ex. 3 at 114:1–25.
[20] Pl.'s Ex. 3 at 151, 162; Pl.'s Ex. 4 at 206; Pl.'s Ex. 1 at 53–54; Pl.'s Ex. 2 at 95–104.

21. Defendant Rebekah M. Gee[21] is the Secretary of the Louisiana Department of Health and Hospitals ("DHH"). Pursuant to La. R.S. § 36:254, she is responsible for the oversight, supervision, and control of DHH and its divisions and is ultimately responsible for ensuring that DHH's services for people with disabilities are provided in conformance with federal law.[22]

22. Defendant DHH is a state agency that operates the CFS program and Eastern Louisiana Mental Health System (ELMHS) in Jackson, Louisiana.[23]

23. DHH receives federal financial assistance and is a public entity as defined by 42 U.S.C. § 12131(1) (B).[24]

24. Defendant Eric Brady is employed as a District Forensic Coordinator (DFC) by DHH and, as such, works under the direction and supervision of Defendant Gee.[25]

25. Mr. Brady is responsible for monitoring individuals who have been found NGRI and placed on conditional discharge and for implementing the policies and procedures of DHH with respect to such persons.[26]

26. One of Mr. Brady's responsibilities as a DFC is to facilitate inpatient hospitalization when other avenues for treatment fail.[27]

---

[21] As the successor in the office of Secretary of Health and Hospitals to Kathy Kliebert, sued in her official capacity only, Rebekah M. Gee is automatically substituted as a party to this action. Fed. R. Civ. P. 25(d).
[22] Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 10).
[23] Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 11).
[24] Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 11); 42 U.S.C. § 12131(1) (B); 29 U.S.C. § 794(a)-(b).
[25] Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 12); Pl.'s Ex. 5 at 212 (Resp. to Interrog. No. 4).
[26] Pl.'s Ex. 5 at 212 (Resp. to Interrog. No. 4); Pl.'s Ex. 1 at 7:15–25, 8:1–9.
[27] Pl.'s Ex. 1 at 20:22–25; 21:1.

27.     Mr. Brady visited Mr. George monthly and provided reports to the court regarding Mr. George's compliance with the terms of his conditional release and recommending whether Mr. George should continue on conditional release.[28]

28.     Mr. Brady was a key decision-maker in the arrest and incarceration of Plaintiff in 2013 and 2014.[29]

29.     Defendant Charles P. Vosburg, Ph.D. is a consulting psychologist with CFS.[30]

30.     Dr. Vosburg is responsible for evaluating and providing mental health services, in accordance with the policies and procedures of DHH, to individuals placed on conditional discharge and persons found NGRI who have been placed at ELMHS. He provides recommendations as to placement, graduation/termination, revocation, and treatment.[31]

31.     Dr. Vosburg was a key decision-maker in the arrest and incarceration of Plaintiff in 2014.[32]

32.     At the time of Mr. George's 2014 arrest, Dr. Vosburg knew or should have known that Mr. George was mentally ill and needed mental health treatment.[33]

**Mr. George's 2013 Incarceration**

33.     In July 2013, six months before Mr. George's conditional discharge term was to end, Mr. George allegedly engaged in verbal outbursts and threatening behavior, which included yelling at a staff member that he "had better get me a hamburger" and telling another resident at the group home that he was going to kill him. These statements were reported to Defendant Scott

---

[28] Pl.'s Ex. 1 at 45–46, 50; Pl.'s Ex. 2 at 95–104.
[29] Pl.'s Ex. 1 at 45–46, 50; Pl.'s Ex. 2 at 104; Pl.'s Ex. 6 at 239 (Resp. to Interrog. No. 11).
[30] Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 13); Pl.'s Ex. 5 at 212 (Resp. to Interrog. No. 4).
[31] Pl.'s Ex. 5 at 212 (Resp. to Interrog. No. 4).
[32] Pl.'s Ex. 7 at 272; Pl.'s Ex. 1 at 56–57; Pl.'s Ex. 2 at 104; Pl.'s Ex. 5 at 217 (Resp. to Interrog. No. 12).
[33] Pl.'s Ex. 7 at 248, 251–55, 261–72.

Tubbs, the Probation and Parole Officer who was monitoring Mr. George's conditional discharge.[34]

34.     Mr. Tubbs attempted to place Mr. George at ELMHS in Jackson, Louisiana. However, Mr. Tubbs was informed that there was no room at ELMHS for Mr. George.[35]

35.     Mr. Tubbs and Mr. Brady, Mr. George's DFC, were aware that the behavior that constituted the alleged violation was a symptom of Mr. George's mental illness.[36] Mr. Tubbs acknowledged that the more appropriate setting for a person exhibiting Mr. George's symptoms would have been a hospital; nevertheless, when Mr. Brady could not locate an available bed at ELMHS, he caused Mr. George's arrest and incarceration.[37]

36.     Mr. Tubbs did not try to find Mr. George placement in another mental health facility, nor did he try to secure any mental health services for Mr. George. As Mr. Tubbs testified:

---

[34] Pl.'s Ex. 3 at 142:8–25; Pl.'s Ex. 4 at 207.
[35] Pl.'s Ex. 3 at 151–52.
[36] Pl.'s Ex. 1 at 46:

> Q. Now, when did you first learn of Mr. Tubbs' decision to arrest and put Mr. George in jail?
>
> A. If I can recall correctly, he called me and notified me of what was going on, that he had become increasingly aggressive and threatening. And that was reported to him by the staff. And, certainly -- I don't know if that's the purpose of his program. But our program is to protect the public.
>
> Q. So when this was reported to you, did you rush down to the group home to sort of check things out, to make sure all this was happening and Mr. Tubbs had his story right?
>
> A. Well, the answer I didn't rush to that question is, no, I didn't rush to the group home. But I had indications of Mr. George becoming increasingly aggressive and threatening. Even at the day treatment programs, they were telling us that he was a little bit more aggressive.
>
> Q. Now, the aggression, correct me if I'm wrong, that -- there was a mental health aspect to it, was there not, in terms of Mr. George's aggression?
>
> A. It's always a mental health side to it.

[37] Pl.'s Ex. 3 at 151-152.

Q. So when you arrest somebody who has violated a condition of their conditional discharge, what is the point of that? What are you trying to achieve by doing that?

A. Basically, on his case, I pulled him out of the environment that he was having an issue with. I would've liked to put him-- to place him back in Jackson Hospital. They had no bed space.

Q. Did you actually contact Jackson Hospital to find out if he could go there?

A. Eric [Brady] did.

Q. He did?

A. Eric does that.

Q. And they said basically no room?

A. No room.

Q. What about other facilities in the state? Did you look at other facilities that you might be able to place him in?

A. No. We just looked at Jackson Hospital.

Q. Why just Jackson?

A. Because that's where they go -- they go to one of two places when they violate conditions of probation. They either go to Jackson Hospital, which is the place that we checked the first time, and if we can put them in there, that's what we do with them. If we can't, we have to put them in jail.

Q. What about places like Central State Hospital? I'm just asking.

A. I don't know.

Q. Never checked into Central?

Q. Well, if we put him at Central State Hospital, then he wouldn't be able to go to court to address the violations of his conditions of probation?

Q. Why is that?

A. Cause he would be in Central Hospital.

Q. But why couldn't he go to court?

9

> A. Well, how would he get there?
>
> Q. Well, how does he get there from Jackson?
>
> A. They transport him.
>
> Q. Okay, well, do they have transportation at Central?
>
> A.  I doubt it.
>
> Q. Are there other reasons why -- putting the transportation issue aside for the moment, are there other issues why he couldn't go to Central?
>
> A.    No.[38]

37.    At the request of Mr. Tubbs, employees of Mr. George's day program drove Mr. George to the Probation Officer's office, where Mr. Tubbs arrested him.[39]

38.    At the time he caused Mr. George's arrest, Mr. Tubbs was well aware of the difficulties in living in a group home under any circumstances,[40] and of the role that Mr. George's mental illness played in his day-to-day behavior.[41] As Mr. Tubbs stated in his deposition:

> Q. Tell me a little bit about your observations about Mr. George's mental health situation.

---

[38] Pl.'s Ex. 3 at 151–52.
[39] Pl.'s Ex. 3 at 145; Pls. Ex. 1 at 45–46.
[40] Pl.'s Ex. 3 at 127.  As Mr. Tubbs testified:

> Q. Eight guys in the house?
>
> A. Yeah, about seven or eight. Something like that.
>
> Q. So how did that go? In terms of the interactions between residents and -
>
> A. There were issues, sure. Yeah. You get seven mental health cases, in a house, for a long period of time, you're going to have issues. But it was, you know, he's eating my food, you know, he used my soap.
>
> Q. People -- did you ever experience people sort of yelling at each other?
>
> A. Oh, absolutely, yeah. All the time.

[41] Pl.'s Ex. 3 at 125, 131–32.

A. I refer to Mr. George as being an adult with a kid personality. I would say his level of understanding was probably 13, 14 years old. Just -- just my opinion. He was like a big kid. And he was -- he's got a big body and when he would talk to you, it was almost -- you would almost feel intimidated, but he wasn't trying to intimidate you. Schizophrenic, typical schizophrenic. Voices, he would do what the voices told him to do. Temper tantrums. If he didn't get his way, he'd try to strong arm you. You know.[42]

39.     At the time he caused Mr. George's arrest, Mr. Tubbs was aware that Mr. George had received treatment at a number of mental health facilities over the years, including Greenwell Springs, Cypress Hospital, Our Lady of Lake Hospital, and Beacon Behavioral Health.[43]

40.     At the time he caused Mr. George's arrest, Mr. Tubbs was aware of the relationship between the medication that Mr. George was taking and his behavior, and that hospitalization stabilized Mr. George's behavior.[44] As Mr. Tubbs testified at his deposition:

Q. Yeah, sure. I mean, what was the relationship, if any, between Mr. George's medication and his behavior? So for example, when he went off medication, did his behavior get worse?

A. Oh, yes.

Q. What about after medication changes?

A. It was controlled.

Q. Was the main goal in putting him in the hospital basically to stabilize his medication?

A. Right. Yeah.

Q. Were there other goals related to the hospitalization? Any other reason -

A. No, I believe medication stabilization was the goal.[45]

---

[42] Pl.'s Ex. 3 at 125.
[43] Pl.'s Ex. 3 at 131–32, 137.
[44] Pl.'s Ex. 3 at 134–35, 143–44.
[45] *Id.* at 134–35.

11

41. After Mr. George's arrest, he was incarcerated from July 29, 2013, to August 23, 2013, at the East Baton Rouge Parish Prison. He was released only after undersigned counsel filed a petition for habeas corpus on his behalf in the Nineteenth Judicial District Court of East Baton Rouge Parish.[46]

42. Mr. George was not charged with any crime at all during the 25 days he was incarcerated between July 29 and August 23, 2013. No criminal charges were ever filed against Mr. George for the alleged 2013 violation of his conditional discharge.[47]

43. After Mr. George's arrest, it was Mr. Tubbs's responsibility to request a court hearing.[48]

44. Mr. Tubbs did not submit the paperwork to request a court hearing until two weeks after Mr. George's July 2013 arrest.[49]

45. After his release from East Baton Rouge Parish Prison in August 2013, Mr. George returned to live in a PHP group home.[50]

46. In December 2013, prior to the expiration of Mr. George's five-year conditional release period, DHH's DFC, Defendant Eric Brady, requested that Mr. George's conditional release be extended an additional year.[51]

47. On May 14, 2014, the court granted the Department's request and extended Mr. George's conditional release to December 14, 2014.[52]

---

[46] Pl.'s Ex. 3 at 162:13–25, 163:1–22, 178:17–25, 179:1–25, 180:1–13; Pl.'s Ex. 10.
[47] Pl.'s Ex. 3 at 162:13–25, 163:1–22.
[48] Pl.'s Ex. 3 at 183:2–6.
[49] Pl.'s Ex. 3 at 182:22–25, 183:22–26.
[50] Pl.'s Ex. 3 at 163:19–22
[51] Pl.'s Ex. 2 at 102–03.
[52] Pl.'s Ex. 11 at 482, 486

48. Within a week after the May 14, 2014 hearing, Defendant Brady arranged for Mr. George to be removed from the group home and involuntarily hospitalized at ELMHS.[53]

49. Mr. George did not agree to a voluntary admission.[54]

50. Defendant Brady did not secure an emergency certificate pursuant to La. R.S. § 28:53.[55]

51. DHH did not apply for a judicial commitment to a mental health facility under La. R.S. § 28:54. Instead, Mr. George remained in ELMHS without written notice of the allegations on which his commitment was based nor an opportunity for a hearing.[56]

**Mr. George's 2014 Incarceration**

52. On July 1, 2014, while Mr. George was hospitalized at ELMHS, Defendants Eric Brady, Mr. George's DFC, and Dr. Charles P. Vosburg, a psychologist with CFS, consulted and decided that Mr. George's conditional release should be revoked and that his probation officer should remove him from ELMHS and cause him to be incarcerated in the East Baton Rouge Parish Prison.[57]

53. The basis for Mr. George's alleged violation of his conditional discharge was that he refused to accept a transfer to a different unit of ELMHS.[58]

54. On July 1, 2014, at a meeting at ELMHS, Dr. Vosburg informed Mr. George that he had the option of moving to a different unit within the ELMHS system. He told Mr. George that, if Mr. George refused the transfer, they could not force him to go the suggested unit. In that

---

[53] Pl.'s Ex. 1 at 62–65; Pl.'s Ex. 2 at 104; Pl.'s Ex. 3 at 176:9–22
[54] Pl.'s Ex. 1 at 62–65; Pls. Ex. 2 at 104; Pls. Ex. 3 at 178:17–25, 179:1–25; 180:1–13.
[55] Pl.'s Ex. 1 at 62–65; Pls. Ex. 2 at 104.
[56] Pl.'s Ex. 1 at 62–65; Pls. Ex. 2 at 104.
[57] Pl.'s Ex. 2 at 104; Pl.'s Ex. 8 at 357–71.
[58] Pl.'s Ex. 8 at 357–71; Pl.'s Ex. 15(a) at 724–26.

13

case, Dr. Vosburg told Mr. George, the next logical step would be to place him at the Forensics unit at ELMHS.[59]

55.     Dr. Vosburg further informed Mr. George that, if he refused the suggested unit, there might not be a bed available at the Forensics unit.  In that case, Mr. George would have to wait in jail until a bed became available.[60]

56.     Dr. Clay Kelly of ELMHS, who was present at the staffing meeting, later testified that the Forensic Unit of ELMHS would have been an appropriate higher-security area of the facility in which Mr. George could have received mental health treatment.  However, there were no beds available in that unit at that time.[61]

57.     Mr. George reacted to Dr. Vosburg's recommendations by acting angry and exhibiting language that Dr. Kelly described as "psychotic [and] paranoid."[62]

---

[59] Pl.'s Ex. 8 at 365–67; Pl.'s Ex. 7 at 263–74.
[60] Pl.'s Ex. 8 at 366.
[61] Pl.'s Ex. 15(a) at 731-734:

> Q:  …[Y]our options were either to medicate him involuntarily at that time or put him in the restrictive
> forensic facility for which there was no bed or call his probation officer and defer to their course of action; is that correct?
>
> A:  That's correct.
>
> ….
>
> A:  Well, I mean, you know, yes, it probably -- his care was not as good at the parish prison, I agree, than it
> would have been in a forensic setting.
>
> Q:  I mean, you know that parish – nothing against any parish prison in the state of Louisiana or probably this country, but they don't have the ability to give medications like your facility; correct?
>
> A. That's correct.

[62] Pl.'s Ex. 15(a) at 722.

58. Mr. George did not strike or attempt to strike anyone during the course of the July 1, 2014 conversation at ELMHS.[63]

59. At the time of his arrest, Mr. George had been compliant with the medication regimen and treatment recommended by the staff at ELMHS.[64]

60. There were treatment options available to Mr. George at ELMHS upon the escalation of his mental health-related behaviors, including, but not limited to, injectable medications or use of restraints. At the time of the staffing meeting on July 1, 2014, Mr. George was not provided with any of these treatments.[65]

61. Instead, a representative of the Division of Probation and Parole arrested Mr. George and transported him to the East Baton Rouge Parish Prison for violating the terms of his conditional discharge.[66]

62. In Mr. George's Discharge Summary, Dr. Kelly described Mr. George's condition upon discharge from ELMHS as "angry, upset, but not threatening to harm self or others."[67]

---

[63] Pl.'s Ex. 8 at 385; Pl.'s Ex. 15(a) at 729.
[64] Pl.'s Ex. 15(a) at 729.
[65] Pl.'s Ex. 15(a) at 727-729; 733.

   A. …[W]e have restraints.

   Q. What kind of restraints?

   A. Leather restraints.

   Q. Is he able to break through those?

   A. No.

   Q. So, if he -- if you put the leather restraints on, would it matter how many guards you do or do not have?

   A. Well, we had enough guards to get him in leather restraints.

[66] Pl.'s Ex. 1 at 62–65; Pls.' Ex. 2 at 104; Pl.'s Ex. 8 at 376–77; Pl.'s Ex. 11 at 494.
[67] Pl.'s Ex. 7 at 263–74.

63. At the time they caused him to be arrested and incarcerated, Defendants Eric Brady, Scott Tubbs, and Charles P. Vosburg knew of Mr. George's disabilities and his need for appropriate mental health treatment.[68]

64. Plaintiff was released from the East Baton Parish Rouge Prison and placed back at ELMHS on August 25, 2014.[69]

65. Mr. George was not charged with any crime at all during the 55 days he was incarcerated between July 1 and August 25, 2014. No criminal charges were ever filed against Mr. George for the alleged 2014 violation of his conditional discharge.[70]

**Conditions at East Baton Rouge Parish Prison**

66. While incarcerated in both 2013 and 2014, Mr. George did not receive appropriate mental health treatment and became very nervous and paranoid. He did not have a treatment plan, did not receive therapy, and did not consistently take his prescribed medication.[71]

67. While incarcerated in both 2013 and 2014, Mr. George was isolated and placed in lockdown for "mental reasons," which meant that he only had 15 minutes to leave his cell to take a shower, had no exercise time, and was restricted in his use of the canteen and in his ability to receive reading material.[72]

68. At East Baton Rouge Parish Prison, the population of people with mental illness is serviced by: one psychiatrist who is on-site an average of twice per week,[73] no psychologists,[74]

---

[68] Pl.'s Ex. 1 at 16–20; Pl.'s Ex. 2 at 95–105.
[69] Pl.'s Ex. 16 at 774–79.
[70] Pl.'s Ex. 11 at 30, 32-33.
[71] Pl.'s Ex. 9 at 416-420; ; Pl.'s Ex. 14 at 638–49.
[72] Pl.'s Ex. 1 at 64–65; Pl.'s Ex. 9 at 416-420; Pl.'s Ex. 13 at 542; Pl.'s Ex. 14 at 623–25, 632–34.
[73] Pl.'s Ex. 14 at 600–01.
[74] *Id.* at 624.

one Licensed Clinical Social Worker (LCSW),[75] one Licensed Graduate Social Worker,[76] and one psychiatric nurse practitioner.[77] No therapy is provided to inmates apart from medication management and "supportive counseling" from the jail's LCSW.[78] At full capacity, the jail holds about 1,600 inmates.[79] The LCSW sees as many as 10 clients per day for 15–20 minutes each, though an initial visit may be of longer duration.[80] Additional programming, such as substance abuse counseling, may be offered by the sheriff's office, but it is not presented by the jail's mental health professionals or part of a formal treatment plan.[81]

69. The services at ELMHS are more numerous, comprehensively-staffed, and diverse than those provided in a jail setting. ELMHS has 15 part-time psychiatrists from Tulane and one full-time psychiatrist, seven full-time psychologists, a full nursing staff who are mostly RNs, staff dieticians, Occupational Therapists, Recreational Therapists, and social workers (about 37). Every resident has a treatment plan and receives active therapy. ELMHS also has a substance abuse program and behavior management program. When appropriate, residents receive psychotherapy.[82]

70. At a hearing on September 23, 2014, the Nineteenth Judicial District Court in East Baton Rouge, Judge Richard Moore presiding, ordered that Mr. George remain at ELMHS and that his placement be reviewed at a hearing scheduled for December 11, 2014.[83]

---

[75] *Id.* at 600.
[76] *Id.*
[77] *Id.*
[78] *Id.* at 643–44.
[79] *Id.* at 602.
[80] *Id.* at 603.
[81] *Id.* at 644.
[82] Pl.'s Ex. 17 at 834–39.
[83] Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 76); Pl.'s Exs. 15(a) and 15(b).

71. Mr. George remains on conditional release, but is housed at ELMHS on an inpatient basis.

Respectfully submitted this 1st day of February, 2016.

>  */s/ Ronald K. Lospennato*
> Ronald K. Lospennato, Bar No. 32191
> Concepcion "Koki" Otero, Bar No. 29372
> Kathryn E. Fernandez, Bar No. 33829
> Nell Hahn, La. Bar No. 22406
> Advocacy Center
> 8325 Oak Street
> New Orleans, LA 70118
> 504-208-4679 (p)
> 504-522-5507 (f)
> rlospennato@advocacyla.org
> kotero@advocacyla.org
> kfernandez@advocacyla.org
> nhahn@advocacyla.org
>
> Katie M. Schwartzmann, Bar No. 30295
> Eric Foley, Bar No. 34199
> Roderick & Solange MacArthur Justice Center
> 4400 S. Carrollton Ave.
> New Orleans, LA 70119
> 504-620-2259 (p)
> 504-208-3133 (f)
> katie.schwartzmann@macarthurjustice.org
> eric.foley@macarthurjustice.org

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of February, 2016, a copy of the foregoing will be served on the Defendants by the "Notice of Electronic Filing" automatically generated by the Court's Electronic Filing System.

> */s/ Ronald K. Lospennato*
> Ronald K. Lospennato, Bar No. 32191