UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| _____ * | |
| TRUSSELL GEORGE, by and through his * | |
| Guardian Ad Litem, LETETICA WALKER, * | |
| * | |
| PLAINTIFF * | |
| * | |
| * | |
| VS. * | CIVIL ACTION NO. 3:14-00338 |
| * | JWD-RLB |
| * | |
| LOUISIANA DEPARTMENT OF PUBLIC * | |
| SAFETY AND CORRECTIONS, *et al.* [1], * | |
| * | |
| DEFENDANTS. * | |
| _____ * | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS
## MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.     INTRODUCTION

Plaintiff, Trussell George, Jr., is a person with a mental illness who was placed in the community on conditional release following a finding that he was Not Guilty by Reason of Insanity (NGRI) to a criminal offense. Plaintiff filed this civil rights action under 42 U.S.C. § 1983 and federal statutes barring discrimination on the basis of disability, seeking compensatory damages against the Louisiana Department of Health and Hospitals (DHH) and a number of state officials, in their individual capacities. Plaintiff also seeks a declaratory judgment and injunctive relief to enjoin Defendants' policies practices, and procedures that caused him to be incarcerated in East Baton Rouge Parish Prison (EBRPP) on two separate occasions solely because he was alleged to have violated a term of his conditional release.

---

[1] As the successor in the office of Secretary of Health and Hospitals to Kathy Kliebert, sued in her official capacity only, Rebekah M. Gee is automatically substituted as a party to this action. Fed. R. Civ. P. 25(d).

Plaintiff contends that Defendants' policies, practices, and procedures, which caused him to be arrested and incarcerated on two separate occasions following the finding that he was NGRI to all criminal charges, violate his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and subjected him to intentional discrimination in violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504") and Title II of the Americans with Disabilities Act of 1990 ("ADA").

As will be shown in this Memorandum, Plaintiff, at this stage of the proceedings, is entitled to Judgment as a matter of law on his request for a declaratory judgment and injunctive relief.

## II.    STANDARDS FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF

Summary judgment is appropriate if the moving party shows, "by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only) admissions, interrogatory answers, or other materials that there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56 (a). Plaintiff submits that there are no material facts in dispute relevant to his request for declaratory judgment and injunctive relief.

## III.    STATEMENT OF FACTS

Plaintiff refers this Court to and incorporates by reference the Statement of Undisputed Material Facts. See Plaintiff's Statement of Undisputed Material Facts (hereinafter "Undisputed Facts"), which shows that the following facts are not in dispute:

Plaintiff, Trussell George, Jr., is a person with a mental illness and a developmental disability.[2] On December 15, 2008, following a finding that Mr. George was NGRI to a charge of

---

[2] Defs.' Answer to Second Am. Compl. (Rec. Doc. 43 ¶ 1); Pl.'s Ex. 2 at 95 (Unless otherwise noted, pin cites to pages in Plaintiff's Exhibits are to the Bates number.); Pl.'s Ex. 8 at 304:2–6, 324:8–17.

possession of a firearm by a felon, the court ordered that he be conditionally released pursuant to La.C.Cr.P. art. 657.1, for a period of five years, provided he receive adequate outpatient treatment, supervision, and monitoring.[3]

While on conditional release, Mr. George was under the supervision of the Division of Probation and Parole of the Louisiana Department of Safety and Corrections, and the supervision of the Community Forensic Services (CFS) of the Louisiana Department of Health and Hospitals. Defendant Scott Tubbs was assigned as Mr. George's Probation Officer.[4] Defendant Eric Brady was assigned as Mr. George's District Forensic Coordinator (DFC).[5]

Six months prior to the end of his conditional discharge term, Mr. George allegedly engaged in verbal outbursts and threatening behavior, which included yelling at a staff member that he "had better get me a hamburger" and telling another resident at the group home that he was going to kill him. These statements were reported to Scott Tubbs, the Probation and Parole Officer who was monitoring Mr. George's conditional discharge.[6]

At the request of Mr. Tubbs, employees of Mr. George's day program drove Mr. George to the Probation Officer's office, where Mr. Tubbs arrested him.[7]  At the time of Mr. George's arrest in July 2013, Mr. Tubbs was well aware of Mr. George's disabilities and his need for appropriate mental health treatment but failed to explore any options other than incarceration.[8]

---

[3] Pl.'s Ex. 1 at 11:21–25; Pl.'s Ex. 2 at 91–92; Pl.'s Ex. 3 at 119:5–14; Pl.'s Ex. 4 at 199–200.
[4] Pl.'s Ex. 6 at 234 (Resp. to Interrog. No. 4); Pl.'s. Ex. 3 at 113:17–23.
[5] Pl.'s Ex. 1 at 45–46, 50; Pl.'s Ex. 2 at 95–104.
[6] Pl.'s Ex. 3 at 142:8–25; Pl.'s Ex. 4 at 207.
[7] Pl.'s Ex. 3 at 145; Pl.'s. Ex. 1 at 45–46.
[8] Pl.'s Ex. 3 at 127.

Mr. George was consequently incarcerated from July 29, 2013, to August 23, 2013, at the EBRPP based on allegations that he violated his conditional discharge. After his release from EBRPP in August 2013, Mr. George returned to live in a PHP group home.[9]

In May 2014, Defendant Brady arranged for Mr. George to be involuntarily hospitalized at ELMHS.[10] On July 1, 2014, at a meeting at ELMHS Dr. Vosburg informed Mr. George that he had the option of moving to a different unit within the ELMHS system.  He told Mr. George that, if Mr. George refused the transfer, they could not force him to go to the suggested unit.  In that case, Dr. Vosburg told Mr. George, the next logical step would be to place him at the Forensics unit at ELMHS.[11]  Dr. Vosburg further informed Mr. George that, if he refused the suggested unit, there might not be a bed available at the Forensics unit.[12]  In that case, Mr. George would have to wait in jail until a bed became available.  Mr. George reacted to Dr. Vosburg's recommendations by acting angry and exhibiting language that Dr. Clay Kelly of ELMHS, who was present at the time, described as "psychotic [and] paranoid."[13]  Mr. George did not strike or attempt to strike anyone during the course of the July 1, 2014 conversation at ELMHS.[14]

At the time of his arrest, Mr. George had been compliant with the medication regimen and treatment recommended by the staff at ELMHS.[15]  There were treatment options available to Mr. George at ELMHS upon the escalation of his mental health-related behaviors; including, but not limited to, injectable medications or use of restraints.  At the time of the staffing meeting on July 1, 2014, Mr. George was not provided with any of these or any other treatments.[16]  As a result of

---

[9] Pl.'s Ex. 3 at 163:19–22.
[10] Pl.'s Ex. 1 at 62–65; Pl.'s Ex. 2 at 104; Pl.'s Ex. 3 at 176:9–22.
[11] Pl.'s Ex. 8 at 365–67; Pl.'s Ex. 7 at 263–74.
[12] Pl.'s Ex. 8 at 366.
[13] Pl.'s Ex. 15(a) at 722.
[14] Pl.'s Ex. 8 at 385; Pl.'s Ex. 15(a) at 729.
[15] Pl.'s Ex. 15(a) at 729.
[16] Pl.'s Ex. 15(a) at 727-729; 733.

the incident at the July 1 meeting, Mr. George was subsequently arrested and transported to the EBRPP for violating the terms of his conditional discharge.[17]

Plaintiff was released from the EBRPP and placed at ELMHS on August 25, 2014. No criminal charges were ever filed against Mr. George for any behavior that that pertains to his incarceration in the EBRPP between July 1, 2014 and August 25, 2014. [18]

While incarcerated in both 2013 and 2014, Mr. George did not receive appropriate mental health treatment and became very nervous and paranoid.   He did not have a treatment plan, did not receive therapy, and did not consistently take his prescribed medication.[19] While incarcerated in both 2013 and 2014, Mr. George was isolated and placed in lockdown for "mental reasons," which meant that he only had 15 minutes to leave his cell to take a shower, had no exercise time, and was restricted in his use of the canteen and in his ability to receive reading material.[20]

Mr. George remains on conditional release, but is housed at ELMHS on an inpatient basis.

## III.   ARGUMENT

### A.   DEFENDANTS VIOLATED PLAINTIFF'S RIGHTS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION BY INCARCERATING HIM FOR VIOLATING A TERM OF HIS CONDITIONAL RELEASE AND BY DEPRIVING HIM OF ADEQUATE MENTAL HEALTH TREATMENT.

---

A.   …[W]e have restraints.
Q.   What kind of restraints?
A.   Leather restraints.
Q.   Is he able to break through those?
A.   No.
Q.   So, if he -- if you put the leather restraints on, would it matter how many guards you do or do not have?
A.   Well, we had enough guards to get him in leather restraints.

[17] Pl.'s Ex. 1 at 62–65; Pl.'s Ex. 2 at 104; Pl.'s Ex. 8 at 376–77; Pl.'s Ex. 11 at 494.
[18] Pl.'s Ex. 16 at 774–79; Pl.'s Ex. 11 at 30, 32-33.
[19]Pl.'s Ex. 9 at  416–20; ; Pl.'s Ex. 14 at 638–49.
[20] Pl.'s Ex. 1 at 64–65; Pl.'s Ex. 9 at 416-420; Pl.'s Ex. 13 at 542; Pl.'s Ex. 14 at 623–25, 632–34.

1) *Plaintiff has a liberty interest protected by the Due Process Clause to be free from incarceration in jail absent a criminal conviction or on-going criminal proceedings.*

"Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." Hewitt v. Helms, 459 U.S. 460, 466 (1983) (citing Meachum v. Fano, 427 U.S. 215, 223–27 (1976)). The Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction. Baker v. McCollan, 443 U.S. 137, 144 (1979) (although plaintiff "was indeed deprived of his liberty for a period of days," the deprivation was accomplished by due process); see Meachum v. Fano, 427 U.S. 215, 224 (1976) (once defendant is convicted, he is constitutionally deprived of the liberty interest in being free from confinement). Indeed, the paradigmatic liberty interest under the due process clause is freedom from incarceration.

An individual found not guilty by reason of insanity is "exempt from criminal responsibility," La. R.S. § 14:14, and by extension, punishment. "The law has long recognized that criminal punishment is not appropriate for those who, by reason of insanity, cannot tell right from wrong." Delling v. Idaho, 133 S. Ct. 504, 504 (2012) (Breyer, J., dissenting).  As acquittees, individuals found not guilty by reason of insanity may not be punished or incarcerated for punitive purposes.  Foucha v. Louisiana, 504 U.S. 71, 80 (1992); Jones v. United States, 463 U.S. 354, 369 (1983); see also Ohlinger v. Watson, 652 F.2d 775, 777-78 (9th Cir. 1980).

In Jackson v. Indiana, 406 U.S. 715 (1972), the U.S. Supreme Court determined that long-term, indeterminate commitment of an individual based solely on incompetence to stand trial violates the Constitution. The Supreme Court found, among other things, that Mr. Jackson's commitment violated due process. Id. at 717–20. In reaching that decision, the court held that "a

person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." Id. at 738. According to the court, "due process requires that the nature and duration of commitment bear some reasonable relationship to the purpose for which the individual is committed." Id. at 738.

It is clear that the nature of Mr. George's confinements in the parish jail, which spanned several months and were based solely on alleged violations of his conditional discharge, does not bear any reasonable relationship to the purpose behind his conditional discharge. Unlike Jackson v. Indiana, Mr. George was not being confined for any treatment purposes or to prepare him to stand trial on pending criminal charges. Mr. George was exonerated of all criminal charges against him by virtue of the state court's NGRI determination. Plaintiff's status is governed by La.C.Cr.P. art. 654, which is, in essence, a civil commitment statute. As a person who is found not guilty by reason of insanity, Mr. George is entitled to mental health treatment, not incarceration. Indeed, as will be discussed in more detail later in the Memorandum, the sole reason Mr. George was sent to jail was because the state lacked beds at ELMHS and neither his probation officer nor his forensic coordinator made any effort to seek his placement in other mental health facilities.[21]

While it is justifiable to *civilly commit* an individual who violates the terms of his conditional discharge if a court finds that he is both mentally ill and dangerous, Foucha v. Louisiana, 504 U.S. 71, 80 (1992), or if he is charged with a crime, neither of these factors apply to the instant case. There was no legitimate justification for incarcerating Mr. George in a parish

---

[21] Pl.'s Ex. 3 at 151–52.

jail in 2013 or 2014. By causing him to be jailed rather than hospitalized, the Defendants flouted

the standard set in Jackson v. Indiana, and thereby violated Mr. George's due process rights.

> 2) ***Due process requires that persons confined by the State as a result of being on conditional release receive adequate mental health treatment.***

Absent the filing of criminal charges or conviction of a crime, the imprisonment of

persons acquitted of criminal offenses by reason of insanity based solely on a violation of a

condition of their release violates due process. Regardless of the conditions in EBRPP where he

was incarcerated, the fact the he was incarcerated in and of itself violated Mr. George's rights.

The conditions of his incarceration, though highly relevant to the question of damages, are not

relevant to the issue of liability.[22]  However, the lack of mental health treatment in the EBRPP

makes clear that the purpose of Mr. George's conditional release—the provision of mental health

treatment—did not bear any reasonable relationship to his incarcerations in EBRPP.

Although a person who violates a term of his conditional release may not be incarcerated

in a jail or prison in the absence of the filing of criminal charges, he may be civilly committed

for the purpose of providing him treatment.[23]  In Louisiana, when a defendant is acquitted by

reason of insanity, civil commitment proceedings commence by operation of law.  La.C.Cr.P. art.

654.  At the initial commitment hearing, held "promptly" after the NGRI verdict, La.C.Cr.P. art.

654, it may be inferred that at the time of the verdict the acquittee was mentally ill and

dangerous, Foucha v. Louisiana, 504 U.S. 71, 76 (1992).  If the NGRI acquittee cannot carry his

burden of proving that he is not too dangerous to himself or others to be discharged or released

---

[23] However, even in that context, an NGRI acquittee's confinement rests solely on his mental illness and a
determination of dangerousness.  Jones, 463 U.S. at 369; Foucha, 504 U.S. at 77.  Once a NGRI acquittee
is no longer both mentally ill and dangerous, the state must release the individual.  Foucha at 77.  In other
words, the state may not confine NGRI acquittees who are mentally ill but no longer dangerous, nor
acquittees who are considered dangerous but no longer mentally ill.  Id.

on probation, the court must commit the acquittee to a proper state mental health institution or to a private mental health institution approved by the court for custody, care, and treatment. La.C.Cr.P. art. 654. Thus, Louisiana law is in keeping with rulings of the U.S. Supreme Court, in that it acknowledges that the only legitimate purpose for the confinement of an NGRI acquittee is rehabilitation. See also Ohlinger, 652 F.2d at 777-78.

It is clear that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." Jones v. United States, 463 U.S. 354, 361 (1983) (quoting Addington v. Texas, 441 U.S. 418, 425 (1979)); see also Or. Advocacy Center v. Mink, 322 F.3d 1101, 1121 (9th Cir. 2004) (incompetent pretrial detainees have an interest in freedom from incarceration and in receiving restorative treatment). Indeed, "[b]ecause of the huge deprivation of personal freedom attendant upon involuntary commitment, [individuals who are civilly committed] suffer a 'grievous loss' of liberty." Welsch v. Likins, 373 F. Supp. 487, 499 (D. Minn. 1974) supplemented, 68 F.R.D. 589 (D. Minn. 1975) aff'd, 525 F.2d 987 (8th Cir. 1975) (internal citations omitted). As the Court noted in Jackson v. Indiana, 406 U.S. at 736:

> [A] person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future. If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant. Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal.

Lower federal courts that have considered the issue have determined that individuals confined on the basis of mental illness have a due process right to rehabilitative mental health treatment. In Ohlinger v. Watson, 652 F.2d 775 (9th Cir. 1980), appellants were convicted of sex offenses which carried an aggregate maximum prison sentence of fifteen years. Instead,

appellants were sentenced under an Oregon statute allowing for indeterminate life sentences for certain sex offenders who were found to have mental illnesses "predisposing" them to certain sex offenses, thus rendering them dangerous to others.  <u>Ohlinger</u> 652 F.2d at 776 n.2.  Appellants filed suit under the Eighth and Fourteenth Amendments, alleging that the state of Oregon was imprisoning them indefinitely without providing them with the means of their release: mental health treatment.  The Ninth Circuit agreed, holding that "the State may not justify appellants' extended sentence on the basis of mental illness without affording appropriate treatment."  <u>Id.</u> at 777.  "Adequate and effective treatment is constitutionally required because, absent treatment, appellants could be held indefinitely as a result of their mental illness…" <u>Id.</u> at 778.

The courts have consistently found individuals with mental illness who are facing criminal charges to have a liberty interest in freedom from incarceration and restorative treatment.  The court addressed the rights of incompetent pre-trial detainees in <u>Oregon Advocacy Center v. Mink</u>, 322 F.3d 1101 (9th Cir. 2003), <u>Terry ex rel. Terry v. Hill</u>, 232 F. Supp. 2d 934 (E.D. Ark. 2002), and <u>Trueblood v. Washington State Dep't of Soc. & Health Services</u>, 101 F. Supp. 3d 1010 (W.D. Wash. 2015). In <u>Mink</u>, incompetent detainees sat in county jails for up to five months waiting for competency restoration services.  The Ninth Circuit ruled that incarcerated incompetent pretrial detainees "have a liberty interest in receiving restorative treatment" and found that even when balancing these liberty interests in freedom from incarceration and restorative treatment against the legitimate interests of the state in incarcerating pretrial detainees, "such a balance favors the mentally ill defendants awaiting trial."  <u>Mink</u>, 322 F.3d at 1121.  The court held that "[h]olding incapacitated criminal defendants in jail for weeks or months violates their due process rights because the nature and duration of their incarceration

bears no reasonable relation to the evaluative and restorative purposes for which courts commit those individuals." Id. at 1122.

In Terry, incompetent pretrial detainees were not being transferred to the state hospital for evaluation and treatment, but instead were "languishing" in Arkansas jails for up to a year or more. Terry ex rel. Terry v. Hill, 232 F. Supp. 2d 934, 936–37 (E.D. Ark. 2002). The court ruled that "the lengthy and indefinite periods of incarceration, without any legal adjudication of the crime charged, caused by the lack of space at [the state hospital], is not related to any legitimate goal, is purposeless and cannot be constitutionally inflicted upon the [incompetent detainees]." Id. at 943-44.

Finally, the Trueblood court recently entered a permanent injunction against the Washington State Department of Social and Health Services, which had been allowing incompetent detainees to wait in jail, not receiving competency evaluations or restoration, for an average of 25 to 35 days. Trueblood v. Wash. State Dep't of Soc. & Health Servs., 101 F. Supp. 3d at 1016. The court held that because the only legitimate purpose for the incarceration of incompetent detainees is evaluation of or restoration to competency, and in light of the incompetent detainees' liberty interests and due process rights, the state was required to provide such treatment within seven days of the signing of each order remanding the detainee for services.  Id. at 1020–21.

> 3)   *Mr. George, as an NGRI acquittee on conditional release, is entitled to adequate rehabilitative mental health treatment, which requires more than the provision of basic necessities.*

Mr. George, as an NGRI acquittee on conditional release, was entitled to receive appropriate mental health treatment and to remain free from incarceration in a correctional facility that could not and did not meet his mental health needs. Due process requires that NGRI

acquittees on conditional release receive "adequate" rehabilitative mental health treatment. "[T]he State cannot be permitted to affirmatively confine or institutionalize these persons on the basis of non-criminal status without providing them with adequate treatment." Welsch v. Likins, 373 F. Supp. at 499.  Of course, all individuals confined by the state are entitled to a certain level of care. "It is settled that those who are confined by the state, for whatever reason, are entitled under the Constitution to food, clothing, medical care, and reasonable efforts to secure physical safety." Cameron v. Tomes, 990 F.2d 14, 18 (1st Cir. 1993). However, when an individual is confined by the state on the basis of his mental illness, due process requires more than the provision of these basic necessities. For those individuals, "[c]onstitutionally adequate treatment is not that which must be provided to the general prison population, but that which must be provided to those committed for mental incapacity." Ohlinger v. Watson, 652 F.2d at 778.

Specifically, individuals confined on the basis of mental illness, including NGRI acquittees, are entitled to a level of mental health treatment "that gives them 'a realistic opportunity to be cured or improve the mental condition for which they were confined.'" Mink, 322 F.3d at 1121 (quoting Sharp v. Weston, 233 F.3d 1166, 1172 (9th Cir. 2000)).  It is the state's confinement of the individual on the basis of mental illness, paired with the individual's liberty interest, that gives rise to the right to treatment.

Courts are aware of the danger of lax or indifferent standards of mental health treatment. "'All too often the promise of treatment has served only to bring an illusion of benevolence to what is essentially a warehousing operation.'" Sharp v. Weston, 233 F.3d 1166, 1172 (9th Cir. 2000) (quoting Stachulak v. Coughlin, 520 F.2d 931, 936 (7th Cir. 1975)).  As the federal court in the Eastern District of Louisiana likewise noted in Advocacy Center for Elderly & Disabled v. Louisiana Dep't of Health & Hospitals, 731 F. Supp. 2d 603 (E.D. La. 2010), even where a

limited treatment program was provided to incompetent detainees, the detention did not bear a reasonable relationship to its statutorily-mandated purpose of determining or restoring competency. Id. at 621.  Those involuntarily confined via civil proceedings "cannot simply be warehoused and put out of sight; they must be afforded adequate treatment." Turay v. Seling, 108 F. Supp. 2d at 1151.

A civilly committed individual's liberty interests and due process rights are of such importance that a state or state agency's lack of resources cannot be a defense against them. "Lack of funds, staff or facilities cannot justify the State's failure to provide [such individuals] with [the] treatment necessary for rehabilitation."  Mink, 322 F.3d at 1121 (quoting Ohlinger, 652 F.2d at 779).  "A state's constitutional duties toward those involuntarily confined in its facilities does not wax and wane based on the state budget" and cannot outweigh a confined individual's liberty interests.  Advocacy Center, 731 F. Supp. 2d at 626.

### 4)  *The undisputed evidence shows that Plaintiff did not receive adequate mental health treatment during his incarcerations in the EBRPP in 2013 and 2014.*

"It is the Court's duty, under the Constitution, to assure that every resident of [a state hospital] receives at least minimally adequate care and treatment consonant with the full and true meaning of the due process clause." Welsch, 373 F. Supp. at 498. While mental health professionals should determine what mental health treatment is appropriate, it is for the courts to set a constitutional floor for what mental health treatment is adequate.  Mink, 322 F.3d at 1121–22; Ohlinger, 652 F.2d at 779; Cameron v. Tomes, 990 F.2d at 20.  See also, Ohlinger at 778; Welsch at 487; Mink at 1121; Turay v. Seling, 108 F. Supp. 2d at 1151; Advocacy Center, 731 F.Supp.2d at 613.  "State courts, in addition to federal courts, remain competent to

adjudicate and remedy challenges to civil confinement schemes arising under the Federal Constitution." Seling v. Young, 531 U.S. 250, 265 (2001).

While courts are likely not in a position to specify exactly what practices constitute adequate treatment, they have identified some practices that do *not* constitute adequate treatment. As pointed out above, Courts have repeatedly held that a failure to provide treatment constitutes inadequate treatment. The courts have also held that minimal treatment designed to "stabilize" an individual is likewise insufficient.  Ohlinger at 780; Mink at 120.  Merely maintaining an inmate's medication is not adequate, and neither is providing group therapy sessions for one-and-a-half to two hours per week paired with a minimal amount of individual therapy.  Advocacy Center, 731 F.Supp.2d at 614; Ohlinger at 780.   Solitary confinement is certainly not adequate treatment; to the contrary, it "known to be clinically destructive to these individuals' mental health."  Trueblood at 1017.  A "makeshift supplement" such as the Defendants' "Community Forensic Services" program has been found to be insufficient.  Advocacy Center at 615–16. Social activities such as clubs and sports do not constitute treatment for mental illness.  Ohlinger at 780.  "Jails are inherently punitive institutions, and are not designed or administered so as to provide for the needs of the mentally ill." Trueblood at 1017.

It is clear that while he was incarcerated at EBPRR in both 2013 and 2014, Mr. George did not receive appropriate mental health treatment. He became increasingly nervous and paranoid. He did not have a treatment plan, did not receive therapy, and was not consistently provided with prescribed psychotropic medication.  When he was provided with such medication, he did not consistently take it.[24]  Also, while incarcerated in both 2013 and 2014, Mr. George was isolated and placed in lockdown for "mental reasons," which meant that he only

---

[24] Pl.'s Ex. 9 at  416-420; ; Pl.'s Ex. 14 at 638–49.

had 15 minutes to leave his cell to take a shower, had no exercise time, and was restricted in his use of the canteen and in his ability to receive reading material.[25]

The lack of treatment provided to Mr. George while at EBRPP is unsurprising, as the mental health services available at EBRPP are minimal. Lisa Burns, a Licensed Clinical Social Worker at East Baton Rouge Parish Prison, testified that the jail's mentally ill population is serviced by: one psychiatrist who is on-site an average of twice per week,[26] no psychologists,[27] one Licensed Clinical Social Worker (LCSW),[28] one Licensed Graduate Social Worker,[29] and one psychiatric nurse practitioner.[30] No therapy is provided to inmates apart from medication management and "supportive counseling" from the jail's LCSW.[31]  At full capacity, the jail holds about 1,600 inmates.[32]  The LCSW sees as many as 10 clients per day for 15–20 minutes each, though an initial visit may be of longer duration.[33]  Additional programming, such as substance abuse counseling, may be offered by the sheriff's office, but it is not presented by the jail's mental health professionals or part of a formal treatment plan.[34]

Defendants were admittedly aware of the lack of mental health services at EBRPP when they incarcerated Mr. George. Louisiana law acknowledges that its parish jails are not designed to provide adequate mental health treatment.  Upon a judgment of NGRI, a district court is not directed to incarcerate an individual in a parish jail; instead, the court must commit the acquittee

---

[25] Pl.'s Ex. 1 at 64–65; Pl.'s Ex. 9 at 416-420; Pl.'s Ex. 13 at 542; Pl.'s Ex. 14 at 623–25, 632–34.
[26] Pl.'s Ex. 14 at 600–01.
[27] *Id.* at 624.
[28] *Id.* at 600.
[29] *Id.*
[30] *Id.*
[31] *Id.* at 643–44.
[32] *Id.* at 602.
[33] *Id.* at 603.
[34] *Id.* at 644.

to a proper state mental health institution or to a private mental health institution approved by the court for custody, care, and treatment.  La.C.Cr.P. art. 654.  Prison or jail is not an option.

By contrast, had Mr. George been placed at ELMHS in 2013, or remained in the facility in 2014, he could have been afforded a significantly greater number and wider array of mental health services and treatments. As Hampton Lea, the chief executive officer of ELMHS, testified, ELMHS has 15 part-time psychiatrists from Tulane and one full-time psychiatrist, seven full-time psychologists, a full nursing staff who are mostly RNs, staff dieticians, Occupational Therapists, Recreational Therapists, and social workers (about 37). Every resident has a treatment plan and receives active therapy. ELMHS also has a substance abuse program and behavior management program. When appropriate, residents receive psychotherapy.[35]

In sum, even if it was Constitutionally permissible to incarcerate Mr. George in the EBRPP, which Plaintiff disputes, the undisputed facts show that Defendants failed to ensure that he was provided with minimally adequate care and treatment consonant with the full and true meaning of the due process clause.

**B.      DEFENDANTS, BY INCARCERATING PLAINTIFF FOR VIOLATING A TERM OF HIS CONDITIONAL DISCHARGE AND DEPRIVING HIM OF MENTAL HEALTH TREATMENT THAT WAS REASONABLY CALCULATED TO ENABLE HIM TO BE RELEASED FROM STATE CUSTODY, DISCRIMINATED AGAINST HIM OF THE BASIS OF HIS MENTAL DISABILITIES IN VIOLATION OF SECTION 504 AND THE ADA.**

The ADA is a comprehensive civil rights law enacted to provide "a clear and comprehensive national mandate for the elimination of discrimination" against individuals with disabilities. 42 U.S.C. § 12101(b)(1).  Its coverage is accordingly broad, prohibiting

---

[35] Pl.'s Ex. 17 at 834–39.

discrimination in a wide range of programs, including those provided by state and local

government.[36]

Title II of the ADA was enacted to broaden the coverage of Section 504, which prohibits

discrimination in any program or activity that receives federal financial assistance, including

programs and activities of state and local governments, including programs and activities related

Louisiana's conditional release program.[37]  Title II extends these protections to all state and local

government entities, including those receiving no federal funds.[38]

> The substantive provisions of Title II and Section 504 are very similar.  Title II provides:
> [N]o qualified individual with a disability shall, by reason of such disability, be
> excluded from participation in or be denied the benefits of the services, programs,
> or activities of a public entity, or be subjected to discrimination by any such
> entity.

42 U.S.C. § 12132.  Section 504 provides:

> No otherwise qualified individual with a disability in the United States . . . shall,
> solely by reason of her or his disability, be excluded from the participation in, be
> denied the benefits of, or be subjected to discrimination under any program or
> activity receiving federal financial assistance.  28 U.S.C. § 794(a).[39]

---

[36] Congress explicitly delegated to the Department of Justice the authority to promulgate regulations under both statutes.  See 42 U.S.C. § 12134(a); 28 C.F.R. pt. 35 (Title II); 29 U.S.C. § 794(a); 28 C.F.R. pt. 41 (Section 504 coordination regulation); 28 C.F.R. pt. 42, subpt. G (Section 504 regulation governing correctional institution grantees).  Accordingly, the Department's regulations and interpretation thereof are entitled to substantial deference. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).

[37] The courts have broadly interpreted the ADA to cover wide range of state activities. See e.g., Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 213 (1998); Gorman v. Bartch, 152 F.3d 907, 916 (8th Cir. 1998); Cruz ex rel. Cruz v. Pa. Interscholastic Athletic Ass'n, 157 F. Supp. 2d 485, 500 (E.D. Pa. 2001); Bowers v. Nat'l Collegiate Athletic Ass'n, 9 F. Supp. 2d 460, 476 (D.N.J. 1998); Darian v. Univ. of Mass. Boston, 980 F. Supp. 77, 84 (D. Mass. 1997).

[38] Title II was modeled closely on Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which prohibits discrimination on the basis of disability in federally conducted programs and in all of the operations of public entities that receive federal financial assistance.  Title II provides that "[t]he remedies, procedures, and rights" set forth under Section 504 shall be available to any person alleging discrimination in violation of title II.  42 U.S.C. § 12133; see also 42 U.S.C. § 12201(a) (ADA must not be construed more narrowly than Rehabilitation Act).

To achieve their purposes, Title II and Section 504 contain a number of prohibitions of discrimination against individuals with disabilities.  42 U.S.C. § 12132; 29 C.F.R. § 794.  The implementing regulation provides a general prohibition that mirrors the language of Section 202 of the ADA, and which is very similar in substance to Section 504.  It provides: "No qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any public entity." 28 C.F.R. § 35.130(a). The provisions of the ADA and Section 504 at issue in this case work together to prohibit all disability discrimination in all of the programs, services, and activities of public entities.

By operation of state law and Defendants' policies and practices, only persons with mental illness or intellectual disabilities who have been found NGRI are incarcerated in the absence of any pending criminal charges or a criminal conviction. With this in mind, Mr. George asserts that Defendants violated the ADA and Section 504 under three different theories. First, Defendants' policy and practice of arresting and incarcerating persons on conditional release unlawfully discriminates against individuals with a mental illness because such policies and practices:

    a)  Result in the outright denial of the benefits of Defendants' Conditional Discharge programs, services, and activities and,

    b)  Provide an unequal and different, or separate opportunity to participate in programs, services, and activities than non-disabled individuals or other NGRI

---

[39] Under Title II, the term "[q]ualified individual with a disability means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  28 C.F.R. § 35.104.  See also 28 C.F.R. § 42.540(l)(2) (definition of qualified individual for purposes of Section 504).  Mr. George, by virtue of his mental illness and the court's finding that he was NGRI, is clearly an individual with a disability qualified for services and programs in this state available to all NGRI Acquittees.

Acquittees who are receiving treatment at ELMHS or in private mental health institutions, as prohibited by 28 C.F.R. § 35.130(b).

Defendants' actions in incarcerating Mr. George rather than providing him with appropriate mental health treatment to address the alleged violations of the terms of his conditional release constitute a failure to provide treatment and services in the most integrated setting appropriate to his individual needs, as prohibited by 28 C.F.R. § 35.130(d).

Further, Defendants' use of incarceration rather than treatment in a mental health facility to address the alleged violations of the terms of Mr. George's conditional release constitutes a failure to make reasonable or accommodation or modifications as prohibited by 28 C.F.R. § 35.130(b)(7).  Treating Plaintiff's behavior at the group home, behavior that is admittedly a manifestation of his serious mental illness and intellectual disability, as a criminal justice matter rather than a mental health or habilitation matter, is a violation of his rights under the ADA.

1) ***Defendants' actions in incarcerating Mr. George rather than providing him with appropriate mental health treatment resulted in the outright denial of the benefits of Defendants' Conditional Discharge programs, services, and activities and the provision of unequal and different, or separate opportunities to participate in programs, services, and activities than non-disabled individuals or other NGRI Acquittees who are receiving treatment at ELMHS or in a private mental health institution.***

The ADA and Section 504 prohibit the denial of services on the basis of disability.  28 C.F.R. § 35.130(b)(i) & (ii).  Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 286–87 (1st Cir. 2006); McNally v. Prison Health Servs, 46 F. Supp. 2d 49, 58–59 (D. Me. 1999). The Conditional Release program and all other services and programs available to NGRI Acquittees, which control Mr. George's access to mental health, residential and social services, clearly qualify as "service[s], program[s], or activit[ies]" under the ADA.[40]  Moreover, in the context of

---

[40] Services, programs and activities include, essentially, "anything a public entity does"; almost any official activity in which inmates participate in prisons or state mental health facilities are in the scope of the ADA.  See Pa. Dep't of Corr. v. Yeskey, 524 U.S. at 211.

programs that involve the incarceration, confinement, or custody of persons with disabilities,

such as ELMHS, EBRPP, or Louisiana's Conditional Release program, these statutes also

prohibit failing to provide critical mental health, medical, and personal assistance services. See

28 C.F.R. § 35.130(a); see also 28 C.F.R. §§ 42.503, 42.511, 42.520-522 (similar obligations

under Section 504).

Here, the undisputed facts show that in incarcerating Mr. George in the EBRPP,

Defendants intentionally denied him access to the services available at ELMHS and private

mental health facilities in Louisiana, even though it was clear that the behaviors he was

exhibiting were the direct result of his mental illness.[41]  The undisputed facts also show that by

virtue of his incarceration, Mr. George spent a considerable amount of time confined to his cell

for 23 hours a day cut off from meaningful contact with family, friends, and even other

prisoners.[42]  By incarcerating Mr. George rather than providing him with appropriate mental

health treatment, Defendants denied him the benefits of the Conditional Release programs,

services, and activities.  During the period of his incarceration, Defendants provided Plaintiff

with unequal and different, or separate, opportunities to participate in programs, services, and

activities than other NGRI Acquittees who are receiving treatment at ELMHS or in a private

mental health institution.

     2)  ***Defendants' actions in incarcerating Mr. George rather than providing him with appropriate mental health treatment to address violations of the terms of his conditional release constituted a failure to provide treatment and services in the most integrated setting appropriate to his individual needs.***

The ADA requires treatment in the most integrated setting appropriate to a disabled

individual's needs and does not permit segregation imposed due to an individual's disability. See

---

[41] Pl.'s Ex. 3 at 125; Pl.'s Ex. 1 at 46.
[42] Pl.'s Ex. 1 at 64–65; Pl.'s Ex. 9 at 416-420; Pl.'s Ex. 13 at 542; Pl.'s Ex. 14 at 623–25, 632–34.

42 U.S.C. § 12132 ("[N]o qualified individual with a disability shall, by reason of such

disability, be excluded from participation in or be denied the benefits of the services, programs,

or activities of a public entity, or be subjected to discrimination by any such entity."); 42 U.S.C.

§ 12101(a)(2) ("historically, society has tended to isolate and segregate individuals with

disabilities, and, despite some improvements, such forms of discrimination against individuals

with disabilities continue to be a serious and pervasive social problem"); 42 U.S.C. §

12101(a)(5) ("individuals with disabilities continually encounter various forms of discrimination,

including … segregation, and relegation to lesser services, programs, activities, [etc.]"); 28

C.F.R. § 35.130(d) ("A public entity shall administer services, programs, and activities in the

most integrated setting appropriate to the needs of qualified individuals with disabilities.");

Olmstead v. L.C. ex rel Zimring, 527 U.S. 581, 597 (1999) ("Unjustified isolation … is properly

regarded as discrimination based on disability.").

  In this case, even if Plaintiff's incarceration for violating the terms of his conditional

discharge was constitutionally permissible, which Plaintiff disputes, the fact remains that

Defendants, when faced with Plaintiff's allegedly oppositional behavior in the group home in

2013 and again at ELMHS in 2014, had a number of viable choices less drastic than removing

Mr. George from treatment, arresting him, and isolating and segregating him in a lockdown cell

in East Baton Rouge Parish Prison.[43]

  At the time of Mr. George's arrest in 2013, Mr. Tubbs was well aware of the difficulties

in living in a group home under and any circumstances, the role that Mr. George's mental illness

played in his day-to-day behavior, Mr. George's treatment needs, and numerous treatment

options that existed in the Baton Rouge area.[44]  Yet, prior to Mr. George's arrest and

---

[43] Pl.'s Ex. 15(a) at 731-734; Pl.'s Ex. 3 at 131–32, 134–35, 137, 143–44.
[44] Pl.'s Ex. 3 at 125, 127, 131–32, 137.

incarceration, Defendants' only effort to secure mental health treatment of Mr. George was to inquire about placement at ELMHS. When that effort was rebuffed because there was "no room at Jackson for Mr. George," all efforts ceased and Mr. George was removed from his community-based program and incarcerated.[45]

The circumstances of Mr. George's 2014 are even more egregious. At that time, Mr. George was already hospitalized in a facility supposedly designed to address the behaviors of dangerous and mentally ill persons.  However, when Mr. George grew upset with Defendants' proposal to transfer him to a different unit of the facility and expressed paranoia consistent with his mental illness, Defendants Vosburg and Brady, under color of state law and consistent with Defendants' policies and practices, had him arrested and incarcerated.[46]  As a result of Defendants' actions, instead of receiving treatment at a mental health facility, Plaintiff decompensated in jail, where he was placed in lock down for 23 hours a day, isolated from his family and friends, segregated from other prisoners, and denied the appropriate mental health treatment to which he was entitled by virtue of his status as an NGRI Acquittee.[47]

By incarcerating Mr. George rather than providing him with appropriate mental health treatment to address alleged violations of the terms of his conditional release, Defendants denied him treatment and services in the most integrated setting appropriate to his individual needs contrary to his rights under the ADA.

> 3) *Defendants' use of incarceration rather than treatment in a mental health facility to address violations of the terms of Mr. George's conditional release, and their treating behavior that was a manifestation of his serious mental illness and intellectual disability as a criminal justice matter rather than a mental health or habilitation matter, constituted a failure to make reasonable accommodations or modifications.*

---

[45] Pl.'s Ex. 3 at 134–35.
[46] Pl.'s Ex. 2 at 104; Pl.'s Ex. 8 at 357–71.
[47] Pl.'s Ex. 1 at 64–65; Pl.'s Ex. 9 at 416-420; Pl.'s Ex. 13 at 542; Pl.'s Ex. 14 at 623–25, 632–34.

Public entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modification would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7). Here, Mr. George should have received a reasonable modification of Defendants' policies and practices that would have permitted him to obtain appropriate mental health services through the Conditional Release program without the constant threat of incarceration.  See, e.g., Rouse v. Plantier, 997 F. Supp. 575, 582 (D. N.J. 1997), vacated on other grounds, 182 F.3d 192 (3d Cir. 1999) (holding that plaintiffs stated claim under ADA when defendant prison's failure to treat their diabetes had "excluded [them] from participating in prison programs.").  These accommodations should be reasonably designed not only to prevent his incarceration, but enable him to participate in mental health services in the least restrictive environment. See Tennessee v. Lane, 541 U.S. 509 (2004) (describing the reasonable modification requirement as prophylactic). Under the ADA, public entities must "take certain proactive measures to avoid discrimination." See, e.g., Chisolm v. McManimon, 275 F.3d 315, 324–25 (3d Cir. 2001).  The failure to implement a reasonable modification needed by a person with a disability is a type of discrimination under the ADA.

In this case, the Defendants failed to make reasonable modifications to their policies in the following ways:

- Using incarceration, rather than mental health treatment, as a routine management technique to cope with the difficulties presented by Mr. George by virtue of his disability.

- Treating Mr. George's behavior that manifested both a serious mental illness and intellectual disability as a criminal justice matter rather than as a mental health or habilitation issue.

• Denying Mr. George the opportunities to access the appropriate mental
health programs and services available to other NGRI Acquittees, such as
placement in group homes or a state or private mental health facilities, when
he allegedly violated conditions of his release for behavior that is directly
attributable to his mental illness.

• Failing to take account of mental illness or intellectual disability in making
placement decisions.

• Incarcerating Mr. George in a facility that made it impossible for him to
"obtain the same result [or] gain the same benefit" from these programs, 28
C.F.R. § 35.130(b)(1)(iii), or criteria that "screen out" prisoners with
disabilities from "fully and equally enjoying" such program. 28 C.F.R. §
35.130(b)(8).

In both 2013 and 2014, Defendants were well aware of Mr. George's mental health

problems and were aware of the range of psychiatric facilities in the state that previously served

him, but nonetheless failed to take any steps whatsoever to accommodate his needs by placing

him in one of those programs. By incarcerating Mr. George rather than providing him treatment

in a mental health facility to address behaviors that were a manifestation of his serious mental

illness, Defendants failed to make reasonable accommodations or modifications in violation of

the ADA and Section 504.

## IV.   CONCLUSION

For the reasons set forth above, this Court should grant Plaintiff's Motion for Partial

Summary Judgment and declare that Defendants' policies, practices and procedures in

incarcerating Plaintiff for alleged violations of his terms of conditional release and failing to

provide him with appropriate mental health treatment violate his rights under the Due Process

Clause of the Fourteenth Amendment to the United States Constitution, Section 504 of the

Rehabilitation Act of 1973 ("Section 504"), and Title II of the Americans with Disabilities Act of

1990 ("ADA"). This court should also schedule a hearing on the issue of what remedy would be

adequate and just under the circumstances.

Respectfully submitted this 1st day of February 2016.

TRUSSELL GEORGE, JR.

By and through his attorneys,

/s/ Ronald K. Lospennato
Ronald K. Lospennato, Bar No. 32191
Concepcion "Koki" Otero, Bar No. 29372
Kathryn E. Fernandez, Bar No. 33829
Nell Hahn, Bar No. 22406
Advocacy Center
8325 Oak Street
New Orleans, LA 70118
504-208-4679 (p)
504-335-2890 (f)
rlospennato@advocacyla.org
kotero@advocacyla.org
kfernandez@advocacyla.org
lthornton@advocacyla.org

/s/ Katie M. Schwartzmann
Katie M. Schwartzmann, Bar No. 30295
Eric A. Foley, Bar No. 34199
Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)
(504) 208-3133 (f)
katie.schwartzmann@macarthurjustice.org
eric.foley@macarthurjustice.org

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2016, a copy of the foregoing Memorandum was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent electronically to counsel for Defendants.

/s/ Ronald K. Lospennato
Ronald K. Lospennato