UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

TRUSSELL GEORGE, JR.

CIVIL ACTION

VERSUS                                          No. 3:14-00338-JWD-EWD

LOUISIANA DEPARTMENT OF
PUBLIC SAFETY AND
CORRECTIONS, *ET AL*

### ORDER AND RULING ON MOTIONS FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

Before the Court is the Motion for Summary Judgment ("Defendants' MSJ"), (Doc. 74),

filed by nine legal persons—the Louisiana Department of Public Safety and Corrections

("DPSC"); Mr. James LeBlanc ("LeBlanc"), in his capacity as Secretary for DPSC; Mr. Whalen

Gibbs ("Gibbs"), Assistant Secretary for DPSC; Mr. Gerald Starks ("Starks"), Director of the

DPSC's Division of Probation and Parole ("Probation and Parole"); Mr. Scott Tubbs ("Tubbs"),

an agent with Probation and Parole; Ms. Kathy Kliebert ("Kliebert"), in her capacity as Secretary

for the Louisiana Department of Health and Hospitals ("DHH"); [1] DHH; Mr. Eric Brady

("Brady"), a District Forensic Coordinator ("DFC") for DHH; and Dr. Charles P. Vosburg

("Vosburg"), a consulting psychologist for DHH (collectively, "Defendants")—and the

Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's MSJ"), (Doc. 76), filed by Mr.

Trussell George, Jr. ("George" or "Plaintiff") by and through his Guardian Ad Litem, Ms.

Letitica Walker ("Walker"). Defendants' MSJ is supported by a separately docketed

---

[1] Officially, Kliebert has since been replaced as head of DHH by Ms. Rebekah M. Gee ("Gee").
No motion has been filed to formally substitute Kliebert with Gee, though Defendants have made
the switch in their latest filings. (*See* Doc. 98 at 1.)

memorandum ("Defendants' Memorandum"), (Doc. 81); Plaintiff has done the same with his

own memo ("Plaintiff's Memorandum"), (Doc. 82). Defendants have countered Plaintiff's MSJ

with Defendants' Memorandum in Opposition to Plaintiff's Motion for Partial Summary

Judgment ("Defendants' Opposition"), (Doc. 89), and Defendants' Response to Plaintiff's

Statement of Undisputed Facts ("Defendants' Response"), (Doc. 94). To these two motions,

Plaintiff has replied with the Plaintiff's Reply to Defendants' Opposition to Summary Judgment

("Plaintiff's Reply"). (Doc. 96.) Plaintiff has addressed Defendants' MSJ with the Plaintiff's

Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Opposition"), (Doc. 91),

to which Defendants have replied with the Reply Brief in Support of Defendants' Motion for

Summary Judgment ("Defendants; Reply"), (Doc. 98).

In this suit, the reach of one federal constitutional provision—the Due Process Clause of

the United States Constitution's Fourteenth Amendment—and two related federal statutes—the

Americans with Disabilities Act of 1990 ("ADA"), as later amended, and Section 504 of the

Rehabilitation Act of 1973[2]—are at issue. In his dispositive filing, Plaintiff has asked this Court

to declare that two related state laws—Articles 658 and 899 of the Louisiana Code of Criminal

Procedure[3]—pursuant to which he was incarcerated are unconstitutional as applied to persons

similarly situated. In their motion, Defendants maintain no reasonable doubt can be raised about

the applicability of their every defense to and the legal weakness of Plaintiff's three discrete

claims. In essence, Defendants ask for a dispositive ruling as to every fact-specific defense

asserted in their multiple filings, and Plaintiff demands that a state law and a state practice,

---

[2] In this ruling and order, any and all references to "Section 504" or "§ 504" are to this particular
division of this federal statute.
[3] In this ruling and order, any and all references to "Article" or "Articles" are to these particular
subdivisions of Louisiana's Code of Criminal Procedure.

similar to many, be deemed unconstitutional. For the Defendants and Plaintiff (collectively, "Parties"), the law and the facts appear crystal clear.

Having weighed the Parties' arguments, this Court disagrees. As the Parties' lengthy filings suggest, a highly fact-specific analysis is required for every one of Defendants' asserted shields. Moreover, no uncontested principle of law firmly establishes or clearly forbids liability based on this case's particular facts. For purposes of Federal Rule of Civil Procedure 56,[4] this Court must determine whether material issues of fact are in dispute; when it does so in this case, too many questions remain unanswered for any one of Defendants' defenses to be adjudicated at this juncture. As courts have observed, the reasonableness of a certain course of conduct and the inadequacy of a proposed accommodation, so pivotal to one party's case and another's defense, require determinations for which a jury is empaneled and which only it can definitively answer.

Meanwhile, akin in language and structure to other state laws and a federal statute declared constitutional by a multitude of courts, Articles 658 and 899 cannot be found to be facially unconstitutional. It is possible that Plaintiff was subjected to an unconstitutional application of these articles. However, on their face, their constitutionality cannot be questioned based on precedent's overwhelming weight. For these reasons, as more fully explained below, the Plaintiff's MSJ and the Defendants' MSJ (collectively, "Dispositive Motions") must fail.[5]

---

[4] In this ruling and order, any reference to "Rule" or "Rules" is to the Federal Rules of Civil Procedure unless otherwise noted.

[5] Technically, by denying Plaintiff's MSJ, this Court does accept Defendants' contention that Articles 658 and 699 are facially constitutional. To wit, this ruling can be construed as effectively granting in part Defendants' MSJ.

## II. FACTUAL AND PROCEDURAL BACKGROUND

## A. RELEVANT FACTS

Diagnosed with "schizophrenia, bipolar disorder, Psychosis NOS, and significant intellectual and development disability," (Doc. 42 at 3, 11), Plaintiff was found Not Guilty by Reason of Insanity ("NGRI") to a charge of possession of a weapon by a felon. (Doc. 103 ¶ 1 at 4; Doc. 103-2 ¶ 1 at 1; Doc. 76-21 at 2; Doc. 42 at 11.) Treated for these disabilities since the age of twelve, he had previously been convicted of criminal trespass and possession of a schedule II substance. (Doc. 1 at 9; Doc. 42 at 11.) Upon his conviction, as required by law, on December 15, 2008, the Nineteenth Judicial District Court in East Baton Rouge, Louisiana, placed him on conditional release for a period of five years. (Doc. 103 ¶ 2 at 4; Doc. 103-2 ¶ 3 at 1–2; Doc. 74-3 at 1; Doc. 76-21 at 2–3; Doc. 42 at 12.) The conditions totaled eight: (1) residence at Progressive Group Home ("PGH") in Baton Rouge; (2) attendance at a mental health clinic in Baton Rouge and compliance with treatment recommendations; (3) reporting to the local probation office within twenty-four hours of release from jail; (4) subjection to monitoring services provided by DHH's Community Forensic Services Program ("CFS"); (5) consent for release of information from medical providers to agencies to report on a regular basis to the District Forensic Coordinator or State Probation Officer; (6) refraining from consumption of alcohol or illicit drugs and from frequenting places where consumption commonly occurs; (7) that providers notify the District Forensic Coordinator ("DFC") and/or State Probation Officer of any positive drug screens; and (8) refrain from possession of any weapons. (Doc. 103-2 ¶ 4 at 2; Doc. 74-3 at 1–2; Doc. 42 at 12.) Commonly authorized for persons adjudicated NGRI, these conditions were not unusually harsh or particularly unique. (*See, e.g.*, Doc. 103 ¶ 7 at 5; Doc. 103-2 ¶ 13 at 4.)

Following the verdict of NGRI, Plaintiff was placed under the supervision of Probation and Parole and CFS. (Doc. 103 ¶ 5 at 4; Doc. 103-2 ¶ 10 at 3-4; Doc. 76-21 at 3; Doc. 1 at 9.) From December 2008 to May 2014, with certain notable exceptions at the heart of this case, Plaintiff resided in PGH. (Doc. 103 ¶ 4 at 4, 103-2 ¶ 6 at 3.) These supervising agencies contacted and worked with supervisees. (Doc. 103 ¶ 7 at 5; Doc. 103-2 ¶ 13 at 4.) Tubbs was assigned as Plaintiff's probation officer and monitored his conditional release. (Doc. 103-2 ¶ 18 at 5; Doc. 74-3 at 2; Doc. 76-21 at 3.) Brady is one of DHH's DFCs and had been assigned to assist Plaintiff and Tubbs. (Doc. 103 ¶ 14 at 6; Doc. 103-2 ¶ 24 at 6.) Vosburg is a consultant to CFS, (Doc. 103 ¶ 16 at 6; Doc. 103-2 ¶ 29 at 7), and was responsible for providing mental health services of DHH to individuals on conditional release and at the Eastern Louisiana Mental Health System ("ELMHS") in Jackson, Louisiana, and to provide recommendations as to placement and treatment, (Doc. 103-2 ¶ 30 at 7), Starks served as the Director of Probation and Parole; Gibbs served as his immediate superior. (Doc. 42 at 3–4.) As such, by virtue of this state's statutory scheme, *see, e.g.*, LA. CODE CRIM. PROC. art. 658, and Plaintiff's multiple incarcerations and inpatient treatment at various facilities, (Doc. 42 at 13–16), every Defendant was involved, whether directly (i.e. Tubbs, Brady, and Vosburg) or indirectly (i.e. LeBlanc, Kliebert/Gee, and Gibbs), with Plaintiff's case beginning on December 15, 2008. (*See, e.g.*, Doc. 42 at 3–6.)

On June 10, 2013, Tubbs allegedly prepared a letter to the state district court about Plaintiff's verbally aggressive behavior with staff at PGH and requested the court set a review date to address expiration of the conditional release. (Doc. 74-3 at 3.) For an unknown reason, no court date was ever set. (*Id.*) In time, though he was still at PGH, Plaintiff's misbehavior

escalated.[6] (*Id.*; *see also, e.g.*, Doc. 42 at 13–14.) About six months prior to the end of his

conditional discharge term, George was hospitalized and deprived of his needed medication.

(Doc. 1 at 11; Doc. 42 at 13.) As a consequence of this deprivation, in July of 2013, Plaintiff

apparently had an unusually extreme series of outbursts, each of which was reported to Tubbs.

(Doc. 103-2 ¶ 33 at 7-8; Doc. 76-21 at 3; Doc. 1 at 11.) Aware of these "verbal outbursts and

threatening behavior," (Doc. 1 at 11), Tubbs and Brady arrested Plaintiff and confined him in

East Baton Rouge Parish Prison ("EBRP") on July 29, 2013. (Doc. 103-2 ¶ 35 at 8; Doc. 74-3 at

2; Doc. 76-21 at 3–4.)

 The Parties' descriptions of subsequent events diverge. Plaintiff alleges that he was not

charged with any crime during or after this incarceration and that Tubbs failed to request a court

hearing for two weeks following incarceration. (Doc. 103-2 ¶¶ 41–44 at 12; Doc. 1 at 11.)

Conversely, Defendant maintains that Tubbs notified the district court by telephone on the day of

the arrest and, on August 12, 2013, wrote a letter to the state district court outlining Plaintiff's

behavior, and filed a Detainer Notification, Affidavit of Probable Cause, and a Motion for

Hearing to Revoke Probation. (Doc. 74-3 at 2–3.)

 On August 23, 2013, Plaintiff was released. (Doc. 103-2 ¶ 45 at 12; Doc. 74-3 at 3; Doc.

76-21 at 4.) Between August and December 2013, he once more lived in PGH. (Doc. 103-2 ¶ 45

at 12; Doc. 74-3 at 3; Doc. 76-21 at 4.) In December of 2013, Brady requested the conditional

release period be extended by a year. (Doc. 103-2 ¶ 46 at 12; Doc. 74-3 at 3; Doc. 42 at 14.) In

May 2014, the state court granted the request and extended the conditional release to December

---

[6] Notably, per the Behavioral Support Plan produced by PGH, Plaintiff is prone to verbal
aggregation and disobedience, "on occasion . . . engag[ing] outbursts and 'threatening' episodes
when his medication is not correct." (Doc. 1 at 11.) According to Plaintiff, his behaviors "are
typical of behaviors exhibited by many other men with mental illness and developmental
disabilities residing in the close quarters of a group home." (*Id.*)

14, 2015. (Doc. 103-2 ¶ 47 at 12; Doc. 74-3 at 3; Doc. 42 at 15.) Within a week, Brady allegedly arranged for the Plaintiff to be involuntarily hospitalized at ELMHS with no secure emergency certificate and no judicially ordered commitment. (Doc. 103-2 ¶¶ 48–51 at 13; Doc. 76-21 at 4; Doc. 42 at 15.)

On July 1, 2014, while Plaintiff was at ELMHS, Brady, Vosburg, and Kelly decided conditional release should be revoked and Plaintiff should be incarcerated for refusing to accept transfer to a different unit of ELMHS. (Doc. 103-2 ¶¶ 52-56 at 13–14; Doc. 74-3 at 3–4; Doc. 76-21 at 4; Doc. 42 at 15.) Plaintiff contends that he reacted negatively to this news, acting angry and agitated and unleashing a slew of verbal threats. (Doc. 103-2 ¶¶ 57–58 at 14-15; Doc. 76-21 at 4.) Even so, Plaintiff emphasizes that he did not strike or attempt to strike anyone, (Doc. 103-2 ¶¶ 57–58 at 14-15; Doc. 76-21 at 4), and had otherwise been compliant during his time at ELMHS, (Doc. 103-2 ¶¶ 59–60 at 15; Doc. 76-21 at 4). Naturally, Defendants tell a slightly different tale: in July of 2014, Kelly contacted Tubbs to transport Plaintiff because he was concerned that Plaintiff might harm staff or other patients and that Plaintiff indicated he wanted to go to jail. (Doc. 74-3 at 4.) Regardless of the underlying reason, on August 25, 2014, Plaintiff was released from EBRP and returned to ELMHS, having never been charged with any crime. (Doc. 103-2 ¶¶ 64-65 at 16; Doc. 76-21 at 5.)

Plaintiff's treatment during these multiple incarcerations is not itself disputed although the adequacy of that treatment certainly is. Plaintiff alleges that during both incarcerations he did not receive appropriate mental health treatment, resulting in the aggravation of his underlying disorder. (Doc. 103-2 ¶ 66 at 16; Doc. 76-21 at 5.) As an inmate, he was wholly isolated and afforded no exercise time, restricted use of canteen, and limited reading materials. (Doc. 103-2 ¶ 67 at 16; Doc. 76-21 at 5; Doc. 1 at 12.) Throughout his time in jail, Plaintiff claims that he was

not properly medicated, resulting in growing nervousness and paranoia. (Doc. 1 at 12; Doc. 42 at 16 –17.) Stated differently, Plaintiff essentially contends that, during his incarceration, no penal institution treated him for his qualified disability in spite of a record attesting to his manifold disorders. (*See, e.g.*, Doc. 42 at 13–16.)

On August 14, 2014, the state court ordered Plaintiff released from EBRP. (Doc. 42 at 16.) His release, however, did not take place until August 25, 2014. (*Id.*) Through December 23, 2014, Plaintiff was again confined on an inpatient basis at ELMHS in Jackson, Louisiana. (*Id.* at 3.) Until May of 2014, he resided at the Stern Community Group Home located at 15626 Confederate Ave., Baton Rouge, Louisiana. (*Id.*) In the group home, he was under the supervision of LDPSC's Probation and Parole and DHH's CFS. (*Id.*)

## B.   PROCEDURAL HISTORY

Plaintiff filed his first pleading on May 28, 2014, (Doc. 1), an amended complaint on September 24, 2014, (Doc. 24), and the second amended complaint ("Complaint") on December 23, 2014, (Doc. 42). Defendants' MSJ and Plaintiff's MSJ were tendered on February 1, 2016. (Doc. 74, 76.) The supporting memoranda were filed on February 2, 2016. (Docs. 81–82.) On February 24, 2016, Defendants docketed their opposition, (Doc. 91); on February 29, 2016, they filed their reply to the Plaintiff's statement of undisputed facts, (Doc. 94). Plaintiff's Reply came on March 7, 2016. (Doc. 96.) On March 8, 2016, Defendants submitted their reply. (Doc. 98.) On June 6, 2016, for the reasons stated in this ruling, this Court denied the Plaintiff's MSJ and Defendants' MSJ. (Doc. 112.)

## C.    PARTIES' ARGUMENTS

### 1.    Defendants' MSJ

Broadly, Defendants argue that summary judgment is appropriate in the present matter for the following reasons: (1) Defendants are entitled to immunity under the Eleventh Amendment pursuant to 28 United States Code, Section 1983;[7] (2) Defendants are entitled to qualified immunity; (3) Plaintiff's arrest was constitutional and in compliance with the relevant articles of the Louisiana Code of Criminal Procedure; (4) such articles are facially valid and constitutional; (5) Plaintiff's arrest was based on reasonable cause, the sole statutory requirement; (6) Plaintiff is not entitled to punitive damages; and (7) Plaintiff has failed to prove any violation of the ADA and RA. (Doc. 74 at 1-2.)

#### a.    *Eleventh Amendment*

Defendants assert that the Eleventh Amendment provides immunity for states and state officials from suit brought their own citizens. (Doc. 74-3 at 7 (quoting *Tennessee v. Lane*, 541 U.S. 509, 124 S. Ct. 1978, 158 L. Ed. 2d 820 (2004)).) Defendants argue that neither states nor their officials are considered to be "persons" under § 1983 and therefore remain entitled to the immunity provided by the Eleventh Amendment. (Doc. 74-3 at 7 (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)).) The one recognizable exception—*Ex Parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), (Doc. 74-3 at 7)—allows for "suits against state officials for the purpose of enjoining the enforcement of an unconstitutional state statute." (*Id.* at 8 (quoting *Okpalobi v. Foster*, 244 F.3d 405, 411 (5th Cir. 2001)).)

---

[7] In this ruling and order, any and all references to "Section 1983" or "§ 1983" are to this particular federal statute.

Yet, because of the nature of Plaintiff's constitutional claim—he is seeking to enjoin the enforcement of Articles 658(B) and 899, which allow state officials to arrest and incarcerate individuals on the grounds that they have violated a condition of their conditional discharge, (*Id.* at 8–9)—Defendants assert that this lone exception does not apply here for two reasons. First, Defendants argue that only Tubbs, as a probation or peace officer, is authorized to make such arrest and Plaintiff has provided no support to show that the others ever exercised such power. (*Id.* at 8.) In contrast, Gee, Brady, and Vosburg have no ability to arrest and enjoining them from doing so would be meaningless. (*Id.* at 9.) Second, LeBlanc, Gibbs, and Stark are purely supervisory officials. (*Id.* at 10.) Not only does "vicarious liability . . . not apply to § 1983 claims" but such officials may only be held liable if "they affirmatively participate in acts that cause constitutional deprivations" and "implement unconstitutional policies that causally result in plaintiff's injuries." (*Id.* (quoting *Mouille v. City of Live Oak, Tex.*, 977 F.2D 924, 929 (5th Cir. 1992)).)

By Defendants' reckoning, not one of these defendants falls into this exception for supervisory officials. LeBlanc is responsible for the operation of the system of probation and paroles, but he is not authorized to make arrests. (*Id.* at 10.) Gibbs is the Assistant Secretary, who directs the operations of the same system. (*Id.*) Starks, as Director of Probation and Parole, assisted in the administration, development, and implementation of this agency's policies. (*Id.*) It is argued that, as to each of these defendants, Plaintiff has failed to show how they were personally involved in George's arrests, an action beyond their rightful powers. (*Id.*) For that very reason, again, injunctive relief against them would be meaningless. (*Id.* at 10.)

b.      *Qualified Immunity*

As Defendants rightly note, state officials sued in their individual capacity and for monetary relief may assert the doctrine of qualified immunity as a defense. (*Id.* at 11.) A state official may enjoy qualified immunity so long as his or her conduct does not violate "clearly established constitutional rights of which a reasonable person would have known." (*Id.* at 11.) This immunity protects "all but the plainly incompetent or those who knowingly violate the law." (*Id.* at 11 (quoting *Ashcroft v. al-Kidd*, 563 U.S 731, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011)).) To determine whether the actions of a state official are protected by qualified immunity, the court is to consider "(1) whether the claims the Plaintiff alleges constitute a constitutional right and (2) whether the right was clearly established at the time of the incident." (*Id.* at 12) (quoting *Pearson v. Callahan*, 555 U.S. 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009)).)

To Defendants, their apparent compliance with state law defeats application of either prong. Article 658 (B) allows for an individual to be placed on conditional release subject to the supervision of Probation and Parole. (*Id.*) The article further allows the person to be arrested in compliance with Article 899. (*Id.* at 13.) By steadfastly adhering to these articles, Defendants followed governing state law and had no reason to suspect a federal constitutional right was being infringed. (*Id.*) Put differently, in following statutes whose constitutional validity should be presumed, Defendants could not possibly have run afoul of "a clearly established constitutional right" or acted without this doctrine's requisite objective reasonableness. (*Id.*)

c.    **Facial Constitutionality of Articles 658 and 899**

In order for a statute to be unconstitutional on its face, there must be no set of circumstances in which the statute would be valid. (*Id*. at 16.) As Defendants explain, Article 899 sets forth the process by which any probationer may be arrested or detained as the result of a violation of his or her probation. (*Id*. at 17.) Here, Plaintiff has asserted that Article 899 is unconstitutional as applied to individuals found NGRI and conditionally released. (*Id*.) By definition, therefore, other instances exist in which the article could be constitutionally applied, and Plaintiff's facial challenge must necessarily fail. (*Id*.) Further, Defendants contend that the Plaintiff fails to take into account circumstances in which a crime has been committed and/or fear for public safety would warrant an individual's arrest under Articles 899 and 658B. (*Id*.) In this case, as Defendants once more emphasize, Plaintiff was arrested because he was presumed to be a risk to the broader public, a ground which saves these articles' constitutionality and defeats any possible facial argument. (*Id.* at 18.)

d.    **Punitive Damages**

In order to get punitive damages under § 1983, the Plaintiff must demonstrate that the Defendants' conduct was "motivated by evil motive or intent [or that] it involves reckless or callous indifference to the federally protected rights of others." (*Id.* at 19 (citing *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 1640, 75 L. Ed. 2d 632 (1983)).) For Defendants, no such reckless or callous indifference can here be shown, for Plaintiff's arrest was pursuant to Articles 658(B) and 899, presumptively constitutional enactments, and was triggered by Plaintiff's violations of court-imposed conditions. (*Id.*) When the danger presented by Plaintiff was so obvious and clear, their actions—to confine him in a prison without minimally necessary medical

care—and the official policy behind them, cannot be described as indicative of a reckless or callous indifference to Plaintiff's due process rights.

e.  ***Applicability of RA and ADA***

Rightly arguing that the ADA and § 504 encode the same legal standard, Defendants admit that the Plaintiff qualifies as disabled for purposes of both these statutes. (*Id.*) Nonetheless, they deny that Plaintiff was excluded, denied benefits, or discriminated against by reason of his disability. (*Id.*) In so averring, Defendants assume that Plaintiff's argument is that his incarceration caused a denial of benefits. (*Id.* at 20.) In making this argument, Defendants stress that there is no authority to support the idea that dependence on services, benefits, and activities could warrant immunity from incarceration, as Plaintiff's argument necessarily implies. (*Id.*)

**2.  Plaintiff's MSJ**

In a motion more focused than Defendants', Plaintiff asserts that there are no genuine issues of material fact as to two discrete issues. So convinced, Plaintiff requests that this Court: (1) grant his motion; (2) enjoin the Defendants from arresting him because of a violation of his conditional release; (3) declare unconstitutional the Defendants' policies, practices, and procedures for arresting individuals on conditional release for violating a condition thereof; (4) declare Articles 658(B) and 899 facially unconstitutional under the Due Process and Supremacy Clauses of the United States Constitution; and (5) award Plaintiff such other relief as may be appropriate. (*See, e.g.*, Doc. 76-21 at 1.)

*a.*   ***Constitutional Violations***

The Fourteenth Amendment protects liberty interests that arise from the Due Process

Clause itself or the laws of the United States. (*Id.* at 6 (quoting *Hewitt v. Helms*, 459 U.S. 460,

103 S. Ct. 864, 74 L. Ed. 2d 675 (1983)).) An individual has a liberty interest in being free from

incarceration absent a criminal conviction. (*Id.* at 6 (citing *Meachum v. Fano*, 427 U.S. 215, 96

S. Ct. 2532, 49 L. Ed. 2d 451 (1976)).) Plaintiff first contends that, as an individual found not

guilty by reason of insanity, he is exempt from criminal conviction and therefore cannot be

subject to incarceration. (*Id.*) Any long-term or intermediate commitment based on the

individual's incompetence to stand trial, he argues, violates the Constitution. (*Id.*)

Describing Article 658 as a civil commitment statute, Plaintiff alleges that the sole purpose of the

Plaintiff's incarceration, which spanned several months, was because of the lack of beds at

ELMHS. (*Id.* at 7.) However, "due process requires that the nature and duration of the

commitment bear some reasonable relationship to the purpose for which individual is

committed." (*Id.*) Although civil commitment is permissible when the individual is a risk to the

public, the lack of capacity asserted here cannot be a justification for his incarceration. (*Id.*)

Next, as Plaintiff had a right to adequate medical treatment, his incarceration violated the

Due Process Clause because of the lack of mental health treatment available in the prison (*Id.*)

Lastly, Plaintiff maintains that "commitment for any purpose constitutes a significant deprivation

of liberty that requires Due Process Protection," and such commitment will always violate the

Constitution when no essential "rehabilitative" treatment is present or available. (*Id.* at 9.) Thus,

individuals confined due to mental illness are constitutionally entitled to more than the basic

necessities provided to the general prison population. (*Id.* at 12.) Even so, Plaintiff never

received adequate treatment while incarcerated in the EBRP (*Id.* at 14.) He was not provided

with a treatment plan, therapy, or consistent administration of his medication, and he was placed in clinically destructive lock down. (*Id.*) Crucially, Defendants have seemingly admitted awareness of the prison's limited mental health services, services normally provided by a proper mental health institution. (*Id.* at 15–16.) Clearly, Plaintiff argues, as a matter of law, a state's lack of resources cannot justify depriving an individual of these liberty interests. (*Id.* at 13). Yet, as the uncontested facts allegedly show, such deprivation happened here. (*Id.*)

### b. *Applicability of RA and ADA*

The ADA was enacted to eliminate discrimination against individuals with disabilities. (*Id.* at 16.) Section 504 prohibits discrimination on the basis of disability in federally conducted programs and all other operations of public entities that receive federal assistance. (*Id.* at 17.) Substantively similar, these related laws are linked by the ADA's Title II, which extends the protections set forth in Section 504 to all state and local government entities. (*Id.*) Plaintiff argues that by incarcerating individuals on conditional release for violating a condition of that release, the Defendants discriminated against those with mental illness by (1) denying those individuals the benefit of conditional discharge programs and services and (2) providing them with unequal and separate opportunities to participate in programs and activities, different than non-disabled individuals and others adjudicated NGRI, some of whom receive treatment at state or private mental health institutions. (*Id.* at 19.) So as to comply with these federal commands, Defendants should have reasonably modified their policies to allow Plaintiff to receive adequate mental health treatment. (*Id.* at 23 (citing *Rouse v. Plantier*, 997 F. Supp. 575, 582 (D. N.J. 1997)).) Instead, Defendants (1) used incarceration as a routine technique for managing difficulties concerning those with disabilities, (2) treated Plaintiff's mental illness as a criminal

justice matter, (3) denied Plaintiff placement in a mental health institution or group home and failed to take his mental illness into account, and (4) made it impossible for him to obtain the same benefits as provided by programs in such institutions. (*Id.* at 24–25.)

## III.   DISCUSSION

### A.   LEGAL STANDARD

#### 1.   Rule 56

Per Rule 56(a), summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Wilson v. Tregre*, 787 F.3d 322, 325 (5th Cir. 2015) (quoting Rule 56(a)). A dispute is "genuine" so long as "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; a fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Ray v. United Parcel Serv.*, 587 F. App'x 182, 186 (5th Cir. 2014). Axiomatically, a court construes all facts and evidence in the light most favorable to the nonmovant. *Haverda v. Hays Cnty.*, 723 F.3d 586, 591 (5th Cir. 2013). In response to another's motion, the nonmovant cannot rely on "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments." *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002).

Still, "[w]hen both parties have submitted evidence of contradictory facts," *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005), a court is bound to "draw all reasonable inferences in favor of the nonmoving party," *Reeves v. Sanderson Plumping Prods.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 2110, 147 L. Ed. 2d 105 (2000); *see also Anderson*, 477 U.S.

at 248 (emphasizing the irrelevance of "[a]ny proof or evidentiary requirements imposed by the substantive law," materiality "not a criterion for evaluating the evidentiary underpinning of [factual disputes]"). It thus cannot "make credibility determinations or weigh the evidence." *Reeves*, 530 U.S. at 150. This command—that a district court "eschew making credibility determination or weighing the evidence," *Calhoun v. Johnson*, 632 F.3d 1259, 1261 (D.C. Cir. 2011) (citing *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003)); *accord, e.g.*, *Flythe v. Dist. of Columbia*, 791 F.3d 13, 22 (D.C. Cir. 2015)—applies so long as the record contains patches of reasonable ambiguity that have not been artificially manufactured. *See, e.g.*, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) (per curium) ("[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.").

Under Rule 56, this Court must "give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." 9A WRIGHT, *supra*, § 2529. To wit, although this Court "should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151, *cited in Havera*, 723 F.3d at 591. Within the narrow domain of Rule 56, summary judgment is hence inappropriate (1) if there are legitimate, not superficial or frivolous, factual disputes that may affect the outcome of the case under the applicable substantive law, *see Anderson*, 477 U.S. at 248, and (2) so long as the nonmovant does not exclusively rely on "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "a scintilla of evidence," *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Questions of statutory construction are particularly well-suited for resolution by summary judgment. *See, e.g.*, *Asher v. Am. Home Mortg. Servicing, Inc. (In re Asher)*, 488 B.R. 58, 64

(Bankr. E.D.N.Y. 2013); *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)

(citing *Oklahoma ex rel. Dep't of Human Servs. v. Weinberger*, 741 F.2d 290, 291 (10th Cir.

1983*)); Stissi v. Interstate & Ocean Transport Co.*, 765 F.2d 370, 374 (2d Cir. 1985); FEDERAL

JUDICIAL CENTER, THE ANALYSIS AND DECISION OF SUMMARY JUDGEMENT MOTIONS 15 (1991).


2.      **Articles 658 and 899**

    At the center of this case is Article 658 which creates the system of conditional release,

defined as "[w]hen . . . [a] committed person is released on probation." LA. CODE CRIM. PROC.

art. 658A; *see also* LA. R.S. § 28:58–59; *Harper v. State*, 2014-0110 (La. App. 4 Cir. 09/09/15);

176 So. 3d 479, 511 n.8. Pursuant to its first paragraph, "[i]t shall be a condition of every such

probation that the person released shall be recommitted if he becomes dangerous to others or to

himself for reasons of mental illness, substance abuse, or intellectual disability," and "[t]he

probationer" must "be required to agree in writing to the conditions of his probation." LA. CODE

CRIM. PROC. art. 658A. Any probationer is placed "under the supervision of the division of

probation and parole." *Id.* art. 658B(1). If "the probationer violates or is about to violate the

conditions of his probation, he may be arrested and detained in conformity with the applicable

provisions of Article 899." *Id.* Notably, Probation and Parole must "immediately notify court of

any substantive violations or imminent violations of the conditions of a person's probated release

and shall present recommendations to the court regarding whether the court should revoke the

probation and recommit the probationer to a state mental institution or other recommendations as

may be appropriate." *Id.* art. 658B(5).Thereafter, the court may order the relevant person's arrest

but must "immediately hold a hearing to consider the violations listed or transfer the case to the

parish of commitment, if different from that of the arrest, at which place the hearing should be

held as soon as possible." *Id.* art. 658B(6). No arrest is permitted once an insanity acquitee has been completely discharged pursuant to Article 658D. *State ex rel. Reeves v. State*, 00-1798 (La. 09/14/00); 768 So. 2d 595, 595.

Incorporated into Article 658, Article 899 sets forth the rules for arrest for a violation of conditional probation. LA. CODE CRIM. PROC. art. 899. In general, "[a]t any time during probation and suspension of sentence the court may issue a warrant for the arrest of a defendant for violation of any of the conditions of probation, or may issue a summons to appear to answer to a charge of violation or threatened violation." *Id.* art. 899A. "The warrant of arrest may be executed by any peace officer [or probation officer] and shall direct that the defendant be returned to the custody of the court or to a designated detention facility"; it must "be personally served upon the defendant." *Id.* arts. 899A, 899F. But, "[i]f a probation officer has reasonable cause to believe that a defendant has violated or is about to violate a condition of his probation or that an emergency exists so that awaiting an order of the court would create an undue risk to the public or to the probationer, the probation officer may arrest the defendant without a warrant, or may authorize a peace officer to do so." *Id.* art. 899B. Regardless of whether Article 899A or 899B has been invoked, "[w]ithin ten days following the arrest of an offender pursuant to the provisions of this Article, the court shall determine if there is probable cause to detain him pending a final violation hearing and shall consider whether to allow the offender bail pending the final hearing." *Id.* art. 899E. "The determination of probable cause may be made without a formal hearing and may be conducted through the use of affidavits." *Id.* Even if probable cause is found, a final violation hearing must still be promptly held. *Id.*

3.     **ADA and RA**

Under well-established precedent, prisoners may bring claims against their jailors for

disability discrimination under Title II of the ADA and Section 504 of the RA.[8] *Pa. Dep't of*

*Corrections v. Yeskey*, 524 U.S. 206, 209–10, 118 S. Ct. 1952, 1954–55, 141 L. Ed. 2d 215

(1998); *see also, e.g.*, *Frame v. City of Arlington*, 657 F.3d 215, 224–25 (5th Cir. 2011). Title II

prohibits discrimination by "public entities," 42 U.S.C. § 12131(1), and state punitive institutions

fall squarely within this statutory definition, *Yeskey*, 524 U.S. at 210. Typically, a plaintiff

proceeding under Title II must "show that: (1) he or she is a 'qualified individual with a

disability'; (2) he or she is being excluded from participation in, or being denied the benefits of

some service, program, or activity by reason of his or her disability; and (3) the entity which

provides the service, program or activity is a public entity." *Douglas v. Gusman*, 567 F. Supp. 2d

877, 889 (E.D. La. 2008).

Beyond these general guiding principles, precedent establishes two other cardinal rules.

First, while the ADA's reasonable accommodation requirement does not apply under Title II, its

"reasonable modifications" requirement—"A public entity shall make reasonable modifications

in policies, practices, or procedures when the modifications are necessary to avoid discrimination

on the basis of disability, unless the public entity can demonstrate that making the modifications

---

[8] Section 504 of the RA protects qualified individuals from discrimination on the basis of
disability by entities receiving financial assistance from any federal department or agency. 29
U.S.C. § 794 *et seq.* Passed in 1973, the ADA expanded upon its protections. Naturally,
therefore, the same prima facie case be made by a disabled plaintiff under both acts, *Zukle v.
Regents of Univ. of Cal.*, 166 F.3d 1041, 1045 (9th Cir. 1999), and courts readily "examine cases
construing claims under the ADA, as well as section 504 of the Rehabilitation Act, because there
is no significant difference in the analysis of rights and obligations created by the two Acts,"
*Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002). As such, the two law's substantive
applicability is not affected by the possibility that DPSC receives no federal money.

would fundamentally alter the nature of the service, program, or activity," 28 C.F.R. §

35.130(b)(7); 42 U.S.C. § 12182(b)(2)(A)(ii); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682, 121

S. Ct. 1879, 1893, 149 L. Ed. 2d 904 (2001)—has been held to apply in the prison context.

*Garrett v. Thaler*, 560 F. App'x 375, 382 (5th Cir. 2014). Consequently, while the ADA "does

not require prisons to provide *new* services or programs for disabled prisoners," these same

entities "do have an affirmative obligation to make reasonable modifications . . .  so that a

disabled prisoner can have meaningful access to *existing* public services or programs." *Borum v.*

*Swisher Cnty.*, No. 2:14-CV-127-J, 2015 U.S. Dist. LEXIS 8628, at *21, 2015 WL 327508, at *9

(N.D. Tex. Jan. 26, 2015) (emphasis added). Second, the Fifth Circuit has held that a defendant's

failure to make the reasonable modifications necessary to adjust for the unique needs of disabled

persons can constitute intentional discrimination under the ADA. *See, e.g.*, *Melton v. Dall. Area*

*Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004); *Garrett v. Thaler*, 560 F. App'x 375, 382 (5th

Cir. 2014). A different kind of intent, in other words, governs in ADA cases. *See Garrett*, 560 F.

App'x at 385.


4.      **Qualified Immunity**

        Qualified immunity is available when a § 1983 suit is brought against a state official in

his individual capacity, making him or her personally liable for any damages awarded to a

plaintiff. 42 U.S.C. § 1983. "In deciding whether a state official is entitled to qualified immunity,

it must first be determined whether a plaintiff successfully alleged facts showing the violation of

a constitutional right by state officials." *Cohn v. New Paltz Cent. Sch. Dist.*, 363 F. Supp. 2d 421,

431 (N.D.N.Y. 2005). "If a violation could be made out on a favorable view of the parties'

submissions, the next, sequential step is to ask whether the right was clearly established."

*Saucier v. Katz,* 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).[9] For the right to be so classified, its "contours . . . must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). "[I]f . . . [a] defendant's conduct was objectively reasonable in light of clearly established law at the time of the violation," however, even a right's status as firmly established will not foreclose qualified immunity's invocation. *Dorsett-Felicelli v. Cnty. of Clinton*, 371 F. Supp. 2d 183, 193 (N.D.N.Y. 2005). Perhaps unsurprisingly, this inquiry regarding whether a defendant's actions were objectively reasonable, which is commenced only upon proof of a right's positive existence, has been described as "a fact-intensive inquiry" ill-suited for ultimate resolution via Rule 56. *Id.*; *see also, e.g.*, *Sales v. Barizone,* No. 03 Civ. 6691RJH, 2004 WL 2781752, at *16 (S.D.N.Y. Dec. 2, 2004).

**B.     APPLICATION**

**1.     Plaintiff's MSJ**

Bound by the foregoing law, this Court must deny Plaintiff's request for summary judgment for two reasons.

First, Articles 658 and 899 cannot be deemed to be constitutionally infirm as a matter of undisputed constitutional law. Undeniably, as Plaintiff now asserts, (Doc. 42 at 19), "commitment for any purpose constitutes a significant deprivation of liberty that requires Due Process Protection." *Jones v. United States*, 463 U.S. 354, 361, 103 S. Ct. 3043, 3048, 77 L. Ed. 2d 694 (1983); *see also Welsch v. Likins*, 373 F. Supp. 487, 499 (D. Minn. 1974). As such,

---

[9] Despite the language in *Saucier*, this two-part analysis need not proceed sequentially, and the order may be readily reversed depending on the case's peculiar circumstances. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009); *L.A. Cnty. V. Rettele*, 550, U.S. 609, 616, 127 S. Ct. 1898, 1994, 167 L. Ed. 2d 974, (2007) (per curium).

"indefinite commitment of a criminal defendant solely on account of his incompetency to stand trial" cannot be "square[d] with the Fourteenth Amendment's guarantee of due process." *Jackson v. Indiana*, 406 U.S. 715, 731, 92 S. Ct. 1845, 1855, 32 L. Ed. 2d 435 (1972). However, under the Constitution, "it is always true of probationers (as we have said it to be true of parolees) that they do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Griffin v. Wisconsin*, 483 U.S. 868, 874, 107 S. Ct. 3164, 3169, 97 L. Ed 709 (1987) (internal quotation marks omitted) (relying on *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S. Ct. 2593, 2600, 33 L. Ed. 2d 484 (1972)). To pass constitutional muster, the conditions of supervised release or conditional probation "must be reasonably related to the history and characteristics of the defendant and must impose no greater deprivation of liberty than reasonably necessary to deter criminal conduct and protect the public." *United States v. Knight*, 86 F. App'x 2, 4 (5th Cir. 2003). Indeed, rehabilitation is not the sole goal; the public's protection is an equally weighty and occasionally overriding one. *See, e.g.*, *United States v. Bortels*, 962 F.2d 558, 560 (6th Cir. 1992); *accord United States v. Balderas*, 358 F. App'x 575, 579 (5th Cir. 2009). In addition, while the termination of such person's liberty "calls for some orderly process, however informal," only "some informal procedural guarantees" are required. *Morrissey*, 408 U.S. at 482. In particular, the Due Process Clause is satisfied when a preliminary hearing takes place near the time of the parolee's arrest and detention so as "to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions." *Henderson v. Simms*, 223 F.3d 267, 274 (4th Cir. 2000).

Acknowledging this jurisprudence, court after court has refused to declare as unconstitutional statutes that authorize the arrest of a person found NGRI upon his or her

violations of the conditions of his or her release, assuming any such recommission is ultimately reviewable by a court of law. *See, e.g.*, *Archuleta v. Hedrick*, 365 F.3d 644, 648 (8th Cir. 2004); *Phelps v. United States*, 831 F.2d 897, 898 (9th Cir. 1987). Indeed, the constitutionality of a federal statute so allowing has been repeatedly upheld, *see, e.g.*, 18 U.S.C. §§ 4243(g), 4246; *Cochran v. Dysart*, 965 F.2d 649, 649 (8th Cir. 1992), as have been several states' own conditional probation strictures, *see, e.g.*, *Grass v. Reitz*, 643 F.3d 579 (8th Cir. 2011). Pursuant to this extensive jurisprudence, as any arrest under Articles 658 and 899 is subject to judicial review, *see supra* Part II.A.2, neither provision can be deemed facially unconstitutional. LA. CODE CRIM. PROC. arts. 658, 899E. Like their federal equivalent, these articles systemize a program for conditional release and contain both a "statutory procedure" and "a substantive standard" that, in the words of another circuit, "are clearly constitutional." *Archuleta*, 365 F.3d at 648; *cf. Taylor v. San Diego Cnty.*, 800 F.3d 1164, 1170 (9th Cir. 2015) (affirming the constitutionality of a conditional release statute, the Sexually Violent Predator Act, for it did "not create a capricious custody scheme in violation of equal protection tenets").

Second, several questions of material fact render it impossible to conclude that Defendants unquestionably and necessarily violated the ADA. Generally, "[t]he ADA prohibits discrimination because of disability, not inadequate treatment for disability." *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010). Thusly interpreted by sundry courts, the ADA is not violated by a prison failing to attend to the medical needs of its disabled prisoners. *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 121, 123 (7th Cir. 1997) (as to Section 504); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) (as to the ADA); *see also, e.g.*, *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 284 (1st Cir. 2006). Furthermore, under the ADA, a demand for "reasonable accommodations to assure access to an existing program" is cognizable, but a

demand for "additional or different substantive benefits" is not. *Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000). Finally, whether a covered entity has failed to interact in good faith and thus failed to reasonably accommodate a qualified individual is considered an ineradicably factual query, one that can often preclude summary judgment. *See Lowe v. Indep. Sch. Dist. No. 1*, 363 F. App'x 548, 552 (10th Cir. 2010) (as to an employer).

Unfortunately for the success of Plaintiff's MSJ, these principles may yet exempt them from liability in this proceeding. As the apparent facts alone suggest, Defendants' failure to provide Plaintiff with adequate mental health care related not to his disability but the state's limited resources and his seeming danger to the broader public. (Doc. 103-2 ¶ 35 at 8; Doc. 74-3 at 2; Doc. 76-21 at 3–4.) In fact, even Plaintiff concedes his behavior was "threatening" and his "outbursts" frequent. (*See, e.g.*, Doc. 1 at 11.) As such, for a certain reasonable factfinder, Plaintiff's confinement could still be viewed as based not on an intentional disregard for his disability but on an increasingly violent pattern of conduct for which the state's existing facilities at the time of his outbursts were insufficient or unavailable. If a jury so believes, no discrimination under the ADA could be proved, Plaintiff's non-accommodation the product of something besides the ADA's forbidden motive. *Cf. Emmett v. Kwik Lok Corp.*, 528 F. App'x 257, 261 (3d Cir. 2013) ("[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

Similarly, it is presently impossible to conclude that Defendants treated Plaintiff any differently than others determined to be NGRI and who pose a seeming danger to the public and lack the means to obtain private treatment. (*See* Doc. 94 at 4.) Had such incontrovertible evidence been presented, liability may have been inescapable, for Defendants' failure to accommodate a deeply sick man would have been predicated purely on their intent to

discriminate against this state's disabled. For now, however, other reasons, including purported concerns for the public's safety, may explain Defendants' actions. Thus, no such liability can be found as a matter of unquestionable law and fact. Accordingly, genuine issues of fact and law persist, and summary judgment cannot issue.

### B.    *Defendants' MSJ*

With one ostensible exception,[10] Defendants' multipronged MSJ contains similar evidentiary issues.

First, Defendants read the doctrine of sovereign immunity too broadly. True, Section 1983 did not obviate the states' sovereign immunity, as guaranteed by the Eleventh Amendment.[11] However, as permitted by precedent, *Ex parte Young*, 209 U.S. at 152; *accord Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 530 n.24 (1st Cir. 2009), Plaintiff is suing certain Defendants in their official capacities for injunctive relief as to his constitutional claims, (*See, e.g.*, Doc. 1 at 13; Doc. 42 at 19; Doc. 74-3 at 8–9). Other defendants, from Tubbs to Vosburg, were directly and personally involved in his confinement; as a matter of law, they can be sued in their individual capacities. *See, e.g.*, *Hafer v. Melo*, 502 U.S. 21, 29–30, 112 S. Ct. 358, 363, 116 L. Ed. 2d 301 (1991); *Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S. Ct. 1683, 1687, 40 L. Ed. 2d 90 (1974), *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984).

---

[10] By denying the Plaintiff's MSJ, *see supra* Part III.A, this Court has, in effect, endorsed Defendants' argument about the facial constitutionality of Articles 658 and 899. Whether these laws, as applied, violate the Plaintiff's constitutional rights is a separate issue.

[11] No such bar applies to the Plaintiff's ADA claims. *United States v. Georgia*, 546 U.S. 151, 159, 126 S. Ct. 877, 881, 163 L. Ed. 2d 650 (2006). This Court notes that this confusion may have been the result of Plaintiff's drafting. (*See* Doc. 42 at 2.)

Moreover, as the Complaint intimates, Plaintiff has advanced a theory of liability predicated on *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), a long-recognized exception to various state actor's otherwise broad immunity from suit. *See, e.g.*, *Owens v. Balt. City State's Attys. Office*, 767 F.3d 379, 402–03 (4th Cir. 2014); *see also, e.g.*, *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 1388, 137 L. Ed. 2d 626 (1997). He has alleged—and Articles 658 and 899 readily bear this out—that Defendants, individually and collectively, followed a policy in which disabled persons subject to conditional release were incarcerated without regard for their proven medical needs, (*See, e.g.*, Doc. 1 at 1–4; Doc. 42 at 17–18.) Assuming this allegation can be proven, the Eleventh Amendment would pose no hurdle to this suit's success.

Second, Defendants' qualified immunity cannot, as of yet, be firmly established. Unquestionably, this doctrine shields defendants from liability if a constitutional right is not clearly established and their actions are objectively reasonable. *See supra* Part II.A.4. Yet, for two reasons, Defendants have sought to invoke it too early. First, if the constitutional right is clear and it has been violated, no immunity rightly attaches, *see, e.g.*, *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001), and invocation of state law will not absolve any official of blame for such unconstitutional misconduct, *cf. Hollihan v. Pa. Dep't of Corr.*, No. 3:15-CV-5, 2016 U.S. Dist. LEXIS 6318, at *21, 2016 WL 235003, at *8 (M.D. Pa. Jan. 20, 2016). Here, as precedent declares, "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection," and "[t]he Due Process Clause requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jones*, 463 U.S. at 368. Because violation of this very right girds

Plaintiff's constitutional arguments, qualified immunity cannot be rightfully claimed at the summary judgment stage.

Second, establishing whether a defendant's actions were objectively reasonable is uniformly described as "a fact-intensive inquiry." *Sales*, 2004 WL 2781752, at *16. As a consequence, courts have therefore been unsurprisingly reluctant to find qualified immunity applicable on summary judgment. *See, e.g.*, *Dorsett-Felicelli*, 371 F. Supp. 2d at 193.[12] So far, having assembled much credible evidence, Plaintiff has alleged that Tubbs, Sparks, and others fully knew (or should have known) of the medical consequences of his disability and that LeBlanc, Gee, and Gibbs knowingly enforced a system dedicated to imprisonment rather than treatment, thereby ignoring the body of law spawned by *Jones*. If this reasonably colorable contention is later believed and Defendants' protestations to the contrary are disbelieved, a jury may yet find none of Defendants' actions to be objectively reasonable. As long as that reasonable possibility remains, no Defendant may enjoy the privilege of qualified immunity at the summary judgment stage. .

Third, Defendants predicate their motion upon an unduly narrow reading of the ADA. To "win" his disability case at this stage, Plaintiff needed to show no more than that a reasonable jury could conclude that his sundry disorders rendered him disabled, that his disability substantially impaired his ability to perform a wide class of positions, and that Defendants failed to provide him with a reasonable accommodation. *Chambers ex rel. Chambers v. Sch. Dist. of*

---

[12] For this same reason, this Court denies Defendants' request that Plaintiff's claim for punitive damages be dismissed. Quite simply, the evidence presented could allow a reasonable jury to find that Defendants' conduct and/or policy was animated by a callous and reckless indifference to the due process rights of a person adjudicated NGRI. According to Plaintiff, he was denied mental health care with no legal or factual justification and never afforded the kind of care and accommodation to which the law entitles him. It remains reasonably possible that a jury could find this approach to a deeply troubled man for whom Defendants were obliged to provide care, resulted from the kind of callousness that punitive damages are intended to punish.

*Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009). So long as the factual evidence so far assembled can support these allegations, Rule 56 compels the denial of the Defendants' MSJ as to Plaintiff's ADA claim.

Here, two facts, attested to by the existing record, show why such denial must follow. First, Plaintiff's mental state left him unable to live successfully without consistent treatment and medical supervision. Crucially, this need for a particular medical regimen appears in documents produced and accessed by CFS, DHH, Tubbs, and others; indeed, the state court itself made extensive and expansive medical treatment an explicit term of Plaintiff's conditional release. *See supra* Part II.A. Whether ignored in favor of a more punitive policy or pure happenstance, ample evidence of Plaintiff's perilous condition and his certain needs lay, ready and clear, in multiple files of the Defendants.

Second, despite this fact, Tubbs and Starks sent Plaintiff to prisons in which he did not receive this essential treatment and did so pursuant to a state statute. Regardless of these persons' precise reason, and despite DHH's responsibility over these matters, LA. CODE CRIM. PROC. art. 658B(2), Plaintiff was deposited in a prison in which such services were unavailable. Even if overwhelmed, other facilities that do provide such services arguably existed. *See supra* Part II.A. Certainly, even if such other entities could not accommodate Plaintiff, the ADA would still have been violated by such deliberate actions, for it requires "reasonable accommodations to *assure access* to an existing programs." *Wright*, 230 F.3d at 548 (emphasis added).

One more arguable violation merits emphasis. Pursuant to the ADA, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service,

program, or activity," 28 C.F.R. § 35.130(b)(7); 42 U.S.C. § 12182(b)(2)(A)(ii); *PGA Tour, Inc.*, 532 U.S. at 682. Material issues of fact exist as to whether such reasonable and necessary modifications were available and should have been made. In sum, if a reasonable jury found Plaintiff's allegations to be true, Defendants may rightly be found liable under the ADA. Defendants' motion for summary judgment on this issue must therefore be denied.


IV.   **CONCLUSION**

As the record in this case reveals, with discovery complete and on the eve of trial on the merits, much remains unsettled, and genuine issues of material fact continue to be unresolved. Indeed, only one dispute can truly be decided: based on well-settled jurisprudence, Articles 658 and 899 must be declared facially constitutional. Accordingly, for these reasons, this Court DENIES the Plaintiff's Motion for Partial Summary Judgment, (Doc. 76), and the Defendants' Motion for Summary Judgment, (Doc. 74).

Signed in Baton Rouge, Louisiana, on June 23, 2016.


**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**