1  UNITED STATES DISTRICT COURT

2  MIDDLE DISTRICT OF LOUISIANA

3

4  TRUSSELL GEORGE, BY AND THROUGH    : CIVIL ACTION
   HIS GUARDIAN AD LITEM, LETETICA
5  WALKER

6  VERSUS                            : NO. 14-CV-338

7  LOUISIANA DEPARTMENT OF PUBLIC
   SAFETY AND CORRECTIONS, ET AL     : HON. JOHN W. DEGRAVELLES
8

9                                    : JUNE 28, 2016

10 ================================================================

11                 JURY TRIAL VOL II OF III

12 ================================================================

13              A P P E A R A N C E S

14 FOR TRUSSELL GEORGE

15    MR. RONALD K. LOSPENNATO
      MS. LAURA LEE THORNTON
16    MS. ELLEN HAHN
      KATHRYN FERNANDEZ
17    ADVOCACY CENTER
      8325 OAK STREET
18    NEW ORLEANS, LOUISIANA 70118

19

20 FOR LA. DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, ET AL:

21    MR. JAMES L. HILBURN
      MR. JEFFREY K. CODY
22    SHOWS, CALI & WALSH, LLP
      628 ST. LOUIS STREET
23    BATON ROUGE, LOUISIANA 70821-4425

24

25

1    APPEARANCES CONTINUED:

2

3        MS. JENNA G. YOUNG
         LA. DEPARTMENT OF HEALTH & HOSPITALS
4        P.O. BOX 3836
         BATON ROUGE, LOUISIANA   70821
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22           REPORTED BY: GINA DELATTE-RICHARD,CCR

23    ─────────────────────────────────────────────

24             UNITED STATES COURTHOUSE
                 777 FLORIDA STREET
25           BATON ROUGE, LOUISIANA 70801
                  (225) 389-3564

*PLAINTIFF'S WITNESSES:*

ERIC BRADY

    CONT. DIRECT BY MS. FERNANDEZ.............. 14

DR. DELANEY SMITH

    DIRECT BY MR. LOSSPENNATO................. 25

    CROSS BY MR. HILBURN...................... 43

    REDIRECT BY MR. LOSSPENNATO............... 57

DR. CLAY KELLY

    DIRECT BY MR. LOSSPENNATO................. 64

    CROSS BY MR. CODY......................... 86

    REDIRECT BY MR. LOSSPENNATO............... 98

LISA BURNS

    DIRECT BY MS. FERNANDEZ...................105

    CROSS BY MR. HILBURN......................140

    REDIRECT BY MS. FERNANDEZ.................147

BRAD MCCONVILLE

    DIRECT BY MR. LOSSPENNATO.................154

STEPHANIE HOPE

    DIRECT BY MR. LOSSPENNATO.................174

    CROSS BY MR. HILBURN......................196

    REDIRECT BY MR. LOSSPENNATO...............204

PLAINTIFF RESTS.................................207

COURT'S EXAMINATION OF MR. TUBBS...............208

    BY MR. LOSSPENNATO........................211

    BY MR. CODY...............................212

**COURT'S EXAMINATION OF MR. BRADY**. . . . . . . . . . . . . . . 213

BY MR.  LOSSPENNATO. . . . . . . . . . . . . . . . . . . . . . . 217

BY MR.  HILBURN. . . . . . . . . . . . . . . . . . . . . . . . . 218

1    *GEORGE V. LA. DEPT. OF SAFETY & CORRECTIONS, ET AL 06/28/16*

2    **REPORTER'S NOTE:**   (AT THIS TIME TRIAL RESUMED AND

3    ALL PARTIES ARE PRESENT.)

4    **THE COURT:**   GOOD MORNING, EVERYONE.   LET'S BE SEATED

5    FOR ONE SECOND.

6    JUST TO MENTION AGAIN THAT WE HAVE THE TRIAL

7    STIPULATIONS.   YOU NEED TO LET ME KNOW TWO THINGS:   ONE, WHEN

8    DO YOU WANT IT READ, IF YOU WANT IT READ TO THE JURY?   TWO, DO

9    YOU WANT ME TO READ IT OR DO YOU WANT TO READ IT?   AND THREE,

10   DO YOU WANT THE STIPULATIONS INTRODUCED AS A SEPARATE EXHIBIT?

11   BECAUSE I RULED IN ANOTHER CASE RECENTLY WHERE IT WASN'T

12   INTRODUCED AS AN EXHIBIT, THEN I SAID, "YOU DIDN'T INTRODUCE

13   IT AS AN EXHIBIT," SO THEY GOT THE STIPULATION VERBALLY, BUT

14   IT'S NOT IN EVIDENCE.   AND SO YOU'RE GOING TO HAVE TO DECIDE

15   HOW YOU WANT TO HANDLE THAT.   ANY ANSWERS ON THOSE THREE

16   QUESTIONS?

17   **MR. LOSPENNATO:**   YOUR HONOR, I WOULD LIKE TO ENTER

18   IT AS AN EXHIBIT, AND IF YOU DON'T MIND, I WOULD LIKE YOU TO

19   READ IT TO THE JURY.

20   **THE COURT:**   ALL RIGHT.   AND WHEN WOULD YOU LIKE ME

21   TO DO THAT?

22   **MR. LOSPENNATO:**   MIGHT AS WELL DO IT FIRST THING

23   THIS MORNING.

24   **THE COURT:**   ANY OBJECTIONS, MR. HILBURN?

25   **MR. HILBURN:**   NO, YOUR HONOR, I WAS GOING TO SUGGEST

1 | THE SAME THING.

2 |      **THE COURT:**  OKAY, GOOD.  AND THEN WE HAVE MR. BRADY

3 | READY TO RESUME THE STAND ONCE THAT'S DONE; IS THAT CORRECT?

4 |      **MR. HILBURN:**  YES, SIR, HE'S HERE AND READY TO

5 | RESUME.  DO YOU WANT TO READ THE STIPULATION?

6 |      **THE COURT:**  YES, WE CAN READ THE STIPULATION FIRST.

7 | AS SOON AS I'M DONE, WE'LL PUT HIM BACK ON THE STAND AND WE'LL

8 | ROLL.

9 |      OKAY.  WELL, LET'S GET THE JURY IN.

10 |      WHAT EXHIBIT NUMBER WILL THAT BE?

11 |      **MR. LOSPENNATO:**  IT CAN BE PLAINTIFF'S EXHIBIT 24.

12 |      **THE COURT:**  TWENTY-FOUR.  OKAY, THANK YOU.  MR.

13 | HARRIS.  LET'S GET THEM IN.

14 |      **REPORTER'S NOTE:**  (WHEREUPON THE JURY RETURNED TO

15 | THE COURTROOM.)

16 |      **THE COURT:**  ALL RIGHT.  YOU MAY BE SEATED.

17 |      GOOD MORNING, LADIES AND GENTLEMEN.  I HOPE

18 | EVERYBODY GOT A GOOD REST.  WE'RE GOING TO INTERRUPT FOR A

19 | MOMENT THE TESTIMONY OF MR. BRADY TO READ TO YOU WHAT'S CALLED

20 | A "TRIAL STIPULATION."  AND I'LL EXPLAIN TO YOU WHAT THAT

21 | MEANS.  WHEN THE PARTIES GET TOGETHER AND AGREE ABOUT CERTAIN

22 | THINGS, THEN THAT'S CALLED A STIPULATION AND WHEN THE

23 | STIPULATION IS AGREED TO AND READ TO THE JURY, YOU HAVE TO

24 | ACCEPT THAT AS FACT, FOLKS.  THEY'RE NOT ARGUING ABOUT THIS,

25 | OKAY?  SO THIS IS SOMETHING THEY AGREE TO BE AS FACT, SO YOU

1 │ MUST ACCEPT IT AS FACT.

2 │       IN ADDITION TO READING IT -- AND IT'S VERY LONG --

3 │ SO AGAIN, I APPRECIATE YOUR CLOSE ATTENTION TO ALL OF THIS.

4 │ BUT TO ASSIST YOU, IT'S BEEN INTRODUCED AS AN EXHIBIT, SO THAT

5 │ WHEN YOU BEGIN YOUR DELIBERATIONS, YOU'LL HAVE ACCESS TO THIS.

6 │ THIS IS PLAINTIFF'S EXHIBIT NUMBER 24.  SO DO LISTEN TO WHAT

7 │ I'M SAYING, BUT YOU WILL ALSO, IN ADDITION, HAVE IT AS AN

8 │ EXHIBIT WHEN YOU BEGIN YOUR DELIBERATIONS.

9 │       TRIAL STIPULATIONS.  THE PARTIES HAVE STIPULATED OR

10 │ AGREE THAT THE FOLLOWING STATEMENTS ARE FACTS.  YOU WILL,

11 │ THEREFORE, TAKE THESE FACTS TO BE TRUE FOR PURPOSES OF THIS

12 │ CASE.  ONE, PLAINTIFF TRUSSELL GEORGE, JR., IS A PERSON WITH A

13 │ MENTAL ILLNESS WHO HAS BEEN FOUND NOT GUILTY BY REASON OF

14 │ INSANITY TO A CRIMINAL OFFENSE.  MR. GEORGE HAS BEEN DIAGNOSED

15 │ WITH SCHIZOPHRENIA AND MILD MENTAL RETARDATION AMONG OTHER

16 │ DIAGNOSES.

17 │       TWO, ON DECEMBER 15, 2008, THE COURT HAVING

18 │ JURISDICTION OVER MR. GEORGE'S CRIMINAL CHARGES, THE 19TH

19 │ JUDICIAL DISTRICT COURT IN EAST BATON ROUGE PARISH, ORDERED

20 │ THAT HE BE CONDITIONALLY RELEASED PURSUANT TO THE LOUISIANA

21 │ CODE OF CRIMINAL PROCEDURE, ARTICLE 657.1, FOR A PERIOD OF

22 │ FIVE YEARS.  IN ORDERING MR. GEORGE'S CONDITIONAL RELEASE, THE

23 │ COURT ESTABLISHED VARIOUS CONDITIONS IN THE ORDER.  FROM

24 │ DECEMBER 2008 TO MAY 2014, MR. GEORGE RESIDED IN GROUP HOMES

25 │ OPERATED BY PROGRESSIVE HEALTH CARE PROVIDERS, PHP, LOCATED IN

1   BATON ROUGE, LOUISIANA.

2   FIVE, WHILE LIVING IN GROUP HOMES, MR. GEORGE WAS

3   UNDER THE SUPERVISION OF THE DIVISION OF PROBATION AND PAROLE

4   AND THE LOUISIANA DEPARTMENT OF SAFETY AND CORRECTIONS AND

5   COMMUNITY FORENSIC SERVICES, CFS, OF THE LOUISIANA DEPARTMENT

6   OF HEALTH AND HOSPITALS, HAVING BEEN FOUND NOT GUILTY BY

7   REASON OF INSANITY TO THE CHARGE OF POSSESSION OF A WEAPON BY

8   A FELON.   DEFENDANT, LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND

9   CORRECTIONS, IS THE STATE AGENCY RESPONSIBLE FOR MONITORING

10  PERSONS PLACED ON CONDITIONAL RELEASE OR PROBATION.   THE

11  DIVISION OF PROBATION AND PAROLE, WHICH SUPERVISES

12  MR. GEORGE'S CONDITIONAL RELEASE, IS LOCATED WITHIN THE

13  DEPARTMENT.

14  SEVEN, WITH RESPECT TO INDIVIDUALS PLACED ON

15  CONDITIONAL RELEASE PURSUANT TO LOUISIANA CODE OF CRIMINAL

16  PROCEDURE ARTICLE 657, THE DIVISION OF PROBATION AND PAROLE

17  ENSURES THAT THE GENERAL AND SPECIAL CONDITIONS OF THE ORDERED

18  SUPERVISION ARE FOLLOWED FOR EACH SUPERVISEE.   ITS EMPLOYEES

19  MAKE PERSONAL CONTACT WITH THE SUPERVISEES PURSUANT TO THE

20  DIVISION OF PROBATION AND PAROLE'S POLICIES WHEN OTHERWISE --

21  AND WHEN OTHERWISE NECESSARY.   THE AGENCY IS RESPONSIBLE FOR

22  MONITORING SUPERVISEES FOR COMPLIANCE AND CONDITIONS,

23  ADDRESSING ANY ISSUES REQUIRED BY THE COURTS, CONSULTING WITH

24  THE FORENSIC COORDINATOR, DRUG TESTING SUPERVISEES, AND

25  ARRESTING SUPERVISEES.

1   EIGHT, DEFENDANT JAMES N. LEBLANC IS SECRETARY OF

2   THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS.

3   PURSUANT TO LOUISIANA REVISED STATUTE 36:403, HE IS

4   RESPONSIBLE FOR THE ADMINISTRATION, CONTROL AND OPERATION OF

5   THE FUNCTIONS, PROGRAMS AND AFFAIRS OF THE DEPARTMENT.

6   NINE, DEFENDANT WHALEN GIBBS IS THE ASSISTANT

7   SECRETARY OF THE LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND

8   CORRECTIONS.  AS SUCH, HE DIRECTS THE OPERATIONS OF THE

9   LOUISIANA DIVISION OF PROBATION AND PAROLE.  PURSUANT TO

10   LOUISIANA REVISED STATUTE 15:574.11A, THE DIVISION OF

11   PROBATION AND PAROLE PROVIDES FOR THE INVESTIGATION AND

12   SUPERVISION OF ADJUDICATED ADULT OFFENDERS.

13   ALSO, PURSUANT TO LOUISIANA CODE OF CRIMINAL

14   PROCEDURE, 658B-1, THE DIVISION IS CHARGED WITH SUPERVISING

15   INDIVIDUALS WHO HAVE BEEN PLACED ON CONDITIONAL RELEASE

16   FOLLOWING A FINDING OF NOT GUILTY BY REASON OF INSANITY.

17   TEN, DEFENDANT GERALD STARKS IS THE DIRECTOR OF THE

18   LOUISIANA DIVISION OF PROBATION AND PAROLE.  AS SUCH, HE

19   ASSISTS IN THE ADMINISTRATION, DEVELOPMENT AND IMPLEMENTATION

20   OF POLICIES OF THE DIVISION OF PROBATION AND PAROLE.

21   ELEVEN, SCOTT TUBBS IS AN EMPLOYEE OF THE LOUISIANA

22   DIVISION OF PROBATION AND PAROLE.

23   TWELVE, DEFENDANT REBEKAH E. GEE, THAT'S G-E-E, IS

24   THE SECRETARY OF THE LOUISIANA DEPARTMENT OF HEALTH AND

25   HOSPITALS, DHH.  PURSUANT TO LOUISIANA REVISED STATUTE 36:254,

1   SHE IS RESPONSIBLE FOR THE OVERSIGHT, SUPERVISION AND CONTROL

2   OF DHH AND ITS DIVISIONS AND IS ULTIMATELY RESPONSIBLE FOR

3   ENSURING THAT DHH'S SERVICES FOR PEOPLE WITH DISABILITIES --

4   LET ME READ THAT AGAIN BECAUSE I'M NOT SURE I'M READING IT

5   RIGHT.

6        DEFENDANT REBEKAH E. GEE IS THE SECRETARY OF THE

7   LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS, DHH.   PURSUANT

8   TO LOUISIANA REVISED STATUTE 36:254, SHE IS RESPONSIBLE FOR

9   THE OVERSIGHT, SUPERVISION AND CONTROL OF DHH AND ITS

10  DIVISIONS AND IS ULTIMATELY RESPONSIBLE FOR ENSURING THAT

11  DHH'S SERVICES FOR PEOPLE WITH DISABILITIES ARE PROVIDED IN

12  CONFORMANCE WITH FEDERAL LAW.

13        THIRTEEN, LOUISIANA -- I'M SORRY, DEFENDANT,

14  LOUISIANA DEPARTMENT OF HEALTH AND HOSPITALS, DHH, IS A STATE

15  AGENCY WHICH OPERATES THE CFS PROGRAM AND EASTERN LOUISIANA

16  MENTAL HEALTH SYSTEM, ELMHS, IN JACKSON, LOUISIANA.   ERIC

17  BRADY IS EMPLOYED AS A DISTRICT FORENSIC COORDINATOR, DFC, BY

18  THE DHH.   CHARLES V.  VOSBURG IS A CONSULTANT TO COMMUNITY

19  FORENSIC SERVICES OF DHH.

20        SIXTEEN, DEFENDANTS, DEPARTMENT OF HEALTH AND

21  HOSPITALS, DHH, AND LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND

22  CORRECTIONS, LDPSC, RECEIVE FEDERAL FINANCIAL ASSISTANCE AND

23  ARE PUBLIC ENTITIES AS DEFINED BY 42 UNITED STATES CODE,

24  SECTION 12:131 1B.

25        SEVENTEEN, AFTER PLAINTIFF, TRUSSELL GEORGE --

1   PLAINTIFF, TRUSSELL GEORGE'S, ARREST, HE WAS INCARCERATED FROM

2   JULY 29, 2013 TO AUGUST 23RD, 2013 AT EAST BATON ROUGE PARISH

3   PRISON.  ON MAY 14, 2014, THE 19TH JUDICIAL DISTRICT COURT IN

4   EAST BATON ROUGE PARISH EXTENDED PLAINTIFF GEORGE'S

5   CONDITIONAL RELEASE TO DECEMBER 14, 2014.

6        NINETEEN, PLAINTIFF GEORGE WAS RELEASED FROM EAST

7   BATON ROUGE PARISH PRISON AND PLACED BACK AT EAST LOUISIANA

8   MENTAL HEALTH SYSTEM, ELMHS, ON AUGUST 25TH, 2014.  PLAINTIFF

9   GEORGE WAS NOT CHARGED WITH ANY CRIME AT ALL DURING THE 55

10  DAYS HE WAS INCARCERATED BETWEEN JULY 1ST AND AUGUST 25TH,

11  2014.  THAT'S NUMBER 20.

12       TWENTY-ONE, AT A HEARING ON SEPTEMBER 23RD, 2014,

13  THE 19TH JUDICIAL DISTRICT COURT IN EAST BATON ROUGE PARISH,

14  JUDGE RICHARD MOORE PRESIDING, ORDERED THAT MR. GEORGE REMAIN

15  AT ELMHS AND THAT HIS PLACEMENT BE REVIEWED AT A HEARING

16  SCHEDULED FOR DECEMBER 11, 2014.

17       FURTHER, DEFENDANTS HAVE AGREED TO THE ADMISSION OF

18  THE FOLLOWING EXHIBITS BY PLAINTIFF:  ONE, EXHIBIT NUMBER 1,

19  INITIAL CONDITIONAL DISCHARGE ORDER, 19TH JUDICIAL DISTRICT

20  COURT EAST BATON ROUGE.  THAT IS DATED 12/15/2008.

21       TWO, LETTER TO JUDGE MOORE FROM ERIC BRADY: INCIDENT

22  REPORT, TG PEC TO GREENWELL SPRINGS, DATED 06/22/2009.

23       EXHIBIT 3, CONDITIONAL RELEASE, MONTHLY REVIEW,

24  07/31/09, AND THAT IS DATED 07/31/2009.  EXHIBIT 4, LETTER TO

25  JUDGE MOORE FROM ERIC BRADY AND MICHELLE DUNCAN, STATUS OF TG

1   CONDITIONAL DISCHARGE, DATED 12/10/2009.

2   FIVE, LETTER TO JUDGE MOORE FROM ERIC BRADY,

3   INCIDENT REPORT, HOSPITALIZATION AT OUR LADY OF THE LAKE AND

4   CYPRESS, 03/23/2010 IS THE DATE OF THE DOCUMENT.

5   EXHIBIT 6, LETTER TO JUDGE MOORE FROM ERIC BRADY.

6   INCIDENT REPORT FOLLOWING HOME PASS WITH TG'S MOTHER ON THE

7   WEEKEND OF HIS BIRTHDAY, DATED 10/26/2010.   SEVEN, DFC STATUS

8   REPORT, DATED 10/14/2011.   EXHIBIT 8, LETTER TO JUDGE MOORE

9   FROM ERIC BRADY, INCIDENT REPORT REGARDING VERBAL AGGRESSION

10  AND THREATS DIRECTED AT DIRECT CARE STAFF AT GROUP HOME, AND

11  THAT'S DATED MAY 23RD, 2013.

12  EXHIBIT 9, LETTER TO JUDGE MOORE FROM SCOTT TUBBS

13  REQUESTING A REVIEW HEARING TO ADDRESS TG'S EXPIRATION DATE

14  AND VIOLATIONS.   IT'S DATED 06/10/2013.   EXHIBIT 10, LETTER TO

15  PROGRESSIVE NOTIFYING THEM THAT TG WILL BE ARRESTED TODAY.

16  (07/29/13), AND THE DATE OF THE DOCUMENT IS 07/29/13.

17  EXHIBIT 11, DETAINER NOTIFICATION AND AFFIDAVIT OF

18  PROBABLE CAUSE AND MOTION TO REVOKE PROBATION.   THE DATE OF

19  THE DOCUMENT IS 08/12/2013.   EXHIBIT 12, DFC STATUS REPORT.

20  THE DATE OF DOCUMENT IS 12/05/2013.

21  THIRTEEN, ELMHS, DISCHARGE SUMMARY BY C. KELLY.

22  DATE OF DOCUMENT IS 07/13/2014.   EXHIBIT 14, FORENSIC EPISODE

23  REPORT.   DATE OF DOCUMENT IS 08/22/2014.   EXHIBIT 15,

24  CONDITIONAL RELEASE MONTHLY REVIEW BY ERIC BRADY.   DATE OF

25  DOCUMENT IS 02/29/2009 THROUGH 01/28/2015.

1   EXHIBIT 16, EAST LOUISIANA MENTAL HEALTH SYSTEM

2   CONDITION RELEASE POLICIES.   DATE OF DOCUMENT IS 02/20/2015.

3   EXHIBIT 17, EAST BATON ROUGE PARISH PRISON MEDICAL

4   RECORDS, 2013 AND 2014.   DATE OF DOCUMENT IS 03/02/2015.

5   EXHIBIT 18, CFS CONDITIONAL RELEASE MONTHLY REVIEW

6   REPORTS BY ERIC BRADY.   DATE OF DOCUMENT, 02/2011 THROUGH

7   AUGUST 2014.   EXHIBIT 19, NARRATIVE REPORT, RAY TRUSSELL

8   GEORGE, PROVIDED BY SCOTT TUBBS, CREATED 09/17/2014.   THE DATE

9   OF THE DOCUMENT IS FROM 01/26/2009 TO SEPTEMBER 2ND, 2014.

10   EXHIBIT 20, TRANSMISSION REPORT FOR LETTER TO

11   SHERIFF SID GAUTREAUX PROVIDED BY SCOTT TUBBS.   DATE OF

12   DOCUMENT, 07/01/2014.   EXHIBIT 21, PROBATION SUPERVISION BRD,

13   PROVIDED BY SCOTT TUBBS.   DATE OF DOCUMENT 01/26/2009.

14   EXHIBIT 22, CONDITIONAL RELEASE ORDER FROM THE 19TH JUDICIAL

15   DISTRICT COURT.   DATE OF DOCUMENT, 02/03/2016.

16   EXHIBIT 23, PHOTOGRAPHS OF PLAINTIFF TRUSSELL

17   GEORGE, DATES 2008 THROUGH THE PRESENT.   RESPECTFULLY

18   SUBMITTED THIS 27TH DAY OF JUNE 2016 AND SIGNED BY THE

19   ATTORNEYS FOR BOTH THE PLAINTIFFS -- THE PLAINTIFF AND THE

20   DEFENDANTS.

21   ALL RIGHT.   ANYTHING FURTHER BEFORE WE RESUME

22   TESTIMONY?

23   **MR. LOSPENNATO:**   NO, YOUR HONOR.

24   **THE COURT:**   ALL RIGHT.   MR. BRADY, YOU MAY COME

25   FORWARD, AND I'LL REMIND YOU, YOU'RE STILL UNDER OATH.

1        **THE WITNESS:**  YES, SIR.

2   **BY MS. FERNANDEZ:**

3        **Q**    GOOD MORNING, MR. BRADY.

4        **A**    GOOD MORNING.

5        **Q**    I'D LIKE TO PICK UP RIGHT WHERE WE LEFT OFF.  WE

6   WERE TALKING ABOUT MR. GEORGE'S JULY 29, 2013 ARREST.  UPON

7   MR. GEORGE'S ARREST, HE WAS TAKEN TO THE PARISH PRISON WHERE

8   HE WAS KEPT IN SOLITARY CONFINEMENT; IS THAT CORRECT?

9        **A**    SINGLE CELL LOCKDOWN IS MY UNDERSTANDING.

10       **Q**    SINGLE CELL LOCKDOWN?

11       **A**    YES, MA'AM.

12       **Q**    YOU DON'T RECALL GOING TO SEE MR. GEORGE IN JAIL IN

13  2013, DO YOU?

14       **A**    WHEN I ATTEMPTED TO GO TO VISIT HIM, MY

15  UNDERSTANDING IS HE WAS DISCHARGED, AND THAT WAS WITHIN 30

16  DAYS.

17       **Q**    SO YOU DID NOT SEE MR. GEORGE IN JAIL IN 2013?

18       **A**    WHEN I ATTEMPTED TO CALL --

19       **Q**    I'M SORRY, MR. BRADY, WAS THAT A YES OR NO?

20       **A**    WELL, THE ANSWER IS NO, BUT THE FOLLOW-UP ANSWER TO

21  THAT IS I ATTEMPTED TO GO AND SEE HIM, TO SCHEDULE AN

22  APPOINTMENT THROUGH THE WARDEN TO GET ENTRANCE INTO THE

23  FACILITY, AND THEY INDICATED THAT MR. GEORGE WAS RELEASED.

24       **Q**    YOU DON'T HAVE ANY RECORD OF HAVING CONTACTED THE

25  JAIL WITH A LIST OF MR. GEORGE'S MEDICATIONS, DO YOU?

1          **A**     SAY THAT AGAIN.

2          **Q**     DO YOU HAVE ANY RECORD OF CONTACTING THE JAIL WITH A

3     LIST OF MR. GEORGE'S MEDICATIONS IN 2013?

4          **A**     I DON'T HAVE A RECORD BECAUSE I DIDN'T MAKE IT TO

5     THE JAIL WHEN I ATTEMPTED TO GO AND SEE HIM.   HE WAS

6     DISCHARGED.

7          **Q**     AND YOU DON'T HAVE A RECORD OF SPEAKING TO THE

8     PSYCHIATRIST OR THE SOCIAL WORKER ABOUT MR. GEORGE'S MENTAL

9     HEALTH OR MEDICAL NEEDS?

10         **A**     A DOCUMENTED RECORD?

11         **Q**     NO -- YES, A DOCUMENTED RECORD.

12         **A**     NO, MA'AM, I DON'T.

13         **Q**     DID YOU LEARN AT ANY POINT THAT MR. GEORGE DID NOT

14    CONSISTENTLY TAKE MEDICATION IN JAIL?

15         **A**     I UNDERSTOOD THAT WHEN I ATTEMPTED TO GO TO THE JAIL

16    TO REVIEW TO SEE HOW MR. GEORGE WAS DOING, HE WAS DISCHARGED.

17         **Q**     DID YOU KNOW ANYTHING ABOUT WHETHER MR. GEORGE WAS

18    TAKING HIS MEDICATION IN JAIL OR NOT?

19         **A**     NO, MA'AM, I DON'T.

20         **Q**     JAILS CANNOT FORCE INMATES TO TAKE MEDICATION, CAN

21    THEY?

22         **A**     THAT'S MY UNDERSTANDING, THAT'S CORRECT.   THE

23    INMATES HAVE A -- THEY CAN SAY YEA OR NAY IF THEY WANT TO TAKE

24    THE MEDICATION.   THEY CAN'T FORCE IT, SO THAT'S CORRECT.

25         **Q**     I'D LIKE TO MOVE ON AND TALK ABOUT MR. GEORGE'S

1   RELEASE FROM JAIL IN 2013.   WHAT WAS -- YOU SAW MR. GEORGE ON

2   AUGUST 22ND, 2013, THE DAY AFTER HE WAS RELEASED; IS THAT

3   CORRECT?

4        **A**    THAT'S CORRECT.

5        **Q**    AND WHEN MR. GEORGE WAS RELEASED FROM JAIL, HE WAS

6   GROSSLY PSYCHOTIC AND OFF HIS MEDICATION, WASN'T HE?

7        **A**    THAT'S MY UNDERSTANDING.   AGAIN, I WANT TO REFERENCE

8   BACK TO THE ORIGINAL QUESTION.

9        **Q**    I'D PREFER TO JUST KEEP GOING WITH THE QUESTIONS.

10       **A**    NO PROBLEM, I UNDERSTAND.   OKAY.

11       **Q**    AND WHEN MR. GEORGE WAS RELEASED FROM JAIL, HE

12   ACTUALLY HAD TO BE TAKEN STRAIGHT TO BATON ROUGE GENERAL

13   HOSPITAL AND THEN INVOLUNTARILY COMMITTED; ISN'T THAT RIGHT?

14       **A**    THAT'S MY UNDERSTANDING, YES.

15       **Q**    SO MR. GEORGE WAS SO SICK AT THAT POINT THAT HE HAD

16   TO BE HOSPITALIZED AGAIN IN OCTOBER AND DECEMBER OF 2013; IS

17   THAT YOUR RECOLLECTION?

18       **A**    THAT'S MY RECOLLECTION.

19       **Q**    AND THEN YOU FILED A REPORT WITH THE COURT ASKING

20   FOR MR. GEORGE'S CONDITIONAL RELEASE TO BE CONTINUED FOR A

21   YEAR; IS THAT RIGHT?

22       **A**    BASED UPON WHAT WAS GOING ON WITH MR. GEORGE, YES.

23       **Q**    AND AN EXAMPLE OF THAT WOULD BE MR. GEORGE WAS

24   HAVING DELUSIONS ABOUT SNAKES AND NITROGLYCERIN BEING INJECTED

25   INTO HIS BODY; IS THAT CORRECT?

1      **A**    WELL, IT'S A LITTLE BIT MORE -- MORE INVOLVED THAN

2  THAT.   IT WAS PRIOR INCIDENTS THAT -- CONDITIONS THAT HE

3  VIOLATED THAT CAUSED US TO WARRANT TO EXTEND HIS PROBATION FOR

4  ANOTHER YEAR.

5      **Q**    DO YOU RECALL THE DELUSIONS OF MR. GEORGE HAVING

6  SNAKES AND NITROGLYCERIN BEING INJECTED INTO HIS BODY; DO YOU

7  RECALL THAT?

8      **A**    YEAH, THERE'S A REPORT ON 10-17 THAT REFLECTS THAT.

9      **Q**    AND IS THAT A SYMPTOM OF SEVERE MENTAL ILLNESS?

10     **A**    THAT'S WHAT WAS GOING ON WITH MR. GEORGE, YES,

11  MA'AM.

12     **Q**    I'M SORRY, THAT WASN'T MY QUESTION.   IS THAT A

13  SYMPTOM OF SEVERE MENTAL ILLNESS, MR. BRADY?

14     **A**    BASED UPON DR. VOSBURG'S EVALUATION -- THAT'S WHAT I

15  HAVE -- I WOULD SAY YES.

16     **Q**    SO AFTER MR. GEORGE'S CONDITIONAL RELEASE WAS

17  CONTINUED, A MONTH LATER, HE HAD TO BE HOSPITALIZED AGAIN; IS

18  THAT CORRECT, THIS TIME AT SEASIDE?

19     **A**    THAT'S MY UNDERSTANDING.

20     **Q**    AND THAT WAS FOR DELUSIONAL THINKING; IS THAT RIGHT?

21     **A**    THERE WAS SOME AGITATION THAT WAS GOING ON WITH

22  MR. GEORGE AND, OF COURSE, THE DELUSIONS, AND THE FACILITY

23  ORCHESTRATED, IF YOU WILL, FOR HIM TO GET SOME MORE TREATMENT

24  AT AN ACUTE PSYCHIATRIC HOSPITALIZATION -- HOSPITAL, I'M

25  SORRY.

1   **Q**   AND AFTER THAT HOSPITALIZATION IN JANUARY 2014,

2   MR. GEORGE WAS ULTIMATELY SENT FOR IN-PATIENT TREATMENT AT THE

3   ELMHS HOSPITAL IN JACKSON; IS THAT RIGHT?

4       **A**   THAT'S CORRECT.

5       **Q**   AND THAT WOULD HAVE BEEN MARCH 2014?

6       **A**   YES, MA'AM.

7       **Q**   AND THAT WAS BECAUSE MR. GEORGE WAS NO LONGER ABLE

8   TO FUNCTION IN THE GROUP HOME AT THAT POINT; IS THAT RIGHT?

9       **A**   WHAT DATE WAS THAT AGAIN?

10      **Q**   MARCH 2014.

11      **A**   MY UNDERSTANDING, HE CAME IN MAY 20TH, 2014.

12      **Q**   IS IT POSSIBLE THAT HE WENT TO ELMHS IN MARCH OF

13  2014 AND THEN AGAIN IN MAY OF 2014?

14      **A**   I HAVE -- MAY 20TH IS MY UNDERSTANDING.  HE WENT TO

15  CALCASIEU ACUTE HOSPITAL ON APRIL 28TH, 2014.  DO YOU HAVE

16  THAT?

17      **Q**   YES, I DO.

18      **A**   OKAY.  AND THEN SUBSEQUENTLY HE WAS ADMITTED TO OUR

19  FACILITY BECAUSE PROGRESSIVE REQUESTED OUR ASSISTANCE AND WE

20  HAD A BED AVAILABLE AND MR. GEORGE WAS ADMITTED TO OUR

21  HOSPITAL AT THAT TIME.

22      **Q**   OKAY.  SO AS OF JULY 1ST OF 2014, MR. GEORGE WAS

23  LIVING AT ELMHS IN JACKSON; IS THAT CORRECT?

24      **A**   THAT'S CORRECT.

25      **Q**   AND ON THAT DAY, ON JULY 1ST, 2014, HE WAS EVALUATED

1  BY DR. VOSBURG WITH YOU PRESENT; IS THAT CORRECT?

2  **A**   THAT'S INCORRECT.  I WAS NOT PRESENT.

3  **Q**   YOU WERE NOT PRESENT FOR THE EVALUATION?

4  **A**   THAT'S CORRECT.

5  **Q**   AND YOU LEARNED ABOUT THE EVALUATION AFTER THE FACT

6  FROM DR. VOSBURG?

7  **A**   THAT'S CORRECT.

8  **Q**   ELMHS IS A PSYCHIATRIC HOSPITAL WITH THE ABILITY TO

9  FORCE MEDICATIONS ON ITS PATIENTS; IS THAT RIGHT?

10  **A**   THAT'S CORRECT.

11  **Q**   AND THAT'S DIFFERENT FROM THE JAIL SETTING WHERE

12  MEDICATIONS CAN'T BE FORCED?

13  **A**   THAT'S CORRECT AGAIN.

14  **Q**   AND ELMHS IS DESIGNED TO TREAT PATIENTS WHO ARE

15  DELUSIONAL OR PSYCHOTIC AND IN SOME CASES, HIGHLY DANGEROUS;

16  IS THAT RIGHT?

17  **A**   YES, MA'AM.

18  **Q**   BUT ON JULY 1ST, 2014, AFTER THE EVALUATION WITH

19  DR. VOSBURG, YOU DECIDED THAT MR. GEORGE NEEDED TO BE TAKEN

20  OUT OF THAT ENVIRONMENT AND PLACED IN JAIL; IS THAT CORRECT?

21  **A**   THAT'S INCORRECT.

22  **Q**   SO MR. GEORGE WAS NOT TAKEN OUT OF THAT ENVIRONMENT

23  AND PLACED IN JAIL?

24  **A**   HE WAS TAKEN -- HE WAS TAKEN OUT OF THE ENVIRONMENT.

25  IT WAS A DECISION BY THE -- DR. VOSBURG AND I THINK IT WAS DR.

1    KELLY.  I RECEIVED A CALL, AND HE WAS TAKEN AWAY FROM THE

2    FACILITY.

3        Q     AND YOU WERE NOT INVOLVED IN THAT DECISION?

4        A     I WAS NOT PRESENT FOR THE EVALUATION.

5        Q     AND YOU DISAGREED WITH THAT DECISION?

6        A     NO, I DID NOT.

7        Q     SO MR. GEORGE WAS ARRESTED AT THE HOSPITAL ON

8    JULY 1ST, 2014, AND TAKEN TO EAST BATON ROUGE PARISH PRISON;

9    IS THAT CORRECT?

10       A     YES, MA'AM.

11       Q     DID YOU KNOW THAT ON JULY 9TH OF 2014, HE WAS FOUND

12   ON THE FLOOR OF HIS CELL, UNRESPONSIVE, IN A POOL OF LIQUID?

13       A     NO, I DID NOT.

14       Q     SO YOU VISITED MR. GEORGE FOR THE FIRST AND LAST

15   TIME FIVE WEEKS LATER; IS THAT CORRECT, SIX WEEKS AFTER HE WAS

16   ARRESTED?

17       A     WHAT DATE -- WHAT DATE WOULD THAT BE?

18       Q     AUGUST 14TH.

19       A     AUGUST 14TH, I EVALUATED HIM AT THAT TIME, YES,

20   MA'AM.

21       Q     WHEN YOU VISITED MR. GEORGE IN JAIL, HE WAS STILL

22   HOUSED IN SINGLE CELL LOCKDOWN; IS THAT RIGHT?

23       A     THAT'S CORRECT.

24       Q     AND THE STATED REASON FOR THAT WAS FOR HIS

25   PROTECTION?

1    **A**    THAT'S CORRECT.

2    **Q**    THAT'S BECAUSE PRISON IS NOT A SAFE PLACE FOR PEOPLE

3    WITH MENTAL ILLNESS; IS THAT RIGHT?

4    **A**    WELL, HE WAS PLACED IN SINGLE LOCKDOWN FOR HIS

5    PROTECTION, AND THERE IS A MENTAL HEALTH WARD FOR THOSE GUYS

6    AND -- BUT USUALLY IN CASES OF MR. GEORGE'S CASE, HE WAS

7    PLACED IN A SINGLE CELL LOCKDOWN FOR HIS PROTECTION.

8    **Q**    WHEN YOU SAW MR. GEORGE ON AUGUST 14TH, 2014, YOUR

9    IMPRESSION WAS THAT HE WAS HIGHLY DELUSIONAL, WASN'T HE?

10   **A**    THAT'S -- THAT'S MY UNDERSTANDING OF THE NOTE THAT I

11   WROTE, YES, MA'AM.

12   **Q**    AND AN EXAMPLE OF THAT WAS HE SAID YOU WERE NOT THE

13   REAL ERIC BRADY?

14   **A**    THAT'S CORRECT.

15   **Q**    SO ON AUGUST 22ND, 2014, WHICH IS EIGHT DAYS AFTER

16   YOUR VISIT WITH MR. GEORGE, YOU HAD A PROBATION REVOCATION

17   HEARING IN FRONT OF THE JUDGE; IS THAT RIGHT?

18   **A**    YES, MA'AM.

19   **Q**    AND THAT WOULD HAVE BEEN JUDGE MOORE IN THE 19TH

20   DISTRICT?

21   **A**    THAT'S CORRECT.

22   **Q**    AND THE COURT THEN ORDERED MR. GEORGE OUT OF JAIL

23   AND INTO THE HOSPITAL THAT SAME DAY; IS THAT RIGHT?

24   **A**    THAT'S CORRECT.

25   **Q**    AND THAT WOULD HAVE BEEN SEVEN WEEKS AFTER

1  MR. GEORGE'S INITIAL ARREST?

2  **A**   I THINK SO, YES.

3  **Q**   YOU CONTINUED TO ACT AS MR. GEORGE'S DFC AFTER HE

4  WAS RELEASED FROM JAIL IN AUGUST; IS THAT RIGHT, FOR SOME

5  TIME?

6  **A**   YES.

7  **Q**   UNTIL YOU WERE REPLACED BY MS. KAREN RICARD; IS THAT

8  HOW YOU SAY HER NAME?

9  **A**   THAT'S CORRECT.

10  **Q**   AND THAT WOULD HAVE BEEN JANUARY 2015?

11  **A**   RIGHT.

12  **Q**   AND AS OF JANUARY 2015 WHEN YOU WERE NO LONGER ON

13  MR. GEORGE'S CASE, MR. GEORGE WAS STILL AT ELMHS; IS THAT

14  RIGHT?

15  **A**   THAT'S CORRECT.

16  **Q**   IN FACT, SINCE HIS LAST RELEASE FROM JAIL IN AUGUST

17  OF 2014, HE'S NEVER BEEN ABLE TO GO BACK TO LIVING IN THE

18  COMMUNITY, HAS HE?

19  **A**   THAT'S CORRECT.

20  **Q**   SO HE'S STILL IN THE HOSPITAL IN THE MOST

21  RESTRICTIVE WING?

22  **A**   THAT'S CORRECT.

23  **MS. FERNANDEZ:**  I HAVE NO FURTHER QUESTIONS.   THANK

24  YOU, MR. BRADY.

25  **THE WITNESS:**   YES, MA'AM.

1              **THE COURT:**  THANK YOU.  YOU WANT TO TAKE HIM NOW?

2              **MR. HILBURN:**  YOUR HONOR, NO QUESTIONS RIGHT NOW.

3  WE RESERVE THE RIGHT TO CALL HIM IN OUR CASE.

4              **THE COURT:**  ALL RIGHT, GOOD.  THANK YOU.  YOU MAY

5  STAND DOWN, MR. BRADY.

6              WHO IS YOUR NEXT WITNESS?

7              **MR. LOSPENNATO:**  DR. SMITH, YOUR HONOR, AND THIS IS

8  GOING TO BE BY VIDEO CONFERENCE.

9              **THE COURT:**  THIS IS GOING TO BE LIVE TESTIMONY;

10  CORRECT?

11             **MR. LOSPENNATO:**  I HOPE SO.

12             **THE COURT:**  LET ME EXPLAIN TO YOU, LADIES AND

13  GENTLEMEN, WHAT'S GOING ON.  IN THIS WONDERFUL MODERN AGE OF

14  TECHNOLOGY, WE'RE ABLE TO TAKE THE TESTIMONY LIVE OF A WITNESS

15  WHO IS NOT ACTUALLY PRESENT IN THIS COURTROOM OR EVEN IN

16  LOUISIANA.  I'M NOT SURE WHERE DR. SMITH IS, BUT WE'LL FIND

17  OUT, I SUPPOSE, IN A MINUTE.

18             IN ANY EVENT, THE FACT THAT IT'S BEING SEEN THROUGH

19  VIDEO DOESN'T MEAN YOU TREAT IT ANY DIFFERENTLY.  THIS

20  TESTIMONY IS TREATED AS THOUGH SHE WERE IN COURT AND SWORN,

21  AND SHE WILL BE SWORN TO TELL THE TRUTH.  SO YOU TREAT HER

22  TESTIMONY AS YOU WOULD WITH ANY OTHER TESTIMONY.  AND WE CAN,

23  HOPEFULLY, PROCEED WITHOUT INCIDENT.

24             **REPORTER'S NOTE:**  (AT THIS TIME DR. DELANEY SMITH

25  WAS PRESENT VIA VIDEO CONFERENCE.)

1        **MR. LOSPENNATO:**  GOOD MORNING, CAN YOU HEAR ME?

2        **THE WITNESS:**  YES.  CAN YOU HEAR ME?

3        **MR. LOSPENNATO:**  I CAN.

4        **THE COURT:**  PROBABLY COULD USE A LITTLE MORE VOLUME,

5   IF THAT'S POSSIBLE.

6        **MR. LOSPENNATO:**  WE'RE GOING TO TRY TO GET A LITTLE

7   MORE VOLUME FROM YOUR END.

8        **THE COURT:**  I'M GOING TO LEAVE IT UP TO YOU MR.

9   LOSSPENNATO.  WE CAN CALL AUTOMATION AND SEE IF THEY CAN WORK

10  SOME MAGIC TO GET HER VOLUME UP.  OF COURSE, OBVIOUSLY, THE

11  MOST IMPORTANT THING IS THAT OUR JURORS HEAR THIS.  AND SO WHY

12  DON'T YOU JUST DO A BACK AND FOURTH, AND I'M GOING TO ASK OUR

13  JURORS TO GIVE ME A HIGH SIGN IF THEY CAN HEAR WELL ENOUGH.

14  IF YOU CANNOT HEAR WELL ENOUGH, WE NEED TO KNOW THIS,

15  OBVIOUSLY.  SO WHY DON'T YOU ASK HER A QUESTION OR TWO, NOT

16  SUBSTANTIVELY, JUST SOMETHING.

17       **MR. LOSPENNATO:**  DR. SMITH, WHY DON'T YOU JUST STATE

18  YOUR NAME AND YOUR PLACE OF BUSINESS, JUST SO THAT WE CAN

19  HEAR.

20       **THE WITNESS:**  SURE.  DELANEY SMITH, D-E-L-A-N-E-Y,

21  S-M-I-T-H.  AND I WORK AT TWIN VALLEY BEHAVIORAL HEALTH CARE,

22  AMONG OTHER PLACES.

23       **THE COURT:**  LADIES AND GENTLEMEN, Y'ALL CAN HEAR

24  OKAY?  EVERYBODY IS GIVING ME A HIGH SIGN.

25       DR. SMITH, IF YOU WOULD, I DON'T WANT YOU SCREAMING.

1   YOU'RE GOING TO GET A RAW THROAT, BUT TRY TO SPEAK UP AS LOUD

2   AS YOU CAN COMFORTABLY SO THAT OUR JURORS CAN HEAR YOUR

3   TESTIMONY.   AND WITH THAT, WE'RE GOING TO GO AHEAD AND

4   PROCEED.

5        **MR. LOSPENNATO:**   SHE'S GOING TO BE SWORN IN?

6        **THE COURT:**   YES, SHE IS.

7        (WHEREUPON, DR. DELANEY SMITH, HAVING BEEN DULY

8   SWORN, TESTIFIED AS FOLLOWS.)

9   DIRECT

10  BY MR. LOSPENNATO:

11   **Q**   AGAIN, DR. SMITH, WHY DON'T YOU STATE YOUR NAME AND

12  YOUR BUSINESS ADDRESS FOR THE RECORD.

13   **A**   DELANEY SMITH, D-E-L-A-N-E-Y, S-M-I-T-H, AND MY

14  PRIMARY LOCATION IS TWIN VALLEY BEHAVIORAL HEALTH CARE AT 2200

15  WEST BROAD STREET IN COLUMBUS, OHIO.

16   **Q**   DR. SMITH, THIS IS SOMEWHAT UNUSUAL, TO TESTIFY BY

17  VIDEO CONFERENCING.   WHY DO WE NEED TO DO THIS TODAY?

18   **A**   I APPRECIATE THE ACCOMMODATIONS.   I JUST HAD A BABY

19  A LITTLE OVER TWO WEEKS AGO.

20   **Q**   I SEE.   ARE YOU -- YOU MENTIONED YOU'RE CURRENTLY

21  EMPLOYED.   CAN YOU DESCRIBE YOUR JOBS AND WHERE YOU'RE

22  EMPLOYED AND WHAT YOU DO IN EACH OF YOUR JOBS?

23   **A**   CERTAINLY.   MY PRIMARY CLINICAL POSITION, AS I

24  STATED, IS AT TWIN VALLEY BEHAVIORAL HEALTH CARE.   THAT'S A

25  STATE PSYCHIATRIC IN-PATIENT HOSPITAL HERE IN OHIO.   I WORK IN

1   THE MAXIMUM SECURITY FACILITY THERE, SO THAT'S THE ONLY

2   MAXIMUM SECURITY FORENSIC HOSPITAL FOR THE ENTIRE STATE OF

3   OHIO.   AND THERE, I TREAT INDIVIDUALS WHO'VE BEEN FOUND EITHER

4   NOT GUILTY BY REASON OF INSANITY OR NOT COMPETENT TO STAND

5   TRIAL BECAUSE OF THEIR MENTAL ILLNESS, AND I PROVIDE THEM WITH

6   THEIR PSYCHIATRIC CARE AND TREATMENT.

7           IN ADDITION TO THAT, I ALSO DO COURT REPORTS ON THE

8   PEOPLE I'M NOT TREATING, AND I'LL PREPARE COURT REPORTS ON

9   THINGS, SUCH AS WHETHER THEY'VE BEEN RESTORED TO COMPETENCE,

10  IF THEY CAN MOVE TO A LESS RESTRICTIVE ENVIRONMENT -- BECAUSE

11  WHERE I WORK IS THE MOST RESTRICTIVE -- SO CAN THEY MOVE TO A

12  -- MORE FREEDOM HAVING HOSPITAL OR COULD THEY MOVE INTO THE

13  COMMUNITY IF THEY'RE ALREADY AT ONE OF THE HOSPITALS WITH MORE

14  FREEDOM?   CAN THEY GO OUT ON TO CONDITIONAL RELEASE, THAT SORT

15  OF THING?

16          AND AS A PART OF THAT JOB, AT TIMES IN THE PAST,

17  I'VE ALSO TREATED INDIVIDUALS WHO ARE -- WHO ARE IN THE JAIL,

18  EITHER AWAITING MOVEMENT TO ANOTHER FACILITY OR ARE IN THE

19  JAIL JUST NEEDING PSYCHIATRIC CARE.

20      Q   I'D LIKE TO RETURN TO YOUR EMPLOYMENT, BUT I WANTED

21  TO BACK UP A SECOND.   WHY DON'T YOU TELL ME A LITTLE BIT ABOUT

22  YOUR BACKGROUND.   WHAT'S YOUR EDUCATIONAL BACKGROUND?

23      A   I RECEIVED MY BACHELOR'S DEGREE IN PSYCHOLOGY FROM

24  BOSTON UNIVERSITY IN 1998.   I THEN ATTENDED THE OHIO STATE

25  UNIVERSITY WHERE I RECEIVED MY MEDICAL DEGREE IN 2002.   I

1   CONTINUED ON AT OHIO STATE UNIVERSITY FOR MY PSYCHIATRY

2   DEGREE.   THAT'S A FOUR-YEAR PROGRAM AFTER MEDICAL SCHOOL IS

3   COMPLETED.   SO I COMPLETED THAT IN 2006, AND THEN FROM 2006 TO

4   2007, I DID A FORENSIC SPECIALTY PROGRAM -- IT'S CALLED A

5   FELLOWSHIP -- IN CLEVELAND AT CASE WESTERN RESERVE UNIVERSITY,

6   AND THEN I TOOK A JOB AT TWIN VALLEY BEHAVIORAL HEALTH CARE.

7      **Q**   AND IN YOUR -- IN YOUR EDUCATION, HAVE YOU RECEIVED

8   ANY ACADEMIC TITLES?

9      **A**   YES.   YOU KNOW, I RECEIVED MY MEDICAL DEGREE,

10   OBVIOUSLY.   I'VE ALSO BEEN BOARD CERTIFIED IN BOTH GENERAL AND

11   FORENSIC PSYCHIATRY.   AND THEN I HAVE SEVERAL TEACHING

12   POSITIONS, ACADEMIC APPOINTMENTS RIGHT NOW.

13      **Q**   AND WHERE ARE THOSE, YOUR TEACHING POSITIONS?

14      **A**   I HAVE -- I HAVE AN ACADEMIC TEACHING POSITION AT

15   OHIO STATE UNIVERSITY.   THERE, I BOTH TEACH THEIR PSYCHIATRY

16   RESIDENTS AND THEN I RUN THEIR FORENSIC PSYCHOLOGY FELLOWSHIP

17   PROGRAM.   SO I COORDINATE THE TEACHING FOR THE FELLOW WHO'S

18   DOING HIS YEAR-LONG SPECIALTY IN FORENSIC PSYCHIATRY AND TEACH

19   HIM.   AND THEN I ALSO HAVE AN ACADEMIC APPOINTMENT AT OHIO

20   UNIVERSITY, WHICH IS AN OSTEOPATHIC MEDICAL SCHOOL.

21      **Q**   WHAT KIND OF MEDICAL SCHOOL?

22      **A**   OSTEOPATHIC FOR DOS AS OPPOSED TO MDS, WHICH IS WHAT

23   I AM, A MEDICAL DOCTOR.

24      **Q**   AND HAVE YOU RECEIVED ANY HONORS?

25      **A**   I HAVE.   I RECEIVED AN AWARD FOR RESEARCH I DID

1  REGARDING ALZHEIMER'S DISEASE AND SOME GENETIC TESTING.  I'VE

2  ALSO RECEIVED AN AWARD FROM OUR STATE PSYCHIATRIC ORGANIZATION

3  AS WELL AS AWARDS DURING MY RESIDENCY FROM OHIO STATE

4  UNIVERSITY AS WELL AS BEING RECOGNIZED AS ONE OF THE TOP

5  PHYSICIANS IN COLUMBUS.  AND THEN RECENTLY, THIS YEAR, I

6  RECEIVED AN AWARD FROM OHIO STATE UNIVERSITY RECOGNIZING MY

7  WORK AS A COMMUNITY PSYCHIATRIST.

8    Q  AND I SHOULD MENTION, YOU ARE IN COLUMBUS, OHIO; IS

9  THAT RIGHT?

10    A  CORRECT.

11    Q  HAVE YOU WRITTEN ANY JOURNAL ARTICLES THAT ARE

12  RELEVANT TO ISSUES IN THIS CASE?

13    A  YES.  I'VE PUBLISHED WORK ON TOPICS SUCH AS

14  CONDITIONAL RELEASE, SO I'VE PRESENTED, ABOUT CONDITIONAL

15  RELEASE, A SPECIAL VERSION THAT WE HAVE IN OHIO CALLED

16  INCOMPETENT TO STAND TRIAL, UNRESTORABLES, WHO ARE KEPT UNDER

17  CRIMINAL COURT JURISDICTION.  I'VE PUBLISHED ON THE MENTAL

18  STATUS EXAMINATION AND HOW TO PERFORM THAT AND WHAT THE KEY

19  PARTS OF THAT ARE AS WELL AS OTHER AREAS.

20    Q  DR. SMITH, WHAT IS FORENSIC PSYCHIATRY?

21    A  FORENSIC PSYCHIATRY IS THE INTERSECTION BETWEEN

22  MENTAL HEALTH CARE AND THE LEGAL SYSTEM.  SO SOME OF WHAT WE

23  DO IS TREATMENT RELATED, SO JUST LIKE A PSYCHIATRIST SOMEONE

24  MIGHT SEE IN THE COMMUNITY, WE'RE PRESCRIBING MEDICINES, WE'RE

25  DOING PSYCHOTHERAPY WITH THE PERSON, BUT IT'S PEOPLE WHO HAVE

1   SOME KIND OF LEGAL INVOLVEMENT.

2          SO IT'S REALLY UNDERSTANDING, YOU KNOW, ARE WE

3   NEEDING TO GIVE THEM MEDICINE TO HELP THEM BE RESTORED TO

4   COMPETENCE SO THEY CAN FAIRLY STAND TRIAL?  ARE WE DOING IT IN

5   THE CONTEXT OF THEM HAVING BEEN FOUND GUILTY BY REASON OF

6   INSANITY?  AND THEN THE OTHER HALF OF THE WORK WE DO IS TO

7   HELP THE COURT UNDERSTAND MENTAL HEALTH ISSUES.  SO THAT MIGHT

8   BE THE PREPARING COURT REPORTS AS PEOPLE MOVE THROUGH THE

9   SYSTEM FOR NOT GUILTY BY REASON OF INSANITY, HELPING PEOPLE

10  UNDERSTAND IF THERE HAVE BEEN MENTAL HEALTH CONSEQUENCES FROM

11  ACCIDENTS OR OTHER EVENTS THAT SOMEONE HAS HAD IN THEIR LIFE,

12  WHETHER OR NOT THERE'S BEEN POTENTIAL MALPRACTICE IN THE CASE,

13  THAT KIND OF WORK, TO HELP THE COURT UNDERSTAND THE MENTAL

14  HEALTH CARE WORLD.

15      **Q**    HAVE YOU BEEN INVOLVED IN CASES, REAL CASES AS AN

16  EXPERT IN THE PAST?

17      **A**    YES, I HAVE.

18      **Q**    HOW FREQUENTLY?

19      **A**    PROBABLY ABOUT 40 TO 50, DEPENDING ON WHAT SORT OF

20  CASES.  SO SOME OF THE CASES, AGAIN, ARE MORE FOCUSED ON

21  INDIVIDUALS I'M TREATING.  SO THINGS LIKE APPEALING TO THE

22  COURT FOR FORCED MEDICATIONS, IN THOSE CASES, I'VE BEEN

23  RECOGNIZED TO BE ABLE TO TESTIFY, AND THEN SOME OF IT IS MORE

24  RELATED TO TESTIFYING ABOUT WHETHER OR NOT THE PERSON MEETS

25  THE CRITERIA FOR NOT GUILTY BY REASON OF INSANITY DEFENSE OR

1    AN INCOMPETENT TO STAND TRIAL AND HELPING THE COURT IN THAT

2    WAY.   SO I WOULD SAY ABOUT 40 TO 50, AT LEAST, TOTAL.

3         **MR. LOSPENNATO:**   YOUR HONOR, I'D LIKE TO MOVE THAT

4    DR. SMITH BE RECOGNIZED AS AN EXPERT IN FORENSIC PSYCHOLOGY --

5    PSYCHIATRY.

6         **THE COURT:**   ANY OBJECTIONS, MR. HILBURN?

7         **MR. HILBURN:**   NO TRAVERSAL, NO OBJECTIONS.

8         **THE COURT:**   ALL RIGHT.   DR. SMITH WILL BE ACCEPTED

9    AS AN EXPERT IN THE FIELD OF FORENSIC PSYCHIATRY.

10        LET ME TELL YOU WHAT THAT MEANS, LADIES AND

11    GENTLEMEN.   WHEN SOMEBODY -- ORDINARILY WITNESSES CANNOT GIVE

12    OPINIONS; THEY CAN TALK ABOUT FACTS.   BUT THERE'S AN EXCEPTION

13    TO THAT RULE WHEN IT COMES TO EXPERT WITNESSES.   AND WHEN

14    SOMEBODY'S TECHNICAL EXPERTISE WILL ASSIST THE JURY IN CERTAIN

15    -- IN RESOLVING CERTAIN ISSUES THEY HAVE BEFORE THEM, THE

16    COURT CAN ALLOW THAT AN EXPERT BE ALLOWED TO TESTIFY.   AND IN

17    THIS CASE, THERE'S BEEN NO OBJECTION.   DR. SMITH HAS BEEN

18    ACCEPTED BY THE COURT AS AN EXPERT IN THE AREA OF FORENSIC

19    PSYCHIATRY.

20        HAVING SAID THAT, I CAUTION YOU THAT, AS WITH ANY

21    OTHER WITNESS, IT IS ENTIRELY WITHIN YOUR PROVINCE TO GIVE

22    THIS WITNESS, AS WITH ANY OTHER WITNESS, WHATEVER WEIGHT THAT

23    YOU DEEM THAT WITNESS'S TESTIMONY DESERVES.   AND WITH THAT,

24    YOU MAY PROCEED.

25        **MR. LOSPENNATO:**   THANK YOU, YOUR HONOR.

1  BY MR. LOSPENNATO:

2      **Q**    ARE YOU FAMILIAR WITH TRUSSELL GEORGE?

3      **A**    YES, I AM.

4      **Q**    HOW DID YOU BECOME FAMILIAR WITH HIM?

5      **A**    YOU CONTACTED ME REGARDING HIS CASE ABOUT A YEAR AGO

6  TO ASK WHETHER OR NOT I COULD LOOK AT SOME RECORDS AND

7  INTERVIEW MR. GEORGE.

8      **Q**    AND FOR WHAT PURPOSE?

9      **A**    TO DETERMINE WHETHER OR NOT THE TWO INCARCERATIONS

10  HE HAD IN 2013 AND 2014 HAD LED TO ANY CONSEQUENCES FROM A

11  MENTAL HEALTH CIRCUMSTANCE.

12      **Q**    AND YOU'RE BEING PAID FOR YOUR SERVICES; IS THAT

13  CORRECT?

14      **A**    YES, IT IS.

15      **Q**    SO TYPICALLY WHEN YOU GET INVOLVED IN A CASE AND

16  HAVE TO MAKE A DETERMINATION ABOUT AN INDIVIDUAL, WHAT'S THE

17  PROCESS THAT YOU FOLLOW?

18      **A**    FIRST, I'D SPEAK WITH THE ATTORNEY TO GET KIND OF A

19  SENSE OF THE CASE AND WHETHER I FEEL LIKE IT'S WITHIN MY SCOPE

20  OF EXPERIENCE AND WHETHER I CAN BE HELPFUL.  I'LL THEN ASK FOR

21  RECORDS TO REVIEW, AGAIN, TO DETERMINE WHAT'S GOING ON IN THE

22  CASE, WHAT'S THE QUESTION AT HAND, IS THIS SOMETHING THAT I

23  FEEL IS, YOU KNOW, WITHIN MY AREA OF EXPERTISE, WITHIN MY

24  EXPERIENCE.  AND THEN I'LL INTERVIEW THE INDIVIDUAL AND TRY TO

25  SEE WHAT COLLATERAL SOURCES THERE ARE TO INTERVIEW, SO PEOPLE

1   WHO MAY KNOW THE PERSON OR MAY HAVE KIND OF WITNESSED WHAT WAS

2   GOING ON BEYOND JUST THE RECORDS AND THE INDIVIDUAL

3   THEMSELVES.

4       **Q**   NOW, IS THAT -- IS THAT A PRETTY WELL-ACCEPTED

5   PROCESS, THE ONE YOU'VE JUST DESCRIBED, IN YOUR FIELD?

6       **A**   YES, YES, IT IS.

7       **Q**   AND SO IN MR. GEORGE'S CASE, DID YOU REVIEW HIS

8   RECORDS?

9       **A**   YES, I DID.

10      **Q**   AND CAN YOU SUMMARIZE THE RECORDS THAT YOU REVIEWED,

11  THE TYPE OF RECORDS AND WHERE THEY CAME FROM?

12      **A**   YES.   THERE WERE QUITE A LOT OF RECORDS IN THIS

13  CASE.   THERE WERE A LOT OF RECORDS FROM THE EASTERN LOUISIANA

14  MENTAL HEALTH SYSTEM, THE ELMHS SYSTEM, FROM HIS PREVIOUS

15  HOSPITALIZATIONS AS WELL AS THE HOSPITALIZATIONS THAT LED UP

16  TO THE INCARCERATION AND THEN FOLLOWED THE INCARCERATION.

17          I ALSO LOOKED AT THE RECORDS FROM THE EAST BATON

18  ROUGE PARISH PRISON, AND THEN THERE WERE MULTIPLE OTHER

19  RECORDS FROM VARIOUS HOSPITALIZATIONS THAT HE HAD EITHER

20  BEFORE OR AFTER THOSE INCARCERATIONS THAT I ALSO REVIEWED, AS

21  WELL AS COURT REPORTS AND TESTIMONY FROM DR. MCCONVILLE,

22  REPORTS THAT HAD BEEN PREPARED BY OTHER PSYCHIATRISTS AND

23  PSYCHOLOGISTS REGARDING MR. GEORGE AND HIS PROGRESS THROUGH

24  THE SYSTEM.

25      **Q**   DID YOU ALSO REVIEW SOME DEPOSITIONS, FOR EXAMPLE,

1  THE DEPOSITION OF LISA BURNS?

2      **A**   YES, YES, I DID.

3      **Q**   SO WHAT DID YOU LEARN ABOUT MR. GEORGE IN REVIEWING

4  THOSE RECORDS?

5      **A**   MR. GEORGE HAS A LONG HISTORY OF MENTAL ILLNESS.

6  THAT WAS CERTAINLY CLEAR FROM THE RECORD THAT I REVIEWED.

7  INITIALLY, HIS DIAGNOSIS HAD BEEN KIND OF A PSYCHOTIC

8  DISORDER, NOT OTHERWISE SPECIFIED.  SO TREATERS WEREN'T SURE

9  IF THIS WAS A FULL-BLOWN SCHIZOPHRENIA OR JUST ANOTHER FORM OF

10 PSYCHOSIS.  AND THEN IN THE LATER YEARS, THEY CHANGED HIS

11 DIAGNOSIS TO BE A SCHIZOPHRENIA OR SOME TYPE OF

12 SCHIZO-AFFECTIVE DISORDER, WHICH IS A COMBINATION OF THE

13 THOUGHT DISORDER WITH SCHIZOPHRENIA ALONG WITH A MOOD

14 DISORDER, LIKE A BIPOLAR-TYPE DISORDER.

15      BUT PRIOR TO THE INCARCERATION IN 2013, MR. GEORGE

16 WAS ABLE TO GO INTO THE HOSPITAL, HAVE RELATIVELY BRIEF

17 HOSPITAL STAYS AND THEN GO BACK INTO THE COMMUNITY, LIVING IN

18 A GROUP HOME, PARTICIPATING IN COMMUNITY AND DAY TREATMENT

19 EVENTS, BEING A PART OF HIS FAMILY, GOING TO HOME VISITS WITH

20 FAMILY; AND THEN THINGS REALLY CHANGED DRAMATICALLY AFTER THE

21 2013 INCARCERATION WHEN HE REALLY HAD DIFFICULTY STAYING OUT

22 OF THE HOSPITAL FOR ANY LENGTH OF TIME.  HE HAD VERY MANY

23 FREQUENT REHOSPITALIZATIONS.

24      AND THEN AFTER HIS INCARCERATION IN 2014, HE HASN'T

25 BEEN ABLE TO GET BACK OUT OF THE HOSPITAL SINCE.  SO IT WAS A

1    PRETTY DRAMATIC PICTURE OF SOMEONE WHO, YES, HAD A SEVERE AND
2    PERSISTENT MENTAL ILLNESS, BUT WAS ABLE TO FUNCTION IN THE
3    COMMUNITY TO SOMEONE WHO'S BEEN IN A HOSPITAL SETTING, UNABLE
4    TO GET OUT, SINCE 2014.

5        **Q**    SO AFTER YOU REVIEWED THE RECORDS, WHAT OTHER STEPS
6    DID YOU TAKE TO COMPLETE YOUR ASSESSMENT OF MR. GEORGE?

7        **A**    I WENT TO LOUISIANA TO SEE MR. GEORGE.  I FELT, IN
8    THIS CASE, IT WAS IMPORTANT TO MEET HIM.  THERE ARE SOME CASES
9    THAT I'M ABLE TO DO, JUST BASED ON RECORD REVIEW, BUT I REALLY
10   FELT, YOU KNOW, SEEING WHAT HIS CURRENT FUNCTIONING WAS AND
11   HOW THAT EITHER WAS CONSISTENT WITH THE RECORDS OR MAYBE
12   DIFFERED FROM THE RECORDS WAS REALLY IMPORTANT TO PUT TOGETHER
13   A REPORT AND FORMULATE AN OPINION.  SO I FLEW DOWN AND MET
14   WITH MR. GEORGE AND THEN FOLLOWING THAT, I SPOKE WITH HIS
15   SISTER.

16       **Q**    LET'S TALK A LITTLE BIT ABOUT YOUR INTERVIEW WITH
17   MR. GEORGE.  WHERE DID THAT TAKE PLACE?

18       **A**    AT THE ELMHS SYSTEM IN ONE OF THEIR TREATMENT ROOMS.

19       **Q**    TELL ME -- JUST TELL ME HOW THE -- HOW THE INTERVIEW
20   PROCEEDED.

21       **A**    WELL, INITIALLY OFF THE BAT, IT WAS NOTABLE TO ME
22   THAT KATY MARTINEZ, WHO I HAD TALKED TO BEFORE THE INTERVIEW
23   AND WHO HAD COME TO INTRODUCE ME TO MR. GEORGE, HE DID NOT
24   FEEL COMFORTABLE WITH HER LEAVING INITIALLY, WHICH IS VERY
25   ATYPICAL.  YOU KNOW, I DO THESE KIND OF INTERVIEWS A LOT.  I

1   TREAT INDIVIDUALS WITH SEVERE AND PERSISTENT MENTAL ILLNESS IN

2   THE HOSPITAL, AND USUALLY PEOPLE ARE PRETTY COMFORTABLE WITH

3   ME.   I THINK THAT BEING A WOMAN IS HELPFUL, THAT OFTENTIMES

4   THERE'S NO DIFFICULTY WITH PEOPLE FEELING COMFORTABLE TALKING

5   TO ME, BUT IN THIS CASE, HE DIDN'T WANT MS. MARTINEZ TO LEAVE

6   INITIALLY.   HE FELT UNCOMFORTABLE, EVEN WITHOUT THAT KIND OF

7   PERSON THAT HE'S KNOWN FOR SEVERAL YEARS PRESENT.

8          SO THAT LEVEL OF PARANOIA IS REALLY NOT SOMETHING

9   THAT'S TYPICAL IN FOLKS WITH SCHIZOPHRENIA.   SO MS. MARTINEZ

10  DID STAY WITH US FOR ABOUT THE FIRST 15 MINUTES, AND WE ALL

11  JUST KIND OF HAD SOME SMALL TALK ABOUT HIS EXPERIENCES IN

12  GENERAL, FOODS THAT HE LIKED, THINGS TO JUST KIND OF GET HIM

13  COMFORTABLE AND WARM HIM UP.   AND THEN HE FINALLY FELT THAT

14  SHE COULD LEAVE AND HE COULD BE COMFORTABLE WITH JUST ME IN

15  THE ROOM ALONE.

16          AND THEN THE OTHER THING THAT WAS VERY STRIKING WAS

17  THAT MR. GEORGE, UNLIKE THE PREVIOUS PICTURES I HAD SEEN OF

18  HIM AND THINGS I HAD LEARNED OF HIM BEFORE 2013, WHERE HE WAS

19  VERY PUT TOGETHER, TOOK GREAT PRIDE IN HIS APPEARANCE, HE WAS

20  DISHEVELED.   HE WAS DRESSED IN GARB FROM THE FACILITY.   HE WAS

21  VERY TANGENTIALLY SPEAKING, WHICH MEANS THAT HE WOULD START

22  TALKING ABOUT ONE SUBJECT AND THEN QUICKLY GET DERAILED AND

23  START TALKING ABOUT OTHER TOPICS, EVEN AT TIMES, TO THE POINT

24  WHERE HE WOULD STOP TALKING ALL TOGETHER, AND SEEMINGLY BE

25  DISTRACTED BY SOME KIND OF INTERNAL PROCESS, LIKE A

1    HALLUCINATION OR SOMETHING IN HIS OWN HEAD THAT WAS JUST KIND

2    OF DISTRACTING HIM AND HE WOULD STOP SPEAKING ALTOGETHER.

3           HE WAS VERY PREOCCUPIED WITH DELUSIONS.   UNLIKE IN A

4    REPORT THAT WAS PREPARED ABOUT HIM IN 2012, WHEN IT WAS SAID

5    THAT HIS DELUSIONAL PROCESS HAD IMPROVED, HE WAS VERY FOCUSED

6    ON HIS DELUSIONS ABOUT SAVING GOD FROM A PROFESSOR NAMED BOB,

7    ABOUT HIS OWN ABILITY TO EITHER GO UP TO HEAVEN AND THAT

8    PEOPLE WERE WORRIED ABOUT HIM THAT HE MIGHT SEND THEM TO HELL.

9    HE WAS ALSO VERY PARANOID ABOUT INDIVIDUALS ON HIS TREATMENT

10   TEAM AT THE HOSPITAL AS WELL AS IN THE COURT SYSTEM.   SO JUST

11   VERY NOTABLE FOR SEVERE SYMPTOMS OF HIS ILLNESS THAT REALLY

12   IMPACTED OUR ABILITY TO EVEN CONVERSE OR FOR ME TO GET SOME OF

13   HIS HISTORICAL INFORMATION.

14          HE ALSO WAS EASILY DISTRACTIBLE AT TIMES.   HE WOULD

15   GET UP FREQUENTLY DURING THE INTERVIEW.   I WAS ABLE TO

16   REDIRECT HIM TO COME BACK AND SIT DOWN AND TALK WITH ME UNTIL

17   WE WERE FINALLY DONE, AND I FELT LIKE I COULDN'T GATHER

18   ANYTHING MORE FROM THE CONVERSATION.   AT THAT TIME, WHEN HE

19   GOT UP, I DID LET HIM JUST TERMINATE THE CONVERSATION AFTER

20   ABOUT AN HOUR OF THE TWO OF US TALKING.

21      Q    DO YOU FEEL THAT THE -- YOUR INTERVIEW OF MR. GEORGE

22   WAS SUFFICIENT TO MAKE DETERMINATIONS, THE KIND OF

23   DETERMINATIONS THAT I HAD REQUESTED IN THIS CASE?

24      A    YES, I DO.

25      Q    SO AFTER YOU TALKED TO MR. GEORGE, WHAT STEPS DID

1   YOU TAKE TO FAMILIARIZE YOURSELF WITH MR. GEORGE?

2       **A**     AGAIN, I HAD SPOKEN ALREADY SOME TO MS. MARTINEZ.  I

3   DID SPEAK WITH HER AGAIN AFTER THE INTERVIEW.  I SPOKE WITH

4   HIS SISTER, PAMELA HORTON, TO FIND OUT WHAT HER OBSERVATIONS

5   WERE OF HOW HE FUNCTIONED BEFORE VERSUS AFTER.  SHE ALSO GAVE

6   THE SAME KIND OF STORY THAT, YOU KNOW, PRIOR TO THE

7   INCARCERATION, HE WAS SCHIZOPHRENIC, HE DID HAVE SYMPTOMS OF A

8   SCHIZOPHRENIA, HE DID HAVE HOSPITALIZATIONS, BUT HE WAS ALWAYS

9   ABLE TO COME BACK OUT, BE A PART OF THE GROUP HOME, BE

10  INVOLVED WITH HIS FAMILY, TAKE CARE OF HIMSELF.

11      SHE WAS VERY DISTURBED BY THE WAY HE APPEARED IN

12  COURT WHEN SHE SAT IN, THAT HE LOOKED LIKE HE HAD LOST WEIGHT,

13  THAT HE WAS SO DISORGANIZED THAT HE WAS ALLOWING HIS PANTS TO

14  DROP TO THE POINT WHERE HE WAS EXPOSING HIMSELF AND OTHER

15  PEOPLE HAD TO HELP HIM LIFT HIS PANTS UP.  SO SHE WAS VERY

16  UPSET BY SEEING HIM THAT WAY AND FELT THAT HE JUST HADN'T

17  REALLY COME BACK TO HIS BASELINE EVER SINCE THAT TIME.

18      **Q**     SO DID YOU FIND YOUR DISCUSSIONS WITH PAM HORTON AND

19  HER DESCRIPTION OF MR. GEORGE TO BE CREDIBLE?

20      **A**     I DID.  YOU KNOW, WHENEVER I'M SPEAKING TO FAMILY

21  MEMBERS, I ALWAYS TRY TO MAKE SURE THAT THEIR INFORMATION IS

22  CONSISTENT WITH THE OTHER INFORMATION AVAILABLE.  SO I DON'T

23  TAKE EVERYTHING AT FACE VALUE, BUT HER INFORMATION WAS

24  CONSISTENT WITH WHAT I WAS SEEING IN OTHER PLACES IN THE

25  RECORDS AS WELL AS WITH MS. MARTINEZ'S REPORT OF CHANGES IN

1   HIS BEHAVIOR, SO I DID FEEL IT WAS CREDIBLE.

2        Q    AND DID YOU FEEL LIKE MS. MARTINEZ'S REPORTS ABOUT

3   MR. GEORGE WERE CREDIBLE AS WELL?

4        A    I DID.   AND SHE'S KNOWN HIM SINCE 2009 AND HAS SEEN

5   HIM AT TIMES WHEN HE'S BEEN VERY STABLE IN THE COMMUNITY.   IN

6   FACT, SHE SAID THE FIRST TIME SHE EVER MET HIM, SHE WONDERED

7   IF HE WAS A STAFF AT THE GROUP HOME, HE WAS SO PUT TOGETHER

8   WITH HIS APPEARANCE AND HIS PRESENTATION.

9        BUT SHE WAS ABLE TO ALSO TELL ME REALISTICALLY THAT,

10  YOU KNOW, HE IS SOMEONE WHO, EVEN WHEN HE WAS IN THE

11  COMMUNITY, WOULD HAVE TIMES WHEN HE WOULD HAVE SOME SYMPTOMS

12  AND WOULD REQUIRE HOSPITALIZATION AND ADJUSTMENTS OF HIS

13  MEDICATION.

14       SO I THINK BOTH OF THEM, YOU KNOW, TOLD ME BOTH THE

15  GOOD AND THE BAD ABOUT WHAT HAD BEEN GOING ON WITH HIM AND

16  WERE CONSISTENT IN THEIR REPORTING.

17       Q    WERE YOU ABLE TO TALK TO ANYBODY ELSE ABOUT -- ABOUT

18  MR. GEORGE?

19       A    I DID REACH OUT TO DR. AHMAD, ONE OF HIS TREATING

20  PSYCHIATRISTS.   I NEVER GOT A RETURN CALL, BUT I ALSO HAD A

21  LOT OF INFORMATION, AS I SAID FROM, DR. MCCONVILLE, AS WELL AS

22  DR. O'LEARY.   THERE WERE REPORTS FROM OTHER INDIVIDUALS WHO

23  HAD TREATED HIM, AND WITH ALL OF THE RECORDS THAT I HAD, I

24  FELT THERE WAS SUFFICIENT INFORMATION WITHOUT THAT.

25       Q    JUST -- YOU'VE MENTIONED DR. O'LEARY, WHAT ROLE DID

1  HE PLAY IN THIS?

2      **A**   HE HAD PERFORMED A COMPETENCY EVALUATION ON

3  MR. GEORGE.

4      **Q**   IN WHAT CONTEXT, THE COMPETENCY EVALUATION?

5      **A**   I BELIEVE THAT WAS PART OF WHEN HE HAD TO HAVE HIS

6  SURGERY DONE ON HIS JAW.  I WOULD HAVE TO DOUBLE CHECK, BUT I

7  BELIEVE THAT WAS WHEN THE EVALUATION WAS.

8      **Q**   COULD IT HAVE BEEN ABOUT GUARDIAN AD LITEM?

9      **A**   YEAH, IT MAY HAVE BEEN A PART OF THAT PROCESS AS

10  WELL.

11      **Q**   OKAY.  THANK YOU.  ANYWAY, BASED ON YOUR EXPERIENCE

12  AND TRAINING AS A FORENSIC PSYCHIATRIST, DO YOU BELIEVE YOU

13  HAVE ENOUGH INFORMATION TO FORM AN OPINION ABOUT -- ABOUT THE

14  APPROPRIATENESS OF INCARCERATING MR. GEORGE FROM A CLINICAL

15  POINT OF VIEW IN 2013 AND 2014?

16      **A**   YES, I DO.

17      **Q**   AND WHAT IS YOUR OPINION?

18      **A**   THAT IN NEITHER OF THOSE TIMES WAS IT CLINICALLY

19  APPROPRIATE TO INCARCERATE HIM.  IN 2013, THE RECORDS NOTE

20  THAT HE HAD BEEN HAVING INCREASING PSYCHOTIC SYMPTOMS,

21  AGITATION, IRRITABILITY AND THREATENING BEHAVIOR WITH HIS

22  STAFF AT THE GROUP HOME, AND WHAT THAT REALLY REQUIRES IS THAT

23  SOMEONE NEEDS HOSPITALIZATION TO HAVE THEIR MEDICATIONS

24  ADJUSTED.  THEY DON'T NEED TO BE PUT INTO JAIL WHERE THEY

25  WON'T GET THEIR MEDICINES, AT LEAST, INITIALLY, AND WHERE THEY

1    DON'T HAVE ACCESS TO THE BASIC SERVICES THAT A PSYCHIATRIC

2    HOSPITAL CAN PROVIDE.

3          SO -- AND THE SAME THING APPLIES IN 2014 WHEN

4    MR. GEORGE WAS ALREADY IN A PSYCHIATRIC HOSPITAL, SO HIS

5    OUTPATIENT TEAM, EVERYONE HAD RECOGNIZED THAT HE NEEDED THAT

6    SORT OF HELP, AGAIN, FOR SYMPTOMS OF WORSENING PSYCHOSIS,

7    AGITATION AND THAT DESPITE THAT, THEY MOVED HIM TO A JAIL

8    SETTING WHERE, AGAIN, HE'S NOT GETTING THE APPROPRIATE

9    TREATMENT HE NEEDS, THERE'S NOT TREATMENT PLANS, THEY'RE VERY

10   LOW STAFFED COMPARED TO A PSYCHIATRIC HOSPITAL SETTING WHERE

11   HE CAN HAVE THE APPROPRIATE TREATMENT MODALITIES THAT HE NEEDS

12   TO IMPROVE.

13         PUTTING ANYONE IN A JAIL SETTING IS VERY STRESSFUL,

14   BUT ESPECIALLY INDIVIDUALS WITH MENTAL HEALTH CONDITIONS.

15   THEY'RE VERY SUSCEPTIBLE TO THE IMPACT OF THE SOCIAL ISOLATION

16   OF BEING IN A JAIL.  FOR MR. GEORGE HE WAS ON 23-PLUS HOUR

17   LOCKDOWN, WHICH IS VERY DIFFICULT FOR ANYONE TO DEAL WITH.

18   BUT, AGAIN, SOMEONE WHO'S ALREADY PARANOID, IS SUFFERING

19   VOICES IN THEIR HEAD, HAS DIFFICULTY DISTINGUISHING REALITY,

20   TO PUT THEM ALONE IN A ROOM JUST FURTHER EXACERBATES THEIR

21   MENTAL HEALTH CONDITION.  SO FOR HIM, THAT WAS NOT CLINICALLY

22   APPROPRIATE.  HE COULD HAVE BEEN TREATED IN THE HOSPITAL AND

23   RECEIVED THE CARE THAT HE ACTUALLY NEEDED.

24   Q    SO, AND I THINK YOU'VE ANSWERED THIS, BUT I'LL ASK

25   IT AGAIN.  SO BASED ON YOUR EXPERIENCE AND TRAINING AS A

1  FORENSIC PSYCHIATRY (SIC) AND YOUR REVIEW OF MR. GEORGE'S

2  RECORDS AND OTHER DOCUMENTS, DO YOU HAVE AN OPINION AS TO

3  WHETHER MR. GEORGE WAS DEPRIVED OF MENTAL HEALTH TREATMENT

4  WHILE INCARCERATED IN 2013 AND '14?

5  **A**    YES, IT IS MY OPINION WITH REASONABLE MEDICAL

6  CERTAINTY THAT HE WAS DEPRIVED OF THE APPROPRIATE MEDICAL

7  TREATMENT THAT HE NEEDED.

8  **Q**    AND BASED ON YOUR EXPERIENCE AND TRAINING AS A

9  FORENSIC PSYCHIATRIST AND YOUR REVIEW OF THE DOCUMENTS AND

10  YOUR INTERVIEWS WITH -- WITH THE INDIVIDUALS YOU DISCUSSED, DO

11  YOU HAVE AN OPINION ABOUT WHETHER MR. GEORGE WAS HARMED AS A

12  RESULT OF THESE INCARCERATIONS?

13  **A**    YES, IT'S MY OPINION, AGAIN, WITH REASONABLE MEDICAL

14  CERTAINTY, THAT MR. GEORGE WAS HARMED AS A RESULT OF THIS AND

15  THAT, YOU KNOW, IT WAS A DIRECT AND PROXIMATE HARM RELATED TO

16  THESE INCARCERATIONS.   HIS FUNCTIONING WAS DIFFERENT BEFORE

17  THE INCARCERATIONS WHEN YOU COMPARE IT TO AFTER.

18           AND I THINK, YOU KNOW, IT'S -- IT'S SUCH A

19  SIGNIFICANT DIFFERENCE THAT MR. GEORGE IS NOT ABLE TO LIVE HIS

20  LIFE TO THE FULLEST AT THIS POINT.   YOU KNOW, HE'S IN A

21  HOSPITAL SETTING.   HE HASN'T BEEN ABLE TO GET OUT FOR A LONG

22  TIME.   HE'S NOT AS ACTIVE WITH HIS FAMILY.   HE'S NOT

23  PARTICIPATING IN THE COMMUNITY AS HE WAS ABLE TO DO BEFORE,

24  AND THESE ARE SIGNIFICANT HARMS THAT WOULD BE FORESEEABLE THAT

25  SOMEONE WHO NEEDS TO BE IN A HOSPITAL IS NOT GOING TO HAVE THE

1   SAME KIND OF OUTCOME BY PUTTING THEM INTO A JAIL SETTING.

2        **Q**     NOW, THERE'S BEEN A SUGGESTION THAT HIS PRIOR DRUG

3   USE IS REALLY THE CAUSE OF HIS DETERIORATION.  DO YOU HAVE ANY

4   THOUGHTS ON THAT?

5        **A**     YOU KNOW, HE DOES HAVE A HISTORY OF DRUG USE, BUT

6   THE DRUG USE, HE HAS HAD DRUG SCREENS WHILE HE'S BEEN IN THE

7   COMMUNITY AS PART OF HIS CONDITIONAL RELEASE, AND HE DIDN'T

8   HAVE POSITIVE DRUG SCREENS.  I BELIEVE THE LAST ONE WAS 2010

9   OR 2011, AND AFTER THAT TIME HE WASN'T USING ANY DRUGS

10  ANYMORE.  SO IT WOULDN'T MAKE SENSE THAT THE DRUGS WOULD BE

11  THE CAUSE OF THE CHANGES THAT OCCURRED IN 2013 AND '14 WHEN HE

12  HAD USED THOSE SEVERAL YEARS BEFORE.  SO NO, I DON'T FEEL THAT

13  THERE'S MERIT IN THAT ASSERTION THAT THE DRUGS WERE THE CAUSE

14  OF THE CHANGES.

15       **Q**     AND BY THE WAY, DO YOU WORK WITH INDIVIDUALS THAT

16  HAVE SUBSTANCE ABUSE ISSUES?

17       **A**     YES, THE MAJORITY OF PATIENTS WHO ARE INVOLVED IN

18  THE FORENSIC SYSTEM DO HAVE SOME HISTORY OF SUBSTANCE USE.

19  OFTENTIMES, PEOPLE WILL TRY TO TREAT THEIR OWN SYMPTOMS

20  THROUGH SUBSTANCES OF ABUSE, OR THEY MAY JUST BE MORE

21  SUSCEPTIBLE TO PEOPLE WHO ARE TRYING TO SELL THEM DRUGS.  BUT

22  IT'S VERY TYPICAL THAT INDIVIDUALS WITH SCHIZOPHRENIA,

23  SCHIZO-AFFECTIVE DISORDER HAVE CO-OCCURRING SUBSTANCE USE

24  DISORDER.  SO I WOULD SAY ABOUT 70 TO 80 PERCENT OF MY

25  PATIENTS IN THE HOSPITAL HAVE A CO-OCCURRING SUBSTANCE USE

1  DISORDER.

2         **MR. LOSPENNATO:**  I HAVE NO OTHER QUESTIONS FOR THE

3  TIME BEING.

4         **THE COURT:**  CROSS-EXAMINATION, MR. HILBURN?

5         **MR. HILBURN:**  YES, YOUR HONOR.

6  **CROSS-EXAMINATION**

7  **BY MR. HILBURN:**

8     **Q**    GOOD MORNING, DR. SMITH.  CAN YOU HEAR ME OKAY?

9     **A**    GOOD MORNING.  YES, I CAN.

10    **Q**    THIS IS JAMES HILBURN.  SO THE RECORD'S CLEAR, YOU

11 MENTIONED A MOMENT AGO A DR. O'LEARY PERFORMED A COMPETENCY

12 EVALUATION OF MR. GEORGE, I BELIEVE IT WAS BACK IN 2015; IS

13 THAT CORRECT?

14    **A**    THAT'S MY RECOLLECTION WAS THAT IT WAS, I BELIEVE,

15 IN THE SPRING OF 2015.  I'D HAVE TO LOOK THROUGH MY REPORT TO

16 GET THE EXACT DATE.

17    **Q**    AND IS IT TRUE THAT DR. O'LEARY WAS HIRED BY

18 MR. GEORGE'S LAWYERS TO PERFORM THAT COMPETENCY EVALUATION; IS

19 THAT RIGHT?

20    **A**    YES.

21    **Q**    IS IT TRUE THAT YOUR RECORDS REVIEW IN THIS CASE

22 WENT BACK TO THE YEAR 2007?

23    **A**    YES.

24    **Q**    IN OTHER WORDS, YOU DIDN'T REVIEW ANY RECORDS PRIOR

25 TO 2007; CORRECT?

1    **A**    THAT'S CORRECT.

2    **Q**    AND YOU WOULD AGREE THAT MR. GEORGE'S MENTAL HEALTH

3    HAS STEADILY DECLINED SINCE HE WAS FOUND NOT GUILTY BY REASON

4    OF INSANITY IN 2008 UNTIL THE PRESENT TIME?

5    **A**    YES, THERE'S BEEN A SIGNIFICANT DECLINE COMPARED TO

6    2008 TO NOW.

7    **Q**    DO YOU RECALL HIS DIAGNOSIS -- HIS, MR. GEORGE'S,

8    DIAGNOSIS IN 2008 WHEN HE WAS FOUND NOT GUILTY BY REASON OF

9    INSANITY?

10   **A**    YEAH.  AS I SAID, HE'S HAD VARIOUS DIAGNOSES

11   THROUGHOUT THE YEARS.  THEY'VE ALL BEEN IN THE PSYCHOTIC

12   SPECTRUM.  BUT AT TIMES, IT WAS PSYCHOSIS NOT OTHERWISE

13   SPECIFIED; AT OTHER TIMES, SCHIZOPHRENIA; AT OTHER TIMES,

14   SCHIZO-AFFECTIVE DISORDER.  SO I COULDN'T TELL YOU EXACTLY

15   WHAT THE LABEL WAS AT THAT POINT, BUT THAT'S BEEN A KIND OF

16   GENERAL PROGRESSION FROM A MORE KIND OF CATCHALL PSYCHOTIC

17   TERM TO A MORE SPECIFIED SCHIZOPHRENIA DIAGNOSIS.

18   **Q**    ARE YOU AWARE THAT MR. GEORGE WAS DIAGNOSED WITH

19   MENTAL HEALTH ISSUES AS EARLY AS AGE 12?

20   **A**    YES, I AM.

21   **Q**    ARE YOU AWARE THAT IN 2008, MR. GEORGE WAS DIAGNOSED

22   AS BEING PARANOID SCHIZOPHRENIC WITH MENTAL RETARDATION?

23   **A**    THAT SOUNDS APPROPRIATE, YES.

24   **Q**    AND YOU'RE AWARE THAT HE WAS DIAGNOSED WITH HAVING

25   SEVERE DRUG ABUSE ISSUES IN 2008?

1      **A**    YES.

2      **Q**    AND DO YOU RECALL THOSE DRUGS BEING THE REGULAR

3  LONG-TERM USE OF COCAINE?

4      **A**    THAT WAS ONE OF THE DRUGS, YES.

5      **Q**    DO YOU REMEMBER IT BEING -- ANOTHER DRUG BEING OF

6  LONG-TERM USE METHAMPHETAMINE OR METH?

7      **A**    YES, THAT'S CORRECT.

8      **Q**    AND ALSO MARIJUANA?

9      **A**    THAT'S CORRECT.

10      **Q**    AND ALSO, MR. GEORGE APPARENTLY HAS BEEN DRINKING

11  SINCE HE WAS AN EARLY TEENAGER, DRINKING ALCOHOL, SINCE HE WAS

12  AN EARLY TEENAGER; IS THAT CORRECT?

13      **A**    HE STATED THAT'S WHEN HE STARTED, ALTHOUGH HE DID

14  TELL ME THAT THAT WAS NEVER ONE OF HIS SUBSTANCES OF PRIMARY

15  USE.  HE SAID THAT HE DID START EXPERIMENTING WITH ALCOHOL AS

16  A TEEN, BUT THAT THAT'S NOT BEEN SOMETHING THAT HE HAS

17  CONSIDERED ONE OF HIS MAJOR SUBSTANCES OF USE.

18      **Q**    AND THE POSITIVE DRUG TEST WHILE HE WAS ON

19  CONDITIONAL RELEASE, WOULD THAT HAVE BEEN FOR THE

20  METHAMPHETAMINE AND COCAINE?

21      **A**    YES.  HE HAD ONE THAT WAS POSITIVE FOR

22  METHAMPHETAMINE AND COCAINE AND ONE THAT WAS POSITIVE FOR

23  MARIJUANA.

24      **Q**    DO YOU KNOW, FROM A CLINICAL STANDPOINT, IF THERE'S

25  ANY SAFE LEVEL FOR A PERSON TO TAKE COCAINE FOR A LONG PERIOD

1   OF TIME?

2        **A**     THERE'S NOT.

3        **Q**     IS THERE ANY -- BY THAT, I MEAN I'M TALKING ABOUT

4   DAMAGE TO THE BRAIN.  YOU UNDERSTAND WHAT I MEAN BY THAT?  IS

5   THERE ANY -- WHEN I SAY CLINICAL SIGNIFICANCE?

6        **A**     I'M SORRY, CAN YOU RESTATE THE QUESTION?

7        **Q**     YEAH, I'LL RESTATE THE QUESTION.  FROM A CLINICAL

8   STANDPOINT, WITH RESPECT TO HIS -- THE FUNCTIONING OF HIS

9   BRAIN, IS THERE ANY SAFE LEVEL FOR A PERSON TO BE A LONG-TERM

10  COCAINE USER?

11       **A**     NO, THERE'S NOT.

12       **Q**     THE SAME QUESTION FOR METHAMPHETAMINE, IS THERE ANY

13  SAFE LEVEL FOR THE BRAIN WITH RESPECT TO THE USE OF

14  METHAMPHETAMINE?

15       **A**     AMPHETAMINES ARE A LITTLE DIFFERENT BECAUSE THEY CAN

16  BE PRESCRIBED, CERTAIN FORMS OF AMPHETAMINES, FOR ATTENTION

17  DEFICIT HYPERACTIVITY DISORDER.  SO THERE ARE SAFE WAYS THAT

18  IT CAN BE PRESCRIBED IN A CLINICAL SETTING.  BUT IF YOU'RE

19  REFERRING TO STREET METHAMPHETAMINE, THEN I WOULD AGREE THAT

20  THERE'S NO SAFE LEVEL.

21       **Q**     AND WHAT ABOUT MARIJUANA; WHAT ABOUT THE SAFE LEVEL

22  OF MARIJUANA ON THE FUNCTIONING OF THE BRAIN AND ANY DAMAGE TO

23  THE BRAIN?

24       **A**     THERE'S MUCH LESS RESEARCH REGARDING MARIJUANA, BUT,

25  YOU KNOW, AT THIS POINT IT'S NOT FDA APPROVED AND WHILE THERE

1  ARE STATES THAT HAVE APPROVED ITS MEDICINAL USE, THERE'S NO

2  SET LEVEL THAT'S CLINICALLY ACCEPTABLE, SO I WOULD AGREE WITH

3  THAT STATEMENT.

4  **Q**    WOULD YOU AGREE THAT COCAINE ALONE, THE USE OF

5  COCAINE ALONE, ESPECIALLY OVER A LONG PERIOD OF TIME, DAMAGES

6  THE BRAIN?

7  **A**    YES, IT CAN.

8  **Q**    THE SAME THING WITH STREET -- WE'RE GOING TO REFER

9  TO IT AS STREET METHAMPHETAMINE.  CAN THE LONG-TERM USE OF

10 STREET METHAMPHETAMINE, BY ITSELF, CAUSE DAMAGE TO THE BRAIN?

11 **A**    IT CAN, YES.

12 **Q**    AND HOW ABOUT THE LONG-TERM USE OF MARIJUANA, CAN

13 THAT CAUSE DAMAGE TO THE BRAIN?

14 **A**    IN SOME PEOPLE, IT CAN.  IN OTHER PEOPLE, IT

15 DOESN'T; BUT, YOU KNOW, IT COULD POTENTIALLY IN SOME PEOPLE,

16 YES.

17 **Q**    AND IF YOU COMBINE ALL THREE OF THOSE DRUGS AT THE

18 SAME TIME, CHRONIC, LONG-TERM, MULTI-DECADE USE, WOULD YOU

19 EXPECT THAT TO HAVE A BAD EFFECT ON THE FUNCTIONING OF THE

20 BRAIN?

21 **A**    IT COULD.  HAVING ALL THREE TOGETHER COULD HAVE KIND

22 OF AN ADDITIVE EFFECT POTENTIALLY.

23 **Q**    WHAT IF YOU ADD THE PERSON WHO'S DOING THOSE THINGS

24 ALSO IS SUFFERING FROM SERIOUS MENTAL ILLNESS, SUCH AS

25 SCHIZOPHRENIA?

1       **A**     AGAIN, THAT'S -- IT'S VERY TYPICAL THAT INDIVIDUALS

2    WITH SCHIZOPHRENIA WILL USE THESE SUBSTANCES TO TRY TO DEAL

3    WITH THEIR ILLNESS.  THEY'RE ALSO JUST AT HIGHER RISK FOR

4    SUBSTANCE USE DISORDERS, SO IT CAN HAVE, AGAIN, AN ADDITIVE

5    EFFECT ON INDIVIDUALS.

6       **Q**     YOU WOULD AGREE THAT IN 2008, WHEN MR. GEORGE WAS

7    FOUND NOT GUILTY BY REASON OF INSANITY, THAT HE HAD

8    SIGNIFICANT COGNITIVE FUNCTIONING LIMITATIONS?

9       **A**     YES, THAT'S CORRECT.

10      **Q**     WHAT ARE COGNITIVE FUNCTIONING LIMITATIONS?

11      **A**     IN MR. GEORGE'S CASE, HE HAS BEEN DIAGNOSED WITH AN

12   INTELLECTUAL DISABILITY SINCE CHILDHOOD.  HE'S HAD IQ SCORES

13   RANGING ANYWHERE FROM, I BELIEVE, 56 TO 65, WHICH IS IN THE

14   MILD RANGE OF INTELLECTUAL DISABILITY.  SO AN AVERAGE WOULD BE

15   100.  SO FOR HIM AND INDIVIDUALS WITH SIMILAR LEVELS OF

16   INTELLECTUAL DISABILITY, IT WILL BE DIFFICULT TO LEARN NEW

17   INFORMATION, DIFFICULTIES WITH -- THERE'S SOME DAY-TO-DAY

18   ACTIVITIES, ALTHOUGH, AGAIN, HE DID VERY WELL DESPITE THIS.

19   HE WAS ABLE TO CARE FOR HIS GROOMING, CARE FOR HIMSELF IN A

20   SUPERVISED GROUP HOME SETTING.  BUT YES, HE HAS FUNCTIONED

21   WITHIN THAT MILD INTELLECTUAL DISABILITY RANGE HIS ENTIRE

22   LIFE.

23      **Q**     DURING YOUR INTERVIEW WITH MR. GEORGE BACK IN MARCH

24   OF 2015, HE TERMINATED THAT INTERVIEW WITH YOU, DIDN'T HE?

25      **A**     YES.  HE HAD GOTTEN UP SEVERAL TIMES DURING THE

1  INTERVIEW, BUT EACH TIME I WAS ABLE TO REDIRECT HIM TO SIT

2  BACK DOWN AND CONTINUE.   AND THEN, FINALLY, I WAS DONE WITH

3  THE QUESTIONS I HAD, SO I ALLOWED HIM TO TERMINATE THE

4  INTERVIEW AT THAT POINT.

5      **Q**    AND YOU'VE REVIEWED THE ELMHS'S RECORDS, CERTAIN

6  PARTS OF THE ELMHS'S RECORDS, I GUESS, PERTAINING TO

7  MR. GEORGE; IS THAT RIGHT?

8      **A**    YES.

9      **Q**    IS IT TRUE TO SAY THAT YOU HAVE -- YOU TAKE NO ISSUE

10 WITH THE TREATMENT THAT MR. GEORGE RECEIVED AT ELMHS; IS THAT

11 RIGHT?

12     **A**    THAT'S CORRECT.   THEY HAD HIM ON APPROPRIATE

13 TREATMENTS, INCLUDING ANTIPSYCHOTIC MEDICATIONS, MOOD

14 STABILIZERS.   THEY MADE APPROPRIATE ADJUSTMENTS AS NEEDED.

15     **Q**    WOULD YOU AGREE THAT EACH TIME A PERSON GOES OFF

16 THEIR MEDICATIONS, SUCH AS MR. GEORGE IN THIS CASE, WITH HIS

17 CONDITIONS, THAT MEDICATIONS CAN BE DAMAGING TO THAT PERSON?

18     **A**    YES.   I FIND IN MY CLINICAL PRACTICE THAT EACH TIME

19 SOMEONE GOES OFF THEIR MEDICINE, IT CAN BE MORE DIFFICULT TO

20 GET THEM BACK TO THE PREVIOUS BASELINE THEY WERE AT.   SO

21 DISRUPTIONS IN MEDICATION CAN BE DETRIMENTAL TO THE PERSON'S

22 LONG-TERM FUNCTIONING.

23     **Q**    AND YOU'RE AWARE, CERTAINLY, OF THE VARIOUS

24 INSTANCES WHERE MR. GEORGE WENT OFF OF HIS MEDICATIONS PRIOR

25 TO JULY 29TH, 2013?

1    **A**    YES.   THAT WAS OFTEN THE CAUSE OF HIS

2    HOSPITALIZATIONS.  SO HE MIGHT STOP TAKING THE MEDICINE IN THE

3    COMMUNITY, AND THEN THEY WOULD PUT HIM INTO THE HOSPITAL SO

4    HIS MEDICINES COULD BE ADJUSTED AND RESTARTED APPROPRIATELY.

5    **Q**    YOU SPOKE ABOUT MR. GEORGE BEING INCARCERATED AT

6    EAST BATON ROUGE PARISH PRISON ON JULY 29TH, 2013.  DO YOU

7    RECALL HOW MANY TIMES PRIOR TO JULY 29TH, 2013 MR. GEORGE HAD

8    BEEN INCARCERATED AT EAST BATON ROUGE PARISH PRISON?

9        **MR. LOSPENNATO:**  I OBJECT YOUR HONOR, IRRELEVANT.

10       **THE WITNESS:**  I'M NOT SURE --

11       **THE COURT:**  HANG ON ONE SECOND.  HOLD ON, DOCTOR.  I

12   HAVE AN OBJECTION.  AND CAN YOU PUT THE OBJECTION IN THE MIC.

13       *(REPORTER'S NOTE:  AT THIS TIME THE FOLLOWING MATTER*

14   *WAS HELD AT THE BENCH.)*

15       **THE COURT:**  OKAY.  EVERYBODY ON?  YES, WHAT IS YOUR

16   OBJECTION?

17       **MR. LOSPENNATO:**  MY OBJECTION IS THAT IT'S

18   IRRELEVANT.

19       **THE COURT:**  AND THE QUESTION IS WHETHER HE HAD HAD

20   PREVIOUS ADMISSIONS TO EAST BATON ROUGE PARISH PRISON?

21       **MR. LOSPENNATO:**  YES, SIR.

22       **THE COURT:**  ALL RIGHT.  WHY IS THAT IRRELEVANT?

23       **MR. LOSPENNATO:**  THERE'S NO FOUNDATION FOR IT.

24   THERE'S NO INDICATION THAT IT WAS ANY TIME IN THE RELEVANT

25   PERIOD THAT WE'RE TALKING ABOUT.

1           **THE COURT:**  ALL RIGHT.  I OVERRULE THE OBJECTION.

2   THE WITNESS CAN ANSWER THE QUESTION.

3           **REPORTER'S NOTE:**  (WHEREUPON THE BENCH CONFERENCE

4   WAS CONCLUDED.)

5   **BY MR. HILBURN:**

6       **Q**    DR. SMITH, WE'RE CONTINUING AGAIN.  ARE YOU AWARE OF

7   THE NUMBER OF TIMES MR. GEORGE HAS BEEN INCARCERATED AT EAST

8   BATON ROUGE PARISH PRISON PRIOR TO JULY 29, 2013?

9       **A**    I'M NOT SURE WHERE EACH OF HIS INCARCERATIONS HAVE

10  BEEN, BUT I KNOW HE HAS A LENGTHY LEGAL HISTORY OF ABOUT 30

11  ARRESTS.  I DON'T KNOW IF THEY WERE ALL IN EAST BATON ROUGE

12  PARISH PRISON OR OTHER VARIOUS PARISHES, BUT I KNOW THAT HE

13  DOES HAVE A LENGTHY LEGAL HISTORY.

14      **Q**    BEFORE YOU EXPRESSED YOUR OPINIONS IN THIS CASE, YOU

15  WERE PROVIDED WITH CERTAIN DOCUMENTS, WEREN'T YOU?

16      **A**    YES.

17      **Q**    AND CERTAIN INFORMATION ORALLY; IS THAT CORRECT?

18  PEOPLE TOLD YOU THINGS?

19      **A**    YES, CORRECT.

20      **Q**    WERE YOU PROVIDED WITH INFORMATION REGARDING HIS

21  PRIOR INCARCERATIONS AT EAST BATON ROUGE PARISH PRISON BEFORE

22  YOU RENDERED YOUR OPINIONS IN THIS CASE?

23      **A**    YES, I KNEW THAT HE HAD MULTIPLE PRIOR

24  INCARCERATIONS.

25      **Q**    CAN YOU THINK OF ANY MEDICATIONS THAT COULD HAVE

1    BEEN ADMINISTERED TO MR. GEORGE, SAY, PRIOR TO JULY 29TH,

2    2013, THAT COULD HAVE REVERSED HIS MENTAL RETARDATION OR HIS

3    LEARNING DISABILITIES THAT HE HAD?

4         **A**    THERE ARE NO SUCH MEDICATIONS THAT EXIST.

5         **Q**    ANY SUCH MEDICINE YOU KNOW THAT COULD BE GIVEN TO

6    MR. GEORGE PRIOR TO JULY 29TH, 2013 THAT COULD REVERSE THE

7    EFFECTS OF HIS LONG-TERM CHRONIC DRUG ABUSE?

8         **A**    SIMILARLY THERE'S NO MEDICINE THAT'S FDA APPROVED

9    FOR THAT SORT OF AN INDICATION.

10        **Q**    YOU RECALL THE INCIDENT THAT OCCURRED AT THE ELMHS

11   EAST ACUTE UNIT INVOLVING DR. VOSBURG AND DR. KELLY WHERE

12   MR. GEORGE BECAME AGGRESSIVE WITH THE DOCTORS WHEN THEY WERE

13   DOING A CONSULTATION WITH HIM?

14        **A**    I'VE SEEN THE RECORDS REGARDING IT, YES.

15        **Q**    AND YOU AGREE, DON'T YOU, THAT IT WAS PROPER TO --

16   FOR THE -- THE DECISION THAT WAS MADE TO MOVE MR. GEORGE OUT

17   OF THE EAU AFTER THAT CONFRONTATION?

18        **A**    I THINK MOVING HIM TO A MORE SECURE PART OF THE

19   HOSPITAL WAS APPROPRIATE.   THAT'S SOMETHING WE TYPICALLY SEE

20   IN OUR HOSPITAL SYSTEM.   AGAIN, I'M THE ONLY MAXIMUM SECURITY

21   HOSPITAL IN ALL OF OHIO, SO FREQUENTLY IF THERE'S AN

22   INDIVIDUAL WHO'S AT ONE OF THE NON-MAXIMUM-SECURITY HOSPITALS

23   ACROSS OHIO AND THEY'RE HAVING DIFFICULTY, BEING ASSAULTIVE OR

24   THREATENING, THEY'LL MOVE THEM DIRECTLY TO US IN THE MAXIMUM

25   SECURITY FACILITY.   SO I THINK THAT'S APPROPRIATE.

1      BUT THOSE INDIVIDUALS, UNLESS THERE ARE NEW CHARGES

2  THAT ARE FILED FOR SOME REASON, DON'T GO TO JAIL.  THEY MOVE

3  FROM ONE HOSPITAL SETTING TO ANOTHER SO THAT THEIR TREATMENT

4  PLAN CAN BE CONTINUED AND ADJUSTED AS NEEDED, MEDICINES CAN BE

5  ADJUSTED.  THE THERAPEUTIC ENVIRONMENTS IN THE MAXIMUM

6  SECURITY FACILITIES IS SPECIALLY DESIGNED TO HELP THESE

7  INDIVIDUALS COPE AND DEAL WITH THE PARANOIA THAT THEY'RE

8  HAVING.  SO I AGREE THAT MOVING HIM TO A MORE SECURE FACILITY

9  WAS APPROPRIATE.  IT'S MOVING HIM TO A JAIL SETTING THAT I

10 THINK WAS DETRIMENTAL TO HIM.

11     Q    I'M GLAD YOU BROUGHT UP OHIO, THE STATE THAT YOU

12 PRACTICE IN.  ISN'T IT TRUE THAT IN OHIO, THERE ARE

13 CIRCUMSTANCES IN WHICH SOMEONE WHO'S BEEN FOUND NOT GUILTY BY

14 REASON OF INSANITY AND VIOLATES THE CONDITIONAL RELEASE CAN BE

15 PLACED IN THE LOCAL JAILS UP IN OHIO; IS THAT RIGHT?

16     A    THERE ARE.  YOU KNOW, AGAIN, IF SOMEONE IS

17 ASSAULTIVE AND THEY GET NEW CHARGES AS A RESULT OF THAT,

18 THEY'LL GO TO THE JAIL TO BE ADJUDICATED ON THOSE NEW CHARGES.

19 IF SOMEONE IS IN THE COMMUNITY AND IS NOT DOING WELL, THEY'LL

20 GO INTO THE HOSPITAL UNLESS THERE'S A SITUATION WHERE THE

21 PERSON CAN'T BE FOUND.  IN THAT CASE, THE COURT HAS THE

22 SHERIFF'S DEPARTMENT PICK THEM UP AND BECAUSE THE SHERIFFS

23 CAN'T DIRECTLY ADMIT TO THE HOSPITAL, THE SHERIFFS DO HAVE TO

24 TAKE THEM INITIALLY TO THE JAIL BEFORE THEY CAN GO TO THE

25 HOSPITAL.  BUT THAT'S VERY ATYPICAL THAT THAT HAPPENS.

1    **Q**    WITH RESPECT TO MR. GEORGE'S ISSUES OVER THE YEARS

2   WITH NOT TAKING HIS MEDICINE AS DIRECTED, THE EFFECTS OF THAT

3   ARE THE SAME WHETHER OR NOT HE'S IN A GROUP HOME AND NOT

4   TAKING HIS MEDICINE OR HE'S AT EAST BATON ROUGE PARISH PRISON

5   AND NOT TAKING HIS MEDICINE; IS THAT RIGHT?

6    **A**    WELL, WHEN HE WAS AT THE GROUP HOME AND NOT TAKING

7   HIS MEDICINE, HE WAS MOVED TO A HOSPITAL SETTING WHERE IT WAS

8   RESTARTED AND ADJUSTED.   ADDITIONALLY, WHEN YOU'RE IN A GROUP

9   HOME, HE HAD DAY TREATMENT, HE HAD THERAPEUTIC WORKERS.   IN

10  THE JAIL, HE HAS 23-PLUS HOURS A DAY, SECLUDED IN A ROOM BY

11  HIMSELF, WITH GUARDS WHO AREN'T NECESSARILY TRAINED IN HOW TO

12  DEAL WITH INDIVIDUALS WITH SEVERE AND PERSISTENT MENTAL

13  ILLNESS.   SO IT IS MORE DETRIMENTAL, THE COMBINATION OF

14  EVERYTHING WHEN SOMEONE IS IN THE JAIL AND NOT ON THEIR

15  MEDICINE.

16   **Q**    YOU HAVE REVIEWED THE RECORDS -- MEDICAL RECORDS

17  FROM EAST BATON ROUGE PARISH JAIL, HAVE YOU NOT, FOR

18  MR. GEORGE?

19   **A**    YES, I HAVE.

20   **Q**    AND AFTER REVIEWING THOSE RECORDS FOR 2013 AND 2014,

21  ISN'T IT TRUE THERE ARE NO NOTATIONS IN THOSE RECORDS THAT

22  MR. GEORGE WAS REFUSING TO TAKE HIS MEDICATIONS WHILE AT EAST

23  BATON ROUGE PARISH JAIL; IS THAT RIGHT?

24   **A**    THERE IS ONE NOTATION THAT SAID HE WAS ON AND OFF

25  THE MEDICINE BUT, IN FACT, ONE OF THE NOTES ACTUALLY SAYS THAT

1   HE, HIMSELF, BROUGHT UP THAT HE WAS SUPPOSED TO BE ON MEDICINE

2   SO THAT HE HAD ACTUALLY TOLD STAFF THAT HE WAS SUPPOSED TO BE

3   TAKING MEDICINE AND WASN'T GETTING IT.

4   **Q**   THAT'S RIGHT.  SO IN OTHER WORDS, WHEN HE WAS AT

5   EAST BATON ROUGE PARISH PRISON IN 2013 AND AGAIN IN 2014,

6   THERE WAS NO NEED, BASED ON THE MEDICAL RECORDS, TO FORCE

7   MEDICATE MR. GEORGE, WAS THERE?

8   **A**   ONCE THE MEDICINES WERE PRESCRIBED, IT DID LOOK LIKE

9   HE WAS, FOR THE MOST PART, CONSISTENT.  OTHER THAN THAT, AS I

10  SAID, ONE NOTATION THAT TALKED ABOUT BEING OFF AND ON.

11  **Q**   ARE YOU AWARE, BASED ON YOUR REVIEW OF THE RECORDS,

12  THAT BACK IN 2012, DR. CHARLES VOSBURG, A TREATING FORENSIC

13  PSYCHIATRIST AT ELMHS, NOTED THAT MR. GEORGE HAD EXTRA

14  PYRAMIDAL SYMPTOMS?  YOU ARE AWARE OF THAT, AREN'T YOU?

15  **A**   YES.  I KNEW THAT HE HAD BEEN, YES, DIAGNOSED WITH

16  EPS, OR EXTRA PYRAMIDAL SYMPTOMS, YES.

17  **Q**   WHEN YOU WERE IN BATON ROUGE, OR LOUISIANA, MEETING

18  WITH MR. GEORGE, YOU WERE AT ELMHS; CORRECT?

19  **A**   THAT'S CORRECT.

20  **Q**   DID YOU GO AND LOOK AT THE FORENSIC SIDE OF THE

21  HOSPITAL UP IN JACKSON, THE FORENSIC FACILITY WHILE YOU WERE

22  THERE?

23  **A**   NO, I ONLY SAW THE --

24  **Q**   DID YOU EVEN REQUEST TO BE ABLE TO GO LOOK AT THE

25  FORENSIC SIDE OF THE FACILITY SO YOU COULD EDUCATE YOURSELF AS

1  TO EXACTLY WHAT THAT OPERATION LOOKED LIKE?

2       **A**    I DID NOT.

3       **Q**    WHEN YOU WERE -- I GUESS YOU FLEW INTO -- WHEN YOU

4  WERE IN BATON ROUGE, I GUESS WE'LL SAY, BACK IN 2015 AND

5  EVALUATING MR. GEORGE, DID YOU GO TO THE EAST BATON ROUGE

6  PARISH JAIL?

7       **A**    I DID NOT.

8       **Q**    DID YOU EVEN REQUEST TO GO LOOK AT THE EAST BATON

9  ROUGE PARISH JAIL AND LOOK AT THE MEDICAL UNIT AND THE SINGLE-

10 CELL AREAS?

11      **A**    NO, I DID NOT.

12      **Q**    DO YOU KNOW ANYTHING ABOUT THE EAST BATON ROUGE

13 PARISH JAIL'S PRISON PSYCHIATRIST, DR. ROBERT BLANCHE?

14      **A**    NO.

15      **Q**    YOU DON'T KNOW ANYTHING ABOUT HIS CREDENTIALS, I

16 TAKE IT?

17      **A**    I DO NOT.

18      **Q**    YOU DON'T KNOW ANYTHING ABOUT HIS PROFESSIONAL

19 REPUTATION AS A PSYCHIATRIST, I TAKE IT?

20      **A**    THAT'S CORRECT.

21      **Q**    WERE YOU AWARE, BASED ON THE RECORDS THAT WERE

22 PROVIDED TO YOU, THAT DR. ROBERT BLANCHE WAS, IN FACT,

23 MR. GEORGE'S TREATING PSYCHIATRIST WHEN HE WAS OUTSIDE OF EAST

24 BATON ROUGE PARISH PRISON?

25      **A**    I DON'T BELIEVE I WAS AWARE OF IT AT THE TIME I

1  PREPARED THE REPORT, NO.

2              **MR. HILBURN:**  THAT'S ALL I HAVE.  THANK YOU VERY

3  MUCH, DR. SMITH.

4              **THE COURT:**  ALL RIGHT.  ANY REDIRECT?

5              **MR. LOSPENNATO:**  YES, YOUR HONOR.

6              **THE COURT:**  ALL RIGHT.

7  **REDIRECT**

8  **BY MR. LOSPENNATO:**

9      **Q**    DR. SMITH, I WANT TO TALK A LITTLE BIT ABOUT --

10 INITIALLY ABOUT THE RECORDS REVIEW FROM ELMHS, THE RECORDS

11 FROM 2007.  THOSE RECORDS WERE NOT LIMITED TO DESCRIBING

12 MR. GEORGE'S CIRCUMSTANCES TO THE PERIOD BETWEEN 2007 TO 2015,

13 WERE THEY?

14     **A**    THAT'S CORRECT.  THERE WERE SEVERAL REPORTS THAT HAD

15 SUMMARIZED HIS PREVIOUS TREATMENT HISTORY.

16     **Q**    AND SO YOU WERE AWARE OF WHAT WAS HAPPENING TO

17 MR. GEORGE PRIOR TO 2007?

18     **A**    YES, I WAS.

19     **Q**    WERE THERE REFERENCES, FOR EXAMPLE, TO HIS

20 EDUCATIONAL BACKGROUND?

21     **A**    YES, THERE WERE.

22     **Q**    DO YOU RECALL WHAT THOSE -- WHAT HIS EDUCATIONAL

23 BACKGROUND WAS?

24     **A**    HE HAD REQUIRED SPECIAL EDUCATION SERVICES, AGAIN

25 RELATED TO HIS INTELLECTUAL DISABILITY.  SO, YOU KNOW, HE DID

1    STRUGGLE SOME DURING HIS SCHOOL YEARS AS A RESULT OF THAT.

2        **Q**    NOW, I WANT TO GO BACK TO THE DISCUSSION ABOUT THE

3    DECLINE OF MR. GEORGE'S FUNCTIONING.  WHEN THE QUESTION WAS

4    ASKED, THE WORD "STEADILY" WAS USED IN THE QUESTION.  DO YOU

5    BELIEVE ACTUALLY THAT HIS DECLINE WAS STEADY?

6        **A**    NO.  YOU KNOW, AS I SAID, I FEEL THAT HE WAS -- HE

7    HAD A PRETTY CONSISTENT HISTORY OF BRIEF HOSPITAL STAYS WHERE

8    HE WOULD, YOU KNOW, AGAIN, MAYBE BE NONCOMPLIANT IN HIS GROUP

9    HOME, MAYBE HAVE SOME INCREASE IN PARANOIA, GO INTO THE

10   HOSPITAL, HAVE HIS MEDICINE ADJUSTED AND THEN BE ABLE TO GET

11   BACK INTO THE COMMUNITY.

12           AND THAT WAS HIS CONSISTENT HISTORY UNTIL 2013 AND

13   THAT INCARCERATION, WHEN AFTER THAT INCARCERATION, HE REALLY

14   WASN'T ABLE TO STAY OUT OF THE HOSPITAL FOR ANY LENGTH OF

15   TIME.  HE DID COME OUT BRIEFLY, BUT THEY WERE ALL, YOU KNOW, A

16   TWO-WEEK PERIOD HE WAS ABLE TO STAY OUT OF THE HOSPITAL, A

17   WEEK, AND THEN GOING BACK IN.  AND THEN SINCE HIS 2014

18   INCARCERATION, HE JUST HASN'T BEEN ABLE TO GET OUT AT ALL.

19   YOU KNOW, I DO FEEL THAT THERE HAS BEEN A DECLINE SINCE 2007,

20   2008, BUT IT WAS A VERY STEEP DECLINE AFTER 2013 AND 2014.

21       **Q**    NOW, WHERE DID YOU -- THE INFORMATION ABOUT

22   MR. GEORGE'S DRUG USE, WHERE DID THAT LARGELY COME FROM?

23       **A**    PRIMARILY FROM THE RECORDS.  HE DID TALK WITH ME TO

24   SOME EXTENT ABOUT IT.  YOU KNOW, SO I DID ASK HIM QUESTIONS

25   ABOUT IT.  AND HE TALKED WITH ME A LITTLE BIT ABOUT HIS DRUG

1    AND ALCOHOL USE, BUT PRIMARILY FROM THE RECORDS.

2         Q    IN THE RECORDS, IS IT CLEAR FROM THE RECORDS HOW

3    FREQUENTLY HE USED DRUGS?

4         A    IT'S NOT.  YOU KNOW, AS I SAID, HE HAD MULTIPLE

5    NEGATIVE DRUG SCREENS.  SO EVEN DURING THE TIME WHEN HE HAD

6    THE POSITIVE DRUG SCREEN FOR THE OPIATE AND COCAINE, HE HAD

7    OTHER DRUG SCREENS THAT WERE NEGATIVE.  SO IT CERTAINLY WASN'T

8    AN EVERYDAY THING THAT HE WAS USING AT THAT TIME.  BUT THERE'S

9    NOWHERE THAT IT TALKS ABOUT EXACTLY HOW MUCH HE WAS USING, HOW

10   MANY TIMES A WEEK, THAT DEGREE OF SPECIFICITY.

11        Q    AND IN TERMS OF -- IN TERMS OF THE REFERENCES TO HIS

12   DRUG USE PRIOR TO 2007, DID YOU SEE ANYTHING IN THE RECORDS

13   THAT, YOU KNOW, SORT OF IDENTIFIED DRUG SCREENS OR BLOOD TESTS

14   OR ANYTHING THAT WOULD VERIFY THAT HE HAD ACTUALLY BEEN USING

15   DRUGS AND TO WHAT DEGREE?

16        A    NOT THAT I CAN RECALL OFF THE TOP OF MY HEAD, NO.

17        Q    NOW, AGAIN, YOU TESTIFIED THAT EACH TIME HE GOES OFF

18   HIS MEDS, THERE'S AN ADVERSE IMPACT; ISN'T THAT RIGHT?

19        A    YES.

20        Q    OKAY.  OR COULD BE AN ADVERSE IMPACT.  WHICH IS MORE

21   APPROPRIATE TO SAY, IS IT COULD BE AN ADVERSE IMPACT OR

22   THERE'S ACTUALLY AN ADVERSE IMPACT?

23        A    IT COULD BE.  YOU KNOW, SOME PEOPLE ARE ABLE TO

24   TOLERATE IT.  OTHER PEOPLE, IT'S MORE OF A DRAMATIC IMPACT.

25   SO, YOU KNOW, I THINK IT'S THAT POTENTIAL IS THERE.

1    **Q**    RIGHT.  NOW, LET ME ASK YOU THIS, YOU INDICATED THAT

2    THE SEVERITY OF HIS MENTAL ILLNESS HAS, OVER TIME, INCREASED

3    SUBSTANTIALLY.  ARE THERE -- IS THERE A CORRELATION ABOUT THE

4    EFFECT OF WHEN SOMEBODY GOES OFF DRUGS AND THE -- THEIR LEVEL

5    OF -- AND THEIR LEVEL OF DISABILITY; IN OTHER WORDS, IF A

6    PERSON IS MORE -- IS MORE PSYCHOTIC AND IS HAVING MORE

7    PROBLEMS, IS IT MORE LIKELY GOING OFF THE DRUGS IS GOING TO

8    HAVE A SIGNIFICANT EFFECT THAN IF THEY'RE LESS PSYCHOTIC AND

9    LESS ILL?

10    **A**    WELL, WHAT I WOULD EXPECT IS THAT IF SOMEONE STOPS

11    THE DRUG USE AND HAS BEEN CLEAN OF DRUG USE FOR A FEW YEARS,

12    YOU'RE NOT GOING TO SEE ANY FURTHER IMPACT OF THE DRUG USE

13    BECAUSE THAT HAS STOPPED.  DOES THAT ANSWER THE QUESTION?

14    **Q**    WELL, THAT -- THAT'S A GOOD POINT, BUT THE QUESTION

15    I WAS ACTUALLY ASKING HAS TO DO WITH THE PSYCHOTROPIC

16    MEDICATIONS, THE MEDICATIONS THAT TREAT HIS MENTAL ILLNESS.

17    **A**    OH, I'M SORRY.

18    **Q**    THAT'S OKAY.  BACK IN 2000 -- WHEN HE WAS -- WHEN HE

19    WAS FIRST ON -- PLACED ON CONDITIONAL RELEASE, HOW DID HE

20    COMPARE TO HOW HE IS NOW, FOR EXAMPLE, IN TERMS OF HIS MENTAL

21    HEALTH?

22    **A**    I SEE.  WHEN HE WAS FIRST PLACED ON CONDITIONAL

23    RELEASE, YOU KNOW, AGAIN, HIS MENTAL HEALTH WAS STABLE.

24    AGAIN, HE DID NEED A GROUP HOME SETTING.  HE WASN'T ABLE TO

25    LIVE INDEPENDENTLY.  HE DID NEED THAT SUPPORT.  BUT HE WAS

1   ABLE TO BE IN THE COMMUNITY.  AS I SAID, MS. MARTINEZ ACTUALLY

2   THOUGHT THAT HE WAS A WORKER AT THE GROUP HOME:  HE LOOKED SO

3   PUT TOGETHER AND HIS THINKING WAS SO CLEAR.

4           BUT THEN, AGAIN, AFTER THESE TWO INCARCERATIONS IS

5   WHERE YOU REALLY SEE THE DRAMATIC CHANGE, WHERE EVEN THOUGH AT

6   TIMES BEFORE, HE WOULD HAVE SOME DELUSIONAL PROCESSES, BUT HE

7   COULD STILL CONVERSE AND MAKE SENSE, TO WHERE HE WAS

8   DRAMATICALLY IMPACTED BY THE DELUSIONS, HAD THIS TANGENTIAL

9   THINKING WHERE IT'S DIFFICULT TO KIND OF KEEP HIM ON TRACK AND

10  ISN'T ABLE TO GET BACK INTO THE COMMUNITY.

11      Q    YOU MENTIONED THAT IN OHIO, THAT OCCASIONALLY AN

12  INDIVIDUAL WILL BE PICKED UP BY THE SHERIFF'S OFFICE WHO'S

13  VIOLATED A TERM OF THEIR CONDITIONAL RELEASE AND BROUGHT TO A

14  JAIL.  IN THOSE CASES, HOW LONG DO PEOPLE END UP SPENDING IN

15  JAIL WHEN THAT HAPPENS?

16      A    A BRIEF AMOUNT OF TIME.  REALLY AT THAT TIME --

17           MR. HILBURN:  YOUR HONOR, WE'LL OBJECT.

18           THE COURT:  WHOA -- DOCTOR -- HOLD ON.  DOCTOR, HOLD

19  ON ONE SECOND.  WE HAVE AN OBJECTION.  AND IF YOU CAN SPEAK

20  INTO THE MIC, MR. HILBURN.

21           MR. HILBURN:  YES, YOUR HONOR.  WE OBJECT, ONE, ON

22  THE BASIS OF RELEVANCY AND, TWO, ON THE BASIS OF I THINK WE'VE

23  ALREADY GONE OVER THIS, AND IT'S GOING BEYOND THE SCOPE OF

24  CROSS-EXAMINATION.

25           THE COURT:  YOU DON'T NEED TO PUT THEM ON.  I

1   OVERRULE THE OBJECTION.  YOU MAY ANSWER THE QUESTION.  YOU MAY

2   ANSWER, DOCTOR.

3   **THE WITNESS:**  YOU KNOW, AGAIN, UNLESS NEW CHARGES

4   ARE BEING PRESSED WHERE THE PERSON WOULD HAVE TO WAIT THROUGH

5   THE KIND OF TYPICAL JUDICIAL SYSTEM FOR THE NEW CHARGES, IF

6   THEY'RE PICKED UP BY THE SHERIFF AND JUST WAITING ON A BED,

7   THEY WOULD JUST BE THERE FOR THE LENGTH OF TIME IT WOULD TAKE

8   FOR A BED TO OPEN UP.  SO THAT WOULD JUST KIND OF DEPEND ON

9   HOW BUSY THE FORENSIC UNITS WERE AT THAT TIME.

10  **BY MR. LOSPENNATO:**

11  **Q**   AND TYPICALLY, HOW LONG IS THAT, DO YOU KNOW?

12  **A**   IT REALLY VARIES.  IF THEY'RE WAITING FOR A BED

13  WHERE I WORK IN THE MAXIMUM SECURITY FACILITY, IT'S NOT

14  USUALLY VERY LONG BECAUSE UP UNTIL RECENTLY, WE'VE HAD OPEN

15  BEDS.  IF THEY'RE WAITING FOR A BED IN THE NEXT LOWER LEVEL OF

16  SECURITY, BEDS OPEN UP LESS FREQUENTLY.  SO IT COULD BE A

17  LITTLE BIT LONGER, BUT, I MEAN, WE'RE NOT TYPICALLY TALKING

18  VERY LONG LENGTHS OF STAY.

19  **Q**   WHEN YOU SAY, "LONG," CAN YOU GIVE ME LIKE A NUMBER

20  OF DAYS?

21  **A**   YOU KNOW, IT COULD BE ANYWHERE FROM A FEW DAYS TO

22  LIKE 10 TO 14 DAYS.  AGAIN, IT JUST KIND OF DEPENDS ON WHEN A

23  BED WOULD OPEN UP FOR THEM.

24  **Q**   BUT 10 TO 14 DAYS WOULD BE THE OUTSIDE LENGTH; IS

25  THAT RIGHT?

1    **A**    IN MY EXPERIENCE, YES.

2          **MR. LOSPENNATO:**  I HAVE NO OTHER QUESTIONS.

3          **THE COURT:**  OKAY.  THANK YOU.

4          AND THANK YOU, DOCTOR.

5          WHO IS YOUR NEXT WITNESS?

6          **MR. LOSPENNATO:**  I BELIEVE OUR NEXT WITNESS IS --

7          **THE COURT:**  WE'RE GOING TO TAKE TEN MINUTES.  TAKE A

8    TEN-MINUTE BREAK.  THANK YOU.

9          **MR. LOSPENNATO:**  THANK YOU, DR. SMITH.

10         **REPORTER'S NOTE:**  (WHEREUPON THE JURY EXITED THE

11   COURT ROOM AND THE COURT WAS IN RECESS.)

12         **MR. LOSPENNATO:**  YOUR HONOR, JUST ONE MATTER, --

13         **THE COURT:**  HANG ON ONE SECOND, SIR.

14         **MR. LOSPENNATO:**  THE -- WE HAVE -- DR. KELLY IS

15   TESTIFYING NEXT.  IN TERMS OF OTHER WITNESSES, APPARENTLY LISA

16   BURNS IS NOT GOING TO BE HERE UNTIL 1:00 AND DR. MCCONVILLE

17   UNTIL 2:00.  SO I DON'T KNOW HOW LONG IT'S GOING TO TAKE FOR

18   DR. KELLY, BUT I DOUBT IT'S GOING TO TAKE THE WHOLE HOUR.

19   WOULD THE COURT HAVE ANY PROBLEM TAKING AN EARLY LUNCH IF WE

20   NEED TO?

21         **THE COURT:**  THE COURT ALWAYS HAS A PROBLEM WITH

22   THAT, BUT I WILL DEAL WITH IT.  SO WE'LL TAKE AN EARLY LUNCH,

23   BUT WE'LL GET THEM BACK EARLY.

24         **MR. LOSPENNATO:**  THANK YOU, YOUR HONOR.

25         **REPORTER'S NOTE:**  (WHEREUPON THE JURY RETURNED TO

1  THE COURTROOM.   TRIAL RESUMED AND ALL PARTIES ARE PRESENT.)

2  **THE COURT:**  OKAY.  YOU MAY BE SEATED.

3  ALL RIGHT.  YOU MAY CALL YOUR NEXT WITNESS.

4  **MR. LOSPENNATO:**  WE ARE CALLING DR. CLAY KELLY.

5  **THE COURT:**  ALL RIGHT.  DR. KELLY.

6  **MR. LOSPENNATO:**  I APOLOGIZE, YOUR HONOR.  I WAS

7  TOLD THAT HE WAS PARKING HIS CAR AND CLOSE TO COMING INTO THE

8  BUILDING, BUT HE ISN'T HERE YET.

9  **THE COURT:**  ALL RIGHT.  WELL -- WE COULD TELL

10 STORIES, BUT RATHER THAN JUST CHIT-CHAT, WHY DON'T WE TAKE

11 ANOTHER FIVE MINUTES -- WAIT, IS HE HERE?  ALL RIGHT.  WE'LL

12 SIT IN SILENCE, AN UNCOMFORTABLE SILENCE.

13 DR. KELLY, COME FORWARD, SIR, AND BE SWORN.

14 **(WHEREUPON, CLAYTON KELLY, HAVING BEEN DULY SWORN,**

15 **TESTIFIED AS FOLLOWS.)**

16 **DIRECT**

17 **BY MR. LOSPENNATO:**

18 **Q**    GOOD MORNING, DR. KELLY.  YOU MAY REMEMBER ME, I'M

19 RON LOSPENNATO?

20 **A**    YES.

21 **Q**    DR. KELLY, WILL YOU STATE YOUR NAME AND YOUR

22 BUSINESS ADDRESS FOR THE RECORD?

23 **A**    MY NAME IS DENNIS CLAYTON KELLY, JR.  MY BUSINESS

24 ADDRESS IS TULANE UNIVERSITY SCHOOL OF MEDICINE.

25 **Q**    AND DO YOU WORK AT -- ALSO WORK AT THE EAST

1    LOUISIANA MENTAL HEALTH SYSTEM?

2        **A**    I DO.

3        **Q**    AND WHAT ARE YOUR -- WHAT IS YOUR JOB THERE?

4        **A**    I'M AN ASSISTANT CLINICAL DIRECTOR AND A STAFF

5    PSYCHIATRIST.

6        **Q**    AND WHAT UNIT IN ELMHS?

7        **A**    WELL, I WORK ON TWO DIFFERENT UNITS.  ONE IS THE

8    ACUTE ADMISSION UNIT FOR THE CIVIL SIDE, AND THE OTHER ONE IS

9    OAK CREST, WHICH IS A FORENSIC PRETRIAL COMPETENCY RESTORATION

10   UNIT.

11       **Q**    IN 2014, WERE YOU WORKING ON THOSE UNITS AT THAT

12   TIME?

13       **A**    YES.

14       **Q**    AND WHY DON'T YOU EXPLAIN FIRST, WHAT YOUR JOB

15   TITLES MEAN IN TERMS OF YOUR DAY-TO-DAY ACTIVITIES; WHY DON'T

16   YOU START THERE?

17       **A**    WELL, ON -- ON THE EAST ACUTE UNIT, WHICH IS -- ON

18   THAT UNIT, I AM A STAFF PSYCHIATRIST.  I'M ALSO THE ASSISTANT

19   CLINICAL DIRECTOR FOR THAT DIVISION, THE ACUTE DIVISION, UNDER

20   DR. THOMPSON, WHO'S THE CLINICAL DIRECTOR FOR THE HOSPITAL.

21   SO I HAVE SORT OF SUPERVISORY ROLES -- A ROLE IN REGARD TO THE

22   OTHER PSYCHIATRISTS THAT WORK ON THAT UNIT.  BUT I ALSO

23   PROVIDE CARE FOR SIX PATIENTS ON EACH OF THE UNITS, THE MALE

24   AND THE FEMALE UNIT.

25       **Q**    AND WHAT IS THE FUNCTION OF THAT PARTICULAR UNIT?

1    **A**    WELL, IT'S -- IT'S A -- IT'S NOT A FORENSIC

2    PSYCHIATRIC UNIT, PER SE.  ITS PRIMARY PURPOSE IS TREATMENT

3    FOR PSYCHIATRIC PATIENTS WITH ACUTE DISTURBANCE, EITHER SEVERE

4    DEPRESSION, USUALLY, OR PSYCHOSIS OR MANIA.

5    **Q**    AND SOME OF THOSE PEOPLE ARE CIVILLY COMMITTED?

6    **A**    MOST OF THE PATIENTS ADMITTED TO OUR FACILITY ARE

7    CIVILLY COMMITTED, ALTHOUGH IN MORE RECENT DAYS, THE MALE UNIT

8    HAS BECOME MUCH MORE -- MORE CONSISTENTLY, WE SEE ADMISSIONS

9    OF FORENSIC PATIENTS.  BUT THAT'S REALLY JUST A BYPRODUCT OF

10   THE CURRENT SITUATION AS FAR AS, YOU KNOW, LACK OF BEDS IN THE

11   STATE AND SO FORTH, SO.

12   **Q**    LET ME JUST ASK YOU A LITTLE QUESTION SO THAT YOU --

13   CAN YOU DISTINGUISH BETWEEN A CIVIL PATIENT AND A FORENSIC

14   PATIENT; WHAT IS THE MAIN DIFFERENCE IN YOUR MIND?

15   **A**    WELL, THE PRIMARY DIFFERENCE IS THAT -- THEY'RE SORT

16   OF, I GUESS, IN A WAY, THERE'S SORT OF THREE CATEGORIES THERE,

17   IF YOU WILL.  THERE'S A PURELY CIVIL PATIENT, WHICH WOULD BE

18   SOMEONE THAT DOES NOT HAVE ANY PRIOR ADJUDICATION, CRIMINAL

19   ADJUDICATION, THAT WOULD MAKE THEM BE TREATED AT SOME POINT IN

20   THE -- IN THE FORENSIC SETTING FOR COMPETENCY RESTORATION

21   PRIMARILY, OR IF ADJUDICATED THERE, MAY BE EVENTUALLY FOUND

22   NOT GUILTY BY REASON OF INSANITY.  AND THEN -- SO THAT WOULD

23   BE SORT OF -- I GUESS SORT OF A PURE CIVIL PATIENT.

24        THEN THERE WOULD BE SOMEBODY WHO WAS, YOU KNOW,

25   FOUND -- WHO, YOU KNOW, WHO WAS ARRESTED, CHARGED WITH A

1  CRIME, SENT TO THE FORENSIC HOSPITAL FOR COMPETENCY

2  RESTORATION OR POSSIBLY RECEIVED COMPETENCY RESTORATION

3  ACTIVITIES IN THE JAIL BECAUSE OF MENTAL ILLNESS.  AND THEN

4  THEY MIGHT ULTIMATELY BE FOUND INCOMPETENT TO STAND TRIAL, A

5  648 MOTION WOULD BE FILED, AND -- EXCUSE ME, THEY WOULD

6  EVENTUALLY BE TREATED UNDER CIVIL COMMITMENT, BUT WITH THE

7  UNDERSTANDING THAT THE COURT WOULD STILL BE NOTIFIED ABOUT

8  THEIR MOVEMENTS.

9         AND THEN THE THIRD TYPE WOULD BE A SORT OF PURE

10 FORENSIC PATIENT, AND THAT WOULD BE A NOT GUILTY BY REASON OF

11 INSANITY ACQUITTEE WHO, YOU KNOW, WOULD HAVE A JUDGMENT FROM

12 THE CRIMINAL COURT AND WOULD BE SUPERVISED BY THE CRIMINAL

13 COURT.

14    Q    WHEN YOU SAY THEY HAVE A JUDGMENT FROM THE CRIMINAL

15 COURT, WHAT DO YOU MEAN BY THAT?

16    A    WELL, THEY HAVE AN ACQUITTAL, BUT IT'S WITH

17 CONDITIONS THAT THEY -- YOU KNOW WHAT I MEAN, THE NGRI PLEA IS

18 AN AFFIRMATIVE PLEA.  SO THEY'RE PLEADING GUILTY TO THE ACT,

19 BUT THEY ARE -- THEY ARE FOUND TO BE MENTALLY ILL, TO LACK

20 CULPABILITY AT THE TIME OF THE ACT AND, THEREFORE, THEY HAVE A

21 -- ALTHOUGH THEY'VE BEEN ACQUITTED OF THE CRIMINAL ACT, THEY

22 ARE SUPERVISED BY THE COURT AND SENT TO THE HOSPITAL USUALLY

23 FOR TREATMENT.

24    Q    ARE YOU FAMILIAR WITH TRUSSELL GEORGE?

25    A    YES.

1    **Q**    CAN YOU TELL ME HOW YOU BECAME FAMILIAR WITH HIM?

2    **A**    I'VE TREATED HIM, I THINK, ON TWO OCCASIONS.   THE

3    FIRST OCCASION -- AND I DON'T REMEMBER THE EXACT DATE -- BUT

4    SOMEWHERE AROUND 2009, 2010, I BELIEVE, HE WAS ADMITTED TO

5    GREENWELL SPRINGS HOSPITAL WHEN THE EAST ACUTE UNIT WAS STILL

6    SEPARATE AND ON THAT CAMPUS.   AND I DON'T REMEMBER THE EXACT

7    DISPOSITION AFTER THAT AS TO WHERE HE WENT, BUT I DO KNOW THAT

8    I HAD A -- YOU KNOW, THERE WAS AN EPISODE OF TREATMENT BACK

9    THEN WHERE HE WAS SENT TO THE ACUTE UNIT FOR STABILIZATION.

10    THE SECOND TIME WAS THE ADMISSION ABOUT WHICH WE'RE

11    HERE TODAY, I BELIEVE, PRIMARILY.   I THINK HE WAS ADMITTED ON

12    MAY THE 20TH, 2014 TO THE EAST ACUTE UNIT, AND THIS WAS AFTER

13    WE HAD MOVED FROM THE GREENWELL SPRINGS CAMPUS TO ON THE MAIN

14    JACKSON CAMPUS.   AND I -- I WAS NOT DIRECTLY INVOLVED IN HIS

15    CARE AT THAT POINT.   WHAT HAD HAPPENED EVERY -- EVERY YEAR I

16    COVER VACATIONS AT THE END OF THE YEAR FOR THE DOCTORS AND ONE

17    OF THE DOCTORS, THE ONE THAT WORKS ON THE FEMALE UNIT, WAS ON

18    A VACATION, SO -- FOR LIKE A MONTH AND A HALF AND SO I WAS

19    COVERING HIS UNIT.

20    SO I WASN'T CARRYING ANY PATIENTS ON THE MALE SIDE.

21    HOWEVER, I WAS AWARE OF TRUSSELL GEORGE BEING THERE BECAUSE ON

22    A DAY THAT DR. AHMAD, WHO'S THE DOCTOR THAT COVERS THE MALE

23    SIDE -- WHO WAS COVERING THE MALE SIDE AT THE TIME AND IS

24    STILL THERE, WHO WAS TAKING CARE OF MR. GEORGE, WAS WANTING

25    HIM TO BE MOVED TO CEDARVIEW, WHICH IS AN INTERMEDIATE

1   TREATMENT UNIT IN THE CIVIL DIVISION.  SO THEY CALLED ME AND

2   SAID, "WE NEED A TRANSFER ORDER."  AND I GAVE THEM THAT ORDER,

3   AND I BELIEVE THAT WAS ON JUNE THE 3RD OF 2014.

4           AND MR. GEORGE REFUSED TO GO TO CEDARVIEW.  AND HE

5   TOLD THE NURSE THAT HE WOULDN'T GO, AND THE NURSE CALLED ME

6   AND ASKED ME ABOUT IT.  AND I SAID:  WELL, YOU KNOW, HE SORT

7   OF TOLD ME THAT, YOU KNOW, WE REALLY CAN'T TRANSFER HIM IF

8   HE'S NOT COOPERATIVE BECAUSE CEDARVIEW PROBABLY WOULD NOT

9   ACCEPT HIM IF HE'S FIGHTING WITH US WHEN WE TRANSFER HIM OVER

10  THERE.  SO I TOLD THEM TO CANCEL THE TRANSFER, AND AT THE END

11  OF THE MONTH, WHEN THE OTHER DOCTOR RETURNED --

12      **Q**    BEFORE YOU --

13      **A**    SURE.

14      **Q**    BEFORE YOU GO ON TO TALK ABOUT THE END OF THE MONTH,

15  YOU MENTIONED A COUPLE OF UNITS.  I'D JUST LIKE TO TRY TO

16  UNDERSTAND HOW THEY RELATE TO ONE ANOTHER.

17      **A**    SURE.

18      **Q**    SO AT THE TIME HE WAS -- WE STARTED TO TALK ABOUT

19  TRANSFERRING HIM, WHERE WAS HE?

20      **A**    HE WAS ON THE EAST ACUTE UNIT, THE MEN'S UNIT, WHICH

21  IS THE UNIT, YOU KNOW, THAT -- THAT WE'VE BEEN TALKING ABOUT.

22  AND I THINK DR. AHMAD WANTED TO TRANSFER HIM BECAUSE WE DIDN'T

23  BELIEVE THAT HE WAS READY TO RETURN TO THE -- TO THE

24  OUTPATIENT SETTING YET; THAT IS, TO A GROUP HOME, AND WE

25  THOUGHT HE NEEDED A LITTLE BIT MORE -- MORE TREATMENT.

1    AND CEDARVIEW IS AN INTERMEDIATE TREATMENT UNIT,

2  WHICH MEANS IT'S A SLIGHTLY LESS RESTRICTIVE UNIT THAN EAST

3  ACUTE UNIT.   THEY HAVE MORE TIME OUTSIDE.   THEY'RE ALLOWED TO

4  GO ON PASSES, AND THERE'S SOME OTHER PRIVILEGES THEY HAVE THAT

5  YOU WOULDN'T HAVE ON THE EAST ACUTE UNIT.   AND SO WE THOUGHT

6  IT WOULD BE A REASONABLE STEP, YOU KNOW, FOR MR. GEORGE.

7    Q    SO AND, AGAIN, TO FIGURE THIS OUT IN CONTEXT --

8  SORRY FOR LOSING MY GLASSES -- SO WHAT OTHER UNITS ARE THERE

9  AT ELMHS THAT -- THAT YOU'RE AWARE OF?

10    A    WELL, THERE'S -- ESSENTIALLY THE HOSPITAL IS DIVIDED

11  INTO A CIVIL DIVISION AND A FORENSIC DIVISION, AND THEN

12  THERE'S SOME -- ON THE CAMPUS, THERE ARE SOME OTHER TREATMENT

13  SITES OR FACILITIES.   THERE'S A LARGE FORENSIC GROUP HOME ON

14  CAMPUS, AND THERE'S A COUPLE OF OTHER SMALLER GROUP HOMES FOR

15  INTELLECTUALLY DISABLED CLIENTS, AND THAT'S SORT OF THE

16  OVERALL SCOPE.

17    I THINK THE FORENSIC DIVISION HAS FIVE DIFFERENT

18  SITES, TREATMENT SITES, DIFFERENT BUILDINGS.   SO IT'S A MUCH

19  LARGER DIVISION NOW.   A LOT OF THE OLD CIVIL BEDS WERE CLOSED

20  SEVERAL YEARS AGO.   SO IT'S A MUCH SMALLER SECTION OF THE

21  HOSPITAL.

22    Q    AND IN THE PRIOR TESTIMONY, THE ASSA WAS MENTIONED

23  AND -- IS THAT THE CORRECT NAME?

24    A    YES.

25    Q    AND WHAT IS THAT?

1      **A**     THAT'S THE ACUTE ADMISSION UNIT FOR THE FORENSIC

2   DIVISION.   THERE'S SORT OF TWO ENTRY POINTS FOR ADMISSION,

3   TYPICALLY, TO THE FORENSIC HOSPITAL, OAK CREST, WHICH IS A

4   PRETRIAL COMPETENCY RESTORATION UNIT AND ASSA, WHICH IS ALSO A

5   PRETRIAL COMPETENCY RESTORATION UNIT.   BUT ASSA ALSO PROVIDES

6   CARE FOR NOT GUILTY BY REASON OF INSANITY CLIENTS WHO MIGHT

7   NOT BE STABILIZED AND NEED MORE SECURE TREATMENT, OR IF THEY

8   HAD BEEN REVOKED, IF THEIR CONDITIONAL RELEASE HAS BEEN

9   REVOKED, THEY WOULD RETURN TO ASSA.

10      **Q**     NOW, ALL OF THE UNITS THAT YOU'VE MENTIONED, WOULD

11   YOU DESCRIBE THEM AS BEING THERAPEUTIC ENVIRONMENTS?

12      **A**     YES.

13      **Q**     WHEN YOU DESCRIBE THEM AS SUCH, WHAT DOES THAT MEAN

14   TO YOU?

15      **A**     WELL, I MEAN, THEY ARE STAFFED BY NURSES, SOCIAL

16   WORKERS ON THE CIVIL SIDE, PSYCHIATRIC AIDS ON THE -- ON THE

17   FORENSIC SIDE, CORRECTIONAL GUARDS THAT HAVE BEEN TRAINED,

18   THEY'RE CALLED CORRECTIONAL GUARD THERAPEUTIC.   THEY'VE BEEN

19   TRAINED IN SOME PATIENT MANAGEMENT TECHNIQUES, AND THEY

20   PROVIDE SECURITY BUT ALSO ARE INVOLVED IN TRANSFERRING THE

21   PATIENTS, YOU KNOW, TALKING TO THEM, YOU KNOW, INTERACTING

22   WITH THEM ON A DAY-TO-DAY BASIS.

23            YOU KNOW, THAT -- THAT'S THE SORT OF THERAPEUTIC

24   ENVIRONMENT, IF YOU WILL, THE -- I MEAN, BOTH SIDES ARE

25   JOINT-COMMISSION CERTIFIED, SO, I MEAN, THEY'RE, YOU KNOW,

1    WELL-RESPECTED, CERTIFIED HOSPITAL ENVIRONMENTS.

2        **Q**    AND YOU MENTIONED THAT THERE WAS A DESIRE TO MOVE

3    MR. GEORGE FROM THE EAU TO CEDARCREST --

4        **A**    CEDARVIEW.

5        **Q**    -- CEDARVIEW.  AND BECAUSE THAT WAS A LESS

6    RESTRICTIVE ENVIRONMENT.  WHY IS THAT SIGNIFICANT, IN YOUR

7    MIND?

8        **A**    WELL, I MEAN, ONE OF THE THINGS IS THAT WE -- AS THE

9    ACUTE UNIT, WE ARE TASKED WITH TREATING PEOPLE AND THEN WHEN

10   THEY'RE REASONABLY STABILIZED, GETTING THEM MOVED TO ANOTHER

11   FACILITY AS SOON AS POSSIBLE.  I MEAN, THAT'S THE WHOLE NATURE

12   OF ACUTE TREATMENT IS THAT ONCE SOMEONE IS REASONABLY

13   STABILIZED, THAT THEY WOULD BE MOVED TO A LESS RESTRICTIVE

14   ENVIRONMENT.

15            AND, YOU KNOW, WE FELT THAT, YOU KNOW, TO THAT

16   POINT, ANYWAY, MR. GEORGE WAS -- WAS DOING RATHER WELL, SEEMED

17   TO BE MAKING PROGRESS, WAS NOT HAVING ANY PROBLEMS ON THE

18   UNIT.  AND, YOU KNOW, THAT EPISODE BECAME SORT OF A FOCUS OF,

19   I DON'T KNOW, SOME RESISTANCE AND RESENTMENT ON HIS PART

20   BECAUSE I THINK MR. GEORGE WANTED TO GO DIRECTLY BACK TO THE

21   GROUP HOME IN THE COMMUNITY AND DID NOT WANT TO BE PLACED

22   EITHER IN THE FORENSIC DIVISION OR EVEN AT CEDARVIEW BECAUSE

23   HE FELT LIKE THAT WAS A -- IT WAS JUST GOING TO DELAY HIM

24   GOING BACK TO THE COMMUNITY.

25            SO OUR THOUGHT WAS JUST THAT HE WAS DOING WELL

1    ENOUGH THAT WE THOUGHT HE MERITED A TRANSFER OVER THERE, AND

2    IT WOULD JUST BE A SIMPLE TRANSFER.  THEY'RE IN THE SAME

3    DIVISION.  AND IF HE DID POORLY, THEY WOULD HAVE TRANSFERRED

4    HIM -- THEY WOULD HAVE ASKED TO TRANSFER HIM BACK.  SO WE

5    ALWAYS -- THERE'S SORT OF A CONSTANT MOVEMENT OF PATIENTS BACK

6    AND FORTH BETWEEN THE UNITS BASED ON THEIR ACUITY.

7        Q    WHEN YOU SAY THERE'S A CONSTANT TRANSFER BETWEEN THE

8    UNITS, YOU'RE REFERRING TO EAU --

9        A    AND CEDARVIEW.

10       Q    -- AND CEDARVIEW.  WHAT ABOUT THE OTHER UNITS, IS

11   THERE SOME FLUIDITY OF MOVEMENT BETWEEN THE OTHER UNITS YOU

12   MENTIONED?

13       A    THEY CAN BE MOVED TO THE FORENSIC DIVISION FROM OUR

14   DIVISION AND HAVE BEEN ON OCCASION, BUT THAT REQUIRES A

15   DISCHARGE FROM US AND AN ADMISSION TO THEIR SYSTEM.  IT'S A

16   SEPARATE -- THEY HAVE SEPARATE NUMBERS, SEPARATE LICENSES, SO

17   IT REQUIRES A LITTLE MORE, YOU KNOW, PAPERWORK AND IT'S NOT AS

18   SIMPLE AS SIMPLY TRANSFERRING SOMEBODY.

19       Q    BUT IT'S ESSENTIALLY A BUREAUCRATIC FUNCTION?

20       A    RIGHT, RIGHT.

21       Q    AND IT'S SOMETHING THAT CAN BE ACCOMPLISHED WITHIN A

22   COUPLE OF HOURS?

23       A    IF THERE'S A BED.  IF THERE'S A BED AVAILABLE OR IF

24   THEY CAN MAKE A BED AVAILABLE BY A DISCHARGE OR WHATEVER

25   PROCEDURE MIGHT ALLOW THEM TO HAVE A BED -- HAVE BED

1  AVAILABILITY, YEAH, A COUPLE OF HOURS, PROBABLY; TWO OR THREE

2  HOURS.

3      **Q**    PEOPLE WHO END UP IN ELMHS SOMETIMES COME FROM OTHER

4  PSYCHIATRIC FACILITIES, IS THAT TRUE?

5      **A**    THAT'S TRUE.

6      **Q**    IS THERE -- ARE THERE TIMES WHEN PEOPLE ARE MOVED

7  FROM ELMHS TO OTHER PSYCHIATRIC FACILITIES?

8      **A**    YES.   I MEAN, WE -- THE EAST ACUTE UNIT SOMETIMES

9  SENDS PATIENTS TO CENTRAL STATE HOSPITAL.   WHEN SOUTHEAST WAS

10  STILL IN EXISTENCE, WE USED TO SEND PEOPLE THERE, SEND

11  PATIENTS THERE.   OTHER THAN THAT, I MEAN, I DON'T -- WE DON'T

12  TYPICALLY SEND PATIENTS TO OTHER PSYCHIATRIC FACILITIES.   I

13  CAN'T THINK OF ANY OTHER -- I MEAN, EXCEPT FOR GROUP HOME

14  SETTINGS OR THAT SORT OF THING.

15      **Q**    WELL, THERE'S NO -- IS THERE ANY BARRIER IF THE

16  DECISION WAS MADE TO DO THAT FOR ONE REASON OR ANOTHER?   WOULD

17  THERE BE --

18      **A**    WELL, THERE'S USUALLY -- I MEAN, CENTRAL USUALLY HAS

19  A LONG WAITING LIST.   SO IT'S NOT LIKE -- IT'S NOT LIKE WE

20  COULD ACUTELY MOVE SOMEBODY TO A PLACE LIKE CENTRAL.   THEY

21  WOULD HAVE TO BE ON A -- THEY TAKE THE NEXT PERSON ON THE

22  WAITING LIST.   AND THEY HAVE OUTSIDE -- THEY HAVE OTHER

23  REFERRING FACILITIES BESIDES US, SO IT TAKES A LONG TIME TO

24  GET SOMEONE THERE.

25      **Q**    BUT ASIDE FROM CENTRAL, I'M TALKING ABOUT OTHER

1    PRIVATE PSYCHIATRIC FACILITIES IN AND AROUND THE STATE, IS

2    THERE ANY BARRIERS IN MOVING SOMEBODY TO ANOTHER FACILITY?

3        **A**     THEORETICALLY, I GUESS IT WOULD BE POSSIBLE, BUT

4    NOBODY WANTS TO TAKE OUR PATIENTS.  MOST OF THEM ARE INDIGENT

5    AND IF THEY HAVE FORENSIC INVOLVEMENT, THEY'RE PARTICULARLY

6    NOT INTERESTED IN THOSE SORTS OF PATIENTS BECAUSE THEY -- THEY

7    WORRY ABOUT THEIR ABILITY TO MANAGE THEM FROM, YOU KNOW, A

8    SECURITY STANDPOINT.  SO, I MEAN, I -- I CAN'T THINK OF A --

9    I'VE HAD PATIENTS REQUEST IT BEFORE, BUT I DON'T THINK I'VE

10   EVER TRANSFERRED A PATIENT FROM THE ACUTE UNIT TO ANOTHER

11   ACUTE UNIT, IF YOU KNOW WHAT I'M SAYING.

12       **Q**     RIGHT.  YOU'RE AWARE THAT MR. GEORGE HAS BEEN IN

13   QUITE A NUMBER OF PRIVATE PSYCHIATRIC FACILITIES AROUND THE

14   STATE?

15       **A**     SURE.

16       **Q**     AND, IN FACT, HE WAS IN A PRIVATE PSYCHIATRIC

17   FACILITY NOT TOO LONG BEFORE HE CAME TO ELMHS; ISN'T THAT

18   RIGHT?

19       **A**     I BELIEVE THAT'S RIGHT.

20       **Q**     AND DO YOU HAVE ANY INFORMATION AT ALL TO SUGGEST

21   THAT IF THERE WAS AN EFFORT TO PLACE HIM BACK IN ONE OF THOSE

22   PSYCHIATRIC FACILITIES, THEY WOULDN'T TAKE HIM?

23       **A**     WELL, I MEAN, THERE'S A DIFFERENCE BETWEEN -- IF

24   YOU'RE -- IF YOU WALK INTO AN EMER -- IF YOU'RE TAKEN TO AN

25   EMERGENCY ROOM BY STAFF BECAUSE YOU'RE ACUTELY AGITATED AND

1    PSYCHOTIC AND THEY MAKE AN APPLICATION TO HAVE YOU PLACED IN A
2    HOSPITAL, THE -- IT WOULD BE A VIOLATION OF LAW NOT TO ALLOW
3    THEM TO COME INTO THE HOSPITAL.

4              SO IF THEY'RE IN AN EMERGENCY ROOM AND YOU HAVE THE
5    ONLY AVAILABLE BED AND YOU'RE A PRIVATE FACILITY, YOU HAVE TO
6    TAKE THAT PATIENT.  BUT IF YOU'RE ALREADY IN A FACILITY, THEN
7    EMTALA LAWS DO NOT APPLY.  SO THEY HAVE NO REASON TO TAKE A
8    PATIENT FROM US.  AND WE HAVE TRIED BEFORE -- WE'VE HAD
9    PATIENTS SAY, "WELL, I WANT TO BE BACK IN THE HOSPITAL THAT'S
10   NEAR MY HOME."  AND WE HAVE MADE THOSE SORTS OF EFFORTS
11   BEFORE, AND THE HOSPITALS NEVER DO IT BECAUSE THEY'RE UNDER
12   NO -- THERE'S NO LEVERAGE THERE.  SO THEY DON'T REALLY FEEL
13   COMPELLED TO COOPERATE WITH US.

14       Q    LET ME DRAW YOUR ATTENTION TO JULY 1ST, 2014; DO YOU
15   RECALL THAT DATE?

16       A    YES.

17       Q    AND CAN YOU TELL ME WHAT HAPPENED ON THAT DAY?

18       A    WELL, THAT WAS THE -- AS I WAS TELLING YOU EARLIER,
19   I -- THE SECOND DOCTOR RETURNED FROM HIS VACATION IN LATE JUNE
20   AND DR. AHMAD, THE DOCTOR ON THE MEN'S UNIT ASSIGNED ME SIX
21   PATIENTS THAT HE HAD BEEN TAKING CARE OF.  HE USUALLY GIVES ME
22   PATIENTS THAT HAVE FORENSIC INVOLVEMENT BECAUSE I'M, YOU KNOW,
23   A FORENSIC PSYCHIATRIST AND HE'S NOT.  SO THAT'S JUST SORT OF
24   AN ARRANGEMENT THAT WE HAVE.

25              SO MR. GEORGE WAS PUT ON MY LIST BECAUSE HE'S A

1    FORENSIC PATIENT.  AND I KNEW ABOUT HIS REFUSAL TO GO TO

2    CEDARVIEW BECAUSE I HAD BEEN CALLED ABOUT IT THAT DAY TO

3    GET -- YOU KNOW, THEY WANTED A VERBAL ORDER TO TRANSFER HIM.

4            AND SO I CALLED DR. VOSBURG AND I KNEW THAT, YOU

5    KNOW, HE MONITORS OUR PATIENTS, FORENSIC PATIENTS ON THE AU.

6    SOME OF THE DFCS, THE DISTRICT FORENSIC COORDINATORS, LIKE

7    MR. BRADY AND OTHERS ALSO PROVIDE SOME SUPPORT FOR US:

8    COMMUNICATION WITH THE COMMUNITY OF FORENSIC SERVICES

9    DIVISION, WHICH IS ANOTHER DIVISION OF THE HOSPITAL.

10           SO I ASKED DR. VOSBURG TO COME TO THE MEETING

11   BECAUSE I WANTED TO DISCUSS WITH MR. GEORGE HIM GOING TO

12   CEDARVIEW AND THAT -- YOU KNOW, TO TRY TO EXPLAIN TO HIM THAT

13   THIS WAS OUR PLAN, TO SORT OF GRADUALLY STEP HIM DOWN OUT OF

14   THE ACUTE UNIT TO A LESS RESTRICTIVE ENVIRONMENT AND THAT IF

15   HE DID WELL ON CEDARVIEW, THAT WE WOULD ULTIMATELY MOVE HIM TO

16   A GROUP HOME FROM THERE.

17           WE WANT TO AVOID REVOCATION AND THINGS LIKE THAT, IF

18   POSSIBLE.  SO WE FELT THAT IT WOULD BE A PRODUCTIVE MEETING

19   TO -- YOU KNOW, TO HAVE HIM THERE, DISCUSS KIND OF OUR PLAN,

20   AND THAT'S WHAT WE DID ON THAT DAY.

21      Q    NOW, YOU'RE AWARE OF MR. GEORGE'S INTELLECTUAL

22   LIMITATIONS, I ASSUME?

23      A    YES.

24      Q    AND THE NATURE OF HIS MENTAL ILLNESS, YOU'RE ALSO

25   AWARE OF THAT AS WELL?

1   **A**   YES.

2   **Q**   OKAY.  WHAT ROLE, IF ANY, DO YOU THINK THAT THOSE

3   FACTORS WERE PLAYING IN HIS RESISTANCE TO MOVE INTO A LESS

4   RESTRICTIVE ENVIRONMENT?

5   **A**   WELL, I THINK THEY CERTAINLY WERE INVOLVED.  THE --

6   YOU KNOW, HOW -- HOW MUCH ROLE THEY PLAY, I REALLY COULDN'T

7   SAY.  BUT, YOU KNOW, HE TENDS TO BE SOMEWHAT CONCRETE, SEES

8   THINGS IN BLACK AND WHITE, AND HE DIDN'T WANT TO CONSIDER A

9   SORT OF, I DON'T KNOW, INTERMEDIATE PLAN INSTEAD OF, YOU KNOW,

10   SOMETHING EITHER GO TO FORENSIC OR GO TO THE GROUP HOME.  I

11   MEAN I THINK HE SAW IT IN SORT OF STARK TERMS.  AND HE BECAME

12   MORE -- MORE SO THAT DAY.

13       IN FACT, WHEN HE BECAME ANGRY, I THINK HE -- I THINK

14   ONE OF THE THINGS HE SAID WAS, "WELL, JUST SEND ME BACK TO THE

15   JAIL, THEN, BECAUSE I DON'T WANT TO DO THIS."  SO I MEAN,

16   THERE WAS -- I THINK FROM JULY -- EXCUSE ME, FROM JUNE 3RD,

17   THAT INCIDENT PROBABLY GOT UNDER HIS SKIN A LITTLE BIT, THE

18   WHOLE THING ABOUT TRANSFERRING HIM TO CEDARVIEW.

19       AND HE WAS SOME -- HE WASN'T A MAJOR BEHAVIORAL

20   PROBLEM, BUT HE WAS SOMEWHAT ANGRY ABOUT THE EPISODE, THAT WE

21   TRIED TO DO THAT, THAT HE DIDN'T WANT TO GO TO CEDARVIEW AND

22   HE WANTED TO GO BACK TO THE GROUP HOME.  SO I DON'T THINK

23   THINGS WENT QUITE AS WELL FROM THAT POINT FORWARD, ALTHOUGH

24   THERE WEREN'T ANY MAJOR INCIDENTS UNTIL JULY THE 1ST.

25   **Q**   SO WHY DON'T YOU GO ON AND TELL ME -- TELL US WHAT

1   HAPPENED AT THE MEETING ON JULY 1ST.

2   **A**   WELL, WE -- YOU KNOW, I THINK, YOU KNOW, DR. VOSBURG

3   AND I BOTH SPOKE ABOUT KIND OF WHAT THE -- WHAT THE PLAN WOULD

4   BE, YOU KNOW, TRIED TO EXPLAIN TO HIM THAT CEDARVIEW WOULD BE

5   A STEP IN THE RIGHT DIRECTION AND THAT WE FELT THAT IF HE

6   CONTINUED -- IF HE WENT OVER THERE AND HE DID WELL, IF HE

7   FUNCTIONED WELL OVER THERE, THEN OUR PLAN WOULD BE -- YOU

8   KNOW, IT WOULDN'T BE MY PLAN AT THAT POINT, BUT DR. VOSBURG

9   AND THE COMMUNITY FORENSIC SERVICES STAFF WOULD TRY TO MOVE

10  HIM TO LESS RESTRICTIVE ENVIRONMENTS, POSSIBLY THE GROUP HOME

11  ON CAMPUS FIRST AND THEN MAYBE OUT TO THE COMMUNITY.

12       SO WE KIND OF TRIED TO LAY THAT -- WE DID LAY THAT

13  OUT FOR HIM.   BUT HE IMMEDIATELY STARTED RESISTING THE PLAN

14  AND AS WE -- WE TOLD HIM THAT IF -- IF HE DIDN'T COOPERATE

15  WITH THE PLAN, HE COULDN'T STAY ON THE ACUTE UNIT

16  INDEFINITELY.   I MEAN WE CAN'T JUST KEEP PATIENTS FOREVER ON

17  THE ACUTE UNIT.   WE HAVE TO MOVE THEM ON AND THAT IF HE DIDN'T

18  COOPERATE WITH THE CLINICAL MANAGEMENT, THEN WE WOULD HAVE TO

19  MOVE HIM TO THE ACUTE DIVISION ON THE FORENSIC SIDE, YOU KNOW,

20  THE ACUTE UNIT, ASSA.

21       AND AT THAT POINT, HE BECAME INCREASINGLY ANGRY,

22  ULTIMATELY GOT UP AND STARTED YELLING AT US, WALKED OUT OF THE

23  ROOM, WENT INTO THE HALLWAY, WAS YELLING, YOU KNOW, SORT OF

24  THREATENING LANGUAGE AT US.   AND THE CGTS, THE CORRECTIONAL

25  GUARD ON THAT UNIT -- WE DO HAVE ONE OR TWO -- AND I THINK

1   THEY MIGHT HAVE EVEN CALLED A -- AS I REMEMBER, A DOCTOR

2   QUICK, WHICH BRINGS MORE GUARDS OVER.  THEY HAD TO SORT OF

3   RESTRAIN HIM IN THE HALLWAY AND BECAUSE OF THE THREATS HE WAS

4   YELLING AT DR. VOSBURG IN PARTICULAR, WE -- WE -- I TALKED TO

5   ONE OF THE CGTS TO ESCORT DR. VOSBURG OFF THE UNIT FOR HIS OWN

6   PROTECTION.

7          AND AT THAT POINT, I DIDN'T FEEL THAT IT WAS SAFE TO

8   LEAVE MR. GEORGE ON OUR UNIT BECAUSE I WASN'T JUST CONCERNED

9   ABOUT DR. VOSBURG, I WAS CONCERNED ABOUT MY OTHER CIVIL

10  PATIENTS ON THE UNIT THAT COULD BE ENDANGERED BY HIS, YOU

11  KNOW, BEHAVIOR.

12     Q    OKAY.  SO WHAT HAPPENED?

13     A    I CALLED HIS -- I CALLED THE PROBATION OFFICER -- I

14  THINK I CALLED THE -- AS I REMEMBER, I THINK I CALLED THE

15  COMMUNITY OF FORENSIC SERVICES OFFICE FIRST.  THEY GAVE ME THE

16  NUMBER FOR THE PROBATION OFFICER OR THEY CALLED HIM AND HE

17  CALLED ME.  I DON'T REMEMBER THE EXACT SEQUENCE, BUT I DID GET

18  IN TOUCH WITH HIM, AND I TOLD HIM THAT HE HAD TO GET

19  MR. GEORGE OFF MY UNIT.

20          I MEAN, I DID NOT -- I DID NOT INSTRUCT HIM TO TAKE

21  HIM TO THE JAIL OR TO TAKE HIM TO ASSA.  THAT'S REALLY AT HIS

22  DISCRETION, AND I DON'T HAVE ANY AUTHORITY OVER THAT.  I

23  SAID -- I THINK I TOLD HIM IF THEY HAD A BED IN THE FORENSIC

24  DIVISION, WHICH I DOUBTED, BUT IF THEY DID, THAT HE COULD BE

25  MOVED INTO IT RIGHT THEN.

1  **Q**   AT THAT POINT, DID YOU EXPLORE OTHER OPTIONS OTHER

2  THAN GOING TO THE FORENSIC UNIT?  FOR EXAMPLE, OTHER UNITS

3  WITHIN THE EAST -- SYSTEM?

4  **A**   I DIDN'T BECAUSE, YOU KNOW, THE -- THE NATURAL UNIT

5  FOR HIM TO GO TO WOULD HAVE BEEN CEDARVIEW, AND AT THAT POINT,

6  THERE'S NO WAY THAT CEDARVIEW WOULD HAVE ACCEPTED HIM BECAUSE

7  OF HIS LEVEL OF ANGER AND RAGE AT THAT POINT SO... I MEAN HE

8  HAD ALREADY TOLD US HE WASN'T GOING.  A SIMPLE REFUSAL WOULD

9  ESSENTIALLY INVALIDATE A TRANSFER.  WE CAN'T FORCE SOMEONE TO

10  GO INTO A LESS RESTRICTIVE ENVIRONMENT.  THEIR RESISTANCE

11  ITSELF IS SORT OF A SIGN THAT THEY'RE NOT READY TO GO OVER

12  THERE.

13  **Q**   SO MAYBE THE IDEA OF MOVING HIM TO THAT UNIT WASN'T

14  THE RIGHT IDEA AT THE TIME?

15  **A**   WELL, I MEAN, I THOUGHT IT WAS, BASED ON HIS PRIOR

16  BEHAVIOR, BUT THAT SORT OF CHANGED.

17  **Q**   SO LET'S TALK ABOUT WHAT OPTIONS ARE AVAILABLE WHEN

18  SOMEBODY STARTS -- GETS UPSET AND REALLY STARTS YELLING AND

19  ENGAGING IN, YOU KNOW, THE KIND OF BEHAVIOR MR. GEORGE WAS

20  EXHIBITING THAT DAY.  WHAT ARE YOUR OPTIONS AT THE HOSPITAL

21  FOR DEALING WITH THAT BEHAVIOR?

22  **A**   HE COULD RECEIVE AN ACUTE TREATMENT, LIKE AN

23  INJECTION.  HE COULD RECEIVE --

24  **Q**   LET ME STOP YOU THERE.  DID YOU CONSIDER THAT IN

25  MR. GEORGE'S PLACE -- SITUATION?

1    **A**    I THINK I THOUGHT ABOUT IT, BUT I JUST DIDN'T THINK

2    THAT -- MY FEELING WAS THAT MR. GEORGE HAD SORT OF TURNED A

3    CORNER IN HIS -- I MEAN -- I DON'T -- I DON'T REGARD, YOU

4    KNOW, NOT GUILTY BY REASON OF INSANITY CLIENTS THAT ARE PLACED

5    ON THE ACUTE UNIT THE SAME WAY THAT I REGARD NON-NGRI CLIENTS,

6    AND THAT'S BECAUSE THEY'RE UNDER A CONDITIONAL RELEASE AT THAT

7    POINT.   AND THEY'RE EXPECTED TO COMPLY WITH TREATMENT, AND I

8    FELT THAT HE WAS TURNING AWAY FROM COMPLYING WITH TREATMENT

9    COMPLETELY AND, YOU KNOW, WE HAD -- WE HAD ALREADY LAID OUT

10   FOR HIM HIS CHOICES, AND HE WAS CHOOSING NOT TO COMPLY WITH

11   OUR RECOMMENDED TREATMENT, AND I FELT LIKE HE NEEDED TO GO

12   BACK TO THE FORENSIC DIVISION.

13   **Q**    SO -- AND FOR -- THE FORENSIC DIVISION IS WITHIN

14   ELMHS; IS THAT RIGHT?

15   **A**    RIGHT.

16   **Q**    SO LET'S -- IF MR. GEORGE HAD BEEN A CIVIL PATIENT

17   OUT THERE AND HE ENGAGED IN EXACTLY THE SAME BEHAVIOR, PUT

18   ASIDE THE NOT GUILTY BY REASON OF INSANITY PART OF IT

19   COMPLETELY --

20   **A**    OKAY.

21   **Q**    -- WHAT WOULD -- WHAT WOULD BE THE TREATMENT OPTIONS

22   IN THAT CONTEXT?

23   **A**    I WOULD NOT HAVE AN OPTION TO MOVE HIM TO THE

24   FORENSIC DIVISION WITHOUT -- WE HAVE DONE THAT ON OCCASION FOR

25   PATIENTS THAT HAVE -- THAT ARE EITHER SO AGITATED AND VIOLENT

1   THAT WE CAN'T MANAGE THEM EFFECTIVELY IN THE CIVIL DIVISION,

2   IT REQUIRES AN INTERNAL PROCESS WHERE TWO DOCTORS, USUALLY THE

3   TREATING DOCTOR AND A SECOND DOCTOR BROUGHT IN, EXAMINE THE

4   PATIENT, DETERMINE THAT THEY'RE UNMANAGEABLE AND THEN APPLY TO

5   THE CLINICAL DIRECTOR FOR THE FORENSIC SIDE FOR PLACEMENT IN

6   THAT DIVISION.  AND IF THAT ALL GOES -- WE SEND LETTERS IN TO

7   THE TWO PEOPLE.  IF THAT ALL GOES THROUGH, THEN A CIVIL

8   PATIENT COULD POTENTIALLY BE MOVED, AND THEY HAVE BEEN MOVED.

9   IT'S PRETTY -- IT'S AN UNUSUAL CIRCUMSTANCE, BUT IT HAS

10   HAPPENED.

11       **Q**    AND THAT'S, AGAIN, A BUREAUCRATIC FUNCTION.

12       **A**    THAT'S A BUREAUCRATIC FUNCTION, BUT IT'S A LITTLE --

13   IT'S FAIRLY INVOLVED, AND IT CAN'T BE DONE AT THE DROP OF A

14   HAT, OBVIOUSLY, IT HAS TO BE DONE -- SO IN THE INTERIM, YOU

15   WOULD HAVE TO ACCEPT THE FACT THAT PERSON IS GOING TO BE

16   THERE, AND YOU WOULD HAVE TO USE, YOU KNOW, INJECTABLE

17   MEDICATION, YOU KNOW, PHYSICAL RESTRAINTS, IF NECESSARY, TO

18   PREVENT THEM FROM ACTING OUT VIOLENTLY.

19       **Q**    FOR A CIVIL PATIENT, JAIL IS NOT AN OPTION; IS THAT

20   RIGHT?

21       **A**    THAT'S RIGHT.  UNLESS THERE'S A CHARGE FOR SOMETHING

22   ON THE UNIT AND THE SHERIFF CAME AND TOOK THEM AWAY, THAT'S

23   THE ONLY POSSIBILITY.

24       **Q**    SO IF THEY WERE CHARGED WITH A CRIME, THEN YOU COULD

25   HAVE THEM ARRESTED AND --

1    **A**    THAT WOULD BE UP TO THE ARRESTING OFFICERS.  THEY

2   USUALLY DON'T MOVE THEM IMMEDIATELY, EVEN IF THEY'VE ATTACKED

3   SOMEONE, UNLESS IT'S VERY SEVERE.

4    **Q**    NOW, ON THAT DAY IN JULY, MR. GEORGE DID NOT ATTACK

5   ANYBODY; IS THAT RIGHT?

6    **A**    THAT'S CORRECT.

7    **Q**    BEAR WITH ME ONE SECOND.

8    **MR. LOSPENNATO:**  I SUPPOSE I SHOULD -- I'M GOING TO

9   GO BACK TO THE ELM -- TO THE ELMO BACK THERE AND SHOW MR.  --

10   DR. KELLY A DOCUMENT.

11    **THE COURT:**  SURE, THAT'S FINE.

12   BY MR. LOSPENNATO:

13    **Q**    CAN YOU READ THAT OKAY?  CAN YOU READ THAT OKAY?

14    **A**    I CAN.

15    **Q**    DO YOU RECOGNIZE THAT DOCUMENT?

16    **A**    YES.

17    **Q**    AND WHAT IS IT?

18    **A**    IT IS A DISCHARGE SUMMARY FOR MR. GEORGE.

19    **Q**    OKAY.  WOULD YOU READ THE DISCHARGE -- READ THE

20   PSYCHIATRIC CONDITIONS AT THE TIME OF DISCHARGE.

21    **A**    YES.  "ANGRY, UPSET, BUT NOT THREATENING TO HARM

22   SELF OR OTHERS."

23    **Q**    I ASSUME WHEN YOU WROTE THAT, YOU FELT THAT THAT WAS

24   AN ACCURATE DESCRIPTION OF WHAT HAD HAPPENED THAT DAY; IS THAT

25   RIGHT?

1      **A**    WELL, I MEAN, THE -- I DON'T THINK HE WAS MOVED

2   UNTIL THE NEXT DAY.  SO, I MEAN, HE CALMED DOWN AFTER THE

3   INITIAL ANGER.  MY FEELING WAS, THOUGH, THAT -- THAT HE HAD

4   NOT REALLY ACCEPTED WHAT WE WANTED TO DO AND, THEREFORE, HE

5   NEEDED TO BE TAKEN BACK BY THE FORENSIC DIVISION.

6      **Q**    SO LET ME UNDERSTAND THIS, SO MR. GEORGE WASN'T

7   MOVED UNTIL THE DAY AFTER THIS INCIDENT?

8      **A**    MY UNDERSTANDING IS HE WASN'T ACTUALLY ADMITTED TO

9   THE JAIL UNTIL THE NEXT DAY.  NOW, I DON'T KNOW WHERE HE

10   WAS -- I MEAN, I DON'T THINK HE WAS TAKEN OFF THE UNIT FOR

11   QUITE SOME TIME AFTER THIS INCIDENT OCCURRED.

12      **Q**    AND BY THAT TIME, WAS HE YELLING AND SCREAMING?

13      **A**    HE PROBABLY WASN'T BY THAT TIME.  THAT'S WHY I SAID

14   I DON'T THINK THAT HE WAS AN IMMEDIATE THREAT RIGHT AT THAT

15   MOMENT WHEN HE LEFT.

16      **Q**    ARE YOU FAMILIAR WITH EAST BATON ROUGE PRISON?

17      **A**    YES.

18      **Q**    DO YOU CONSIDER THAT A THERAPEUTIC ENVIRONMENT?

19      **A**    WELL, IT'S NOT AS THERAPEUTIC AS A HOSPITAL, BUT

20   THEY DO HAVE A PSYCHIATRIST AND THEY HAVE A NURSE, SEVERAL

21   NURSES.  THEY HAVE A SOCIAL WORKER.

22      **Q**    IT'S NOT A PLACE YOU WOULD SEND A CIVIL PATIENT TO;

23   IS THAT RIGHT?

24      **A**    I CAN'T.

25      **Q**    AND WHY IS THAT?

1    **A**    THERE'S -- THERE'S NO PROVISION IN -- I MEAN, I

2    CAN'T -- ACTUALLY I CAN'T SEND A FORENSIC PATIENT OVER THERE,

3    FOR THAT MATTER.  THAT'S UP TO THE PROBATION OFFICER.

4            **MR. LOSPENNATO:**  I HAVE NO OTHER QUESTIONS.

5            **THE WITNESS:**  OKAY.

6            **THE COURT:**  THANK YOU.  CROSS-EXAMINATION.

7    **CROSS-EXAMINATION**

8    **BY MR. CODY:**

9        **Q**    GOOD MORNING, DR. KELLY.

10       **A**    GOOD MORNING.

11       **Q**    A MOMENT AGO, YOU WERE ASKED BY MR. LOSPENNATO IF

12   MR. GEORGE HAD BECOME PHYSICALLY VIOLENT DURING THE ENCOUNTER

13   ON JULY THE 1ST, 2014.

14       **A**    RIGHT.

15       **Q**    NOW, DO YOU -- DO YOU THINK YOU SHOULD HAVE WAITED

16   UNTIL HE HAD BECOME PHYSICALLY VIOLENT BEFORE YOU MADE THE

17   DECISION THAT YOU MADE THAT DAY?

18       **A**    WELL, I MEAN, THAT -- YEAH, THE DECISION I MADE THAT

19   DAY WAS BASED ON THE FACT THAT HE HAD A HISTORY OF CHARGES FOR

20   VIOLENCE, THAT HE HAD A -- YOU KNOW, THAT HE'D HAD -- HE HAD

21   BEEN THREATENING BEFORE AND HAD A LOT OF DIFFICULTY MANAGING

22   HIS IMPULSES AND RAGE AT TIMES OVER THE YEARS.  I THINK HE'S

23   BEEN ARRESTED, YOU KNOW, MANY, MANY TIMES.  SO I DIDN'T THINK

24   THAT --

25            I WAS CONCERNED ABOUT MY OTHER CIVIL PATIENTS, WHO I

1    DIDN'T FEEL WERE SAFE IN AN ENVIRONMENT WHERE A FORENSIC

2    PATIENT WAS IN THAT STATE OF MIND, THAT SORT OF, YOU KNOW,

3    AGITATED, PROBABLY EARLY PSYCHOTIC STATE OF MIND.

4         Q    AND CAN YOU EXPLAIN TO THE JURY KIND OF THE

5    DIFFERENCE BETWEEN A FORENSIC PATIENT LIKE MR. GEORGE AND THE

6    OTHER -- THE CIVIL PATIENTS THAT WERE ON THE EAST ACUTE UNIT?

7         A    I MEAN, IF YOU -- WE HAVE PATIENTS ON THE UNIT THAT

8    HAVE NO CRIMINAL BACKGROUND WHATSOEVER THAT MAY BE JUST

9    DEPRESSED, CAME IN BECAUSE THEY WERE HAVING THOUGHTS OF

10   SUICIDE, YOU KNOW, WOULD NOT NECESSARILY BE ABLE TO DEFEND

11   THEMSELVES AGAINST A VERY STRONG, YOU KNOW, PERSON THAT HAD,

12   YOU KNOW, A CRIMINAL BACKGROUND OR CRIMINAL HISTORY.  SO, YOU

13   KNOW, I DIDN'T FEEL THAT IT WAS FAIR TO THE OTHER -- OR SAFE

14   FOR THE OTHER PATIENTS ON THE UNIT IF HE WAS GOING TO MAKE A

15   TURN IN THAT DIRECTION.

16        Q    AND THE EAST ACUTE UNIT, IS THAT A PLACE -- IS THAT

17   CONSIDERED A PERMANENT PLACEMENT OR IS THAT SOMEPLACE YOU

18   WOULD WANT SOMEBODY LIKE MR. GEORGE TEMPORARILY?

19        A    IT'S JUST AN ACUTE STABILIZATION UNIT.  YOU KNOW, AS

20   SOON AS WE HAVE A DISCHARGE OPTION WORKED OUT, WE DISCHARGE

21   PEOPLE.  YOU KNOW, SOMETIMES THERE'S, YOU KNOW, IMPEDIMENTS,

22   THERE'S BLOCKS TO US BEING ABLE TO DISCHARGE PEOPLE FOR

23   VARIOUS REASONS BUT, YOU KNOW, IF WE HAVE A DISCHARGE OPTION,

24   THEN WE EXERCISE IT.

25        Q    NOW, A MOMENT AGO, YOU HAD MENTIONED THAT THERE WAS

1  AN EARLIER ORDER TO MOVE MR. GEORGE TO THE CEDARVIEW UNIT.

2       **A**    RIGHT.

3            **MR. CODY:**   AT THIS POINT, MS. NUSS, WOULD YOU PLEASE

4  PULL UP WHAT'S PREVIOUSLY BEEN ADMITTED AS DEFENDANT'S

5  EXHIBIT 9-1604?

6  **BY MR. CODY:**

7       **Q**    NOW, MR. KELLY, DO YOU HAVE THAT DOCUMENT IN FRONT

8  OF YOU?  CAN YOU IDENTIFY THAT, PLEASE?

9       **A**    YES, THAT'S A DOCTOR'S ORDER SHEET FROM THE UNIT,

10  AND THERE'S AN ORDER ON THERE FROM ME TO TRANSFER HIM TO

11  CEDARVIEW.  IT'S A READBACK VERBAL ORDER, OR TELEPHONE ORDER,

12  BUT IT'S -- IT'S -- THE NURSE CALLED ME TO GET THE ORDER AND

13  THEN CALLED ME BACK AND TOLD ME THAT HE WOULDN'T GO.

14       **Q**    AND THE DATE OF THAT ORDER IS JUNE THE 3RD, 2014?

15       **A**    THAT'S CORRECT.

16       **Q**    AND YOU MET WITH HIM ON JULY 1ST, 2014; IS THAT

17  CORRECT?

18       **A**    YES.

19       **Q**    SO AT THIS POINT, MR. GEORGE HAD HAD, IT LOOKS LIKE,

20  ALMOST A MONTH TO CONSIDER THE TRANSFER REQUEST?

21       **A**    RIGHT.

22       **Q**    AND YET AT THE TIME YOU MET WITH HIM ON JULY 1ST,

23  2014, WHAT WAS HIS TEMPERAMENT AT THAT POINT?

24       **A**    WELL, HE -- HE WAS JUST -- YOU KNOW, I THINK FROM

25  THE FIRST TIME WE MENTIONED IT THAT DAY, HE WAS JUST LIKE,

1    "I'M NOT GOING.  I'M NOT GOING TO CEDARVIEW."  YOU KNOW, HE

2    WAS ADAMANT ABOUT IT, NOT INITIALLY REALLY ANGRY ABOUT IT, BUT

3    JUST:  "I'M NOT GOING."  AND THEN AS WE SORT OF BEGAN TO TELL

4    HIM THAT, YOU KNOW, WELL, THAT'S JUST NOT AN OPTION AS FAR AS

5    THIS PLACEMENT.  I MEAN YOU'RE GOING TO HAVE TO COMPLY WITH

6    THE TREATMENT RECOMMENDATIONS OF THE TREATMENT TEAM OR YOU'RE

7    GOING TO BE CONSIDERED TO BE KIND OF OUT OF COMPLIANCE -- OUT

8    OF COMPLIANCE WITH YOUR CONDITIONAL RELEASE.

9        Q    AND DID YOU FEEL THAT THIS DECISION TO TRANSFER HIM

10   TO THE CEDARVIEW UNIT WAS IN HIS BEST INTEREST?

11       A    YES.

12       Q    IS THAT -- IS THAT IN SYNC WITH THE OVERALL GOAL

13   CONCERNING RESTRICTIVE ENVIRONMENT FOR PATIENTS AT ELMHS?

14       A    YES.  I MEAN, WE ALWAYS TRY TO MOVE PEOPLE TO THE

15   LEAST RESTRICTIVE ENVIRONMENT POSSIBLE AT ANY GIVEN TIME.  SO,

16   YOU KNOW, THAT WAS A MOVE TOWARD A LESS RESTRICTIVE

17   ENVIRONMENT AND I, YOU KNOW -- I THINK IF MR. GEORGE HAD TAKEN

18   IT, HE PROBABLY WOULD HAVE MOVED ON.  I DON'T -- I THINK WHEN

19   HE GOT OVER THERE, I DON'T KNOW THAT HE WOULD HAVE HAD THE

20   SORT OF DIFFICULTIES THAT -- I MEAN, I CAN'T -- I CAN'T KNOW

21   FOR SURE, BUT WE'VE HAD CLIENTS DO THIS BEFORE, YOU KNOW, MOVE

22   FROM OUR UNIT TO CEDARVIEW, AND THEN THEY MOVE FROM CEDARVIEW

23   TO A GROUP HOME.  SO, I MEAN, THAT WAS OUR PLAN.

24       Q    AND CAN YOU KIND OF DESCRIBE -- I DON'T RECALL IF

25   YOU WENT INTO IT EARLIER IN YOUR TESTIMONY -- BUT CAN YOU KIND

1    OF DESCRIBE SOME OF THE FREEDOMS HE WOULD HAVE ENJOYED AT

2    CEDARVIEW?

3        **A**    WELL, HE WOULD HAVE -- HE WOULD HAVE BEEN ALLOWED

4    MORE TIME OUTSIDE.   AND ACTUALLY OVER THERE -- I MEAN, I --

5    THEY HAVE LIKE AN INITIAL PLACEMENT UNIT AND A SECONDARY

6    PLACEMENT, SO THERE'S MORE FREEDOMS WHEN YOU'RE MOVED FROM THE

7    ADMISSION -- YOU KNOW, THE ENTRY UNIT TO THE STEPDOWN UNIT

8    FROM -- YOU KNOW, THEY HAVE TWO UNITS.

9            BUT ULTIMATELY, IF HE FUNCTIONED WELL, HE WOULD BE

10   ALLOWED TO SPEND MORE TIME OUTSIDE.   HE WOULD BE ALLOWED TO

11   POSSIBLY HAVE GROUNDS PRIVILEGES TO GO WALKING FOR BRIEF

12   PERIODS OF TIME.   THEY HAVE PASSES.   THEY GO TO RESTAURANTS,

13   THEY GO TO MOVIES, MORE RECREATIONAL THERAPY OPPORTUNITIES,

14   MORE TREATMENT GROUPS.   IT'S MORE LONG -- LONG-TERM IN ITS

15   FOCUS AND AIMS TOWARD MORE OF A REHABILITATION THAN

16   STABILIZATION.

17       **Q**    AND DO YOU RECALL ANY STATEMENTS MADE BY MR. GEORGE

18   AT THE TIME OF THE INCIDENT ON JULY 1ST, 2014?

19       **A**    ANY OF THE STATEMENTS?

20       **Q**    SPECIFICALLY ANY STATEMENTS MAYBE CONCERNING -- YOU

21   KNOW, THAT WOULD HAVE BEEN PERCEIVED AS A THREAT OF HARM

22   PERHAPS TO YOU OR TO DR. VOSBURG?

23       **A**    I THINK HE MADE -- YOU KNOW, HE WAS YELLING AT US

24   FROM THE HALLWAY, THREATENING DR. VOSBURG DIRECTLY, YOU KNOW,

25   WITH BODILY HARM.   AND THAT'S WHY WE DECIDED TO HAVE HIM

1   ESCORTED OFF THE UNIT BECAUSE WE WERE CONCERNED THAT HE MIGHT

2   ATTACK HIM.   BECAUSE THE DOOR -- THE DOOR THAT -- YOU KNOW,

3   THE DOOR THAT HE WOULD -- THAT HE WOULD HAVE TO EXIT FROM

4   WOULD BE RIGHT IN FRONT OF WHERE DR. -- WHERE MR. GEORGE WAS,

5   SO DR. VOSBURG WOULD HAVE BEEN POTENTIALLY IN AN AREA WHERE HE

6   COULD BE ATTACKED.

7        Q     SO DID YOU FEEL THAT DR. VOSBURG -- DID YOU FEEL

8   THAT HE ALSO SHARED THIS CONCERN ABOUT PHYSICAL SAFETY FROM

9   MR. GEORGE?

10       A     HE TOLD ME HE DID.   I MEAN, HE SAID THAT HE THOUGHT

11  HE NEEDED, YOU KNOW, SOME PROTECTION TO LEAVE THE UNIT BECAUSE

12  HE DIDN'T KNOW THAT MR. GEORGE WOULDN'T ATTACK HIM.

13       Q     NOW, A MOMENT AGO, YOU WERE ASKED ABOUT EAST BATON

14  ROUGE PARISH PRISON.   HAVE YOU EVER ACTUALLY VISITED EAST

15  BATON ROUGE PARISH PRISON?

16       A     YES.

17       Q     ABOUT HOW MANY TIMES?

18       A     YOU KNOW, PROBABLY 50 OR 60 TIMES.

19       Q     AND ARE YOU FAMILIAR AT ALL WITH DR. BLANCHE?

20       A     YES.

21       Q     AND WHO IS DR. BLANCHE?

22       A     HE IS THE TREATING PSYCHIATRIST FOR EAST BATON ROUGE

23  PARISH PRISON.

24       Q     WHAT CAN YOU TELL THE JURY CONCERNING HIS REPUTATION

25  AS A PSYCHIATRIST?

1             **MR. LOSPENNATO:** I OBJECT, IRRELEVANT.

2             **THE COURT:** OVERRULED.

3             **THE WITNESS:** HE'S -- I KNOW DR. BLANCHE THROUGH

4 REPUTATION AND ALSO, YOU KNOW, SOME INTERACTIONS.  YOU KNOW,

5 OVER THE YEARS, I'VE TALKED TO HIM SEVERAL TIMES.  WE'VE BEEN

6 INVOLVED IN SOME CASES TOGETHER WHERE WE WERE ON SANITY

7 COMMISSIONS TOGETHER OR WE WORKED ON CASES, EVEN CIVIL CASES

8 WHERE WE EXAMINED PATIENTS OR REVIEWED RECORDS.  HE'S A

9 WELL-RESPECTED PSYCHIATRIST IN THIS COMMUNITY, I THINK ONE OF

10 THE MOST RESPECTED.

11      **Q**     AND ARE YOU FAMILIAR WITH LISA BURNS?

12      **A**     YES.

13      **Q**     AND WHO IS LISA BURNS?

14      **A**     SHE'S THE SOCIAL WORKER FOR EAST BATON ROUGE PARISH

15 PRISON.

16      **Q**     IN ADDITION TO MS. BURNS, ARE THERE ANY OTHER STAFF

17 THERE THAT ARE INVOLVED IN MENTAL HEALTH TREATMENT?

18      **A**     I KNOW THEY HAVE A -- I DON'T KNOW THE OTHER NAMES.

19 I'VE WORKED WITH, YOU KNOW, MS. BURNS QUITE -- QUITE --

20 SEVERAL TIMES, MANY TIMES, BECAUSE SHE KEEPS THE RECORDS FOR

21 THE TREATMENT.  YOU KNOW, THEY HAVE A -- A COMPUTERIZED CHART

22 THAT THEY USE AND SHE -- WHEN I GO TO SEE -- THE USUAL

23 SCENARIO IS I GO OVER THERE TO SEE A DEFENDANT FOR COMPETENCY

24 ASSESSMENT, SANITY COMMISSION WORK FOR JUDGES, AND SHE

25 PROVIDES RECORDS FOR ME.  AND THOSE RECORDS INCLUDE THEIR

1   MEDICATIONS, THE SESSIONS THAT THEY -- THAT SHE HAS WITH THEM

2   AND ALSO THE SESSIONS THAT DR. BLANCHE HAS WITH THEM.  IT HAS,

3   YOU KNOW, SORT OF NOTES THAT GIVE QUOTES AND SO FORTH TO KIND

4   OF GET AN IDEA OF HOW THE PATIENT IS DOING.

5          AND THEN I KNOW THEY HAVE A REGISTERED NURSE

6   PRACTITIONER THAT WORKS WITH DR. BLANCHE AND MS. BURNS AND

7   THEN OTHER NURSES THAT ARE INVOLVED IN ADMINISTERING

8   MEDICATION, PSYCHIATRIC AND OTHERWISE.

9   **Q**    AND KNOWING NOW THAT MR. GEORGE WAS PLACED THERE AT

10  EAST BATON ROUGE PARISH PRISON FOR A PERIOD OF TIME FOLLOWING

11  JULY 1ST, 2014, DO YOU HAVE ANY CONCERNS AS TO WHETHER OR NOT

12  HIS MENTAL HEALTH NEEDS WERE PROPERLY ATTENDED TO BY DR.

13  BLANCHE AND HIS STAFF?

14  **A**    I THINK -- I WOULD TRUST DR. BLANCHE TO PROPERLY

15  ATTEND TO THE -- ANY PATIENT SENT THERE, TO THEIR PSYCHIATRIC

16  NEEDS.  AND, YOU KNOW, ON SEVERAL OCCASIONS WHEN THERE HAS

17  BEEN A PATIENT AT EAST BATON ROUGE PARISH PRISON WHO WAS

18  ACUTELY UNSTABLE, THEY THOUGHT MIGHT BE SUICIDAL OR NEED A

19  HIGHER LEVEL OF CARE, THEY COULDN'T MANAGE THEIR PSYCHIATRIC

20  SYMPTOMS, THEY HAVE CALLED ME AND SAID, YOU KNOW, "DR. KELLY,

21  WE HAVE A PATIENT OVER HERE THAT WE JUST CANNOT MANAGE IN THIS

22  SETTING.  THEY'RE TOO PSYCHIATRICALLY ILL."

23          AND, YOU KNOW, DR. BLANCHE WILL FILL OUT A

24  PHYSICIAN'S EMERGENCY CERTIFICATE, AND WE'LL PROVIDE A BED FOR

25  THEM AND GET THEM INTO THE HOSPITAL AND TREAT THEM AND THEN

1  SEND THEM BACK.  SO, I MEAN -- YOU KNOW, I THINK THEY ARE VERY

2  THOROUGH AND COMPETENT -- A VERY THOROUGH AND COMPETENT

3  TREATMENT TEAM.

4       Q    AS FAR AS THE DECISION THAT YOU HAD MADE TO GET HIM

5  OFF THE UNIT, AS YOU'VE SAID, OFF THE EAST ACUTE UNIT ON

6  JULY 1ST, 2014, DID YOU TAKE THAT DECISION LIGHTLY?

7       A    NO.

8       Q    THERE WERE IMPORTANT CONSIDERATIONS, I SUPPOSE?

9       A    RIGHT.  I THINK I WAS BALANCING HIS CARE VERSUS THE

10  RISK HE WAS POSING ON -- THAT I THOUGHT HE WAS POSING ON THE

11  UNIT AND WOULD CONTINUE TO POSE.  AND, YOU KNOW -- YOU KNOW,

12  IF YOU -- THE DISCHARGE ORDER, I LOOKED BACK AT MY DISCHARGE

13  ORDER FOR THAT DAY.  I DID NOT SAY TO DISCHARGE HIM TO EAST

14  BATON ROUGE PARISH PRISON.  I SAID TO DISCHARGE HIM TO THE

15  CARE OF THE PROBATION OFFICER, TO THE CUSTODY OF THE PROBATION

16  OFFICER.  IT'S UP TO THEM TO DETERMINE THEIR PLACEMENT AT THAT

17  POINT.

18            **MR. CODY:**  MS. NUSS, CAN YOU BRING UP DEFENDANT'S

19  EXHIBIT 9-1608?

20  **BY MR. CODY:**

21       Q    DR. KELLY, CAN YOU IDENTIFY THAT, PLEASE?

22       A    YES, THAT'S MY DISCHARGE ORDER THAT I JUST SPOKE OF.

23       Q    AND CAN YOU READ THE LANGUAGE, THE FIRST WRITTEN

24  LANGUAGE THERE ON THE SHEET?

25       A    DISCHARGED TO CUSTODY OF PROBATION OFFICER.

1      **Q**     AND DID YOU HAVE ANY COMMUNICATION WITH ERIC BRADY

2    PRIOR TO MR. GEORGE'S RELEASE TO CUSTODY ON JULY 1ST, 2014?

3      **A**     I DON'T REMEMBER IF WE TALKED THAT DAY.  I THINK I

4    MAY HAVE TRIED TO GET IN TOUCH WITH HIM, BUT I JUST CAN'T

5    REMEMBER IF WE ACTUALLY HAD A CONVERSATION ON THAT PARTICULAR

6    DAY.  WE PROBABLY TALKED ABOUT IT LATER.  HE MAY HAVE CHECKED

7    IN WITH ME LATER ABOUT, YOU KNOW, WHAT HAD HAPPENED AND SO

8    FORTH, BECAUSE HE HAD BEEN -- HAD SUPERVISORY -- A SUPERVISORY

9    ROLE IN RELATION TO MR. GEORGE.

10            SO I WANT TO SAY THAT WE TALKED ABOUT IT AT SOME

11   POINT, BUT I DON'T -- I DON'T SPECIFICALLY REMEMBER TALKING TO

12   HIM THAT DAY.  I MAY HAVE TRIED, BUT BEEN UNABLE TO REACH HIM.

13     **Q**     AND FORGIVE ME IF YOU MAY HAVE SAID EARLIER, BUT DO

14   YOU RECALL THE NAME OF THE PROBATION OFFICER WHO WAS

15   OVERSEEING MR. GEORGE'S CASE AT THAT TIME?

16     **A**     YES, BOBBY CASTILLO.

17     **Q**     AND I THINK EARLIER YOU MAY HAVE SAID YOU WEREN'T

18   SURE WHO CALLED WHOM, BUT DO YOU RECALL MAYBE AN EFFORT TO

19   CONTACT MR. CASTILLO?

20     **A**     YES.

21     **Q**     AND DO YOU KNOW IF DR. VOSBURG HAD ANY INVOLVEMENT

22   IN THAT?

23     **A**     HE DID NOT.  I DON'T -- I DON'T THINK HE TALKED TO

24   HIM.  IN FACT, I THINK BY THE TIME THAT I GOT IN TOUCH WITH

25   MR. CASTILLO, DR. VOSBURG WAS ALREADY OFF THE UNIT.  AND WE

1   WERE TRYING TO WORK OUT, YOU KNOW, GETTING MR. GEORGE MOVED

2   BECAUSE I DIDN'T FEEL HE WAS SAFE TO REMAIN ON THE UNIT.

3        Q    AGAIN, AS FAR AS THE POWER TO ACTUALLY ARREST

4   MR. GEORGE, DO YOU FEEL LIKE YOU HAD THAT AUTHORITY?

5        A    I DO NOT.

6        Q    AND WHO HAD THAT AUTHORITY?

7        A    ONLY A PROBATION OFFICER COULD -- COULD DO -- I

8   MEAN, I GUESS THERE'S OTHER LAW ENFORCEMENT OFFICERS THAT

9   WOULD BE EMPOWERED TO DO SO, BUT NORMALLY, THE WAY THAT THAT

10  HAPPENS IS THE PROBATION OFFICER ASSIGNED TO THE CASE OR --

11  YOU KNOW, PART OF IT IS WHAT PARISH YOU'RE IN.  I THINK HE --

12  BOBBY CASTILLO WAS INVOLVED IN THE CASE AT THAT POINT BECAUSE

13  OF THE PARISH THAT HE WAS -- THAT MR. GEORGE WAS IN.  BUT THE

14  LOCAL PROBATION OFFICER ASSIGNED TO THE CASE IS THE ONE THAT

15  WOULD HAVE TO MAKE THAT -- TO MAKE AN ARREST OR TO MOVE

16  SOMEBODY.

17       Q    AND, MR. CASTILLO, DO YOU HAVE ANY RELATIONSHIP WITH

18  HIM OUTSIDE OF HIM JUST BEING A PROBATION OFFICER?

19       A    HE DID WORK AT THE HOSPITAL.  HE'S A SOCIAL WORKER

20  OR WAS TRAINED AS A SOCIAL WORKER ORIGINALLY, AND HE DID WORK

21  AT THE HOSPITAL FOR MANY YEARS.  I MEAN, I DIDN'T WORK WITH

22  HIM THAT MUCH.  HE WAS NEVER LIKE THE SOCIAL WORKER ASSIGNED

23  TO MY UNIT.  BUT I -- YOU KNOW, I STAFFED.  WHEN I WAS

24  COVERING OTHER DOCTORS' PATIENTS OR WHATEVER, I MEAN, I WAS

25  INVOLVED IN STAFFINGS WITH HIM, AND I KNEW HIM, YOU KNOW,

1  FAIRLY WELL.

2      **Q**    AND ABOUT HOW MANY YEARS WOULD YOU SAY --

3          **THE COURT:**   LET'S GO TO THE EARPHONES, PLEASE.

4  LET'S GO TO THE HEADPHONES, PLEASE.

5          **REPORTER'S NOTE:**   (AT THIS TIME THE FOLLOWING

6  DISCUSSION WAS HELD AT THE BENCH.)

7          **THE COURT:**   MR. CODY, THE REASON THAT I DID NOT

8  GRANT OR AT LEAST A CONSIDERATION IN ME NOT GRANTING THE

9  MOTION TO EXCUSE ONE OF THE JURORS IN THIS CASE WAS BECAUSE I

10  WAS ASSURED THAT MR. CASTILLO WOULD NOT BE CALLED AS A

11  WITNESS, AND I'M SURE HE'S NOT GOING TO BE.   BUT THIS IS

12  SOMEWHAT OF AN END RUN, IT SEEMS TO ME, WHEN YOU'RE PUTTING

13  MR. CASTILLO, WHO APPARENTLY HAD VERY LITTLE TO DO WITH IT,

14  DIRECTLY FRONT AND CENTER FOR A VERY OBVIOUS PURPOSE.   SO I'M

15  GOING TO SUGGEST THAT YOU DO NOT GO THERE.

16          **MR. CODY:**   YOUR HONOR, AND MY APOLOGIES.   I WAS NOT

17  TRYING TO GET IN ANYTHING THAT WAS OTHERWISE GOING TO BE NOT

18  PUT IN BECAUSE OF HIS NOT TESTIFYING.   IT WAS JUST SIMPLY

19  BECAUSE HE --

20          **THE COURT:**   IF I KNEW Y'ALL WERE GOING TO MAKE THIS

21  AN ISSUE I WOULD HAVE CONSIDERED IT DIFFERENTLY WHEN THE

22  MOTION WAS MADE.   BUT AT LEAST THE SUGGESTION WAS -- WELL, THE

23  DIRECT REPRESENTATION WAS HE WAS NOT GOING TO BE CALLED AS A

24  WITNESS, SORT OF IMPLIED IN THAT THAT HIS CREDIBILITY WAS NOT

25  GOING TO BE AN ISSUE IN THE CASE, WHICH IS WHY I SAID AT THAT

1  POINT THAT WE DON'T NEED TO WORRY ABOUT THAT.  SO IT IS NOW

2  BECOMING THAT, AND YOU CAN DO WHAT YOU WANT, BUT I'M URGING

3  YOU NOT TO DO THAT.

4       **MR. CODY:**  YES, YOUR HONOR.  THAT'S ALL I HAVE.

5       **THE COURT:**  OKAY.

6       **REPORTER'S NOTE:**  (WHEREUPON THE BENCH CONFERENCE

7  WAS CONCLUDED.)

8       **MR. CODY:**  THANK YOU, DR. KELLY.  NO FURTHER

9  QUESTIONS.

10      **THE WITNESS:**  OKAY.

11      **THE COURT:**  ANY REDIRECT?

12      **MR. LOSPENNATO:**  YES, YOUR HONOR.

13 **REDIRECT**

14 **BY MR. LOSPENNATO:**

15     **Q**    BEAR WITH ME FOR ONE SECOND.  SO DR. KELLY, YOU

16 TESTIFIED THAT ESSENTIALLY THE DECISION TO JAIL MR. GEORGE

17 WASN'T YOUR DECISION; IT WAS REALLY SOMEBODY ELSE'S DECISION;

18 IS THAT RIGHT?

19     **A**    WELL, I JUST DON'T HAVE ANY AUTHORITY TO MOVE

20 SOMEONE TO THE JAIL.

21     **Q**    BUT IF YOU REVIEW THE EXHIBIT THAT'S ON THE --

22 THAT'S BEFORE YOU, IT CLEARLY SHOWS THAT -- WHEN YOU WROTE

23 THIS, WHICH WAS ON JULY 1ST, YOU KNEW HE WAS GOING TO JAIL;

24 ISN'T THAT RIGHT?

25     **A**    I DON'T THINK THIS WAS DICTATED ON JULY THE 1ST.  I

1   THINK IT WAS DICTATED AFTER THE FACT.  I'M CERTAIN THAT BY THE

2   TIME I DICTATED THIS, HE HAD ALREADY BEEN MOVED TO THE JAIL.

3       Q    BUT YOU ALSO KNOW THAT THE DISCUSSIONS ACTUALLY THAT

4   OCCURRED AT THE MEETING OF JULY 1ST INCLUDED REFERENCES THAT

5   MR. GEORGE WOULD BE ARRESTED AND PUT IN JAIL IF HE DIDN'T

6   AGREE TO GO TO CEDARVIEW; ISN'T THAT RIGHT?

7       A    YES.  WELL, I DON'T KNOW THAT WE SAID JAIL.  I THINK

8   WE SAID ASSA, THAT HE WOULD HAVE TO GO BACK TO THE FORENSIC

9   DIVISION AND IF THERE WASN'T A BED HE MIGHT GO TO JAIL.  I

10  MEAN, THAT -- I THINK HE UNDERSTOOD THAT.

11      Q    OKAY.  SO I'M READING FROM YOUR SUMMARY DISCHARGE,

12  AND IT'S BEFORE YOU.  IT SAYS, "THIS STAFFING WAS ESSENTIALLY

13  TO INFORM -- INFORM MR. GEORGE THAT HE WOULD EITHER HAVE TO

14  ACCEPT PLACEMENT IN THE CIVIL DIVISION OR WE WOULD PURSUE

15  REVOCATION AND HE WOULD PROBABLY HAVE TO GO TO JAIL FIRST"; IS

16  THAT RIGHT?

17      A    THAT'S RIGHT.

18      Q    AND THAT'S AN ACCURATE STATEMENT OF THE DISCUSSION

19  ON THAT DAY?

20      A    WELL, I MEAN, IT'S ONLY BECAUSE THERE'S NOT A BED IN

21  THE FORENSIC DIVISION, BUT THAT'S ESSENTIALLY TRUE.

22      Q    YOU TALK IN GLOWING TERMS ABOUT DR. BLANCHE.  DO YOU

23  KNOW WHETHER DR. BLANCHE EVEN SAW MR. GEORGE WHILE HE WAS IN

24  THE EAST BATON ROUGE PARISH PRISON?

25      A    I DON'T.  I DON'T HAVE -- I HAVEN'T LOOKED AT THOSE

1    RECORDS.

2        **Q**    DO YOU KNOW WHETHER MR. GEORGE RECEIVED TREATMENT

3    WHILE HE WAS AT EAST BATON ROUGE PRISON?

4        **A**    I MEAN MY UNDERSTANDING IS IS THAT HE WAS PLACED ON

5    MEDICATIONS, BUT I DON'T -- I MEAN, I HAVEN'T REVIEWED THE

6    RECORDS.

7        **Q**    SO YOU DON'T KNOW?

8        **A**    I DON'T KNOW FOR SURE, NO.

9        **Q**    AND DO YOU KNOW THAT MR. GEORGE WAS PLACED IN

10   LOCKDOWN DURING THE TIME HE WAS IN EAST BATON ROUGE PRISON?

11       **A**    I -- I DON'T KNOW ANYTHING ABOUT HIS CARE AFTER HE

12   WENT THERE.

13       **Q**    OKAY.  SO -- NEVER MIND.  DID YOU CONSIDER

14   MR. GEORGE'S DECISION TO REFUSE TO GO TO CEDAR -- CEDARVIEW A

15   RATIONAL DECISION?

16       **A**    I MEAN, YOU KNOW, I DIDN'T FEEL THAT THERE WAS SOME

17   SORT OF PSYCHOTIC MOTIVE UNDERLYING THE DECISION.  I THINK HE

18   WAS MAD BECAUSE HE WANTED TO GO BACK TO THE GROUP HOME, AND

19   THAT'S THE WAY HE EXPRESSED IT TO ME.

20       **Q**    SO WHEN PEOPLE ARE IN A HOSPITAL SETTING -- TAKE

21   AWAY THE NGRI LABEL FOR THE MOMENT -- WHEN PEOPLE ARE IN A

22   HOSPITAL SETTING, IS IT COMMON THAT THEY REFUSE MODALITIES OF

23   TREATMENT OR EVEN PLACEMENT RECOMMENDATIONS?

24       **A**    SOMETIMES.

25       **Q**    AND WHEN THEY DO THAT, ARE THEY ARRESTED?

1    **A**    NOT TYPICALLY.

2    **Q**    IN A CIVIL PATIENT WHO REFUSED THOSE KINDS OF -- A

3    RECOMMENDATION, FOR EXAMPLE, THAT THEY GO TO ANOTHER PLACEMENT

4    WOULD NEVER BE ARRESTED; IS THAT RIGHT?

5    **A**    THERE'S NO BASIS FOR AN ARREST BY REFUSING

6    TREATMENT.

7    **Q**    BECAUSE IT'S NOT A CRIME?

8    **A**    RIGHT.

9    **Q**    NOW, YOU INDICATED TO ME THAT -- OR YOU TESTIFIED

10    THAT THE ORIGINAL DECISION BY MR. GEORGE NOT TO GO TO

11    CEDARVIEW WAS IN EARLY JUNE, AND THIS MEETING WAS, OBVIOUSLY,

12    IN LATE JUNE, THE FIRST OF JULY; IS THAT RIGHT?

13    **A**    RIGHT.

14    **Q**    BETWEEN THE TIME THAT MR. GEORGE WAS INITIALLY

15    LETTING YOU KNOW THAT HE DIDN'T WANT TO GO THERE, TO THE TIME

16    THAT THERE WAS THIS JULY 1ST MEETING, WHAT KIND OF EFFORTS

17    WERE MADE TO CONVINCE HIM OTHERWISE?  FOR EXAMPLE, DID HE GET

18    COUNSELING DURING THIS TIME?

19    **A**    I THINK DR. AHMAD WAS CONTINUING TO ASK HIM OR TALK

20    TO HIM ABOUT ACCEPTING THE PLACEMENT AND GOING OVER THERE.  I

21    MEAN, I THINK THOSE NOTES THAT HE WROTE INDICATE THAT THAT WAS

22    STILL A PLAN FOR HIM AND THAT THAT'S WHAT THEY -- YOU KNOW,

23    THEY WANTED HIM TO DO.  BUT I WASN'T INVOLVED IN HIS DIRECT

24    CARE AT THAT POINT UNTIL JULY THE 1ST AND I THINK BY

25    SUGGESTING IT ON JUNE THE 3RD, HE HAD A MONTH TO MULL THAT

1 | OVER AND HE STILL DIDN'T DO IT.

2 |     **Q**    WELL, THAT MAY BE TRUE, BUT THE QUESTION I HAVE IS,

3 | BETWEEN JUNE 3RD AND JULY 1, WHAT KIND OF EFFORTS WERE REALLY

4 | MADE ON THE HOSPITAL TO CONVINCE HIM THAT THAT WAS A REALLY

5 | GOOD THING FOR HIM?

6 |     **A**    I CAN'T SAY FOR SURE BECAUSE I WASN'T INVOLVED IN

7 | THOSE STAFFINGS.

8 |     **Q**    WHILE MR. GEORGE WAS AT EAST BATON ROUGE -- I'M

9 | SORRY, IN ELMHS, YOU MENTIONED HE TAKES MEDICATION.  WHAT

10 | OTHER KINDS OF SERVICES WAS HE GETTING?

11 |     **A**    THEY HAVE SEVERAL DAILY GROUPS:  NURSING MORNING,

12 | AND WRAP-UP GROUPS AT NIGHT.  THE SOCIAL WORKERS HAVE

13 | TREATMENT TRACK GROUPS.  SO HE WAS PROBABLY ASSIGNED TO THE --

14 | ONE OF THE TREATMENT TRACKS, PROBABLY A FOCUS TRACK, FOR

15 | PATIENTS THAT HAVE MORE COGNITIVE ISSUES.  ALSO, SUBSTANCE

16 | ABUSE GROUP IS HELD, YOU KNOW, TWO OR THREE TIMES A WEEK, AND

17 | I THINK HE WAS PROBABLY ASSIGNED TO THAT.

18 |     **Q**    AND PSYCHOTHERAPY IS AVAILABLE AT THE HOSPITAL, IF

19 | IT'S NECESSARY?

20 |     **A**    IT IS, BUT WE DON'T DO THAT ON THE ACUTE UNIT

21 | BECAUSE IT'S AN ACUTE UNIT AND WE DON'T -- THERE'S NO TIME TO

22 | DO THOSE SORTS OF INTERVENTIONS.  NOW, IF SOMEONE NEEDS LONGER

23 | TERM, BEYOND SUPPORTIVE THERAPY, WHICH I'M SURE HE RECEIVED

24 | FROM THE SOCIAL WORKER, BUT LONGER-TERM PSYCHOTHERAPY, IT

25 | WOULD HAVE BEEN IN A PLACE LIKE CEDARVIEW.

1   **Q**   WELL, PEOPLE GET COUNSELING, DON'T THEY, IN THE

2   ACUTE UNIT?

3   **A**   WELL, ONLY SUPPORTIVE COUNSELING, YOU KNOW, MORE

4   SORT OF IMMEDIATE, YOU KNOW, REALITY BASED, YOU KNOW, THIS IS

5   WHAT WE THINK YOU SHOULD DO, THIS IS YOUR TREATMENT PLAN, YOU

6   KNOW, THAT SORT OF THING.   THERE'S JUST NOT TIME TO GET INTO

7   ANY SORT OF IN-DEPTH PSYCHOTHERAPY THAT YOU WOULD DO IN A

8   LONGER-TERM SETTING.

9   **Q**   BUT THAT IS SOMETHING THAT PERHAPS COULD HAVE BEEN

10  DONE FOR MR. GEORGE; ISN'T THAT TRUE?

11  **A**   WELL, I MEAN, I WOULDN'T HAVE DONE IT FOR ANYONE

12  ELSE, SO I DON'T KNOW WHY I WOULD HAVE DONE IT FOR MR. GEORGE.

13  **Q**   MAYBE AS AN ACCOMMODATION?   COULD YOU HAVE DONE IT

14  AS AN ACCOMMODATION?

15  **A**   I MEAN, I DON'T -- I DON'T REALLY SEE A -- YOU KNOW,

16  I THINK IT'S A VERY SIMPLE MATTER.   HE -- YOU KNOW, HE HAS

17  CONDITIONS OF RELEASE, WHICH HE SIGNED.   HE'S EXPECTED TO

18  COMPLY WITH TREATMENT, AND HE'S NOT COMPLYING WITH TREATMENT.

19  I MEAN, I DON'T -- THIS ISN'T A CALCULUS PROBLEM.   SO I THINK

20  IT'S JUST VERY SIMPLE AND STRAIGHT FORWARD.   AND HE WASN'T --

21  HE WASN'T COMPLYING.

22  **Q**   ARE YOU FAMILIAR WITH -- YOU'VE REFERRED A COUPLE OF

23  TIMES TO THE CONDITIONS OF RELEASE.   BUT HAVE YOU EVER

24  ACTUALLY READ THEM?

25  **A**   YES.

1    **Q**    YOU HAVE.   AND IN THE CONDITIONS OF RELEASE

2  ANYWHERE, IS THERE A REFERENCE TO IF MR. GEORGE DOESN'T COMPLY

3  HE GETS SENT TO JAIL?

4    **A**    I DON'T THINK IT'S QUITE STATED IN THOSE TERMS, BUT,

5  I MEAN, IT'S -- IT'S -- IF THEY DON'T COMPLY, THEY MAY BE

6  REVOKED AND SENT BACK TO THE FORENSIC HOSPITAL.

7    **Q**    OH, SO HE COULD BE SENT BACK TO A HOSPITAL?

8    **A**    YES.

9    **Q**    AND THAT'S REFERENCED IN THE CONDITIONAL RELEASE;

10  ISN'T THAT RIGHT?

11    **A**    YES.

12    **Q**    BUT JAIL'S NOT MENTIONED, IS IT?

13    **A**    WELL, IF YOU'RE NOT GUILTY BY REASON OF INSANITY AND

14  YOU'RE IN A GROUP HOME AND YOU'RE OUT IN THE COMMUNITY AND YOU

15  -- YOU KNOW, THE FORENSIC COORDINATOR IS CALLED BECAUSE THE

16  PATIENT IS ACTING OUT, THEY OFTEN END UP IN JAIL BECAUSE

17  THERE'S NO BED IN THE FORENSIC DIVISION.   I MEAN, THAT'S WHY

18  WE'RE HERE TODAY.

19    **Q**    BUT WHAT PART OF NOT GUILTY DON'T YOU UNDERSTAND?

20    **A**    IT'S NOT NOT GUILTY.

21    **Q**    IT IS NOT GUILTY.

22    **A**    IT'S NOT GUILTY BY REASON OF INSANITY.

23    **Q**    CORRECT.

24    **MR. CODY:**   YOUR HONOR, OBJECTION.   I THINK THIS

25  EXCEEDS CROSS-EXAMINATION, THE SCOPE OF CROSS AND I DON'T

1    THINK THIS IS --

2              **THE COURT:**  I THINK IT'S BEEN ASKED AND ANSWERED.

3              **MR. LOSPENNATO:**  THANK YOU.  I HAVE NO OTHER

4    QUESTIONS.

5              **THE COURT:**  THANK YOU, SIR.  YOU MAY STAND DOWN.  IT

6    IS FIVE TILL, SO WHAT WE'RE GOING TO DO IS TO COME BACK

7    AT 1:20 TO RESUME.  HAVE A NICE LUNCH.

8              **REPORTER'S NOTE:**  (WHEREUPON THE JURY EXITED THE

9    COURT ROOM AND COURT WAS IN RECESS.)

10             **REPORTER'S NOTE:**  (AT THIS TIME TRIAL RESUMED AND

11   ALL PARTIES ARE PRESENT.)

12             **THE COURT:**  LET'S GET THE JURY IN.

13             **REPORTER'S NOTE:**  (WHEREUPON THE JURY RETURNED TO

14   THE COURTROOM.)

15             **THE COURT:**  YOU MAY BE SEATED.  YOU MAY CALL YOUR

16   NEXT WITNESS.

17             **MS. FERNANDEZ:**  WE CALL MS. LISA BURNS, YOUR HONOR.

18             **THE COURT:**  ALL RIGHT.  MS. BURNS.  MS. BURNS, COME

19   FORWARD AND BE SWORN.

20             **(WHEREUPON, LISA BURNS, HAVING BEEN DULY SWORN,**

21   **TESTIFIED AS FOLLOWS.)**

22   **DIRECT**

23   **BY MS. FERNANDEZ:**

24        **Q**   GOOD AFTERNOON.  THANK YOU FOR BEING HERE.  SORRY

25   I'M ALL THE WAY OVER HERE.  WOULD YOU PLEASE STATE YOUR NAME

1   FOR THE RECORD?

2        **A**    YES, IT'S LISA GARRETT BURNS.

3        **Q**    AND WHAT DO YOU DO FOR A LIVING, MS. BURNS?

4        **A**    I'M A SOCIAL WORKER AT EAST BATON ROUGE PARISH

5   PRISON.

6        **Q**    HOW LONG HAVE YOU WORKED AT THE PARISH PRISON?

7        **A**    SINCE 2000.

8        **Q**    SO FOR TODAY'S PURPOSES, I'M JUST CONCERNED ABOUT

9   THE PERIOD OF 2013 AND 2014.   SO IF I ASK YOU QUESTIONS AND

10  THINGS ABOUT THE JAIL HAVE CHANGED SINCE THAT TIME, JUST REFER

11  BACK TO THOSE OLDER DATES.

12       **A**    OKAY.

13       **Q**    WHAT ARE YOUR JOB DUTIES AS A LICENSED CLINICAL

14  SOCIAL WORKER AT THE JAIL?

15       **A**    I SEE PEOPLE THAT ARE REFERRED TO ME BY NURSING

16  STAFF, BY SECURITY.   I WORK WITH DR. BLANCHE, WHO'S THE

17  PSYCHIATRIST, AND I WORK WITH CHRISTY PERRY, WHO IS THE

18  PSYCHIATRIC NURSE PRACTITIONER.   I ALSO SEE PEOPLE THAT ARE

19  REFERRED TO ME BY SECURITY.

20       **Q**    AND HOW MANY INMATES IN TOTAL ARE HOUSED AT THE

21  JAIL?

22       **A**    APPROXIMATELY 1,600.   SOMETIMES, YOU KNOW, IT

23  VARIES.

24       **Q**    ARE YOU FAMILIAR WITH MR. TRUSSELL GEORGE?

25       **A**    I AM.

1    **Q**   WHEN DID YOU FIRST MEET MR. GEORGE?

2    **A**   IN 2013.  I BELIEVE JULY OR AUGUST, I'M NOT SURE,

3    BUT 2013.

4    **Q**   WOULD IT HELP YOU TO SEE YOUR NOTES FROM YOUR FIRST

5    MEETING WITH MR. GEORGE TO REMEMBER THE EXACT DATE?

6    **A**   YES, IT WOULD.  I DON'T HAVE THEM WITH ME.  I DIDN'T

7    BRING THEM.

8    **Q**   I'M ACTUALLY GOING TO SHOW YOU THE VERY BEGINNING OF

9    THIS PACKET OF RECORDS JUST TO MAKE SURE THAT THIS IS A

10   CERTIFIED COPY OF THE RECORDS YOU SENT US.

11   **A**   OKAY.

12   **Q**   DO YOU RECOGNIZE THESE, MS. BURNS?

13   **A**   RIGHT, THAT'S THE INTAKE PACKET THAT THE NURSING

14   STAFF DID.  I CAN'T SEE THE DATE.  SORRY.  IT LOOKS LIKE

15   07/01 -- EXCUSE ME, 2014.

16   **Q**   SO THIS IS THE VERY FIRST PAGE OF A PACKET OF

17   RECORDS THAT WE WERE SENT.  IT'S BEEN MARKED AS PLAINTIFF'S

18   EXHIBIT NUMBER 17.  BUT I JUST WANTED TO MAKE SURE YOU SAW THE

19   PART THAT SHOWS THAT IT WAS CERTIFIED.

20   **A**   RIGHT.

21   **Q**   DOES THAT LOOK FAMILIAR TO YOU?

22   **A**   YES, THAT'S THE MEDICAL RECORDS --

23   **Q**   THIS SHOULD BE A COPY -- OKAY.

24   **A**   THAT'S THE MEDICAL RECORDS PERSON, SHANEKA SYLVAN.

25   **Q**   SO THIS SHOULD BE A COPY OF YOUR RECORDS ABOUT

1  MR. GEORGE, THEN?

2  **A**   RIGHT.  IF IT'S A PART OF THAT PACKET.  THAT'S --

3  THE NURSING STAFF DOES THAT PART.

4  **Q**   RIGHT.  SO I'M GOING TO FLASH BACK TO YOUR FIRST

5  NOTE, OR WHAT I BELIEVE TO BE YOUR FIRST NOTE ABOUT

6  MR. GEORGE, AND ASK YOU SOME QUESTIONS ABOUT IT.

7  **A**   I GOT NEW CONTACTS AND I'M LIKE, WHOA, I CAN'T SEE.

8  **Q**   SHOULD I ZOOM IN?  IS THAT TOO DIFFICULT TO READ?

9  **A**   NO, I'M TRYING TO SEE -- OKAY, WAIT.  CAN YOU GO

10  BACK TO THAT ONE?

11  **Q**   OH, OKAY.  LET'S DO THAT.  WE'LL GIVE YOU A PAPER

12  COPY SO IT'S NOT TOO DIFFICULT FOR YOU.

13  **A**   THANK YOU.

14  **Q**   SORRY ABOUT THAT.

15  **A**   YEAH, I'VE REVIEWED IT, BUT I JUST CAN'T SEE THAT

16  VERY GOOD.  MY CONTACTS AREN'T WORKING.

17  **Q**   NO WORRIES.  WE WILL --

18  **A**   AT THIS TIME OF THE DAY, IT'S USUALLY GLASSES TIME.

19  **MS. FERNANDEZ:**  YOUR HONOR, MAY I APPROACH

20  MS. BURNS?

21  **THE COURT:**  YES, YOU MAY.

22  BY MS. FERNANDEZ:

23  **Q**   SO THIS IS THE EXACT SAME THING I HAVE?

24  **A**   OKAY.

25  **Q**   SO HOPEFULLY THIS WILL BE EASIER.  IF YOU'LL JOIN ME

1  ON PAGE -- IT'S MARKED AT THE TOP RIGHT TG000123.

2      **A**    SO YOU'RE REFERRING TO THE -- THAT WASN'T MY FIRST

3  ENCOUNTER WITH HIM.  THAT'S 2014, I BELIEVE.

4      **Q**    TG000123?

5      **A**    UH-HUH.  LET ME CONFIRM THAT.  I'M SORRY.  I'M NOT

6  LOOKING AT IT.  LET ME MAKE SURE.  OKAY.  THAT DOES HAVE --

7  THE WAY IT'S DONE IN THIS COPY IS DIFFERENT THAN WHAT I'M USED

8  TO LOOKING AT.  SO AUGUST THE 3RD, 2013, IS THAT WHAT YOU'RE

9  REFERRING TO?

10      **Q**    YES.  AND CAN YOU -- CAN YOU IDENTIFY THIS FOR ME,

11  JUST WHAT WE'RE LOOKING AT HERE?

12      **A**    WELL, YOU'RE LOOKING AT A PART OF MY NOTE, AND IT

13  LOOKS LIKE ACTUALLY THE DATE IS CUT OFF OF WHERE I MET WITH

14  HIM, BUT IT SAYS ON 08/06 THAT I MET WITH HIM.

15      **Q**    OKAY.  AND WOULD THAT HAVE BEEN YOUR FIRST MEETING

16  WITH MR. GEORGE?

17      **A**    I GUESS IT WOULD HAVE BEEN.  LET ME MAKE SURE.  YES.

18      **Q**    OKAY.

19      **A**    YES.  YES, MA'AM.

20      **Q**    AND -- SO WHAT HAPPENED ON AUGUST 6TH, 2013 WHEN YOU

21  MET WITH MR. GEORGE?

22      **A**    WELL, HE HAD ORIGINALLY COME INTO JAIL ON JULY, IT

23  LOOKS LIKE, 29TH, AND MEDICALLY PROCESSED JULY 30TH.  BUT

24  NURSING STAFF PUT HIM INTO A SINGLE CELL BECAUSE HE WAS HAVING

25  SOME PROBLEMS ON THE OPEN LINE.  AND SO I MET WITH HIM BECAUSE

1   NURSING STAFF ASKED ME TO, IS WHAT IT SAYS HERE.   AND HE HAD

2   BEEN PLACED IN A SINGLE CELL.   HE SAID HE USED TO TAKE

3   MEDICINE, BUT WASN'T GETTING IT, ALTHOUGH THAT'S DIFFERENT

4   THAN WHAT HE SAID ON THE PROCESSING PAPERWORK.   HE DIDN'T TELL

5   THE NURSING STAFF AT THAT POINT WHEN HE WAS PROCESSED ABOUT

6   TAKING MEDICINE.   HE DENIED THAT HE HAD ANY ISSUES.

7          SO I ASKED HIM WHAT KIND OF MEDICINE HE TOOK, AND HE

8   TOLD ME HE DIDN'T KNOW, BUT HE -- I COULD CONTACT HIS SISTER

9   TO FIND OUT.   SO WE CALLED HIS SISTER TOGETHER, AND SHE PUT

10  HIS NIECE ON THE PHONE.   AND MS. WALKER WAS HIS NIECE, AND HE

11  TALKED TO HER AND MS. WALKER TOLD ME THAT HE HAD AN ADVOCATE

12  AT THE ADVOCACY CENTER NAMED MS. KATY MARTINEZ, RIGHT?

13         AND SO WE CALLED MS. KATY MARTINEZ TO FIND OUT ABOUT

14  THE MEDICATION.   HE ALSO ADVISED HE HAD A PROBATION OFFICER AT

15  THAT POINT, AND I REFERRED HIM TO DR. BLANCHE.   HE WASN'T

16  SUICIDAL, HOMICIDAL, YOU KNOW, BUT HE HAD BEEN PLACED THERE

17  FOR HIS OWN PROTECTION.   SO I MAINTAINED THAT PHYSICALLY, YES.

18     **Q**   AND YOU MENTIONED HE HAD A PROBATION OFFICER, SCOTT

19  TUBBS.   HAD YOU HEARD FROM MR. TUBBS AT THAT POINT?

20     **A**   NO, NOT THAT I HAVE DOCUMENTED, NO.

21     **Q**   AND YOU MENTIONED THAT MR. GEORGE WAS ON MENTAL

22  HEALTH LOCKDOWN.   CAN YOU DESCRIBE THAT FOR ME?

23     **A**   WELL, IT'S -- IT'S CALLED MENTAL HEALTH LOCKDOWN,

24  BUT IT'S BASICALLY HE WAS PUT IN A SINGLE CELL BECAUSE HE WAS

25  HAVING PROBLEMS IN GENERAL POPULATION.   HE WAS -- THE NURSING

1  STAFF NOTED THAT -- THAT SECURITY WAS SAYING HE HAD -- A

2  COUSIN WAS IN -- IN THE JAIL WITH HIM AND HAD SAID THAT HE WAS

3  FEELING SUICIDAL AND THAT -- BUT HE WAS ON Q-9 AND HE WAS

4  HAVING PROBLEMS WITH THE -- JUST THE DAY-TO-DAY.  IT'S THE --

5  YOU KNOW, IT'S GENERAL POPULATION AND IT SOMETIMES CAN BE

6  OVERWHELMING FOR PEOPLE.

7          SO HE WAS PLACED IN A SINGLE CELL BY HIMSELF WHERE

8  HIS MEALS ARE BROUGHT TO HIM, SECURITY DOES REGULAR CHECKS, 30

9  MINUTES APART AND THE NURSING STAFF CAN LOOK AT HIM, YOU KNOW,

10  AND CHECK AND MAKE SURE THAT HE'S DOING OKAY.  BUT IT'S

11  BASICALLY A CELL THAT CAN'T BE TAMPERED WITH SO NO ONE CAN GET

12  TO HIM, TO PROTECT HIM.

13      **Q**   SO YOU MENTIONED THAT MR. GEORGE TOLD YOU SOMETHING

14  KIND OF INCONSISTENT WITH HIS INTAKE PACKET, WHICH IS THAT HE

15  HAD BEEN ON MEDICATION --

16      **A**   YES.

17      **Q**   -- BUT HE WASN'T NOW?

18      **A**   YES.

19      **Q**   I'D LIKE TO SHOW YOU A DOCUMENT ALSO FROM THAT

20  PACKET.  WOULD YOU PLEASE LOOK AT TG129 OR TGO00129.

21      **A**   THIS IS REALLY -- THE WAY THIS WAS PRINTED OUT IS

22  VERY CONFUSING BECAUSE IT DOESN'T SHOW -- BUT GO AHEAD.  I'M

23  SORRY.

24      **Q**   I WAS HOPING YOU COULD CLEAR IT UP FOR ME BECAUSE I

25  WAS A BIT CONFUSED TOO.

1    **A**    YEAH, SHE DIDN'T PRINT IT OUT THE WAY THAT I WOULD

2    HAVE PRINTED IT OUT, BUT -- BECAUSE IT JUST SHOWS INITIALS.

3    **Q**    CAN YOU IDENTIFY THIS DOCUMENT FOR ME?

4    **A**    IT'S A MEDICATION ADMINISTRATION RECORD.

5    **Q**    AND WHAT IS THAT?

6    **A**    A MAR, SHOWING WHAT MEDICATIONS HE'S BEEN

7    PRESCRIBED.

8    **Q**    DOES IT ALSO SHOW WHAT MEDICATIONS HE TOOK OR IS IT

9    JUST A PRESCRIPTION?

10   **A**    BASICALLY IT SHOWS -- IF YOU LOOK IN THE THIRD

11   COLUMN, YOU CAN SEE WHAT MEDICATION HE'S TAKEN.   AND THEN THE

12   LAST COLUMN SHOWS HOW MANY TIMES HE'S TAKEN IT.   SO YES, HE

13   WAS FAIRLY COMPLIANT WITH HIS MEDICATION.   HE MISSED SOME

14   TIMES IN THE MORNINGS.   YOU SEE THE 9:00 IN THE THIRD ROW OF

15   THE -- I'M SORRY, NUMBER 4 IN COLUMN 4, DO YOU SEE THAT 0900

16   ON THE DEPAKOTE?   IT SHOWS THAT MAYBE HE MIGHT HAVE BEEN

17   ASLEEP, SO HE ONLY TOOK IT 67 PERCENT OF THE TIME IN THE

18   MORNING, BUT 100 PERCENT AT NIGHT.

19   **Q**    MAYBE I SHOULD START FROM THE TOP AND WORK MY WAY

20   DOWN BECAUSE I THINK I'M NOT QUITE UNDERSTANDING HOW THE

21   RECORD FUNCTIONS.   SO WOULD YOU EXPLAIN -- I UNDERSTAND THIS

22   IS RELATED TO MR. GEORGE.

23   **A**    RIGHT.

24   **Q**    AND THIS IS FROM AUGUST OF 2013?

25   **A**    RIGHT.

1    **Q**    NOW, I DON'T HAVE ONE FROM JULY OF 2013.  WOULD THAT

2    INDICATE THAT HE WAS NOT ON MEDICATION AT THAT POINT?

3    **A**    RIGHT.  HE DIDN'T COME IN UNTIL THE END OF JULY.

4    **Q**    ALL RIGHT.  SO FROM JULY 29TH TO AUGUST, HE WASN'T

5    ON ANY MEDICATION, THEN; IS THAT RIGHT?

6    **A**    TILL AUGUST, IT LOOKS LIKE, PROBABLY THE 9TH, 1OTH.

7    **Q**    SO JULY 29TH TO AUGUST 1OTH.  AND WHAT IS THIS TOP

8    PORTION WITH THE ONES AND THE SYMBOLS AND THE RECEIVED/REFUSED

9    IT?

10   **A**    THAT'S SHOWING THAT HE RECEIVED IT OR REFUSED IT.

11   THERE'S A WAY THAT YOU CAN PRINT THE MEDICATION ADMINISTRATION

12   RECORD OUT THAT SHOWS THE SYMBOLS INSTEAD OF THE INITIALS, AND

13   THAT'S WHAT I DON'T LIKE ABOUT THE WAY THAT IT WAS PRINTED OUT

14   HERE BY THE MEDICAL RECORDS PERSON, BECAUSE IT'S HARDER TO SEE

15   WHICH TIMES HE ACTUALLY -- ACTUALLY TOOK IT.

16          BUT IT SHOWS -- IF HE WERE -- YOU KNOW, THE RECEIVED

17   IS THE CHECKED, OBVIOUSLY.  THE "X" IS THE REFUSED.  THE "A"

18   IS THE ABSENT.  THE "O" IS THE NOT GIVEN, AND THE QUESTION

19   MARK IS MISSING, LIKE MAYBE HE MOVED TO A DIFFERENT LINE OR

20   SOMETHING LIKE THAT, OR MAYBE HE WAS, YOU KNOW, TRANSFERRED.

21          AND THEN THE NEXT SECTION IS THE NURSING STAFF

22   INITIALS, AND THEN YOU GO DOWN TO THE MEDICATION

23   ADMINISTRATION PORTION OF IT, THIS BOTTOM PART.  WELL, YOU

24   CAN'T SEE MY FINGER, I'M THINKING YOU COULD.  I'M SORRY,

25   Y'ALL, THIS IS HIGH TECH.

1      SO, BUT WHAT I'M REFERRING TO IS BASICALLY SHOWING

2  YOU WHAT PERCENTAGE, IF YOU LOOK TO THE FAR, FAR RIGHT AT THE

3  BOTTOM, IT SHOWS YOU THE PERCENTAGE OF THE TIME THAT HE WAS

4  COMPLIANT WITH THE MEDICATION.

5      Q    OKAY.  SO, FOR INSTANCE, IF I'M UNDERSTANDING

6  CORRECTLY, WHEN WE SEE THE RISPERDAL, HE WAS COMPLIANT

7  62 PERCENT OF THE TIME?

8      A    HE WAS COMPLIANT -- NO, 92 PERCENT OF THE TIME AT

9  NIGHT AND 62 PERCENT OF THE TIME IN THE MORNING.

10     Q    OKAY.  AND THEN --

11     A    YOU SEE THE TIME -- IT'LL TELL YOU -- YOU SEE THAT

12 COLUMN LABELED TIME?

13     Q    AND THAT PERCENTAGE IS JUST THE TIME HE WAS ACTUALLY

14 OFFERED THE MEDICATION, RIGHT; SO THAT DOESN'T FACTOR IN THE

15 DATES WHERE THERE'S A SQUIGGLE LINE SAYING HE DIDN'T RECEIVE

16 IT?

17     A    RIGHT.  BECAUSE IT WAS ORDERED.  ONCE WE FOUND OUT

18 ABOUT THE MEDICATION, IT WAS ORDERED BY DR. BLANCHE AS SOON AS

19 HE SAW HIM.  AND THEN WHEN IT CAME IN, IT WAS GIVEN TO HIM.

20     Q    OKAY.  SO IT LOOKS LIKE HE RECEIVED MEDICATION FROM

21 AUGUST 11TH TO AUGUST 22ND, AND HE RECEIVED IT WITH THAT -- HE

22 TOOK IT THAT PERCENTAGE OF THE TIME FOR EACH ONE?

23     A    RIGHT, RIGHT.

24     Q    OKAY.  THANK YOU.

25     A    AND THEN 100 PERCENT FOR THE SEROQUEL, 67 PERCENT

1  FOR THE DEPAKOTE IN THE MORNING, 100 PERCENT AT NIGHT.  AND

2  THEN THE THYROID MEDICATION LOOKS LIKE A LITTLE BIT LESS,

3  LOOKS LIKE 33 PERCENT.  AM I READING THAT RIGHT?

4      **Q**    THAT'S WHAT I SEE.

5      **A**    OKAY.  THE ZANTAC, HE TOOK -- WELL, I'M SORRY.  I'M

6  GOING AHEAD OF MYSELF.  DO YOU WANT TO MOVE TO THE NEXT PAGE?

7      **Q**    THAT'S FINE.  YOU'RE LOOKING AT PAGE 000130 --

8      **A**    RIGHT, RIGHT.

9      **Q**    -- WHICH IS THE END OF THE 2013 MARS?

10      **A**    HE TOOK THE -- IT LOOKS LIKE THE ZANTAC 88 PERCENT

11  OF THE TIME, 46 PERCENT OF THE TIME IN THE MORNING, 44 PERCENT

12  AND 86 PERCENT OR 88 PERCENT AT NIGHT.  GOODNESS GRACIOUS.

13  AND THEN 100 PERCENT OF THE TRAZODONE, WHICH IS THE DESYREL

14  AND THEN THE ZOCOR, 89 PERCENT OF THE TIME.  SO HE KIND OF

15  CHOSE SOMETIMES WHICH ONES HE WANTED TO TAKE, BUT HE DID

16  COMPLY.

17      **Q**    SO IN THE FIRST MEETING WITH MR. GEORGE, HE

18  MENTIONED -- OR HIS FAMILY MENTIONED KATY MARTINEZ.  DID YOU

19  SPEAK TO MS. MARTINEZ AT ANY POINT?

20      **A**    I DID.  I CALLED HER AND LEFT A MESSAGE FOR HER, AND

21  THEN SHE CALLED ME BACK THE NEXT DAY.

22      **Q**    AND WHAT DID MS. MARTINEZ TELL YOU ABOUT MR. GEORGE?

23      **A**    THAT SHE HAD BEEN WORKING WITH HIM FOR A WHILE, THAT

24  SHE WAS HIS ADVOCATE AND SHE AGREED TO FAX THE INFORMATION

25  THAT SHE HAD REGARDING MEDICATIONS.

1  **Q** AND THIS IS -- ARE YOU LOOKING AT YOUR NOTE FROM

2 TG000122; IS THAT FROM AUGUST 9TH?

3  **A** AUGUST 8TH IS WHEN I'M LOOKING AT MY NOTE.

4 ACTUALLY, FOR AUGUST 6TH, EXCUSE ME.  BUT IT'S -- YES.  IT'S

5 WHEN I SAW HIM FROM AUGUST 6TH.

6  **Q** YOU SAW HIM FROM AUGUST 6TH.  I'M SORRY.  WHAT PAGE

7 IS THAT?

8  **A** YES.  123.  TG000123.

9  **Q** SO YOU SPOKE WITH KATY MARTINEZ THAT DAY?

10  **A** NO, I LEFT HER A MESSAGE ON THE 8TH --

11  **Q** YOU LEFT HER A MESSAGE THAT DAY?

12  **A** I'M SORRY, YES.

13  **Q** AND THEN THE NEXT DAY OR --

14  **A** WHEN I CALLED HER, RIGHT.

15  **Q** -- THE NEXT ENTRY IS FROM AUGUST 9TH?

16  **A** RIGHT.

17  **Q** AND IT LOOKS LIKE YOU GOT A CALL FROM MS. MARTINEZ;

18 IS THAT RIGHT?

19  **A** YES, I DID.

20  **Q** SO CAN YOU -- CAN YOU WALK ME THROUGH YOUR

21 CONVERSATION ON THIS DATE, TELL ME WHAT YOU LEARNED?

22  **A** THAT HE WAS ON CONDITIONAL RELEASE FROM FORENSIC AND

23 THAT SCOTT TUBBS HAD BEEN ASSIGNED AS PROBATION OFFICER.  AND

24 HE HAD BEEN LIVING AT -- I'M NOT SURE HOW YOU PRONOUNCE THAT,

25 D'HEMECOURT GROUP HOME, WHICH WAS RUN BY PROGRESSIVE HEALTH

1   CARE AND REPORTEDLY HAD SOME MINOR ISSUES WITH STAFF SEVERAL

2   WEEKS BEFORE THAT AND THAT THE GROUP HOME STAFF TOLD THEM --

3   TOLD HER THAT MR. TUBBS HAD ADVISED THEM TO BRING HIM TO HIS

4   OFFICE WHERE HE WAS -- ENDED UP TAKEN INTO CUSTODY AND THAT

5   SHE AGREED TO FAX THE MOST RECENT INFORMATION.

6       Q    AND DID SHE FAX YOU ANY INFORMATION?

7       A    YES.  AND I TOLD HER THAT HE ALSO HAD SOME VARIOUS

8   CITY COURT ISSUES PENDING AT THAT TIME, AND I GAVE HER THE

9   NUMBER FOR JUDGE WALL.

10      Q    DO YOU RECALL WHAT INFORMATION MS. MARTINEZ FAXED

11  YOU?

12      A    IT WAS FROM PROGRESSIVE.  IT SHOULD BE PART OF THIS

13  PACKET.

14      Q    WILL YOU TURN TO PAGE 150, TG000150?

15      A    OKAY.  I'LL PUT IT BACK IN ORDER THAT YOU HAVE IT.

16  OKAY.  YES.

17      Q    SO DO YOU REMEMBER SEEING THIS DOCUMENT?

18      A    YES.

19      Q    WHAT IS IT?

20      A    IT IS HER FAX TO ME.

21      Q    AND WHAT DID THE FAX CONTAIN?

22      A    IT CONTAINED THE -- BASICALLY THE BEHAVIORAL SUPPORT

23  PLAN FOR MR. GEORGE FROM PROGRESSIVE.

24      Q    ANYTHING ELSE?

25      A    THE INFORMATION ABOUT HIS MEDICATIONS.

1    **Q**    AND IS THAT WHAT WE'RE SEEING HERE ON 154?

2    **A**    YES, YES.

3    **Q**    SO WAS THIS THE FIRST THAT YOU LEARNED OF WHAT

4    MEDICATION MR. GEORGE WAS TAKING?

5    **A**    YES.

6    **Q**    AND HOW DID -- OR DID YOU CONVEY THAT INFORMATION TO

7    DR. BLANCHE?

8    **A**    YES, BUT ACTUALLY, DR. BLANCHE HAD ALREADY SEEN

9    TRUSSELL BEFORE THAT AND HAD ORDERED MEDICATIONS BECAUSE HE

10   KNEW TRUSSELL FROM THE COMMUNITY.

11   **Q**    WHERE DO YOU -- HOW DO YOU KNOW THAT DR. BLANCHE HAD

12   SEEN HIM BEFORE?

13   **A**    IT SHOULD BE IN THE PACKET THAT HE SAW HIM PRIOR TO

14   THE DATE BECAUSE FOR THE MEDICATION -- I THINK HE SAW HIM ON

15   THE 8TH PERHAPS, MAYBE BEFORE.  HE MAKES REGULAR ROUNDS ON

16   LOCKDOWN, AND SO THAT'S WHERE HE RAN INTO RUS -- TRUSSELL.

17   **Q**    I'M NOT SEEING THAT IN YOUR NOTES.  DO YOU HAVE

18   THAT?

19   **A**    WELL, I WOULDN'T NOTE IT.  DR. BLANCHE WOULD NOTE IT

20   IN HIS NOTES.

21   **Q**    OKAY.  WELL, IF IT'S NOT IN YOUR NOTES, HOW DO YOU

22   KNOW THAT IT OCCURRED?

23   **A**    BECAUSE I REVIEWED THE RECORD THAT WAS ON OUR

24   ELECTRONIC RECORDS.

25   **Q**    OH, BEFORE YOU CAME TODAY?

1    **A**    UH-HUH.  YEAH, I REFERRED HIM TO DR. BLANCHE, BUT HE

2  ALREADY SAW HIM.  HE KNEW HIM.

3    **Q**    BUT DR. BLANCHE, I GUESS, HAD NOT PRESCRIBED HIM

4  MEDICATION?

5    **A**    HE HAD.  HE DID.

6    **Q**    DO YOU KNOW WHY MR. GEORGE WASN'T RECEIVING IT

7  BEFORE THE 10TH OF AUGUST?

8    **A**    WELL, WE ORDER OUR MEDICATIONS FROM AN OFF-SITE

9  PRESCRIBER OR CONTRACT PHARMACY, AND SO IT TAKES A DAY OR SO,

10  DEPENDING ON WHAT TIME.  I THINK HE SAW TRUSSELL ACTUALLY ON

11  THE 8TH.  THE MEDICATION WAS ORDERED BY HIM, BUT THE ORDER

12  WASN'T TAKEN OFF UNTIL THE 9TH BECAUSE HE SAW HIM IN THE

13  EVENING ON THE 8TH.  AND SO IT DIDN'T COME IN UNTIL THAT

14  POINT.  AND SO HE WOULD HAVE BEEN OFFERED THE MEDICATION WHEN

15  IT CAME IN.

16    **Q**    WHICH IS AUGUST 10TH?

17    **A**    RIGHT.  IT USUALLY TAKES A DAY OR SO FOR IT TO COME

18  IN, DEPENDING ON WHAT TIME IT'S ORDERED.

19    **Q**    SO AFTER YOU FIRST MET WITH MR. GEORGE ON

20  AUGUST 6TH, WHEN DID YOU MEET WITH HIM AGAIN?

21    **A**    DO YOU KNOW?  I MEAN DO YOU KNOW WHAT PAGE?

22    **Q**    LET'S LOOK AT 000121, PLEASE.

23    **A**    AUGUST 13TH.

24    **Q**    WHAT DOES YOUR NOTE FROM THAT SECOND VISIT SAY?

25    **A**    HE'S REQUESTING TO COME OFF OF LOCKDOWN.  HE'S

1   SAYING HE'S MEDICATION COMPLIANT AND WANTS TO COME OFF

2   LOCKDOWN.  HE'S -- HE'S BEING -- HE'S FEELING FRUSTRATED, AND

3   I ADVISED HIM THAT, YOU KNOW, SECURITY DETERMINED EXACT

4   PLACEMENT OF PEOPLE, BUT THAT I COULD CERTAINLY RECOMMEND THAT

5   HE COME OFF OF MENTAL HEALTH LOCKDOWN BECAUSE HE WAS TAKING

6   MEDICATION AND HE SEEMED TO BE DOING GOOD, OTHER THAN FEELING

7   FRUSTRATED.

8       Q    AND IT LOOKS LIKE -- CAN YOU READ ME WHAT YOU HAVE

9   HERE ABOUT DR. BLANCHE?

10      A    I SAID HE WAS SEEN BY DR. BLANCHE AND MEDICATIONS

11  PRESCRIBED, WHICH HE REPORTS AND COMPUTER CHECK REVEALS HE'S

12  BEEN COMPLIANT WITH.

13      Q    SO WHEN YOU SAY HE WAS SEEN BY DR. BLANCHE, YOU

14  DON'T MEAN ON THAT DATE?

15      A    NO.  NO.

16      Q    AUGUST 13TH?

17      A    NO.  NO, I'M SORRY.  HE WAS PREVIOUSLY SEEN BY

18  DR. BLANCHE.  BECAUSE BY THE TIME THE 13TH ROLLED AROUND, HE

19  HAD ALREADY BEEN TAKING HIS MEDICATION.  I NOTED THAT, YOU

20  KNOW, HE REMAINED A LITTLE BIT PARANOID, BUT -- AND HE WAS

21  EXPRESSING THAT HE WANTED TO GO LIVE WITH HIS MOTHER.  BUT AT

22  THAT POINT, I KNEW THAT HE WAS ON CONDITIONAL RELEASE.  HE WAS

23  FOUND NOT GUILTY BY REASON OF INSANITY, AND THAT WASN'T AN

24  OPTION AT THAT POINT.

25      Q    WHEN WAS THE NEXT TIME YOU SAW MR. GEORGE AFTER THAT

1  SECOND VISIT IN 2013?

2      A    I DID NOT.  I DON'T -- IT DOESN'T LOOK LIKE I SAW

3  HIM AGAIN --

4      Q    SO HE WAS --

5      A    -- BEFORE HE WAS RELEASED.  I THINK HE WAS RELEASED

6  ON THE -- WAS IT -- I DON'T KNOW WHEN HE WAS RELEASED EXACTLY.

7      Q    I BELIEVE IT'S AUGUST 23RD.  DOES THAT --

8      A    OKAY.  POSSIBLY.  I'M NOT SURE IF I WAS OUT OR --

9  BUT I RECOMMENDED THAT HE COME OFF OF LOCKDOWN AT THAT POINT

10  BECAUSE HE WAS DOING BETTER.

11      Q    AND DO YOU KNOW IF HE DID?

12      A    NO, DON'T KNOW EXACTLY IF HE DID.  BUT I DID DO THE

13  PAPERWORK FOR HIM TO COME OFF OF LOCKDOWN, ALTHOUGH, I DON'T

14  SEE THAT IN THIS PACKET.

15      Q    SO IN TERMS OF THE NEXT TIME YOU SAW MR. GEORGE,

16  WOULD YOU LOOK A LITTLE FURTHER UP ON THE SAME PAGE, OOO121?

17      A    UH-HUH.  THAT STARTS IN 2014?

18      Q    SO IS THIS THE NEXT TIME YOU SAW HIM?

19      A    WHEN HE CAME BACK TO JAIL, YES.

20      Q    WHEN WAS YOUR FIRST MEETING WITH MR. GEORGE?

21      A    IT LOOKS LIKE 07/06/14.

22      Q    ARE WE LOOKING AT THE SAME --

23      A    07/07, SORRY.

24      Q    OKAY.  AND WHAT DID YOU -- WHAT DO YOUR NOTES

25  REFLECT FROM THIS VISIT?

1    **A**    NURSING STAFF REQUESTED THAT I SEE HIM.  HE WAS

2  ARRESTED FROM EAST LOUISIANA STATE HOSPITAL ON A PROBATION

3  REVOCATION DETAINER, AND HE WAS CURRENTLY HOUSED ON LOCKDOWN.

4  HE COME -- HE CAME INTO THE MEDICAL DEPARTMENT BUT REFUSED TO

5  COME INTO MY OFFICE.  HE KEPT TELLING ME HE WAS STRAIGHT:

6  "I'M STRAIGHT."  HE WAS FRUSTRATED, ANGRY.

7    **Q**    AND WHAT HAPPENED NEXT?

8    **A**    I SPOKE WITH MS. BISHOP, WHO WAS THERE THAT DAY --

9  OR, NO, SHE WAS COMING THE NEXT DAY.  I SPOKE WITH HER AND SHE

10  WAS ABLE TO FIND OUT WHAT, YOU KNOW, SPECIFIC MEDICATIONS AND

11  THINGS HE WAS ON.

12    **Q**    AND WHO IS MS. BISHOP?

13    **A**    SHE'S A DISTRICT FORENSIC COORDINATOR.

14    **Q**    DID YOU KNOW IF MR. GEORGE HAD A DISTRICT FORENSIC

15  COORDINATOR ASSIGNED TO HIM?

16    **A**    YES.  MR. BRADY CAME TO SEE HIM.

17    **Q**    BUT YOU DIDN'T -- HAD YOU SPOKEN WITH MR. BRADY OR

18  HAD ANY CONTACT WITH HIM?

19    **A**    NOT TO MY KNOWLEDGE.  NOT THAT I CAN REMEMBER.  I

20  DON'T HAVE IT NOTED.

21    **Q**    SO ON THIS DATE, THIS IS JULY 7TH, DO YOU KNOW HOW

22  LONG MR. GEORGE HAD BEEN IN JAIL AT THAT POINT?

23    **A**    NO, NOT EXACTLY.  BUT I CAN LOOK AT THIS AND TELL

24  YOU.  IT LOOKS LIKE HE CAME IN ON JULY 1ST.

25    **Q**    OKAY.  SO IT HAD BEEN A WEEK OR SO, ABOUT A WEEK?

1   **A**   UH-HUH.

2   **Q**   AND WHEN YOU CALLED MS. BISHOP TO SEE WHAT SHE COULD

3   FIND OUT ABOUT HIS STATUS, SHE SAID SHE WOULD LOOK INTO IT.

4   DID YOU KNOW ANYTHING ABOUT HIS MEDICATION AT THAT POINT?

5   **A**   NO, NOT UNTIL -- I DON'T BELIEVE UNTIL THE NEXT DAY

6   WHEN SHE CAME -- OR IT COULD HAVE BEEN THAT DAY.  THEY MAY

7   HAVE FAXED SOMETHING TO ME FROM EAST ACUTE.

8   **Q**   SO I'M SORRY, TO SWITCH -- SWITCH AROUND ON THE

9   PAGES, BUT IF YOU'LL LOOK AT PAGE 127.

10   **A**   OKAY.

11   **Q**   CAN YOU IDENTIFY THIS FOR ME?

12   **A**   ANOTHER MEDICATION ADMINISTRATION RECORD, PRINTED

13   OUT THE WAY I DON'T LIKE.

14   **Q**   IS THIS BASICALLY THE SAME TYPE OF THING YOU LOOKED

15   AT BEFORE?

16   **A**   YES.

17   **Q**   OKAY.  AND WHEN IS THIS ONE FROM?

18   **A**   IT APPEARS TO BE FROM -- AUGUST 2014, I'M SORRY.

19   **Q**   AUGUST 20 --

20   **A**   WAIT, ARE YOU LOOKING AT 127?

21   **Q**   I'M LOOKING AT 1127.

22   **A**   I'M SORRY, JULY 2014.  EXCUSE ME.

23   **Q**   JULY 2014.  SO THIS IS FROM MR. GEORGE'S SECOND

24   ARREST?

25   **A**   RIGHT.

1        **Q**    WILL YOU LOOK AT THE DATES, NOW THAT WE KNOW HOW TO

2    READ THIS A LITTLE BETTER --

3        **A**    RIGHT.

4        **Q**    -- AT THE BOTTOM, WHEN DOES IT SAY THAT MR. GEORGE

5    FIRST BEGAN RECEIVING HIS MEDICATIONS?

6        **A**    JULY 8TH.

7        **Q**    AND IN TERMS OF THAT FIRST MEDICATION, DEPAKOTE,

8    WHAT TYPE OF MEDICATION IS THAT?

9        **A**    IT'S A MOOD STABILIZER.

10       **Q**    WHAT DOES IT SAY IN TERMS OF HIS COMPLIANCE WITH

11   THAT MEDICATION IN JULY?

12       **A**    IT APPEARS THAT HE WAS 76 PERCENT COMPLIANT WITH THE

13   DEPAKOTE AT NIGHT.  HE WAS 8 PERCENT COMPLIANT IN THE MORNING.

14       **Q**    AND THEN FOR THE NEXT ONE, WHAT'S -- WHAT IS

15   BENZTROPINE?

16       **A**    COGENTIN.

17       **Q**    WHAT IS THAT?  SORRY, FOR LAY PEOPLE.

18       **A**    IT'S FOR -- IT'S FOR -- BASICALLY USED TO TREAT THE

19   SIDE EFFECTS THAT MIGHT BE USED IN AN ANTIPSYCHOTIC, THE SIDE

20   EFFECTS THAT MIGHT BE CAUSED FROM THAT.

21       **Q**    SO IT'S A MENTAL-HEALTH-RELATED MEDICATION?

22       **A**    YES, YES.

23       **Q**    AND WHAT WAS HIS COMPLIANCE ON THAT MEDICATION IN

24   JULY?

25       **A**    IN THE EVENING, 67 PERCENT; IN THE MORNING,

1    8 PERCENT.

2        **Q**    OKAY.  AND IF YOU WOULDN'T MIND JUST LOOKING AT THE

3    NEXT ONE, WHAT TYPE OF MEDICATION IS CLONAZEPAM?

4        **A**    CLONAZEPAM, IT'S KLONOPIN.  IT'S USED SOMETIMES FOR

5    ANXIETY, I THINK.  I'M NOT A DOCTOR.  THIS IS JUST MY

6    EXPERIENCE AND WHAT I KNOW.  SO IT LOOKS LIKE IN THE EVENING,

7    HE WAS 29 PERCENT COMPLIANT; IN THE MORNING, HE WAS 4 PERCENT.

8        **Q**    AND IN TERMS OF THOSE DATES, WHEN WE SEE THE DATES

9    LISTED 1 THROUGH 31, IT LOOKS LIKE HE WASN'T TAKING ANY

10   MEDICATION UNTIL THE 8TH, IS THAT -- AM I UNDERSTANDING THAT

11   RIGHT?

12       **A**    YES.

13       **Q**    AND THEN FROM THEN ON, THERE'S SOME INITIALS, BUT

14   THERE'S SOME GAPS.  WHAT WOULD THE GAPS INDICATE?

15       **A**    I DON'T KNOW.  I DON'T KNOW, TO BE HONEST WITH YOU.

16   THERE'S SOMETIMES -- THE SYSTEM THAT WE HAVE UPDATES ITSELF,

17   PERHAPS.  I REALLY CAN'T EXPLAIN THAT.  I DON'T KNOW THE

18   ANSWER TO THAT QUESTION.

19       **Q**    SO IS IT -- IS IT NOT CLEAR WHETHER HE WAS RECEIVING

20   MEDICATIONS ON THOSE DATES?

21       **A**    RIGHT.  IT'S NOT CLEAR WHETHER HE WAS ACTUALLY GIVEN

22   IT OR NOT BECAUSE IT'S NOT INDICATED.  I'VE SEEN THAT BEFORE

23   AND I CAN'T -- I DON'T KNOW.

24       **Q**    OKAY.  THANK YOU.  AND I KNOW WE WERE MOVING DOWN

25   THE LIST.  IF YOU LOOK AT PAGE 128 -- THIS IS TOWARDS THE END

1    OF HIS MEDICATION LIST, WHAT IS HIS -- WHAT IS SEROQUEL?

2        A    SEROQUEL IS ALSO USED TO KIND OF -- AT THAT DOSAGE,

3    I THINK IT -- IT'S USED FOR AN ANTIPSYCHOTIC, BUT IT'S ALSO

4    USED TO HELP PEOPLE WITH THEIR MOOD AND TO HELP THEM REST,

5    BECAUSE A LOT OF TIMES, PEOPLE WITH CHRONIC MENTAL ILLNESS

6    DON'T REST VERY WELL.  SO IT LOOKS LIKE HE WAS -- TO ME, IT

7    LOOKS LIKE HE WAS AT THE ANTIPSYCHOTIC LEVEL OF THE SEROQUEL

8    BECAUSE HE WAS GETTING IT TWICE A DAY.  SIXTY-SEVEN PERCENT

9    COMPLIANT AT NIGHT AND 8 PERCENT AGAIN IN THE MORNING.  AND

10   THEN THE ZYPREXA IS AN ANTIPSYCHOTIC, AND HE WAS 76 PERCENT

11   COMPLIANT WITH THAT.

12       Q    AND JUST TO MAKE SURE I'M -- I'M UNDERSTANDING

13   CORRECTLY, THAT'S JUST THE PERCENTAGE ON THE DAYS HE WAS

14   ACTUALLY OFFERED IT, RIGHT?

15       A    RIGHT.

16       Q    SO IT DOESN'T FACTOR IN THE DAYS HE WASN'T OFFERED?

17       A    RIGHT.

18       Q    OKAY.  THANK YOU.  SO I'D LIKE TO GO BACK TO YOUR

19   NOTES FROM YOUR FIRST MEETING WITH MR. GEORGE A WEEK AFTER HE

20   WAS ADMITTED -- OR SIX DAYS, RATHER, AFTER HE WAS ADMITTED,

21   AND THAT'S JULY 7TH.

22       A    WHAT PAGE AGAIN?  I'M SORRY.

23       Q    THAT'S PAGE 121.

24       A    THANK YOU.

25       Q    AND THEN IT LOOKS LIKE YOU ACTUALLY HAVE ANOTHER

1   NOTE FROM THAT DAY JUST ABOVE IT.  WOULD YOU TELL ME WHAT THAT

2   NOTE IS ABOUT?

3   **A**    ON JULY 8TH, SHE -- SHE CONTACTED THE HOSPITAL AND

4   FOUND OUT THAT HE WAS DISCHARGED FROM EAST ACUTE UNIT, AS HE

5   REFUSED TO BE PLACED AT A FACILITY CALLED CEDARVIEW, WHICH WAS

6   WHERE THEY WERE TRYING TO PLACE HIM.  HE -- AND HE HAD

7   APPARENTLY BEEN SENT TO EAST ACUTE UNIT FROM THE PROGRESSIVE

8   GROUP HOME AFTER BEING -- HAVING INCREASED PROBLEMS.

9   **Q**    I KEEP MOVING US THE WRONG DIRECTION IN TIME BECAUSE

10  THE PAGES ARE IN REVERSE ORDER SO --

11  **A**    SO WE'RE GOING TO 120?

12  **Q**    120 --

13  **A**    OKAY.

14  **Q**    -- YES, PLEASE.  SO IT LOOKS LIKE JULY 7TH WAS YOUR

15  FIRST VISIT WITH MR. GEORGE.  WHEN WAS YOUR SECOND VISIT?  OR

16  ACTUALLY, WHAT IS THIS NEXT NOTE FROM?  I'M NOT SURE --

17  **A**    THE NEXT NOTE IS FROM 07/18, AND THAT'S WHEN

18  MS. MARTINEZ CALLED BECAUSE SHE WAS CONCERNED -- SHE HAD HEARD

19  HE WAS INVOLVED IN AN ALTERCATION AND WAS IN THE HOSPITAL.

20  AND I REVIEWED THE CHART AND COULD NOT FIND ANY INDICATION OF

21  THAT AT ALL.  I JUST TOLD HER THAT HE WAS, YOU KNOW, IN A

22  SINGLE CELL FOR HIS PROTECTION BECAUSE OF MY REQUEST AND THAT

23  HE WAS ALSO SCHEDULED TO BE SEEN BY MS. PERRY, THE PSYCHIATRIC

24  NURSE PRACTITIONER, THIS WEEK, BUT HE REFUSED TO COME TO THE

25  MEDICAL DEPARTMENT TO BE SEEN.  AND THEN SHE SAID SHE WAS VERY

1   RELIEVED -- I TOLD -- I PUT THAT I WOULD SEE HIM AT THE NEXT

2   AVAILABLE OPPORTUNITY, THAT SHE WAS VERY RELIEVED TO HEAR THAT

3   HE WASN'T IN THE HOSPITAL AND THAT SHE PLANNED TO COME TO SEE

4   HIM ON THE 21ST AND THAT I WOULD PUT HIM ON MY CALL-OUT FOR

5   THE 22ND TO ENCOURAGE HIM TO BE MORE COMPLIANT WITH HIS

6   MEDICATIONS.

7       Q    SO WHEN SOMEONE REFUSED TO -- REFUSES TO COME TO SEE

8   THE NURSE PRACTITIONER, WHAT HAPPENS?

9       A    DR. BLANCHE SEES THEM ON THE LINE.

10      Q    ON THE LINE.

11      A    UH-HUH.

12      Q    AND WHY -- WHY WOULD THAT --

13      A    THE NURSING STAFF AS WELL SEES THEM TWICE A DAY AS

14  WELL AS MANY MORE TIMES WHEN THEY GO DOWN, LOCKDOWN.  I AM --

15  I MAKE ROUNDS OCCASIONALLY, YOU KNOW, FROM TIME TO TIME WHEN I

16  CAN ON LOCKDOWN AS WELL OR SINGLE CELL ISOLATION.  BUT ALSO,

17  THE DEPUTIES MAKE ROUNDS EVERY 30 MINUTES, SO HE'S SEEN BY

18  PEOPLE CONSTANTLY.

19      Q    SO IS THIS A FULL RECORD OF MR. GEORGE'S --

20      A    YOU DON'T HAVE DR. BLANCHE'S NOTES.

21      Q    NO.   AND I DON'T SEE ANYWHERE IN THE NOTES THAT SAYS

22  THAT DR. BLANCHE ACTUALLY SAW MR. GEORGE ON THESE DATES.

23      A    I KNOW.  I KNOW.  BUT HE DID.

24      Q    AND HOW DO YOU -- HOW DO YOU KNOW THAT?

25      A    BECAUSE I SAW IT ON THE MEDICAL RECORDS.

1    **Q**    WELL, I'D LIKE TO BRING YOUR ATTENTION TO ANOTHER

2    SET OF DOCUMENTS.

3          DO YOU RECALL GIVING A DEPOSITION IN ANOTHER CASE

4    WITH THE ADVOCACY CENTER?

5    **A**    YES.

6    **Q**    JULY 7TH, 2015?

7    **A**    PROBABLY, I DON'T REMEMBER THE EXACT DATE.

8          **MS. FERNANDEZ:**    MAY I APPROACH THE WITNESS, YOUR

9    HONOR?

10         **THE COURT:**    YES, YOU MAY.

11   BY MS. FERNANDEZ:

12   **Q**    I'LL JUST STAY RIGHT HERE IN CASE YOU NEED ME TO

13   COME POINT SOMETHING OUT.   DO YOU SEE WHERE MR. GEORGE'S NAME

14   IS FIRST MENTIONED IN YOUR DEPOSITION TESTIMONY ON PAGE 81?

15   **A**    I'M READING, I'M SORRY.

16   **Q**    I WAS GOING TO ASK YOU --

17   **A**    THE QUESTION IS, "OKAY, FINALLY, ARE YOU FAMILIAR

18   WITH TRUSSELL GEORGE?"

19         AND I ANSWERED, "I'VE MET TRUSSELL."

20   **Q**    AND WHAT HAPPENED NEXT, WHAT DID YOU SAY NEXT?

21   **A**    "AND UNDER WHAT CIRCUMSTANCES?"   AND THEN THE

22   ATTORNEY OBJECTED.

23   **Q**    AND CAN YOU PLEASE CONTINUE?

24   **A**    THE ATTORNEY OBJECTED BECAUSE IT WAS OUTSIDE OF

25   THE -- WHICH WAY ARE WE GOING THIS TIME?  -- OUT OF THE SCOPE

1  OF THE LITIGATION THAT I WAS BEING DEPOSED ON.  THAT'S

2  UNRELATED.  IT DOESN'T HAVE ANYTHING TO DO WITH THIS

3  LITIGATION.

4      **Q**     AND THEN WHAT HAPPENED NEXT?

5      **A**     MR. LOSPENNATO, DID I SAY IT RIGHT?

6      **Q**     UH-HUH.

7      **A**     HE DISAGREED AND, "WELL, WE CAN DISAGREE, BUT I

8  WOULD SAY THAT THIS NOTICE IS RELATED TO THE" --

9          **MR. HILBURN:**  YOUR HONOR --

10         **THE COURT:**  YEAH, LET'S CUT THROUGH THE COLLOQUY.

11 IF YOU'RE ASKING FOR -- YEAH, LET'S GET TO THE TESTIMONY.

12         **MS. FERNANDEZ:**  IT MIGHT BE EASIER JUST FOR ME TO

13 READ.

14         **MR. HILBURN:**  YOUR HONOR, FOR THE RECORD, I THINK

15 THERE WAS AN OBJECTION TO THE QUESTION, AND THAT OBJECTION HAS

16 NEVER BEEN LIFTED.  SHE'S REFERRING TO THE QUESTION WAS ASKED,

17 THERE WAS AN OBJECTION ENTERED BY COUNSEL FOR THE PARTY AT THE

18 TIME.

19         **THE COURT:**  WHY DON'T WE PUT ON THE HEADPHONES.

20         *(REPORTER'S NOTE:  AT THIS TIME THE FOLLOWING MATTER*

21 *WAS HELD AT THE BENCH.)*

22         **THE COURT:**  OKAY.  EVERYBODY ON?

23         **MR. HILBURN:**  YES, SIR.

24         **THE COURT:**  OKAY.  SO I'M A LITTLE CONFUSED AS TO

25 WHAT -- WHAT IS THE QUESTION THAT YOU ARE IMPEACHING HER WITH?

1      **MS. FERNANDEZ:**   YOUR HONOR, IN DEPOSITION TESTIMONY

2   FROM 2015, MS. BURNS STATED THAT SHE DID NOT RECALL ANYTHING

3   RELATED TO MR. TRUSSELL GEORGE'S INCARCERATION.   AND NOW SHE'S

4   INDICATING THAT SHE REMEMBERS THINGS THAT ARE OUTSIDE OF THE

5   NOTES THAT SHE GAVE TO US AS HER COMPLETE RECORD.   SO I'D LIKE

6   FOR HER TO EXPLAIN HOW SHE REMEMBERS THESE THINGS.

7      **THE COURT:**   I GET YOU.   OKAY.   NOW, WHAT'S THE

8   OBJECTION TO THE USE OF THE DEPOSITION FOR THIS PURPOSE?

9      **MR. CODY:**   YOUR HONOR, THE DEPOSITION IN ANOTHER

10  CASE, AND THAT WAS OBJECTED TO, THAT OBJECTION HAS NEVER BEEN

11  LIFTED, BUT THE OTHER THING IS SHE HAD NOT REVIEWED THE RECORD

12  OF TRUSSELL GEORGE IN PREPARATION FOR THAT DEPOSITION.

13     **THE COURT:**   YEAH, WELL, OKAY.   TWO THINGS, LET'S

14  ADDRESS THE FIRST ONE.   THE FACT THAT IT'S IN ANOTHER CASE

15  DOESN'T MAKE ANY DIFFERENCE.   IT'S SWORN TESTIMONY.   IT SOUNDS

16  LIKE YOU GUYS WERE THERE REPRESENTING HER.   SOMEBODY WAS

17  REPRESENTING HER.   AND SO THAT OBJECTION IS OVERRULED.   THE

18  FACT THAT THERE'S A DEPOSITION -- I MEAN, THERE'S AN OBJECTION

19  IN A DEPOSITION, YOU DON'T HAVE TO LIFT IT IN ORDER FOR --

20  I'LL RULE ON IT.   WHAT'S -- THE NATURE OF THE OBJECTION IS IN

21  THAT DEPOSITION, IT'S UNRELATED TO WHAT YOU'RE TALKING ABOUT.

22     THAT OBJECTION HAS ZERO MEANING IN THIS FORUM

23  BECAUSE WE ARE TALKING ABOUT THE SUBJECT OF THE QUESTION.   SO

24  I'M GOING TO OVERRULE THE OBJECTION AND ALLOW HER TO IMPEACH

25  HER WITH THE TESTIMONY.

1          **MS. FERNANDEZ:**  THANK YOU, YOUR HONOR.

2    BY MS. FERNANDEZ:

3      **Q**    SORRY FOR THE INTERRUPTION.  I THINK I'LL JUST READ

4    FROM IT, IF YOU DON'T MIND, AND THAT WAY, I CAN ASK YOU ABOUT

5    IT MORE EASILY.

6      **A**    ARE YOU SAYING I'M BLIND?

7      **Q**    WHAT'S THAT?

8      **A**    ARE YOU SAYING I'M BLIND?

9      **Q**    NO, I'M JUST SAYING IF YOU'RE NOT USED TO READING

10   THESE, IT CAN BE PRETTY DIFFICULT, JUST LIKE YOUR MEDICAL

11   RECORDS.  SEE, CASE IN POINT.  SO AT THAT POINT, YOU SAID, "I

12   KNOW HIM THROUGH JAIL," INDICATING MR. GEORGE.

13          THE NEXT QUESTION WAS, "OKAY, THANK YOU.  AND WHAT

14   SERVICES DID HE RECEIVE WHILE HE WAS IN JAIL?"

15          YOU SAID, "I DON'T REMEMBER."

16          THEN MR. LOSPENNATO ASKED, "OKAY, YOU DON'T REMEMBER

17   WHAT SERVICES.  DID YOU SEE HIM?"

18          YOU SAID, "YES."

19          HE SAID, "OKAY, HOW FREQUENTLY DID YOU SEE HIM?"

20          "I HAVE NO IDEA."

21          "MORE THAN ONCE?"

22          "I HAVE NO IDEA.  I REALLY DON'T KNOW.  IT'S BEEN A

23   LONG TIME.  I DON'T REMEMBER."

24          "WHERE WAS HE LOCATED WHEN YOU SAW HIM?"

25          "I DON'T KNOW.  I REALLY DON'T REMEMBER."

1    ‖           "YOU KNOW YOU'RE UNDER OATH?"

2    ‖           "I DO KNOW THAT.  I DO KNOW THAT.  I HAVE NO IDEA.

3    ‖ I REALLY DO NOT REMEMBER.  IT'S BEEN MANY, MANY, MANY YEARS

4    ‖ AGO THAT I MET HIM.  MANY, MANY --" OR YOU SAID, "MANY, MANY

5    ‖ PEOPLE AGO.  I DON'T REMEMBER.  I REALLY DON'T REMEMBER."  I'M

6    ‖ JUST GOING TO GO BACK.

7    ‖           SO YOU WERE SAYING YOU DO REMEMBER A LOT OF DETAILS

8    ‖ ABOUT MR. GEORGE'S TREATMENT NOW; IS THAT RIGHT?

9    ‖      A    WELL, AFTER I REVIEWED THE RECORD THAT Y'ALL SENT

10   ‖ ME.

11   ‖      Q    OKAY.  BUT THE RECORD THAT WE SENT YOU DIDN'T HAVE

12   ‖ ANYTHING TO DO WITH DR. BLANCHE'S VISITS, DID IT?

13   ‖      A    NO, BUT I REVIEWED THE CORE -- I WASN'T SUBPOENAED

14   ‖ FOR TRUSSELL GEORGE IN THAT CASE.

15   ‖      Q    SO YOU WENT BACK AND REVIEWED YOUR RECORDS -- OTHER

16   ‖ RECORDS THAT WE DON'T HAVE ACCESS TO?

17   ‖      A    I DON'T KNOW WHY YOU DIDN'T GET THEM.  I REALLY

18   ‖ DON'T.  I'M SORRY.  I DON'T KNOW WHY.  I HAVE NO EXPLANATION

19   ‖ FOR THAT.  I HAVE NOTHING TO DO WITH THE MEDICAL RECORDS PART

20   ‖ OF IT.

21   ‖      Q    SO I'D LIKE TO TAKE YOU BACK TO JULY 18TH TO YOUR

22   ‖ NOTE THAT WE WERE DISCUSSING BEFORE, AND THAT'S PAGE 120.

23   ‖      A    I'M ALSO NOT SURE WHAT DID YOU ALL -- YOU KNOW, WHAT

24   ‖ YOU ALL ASKED FOR WHEN YOU ASKED FOR THE RECORD.  I DON'T KNOW

25   ‖ THAT EITHER.  I'M ONLY ANSWERING WHAT I KNOW.

1   **Q**   WOULD YOU LOOK AT YOUR NOTE FROM AFTER JULY 18TH,

2   2014.  WAS THAT THE NEXT TIME THAT YOU SAW MR. GEORGE?

3   **A**   SO IT STARTS ON ACTUALLY 119?  IT STARTS ON 119?

4   **Q**   YES, PLEASE.

5   **A**   AUGUST 11TH.

6   **Q**   SO IS THIS THE SECOND TIME THAT YOU MET MR. GEORGE

7   DURING HIS 2014 INCARCERATION?

8   **A**   IT APPEARS SO.  IT APPEARS SO.

9   **Q**   AND WHAT -- WHAT HAPPENED DURING THAT VISIT?

10  **A**   HE WAS FRUSTRATED.  HE TALKS ABOUT THAT HE'S BEEN

11  DEALING WITH THIS CHARGE FOR A LONG, LONG TIME AND THAT, "THEY

12  KEPT PUTTING ME IN DIFFERENT GROUP HOMES."  HE SAID HE FEELS

13  LIKE HE'S BEEN ON PROBATION TOO LONG BUT, AGAIN, HE WAS FOUND

14  NOT GUILTY BY REASON OF INSANITY.  I DON'T -- I DON'T KNOW

15  THAT WHOLE PROCESS.  HE SAID THAT HE HADN'T SEEN HIS PROBATION

16  OFFICER SINCE HE HAD BEEN THERE.  THAT'S JUST WHAT HE'S

17  REPORTING TO ME.

18  **Q**   DID YOU HAVE ANY REASON TO BELIEVE THAT WASN'T TRUE?

19  HAD YOU HEARD FROM HIS PROBATION OFFICER?

20  **A**   NO, BUT THAT'S NOT UNCOMMON.  THEY COME SEE PEOPLE

21  ALL THE TIME.  I MEAN, I DON'T GENERALLY TALK TO PROBATION

22  OFFICERS VERY OFTEN.

23  **Q**   BUT IT WOULD HAVE BEEN IN THESE RECORDS IF HE HAD

24  COME TO VISIT HIM, CORRECT?

25  **A**   NO.

1    **Q**    NO?

2    **A**    THESE ARE JUST MEDICAL RECORDS.

3    **Q**    SO THERE WOULDN'T BE ANY RECORD OF A VISIT?

4    **A**    NOT FROM ME, NO, OR THE MEDICAL DEPARTMENT, NO.

5    THAT WOULDN'T HAVE GONE THROUGH MEDICAL.

6    **Q**    BUT MR. GEORGE TOLD YOU --

7    **A**    HE TOLD ME THAT.  SO THAT'S WHY I PUT THAT IN MY

8    NOTES, YES.  I -- HE WAS FRUSTRATED WITH MS. MARTINEZ BECAUSE

9    SHE APPARENTLY -- HE SAID -- I TOLD HIM THAT SHE HAD BEEN

10    CALLING, EXPRESSING CONCERN FOR HIM, AND HE SAID HE WAS VERY

11    FRUSTRATED WITH HER.  HE SAID SHE'S ONLY CONCERNED ABOUT A

12    LAWSUIT.  I DON'T KNOW WHAT HE WAS REFERRING TO, I'M ASSUMING

13    MAYBE WHAT WE'RE HERE FOR TODAY.

14    **Q**    WHERE IS THAT?

15    **A**    I SAID -- "SHE'S NOT TRYING TO GET ME OUT OF

16    HERE" -- IT SAYS -- HE SAID HE'S FRUSTRATED WITH HER TOO.

17    "SHE'S NOT TRYING TO GET ME OUT OF HERE."  I QUESTIONED HIM

18    ABOUT HIS MEDICATIONS.  HE'S BEEN NOT VERY COMPLIANT.  HE SAID

19    HE COULD -- I TOLD HIM THAT THIS WAS SOMETHING HE COULD DO TO

20    HELP HIS SITUATION.  HE SAYS, "I'M TAKING MY MEDICINE.  I'M

21    TAKING IT LIKE I'M SUPPOSED TO," BUT HE HADN'T TAKEN THEM OVER

22    THE LAST SEVERAL DAYS.  I TOLD HIM THAT WAS SOMETHING HE COULD

23    DO TO HELP HIMSELF.  HE LISTENS, BUT HE SEEMS TO GET

24    AGGRAVATED, MORE AND MORE AGGRAVATED, AND REPORTS HE FEELS

25    LIKE ALL ANYBODY WANTS TO DO IS PUT ME IN ANOTHER GROUP HOME.

1    I QUESTIONED HIM AS TO WHAT HE FELT WOULD BE BEST,

2    IN HIS MIND, AND THAT'S WHEN HE TOLD ME HE WANTED TO GO AND

3    LIVE WITH HIS MOTHER AND TAKE HIS MEDICATIONS.  I ATTEMPTED TO

4    PROVIDE SUPPORT AND EDUCATION, YOU KNOW, TO UNDERSTANDING THE

5    BALANCE BETWEEN PUBLIC SAFETY -- YOU KNOW, TO THE BEST OF MY

6    ABILITY, TO EXPLAIN TO HIM THE BALANCE BETWEEN PUBLIC SAFETY

7    AND HIS NEEDS AND WANTS.

8    AND THAT -- THAT THIS IS -- HE SEEMS TO CALM DOWN

9    DURING THIS DISCUSSION, BUT IT'S UNCLEAR AS TO WHAT, IF

10   ANYTHING, CAN BE DONE TO ASSIST HIM WITH HIS CURRENT LEGAL

11   SITUATION.  HE REQUESTS ASSISTANCE IN CONTACTING HIS SISTER

12   AND MS. GIVENS STRONGLY ENCOURAGES HIM TO LISTEN TO

13   MS. MARTINEZ AND FOLLOW HER RECOMMENDATIONS.

14   AND THEN HE BECOMES ANIMATED AND SAYS, "SHE'S NOT

15   TRYING TO HELP ME.  SHE'S JUST TRYING TO GET THE LAWSUIT."

16   IT'S UNCLEAR WHAT HE MEANS BY THIS, AND SOCIAL WORKER DOES NOT

17   ASK HIM, BUT STRONGLY ENCOURAGES HIM, YOU KNOW, TO THINK ABOUT

18   TAKING HIS MEDICATION, AS IT MAY HELP HIM MOVE ALONG IN

19   WHATEVER SYSTEM HE'S IN AND WHEREVER HE'S GOING.

20   Q    BECAUSE AT THAT POINT, HE WAS NOT TAKING IT

21   CONSISTENTLY?

22   A    NO, HE HAD NOT BEEN TAKING IT THE LAST FEW DAYS

23   BEFORE THIS TIME.

24   Q    OKAY.

25   A    AND THEN --

1    **Q**    I'M SORRY, WAS THERE MORE?

2    **A**    I JUST -- I SAID I WILL DISCUSS POSSIBLY --

3    POSSIBILITY OF PLACEMENT ON LINE WITH CLASSIFICATION AS SOON

4    AS POSSIBLE BUT ALSO ENCOURAGED MEDICATION COMPLIANCE.

5    BECAUSE THAT'S REALLY -- YOU KNOW, SOMETIMES IF YOU HAVE

6    SOMEONE WHO HAS CHRONIC MENTAL ILLNESS, THEY DON'T -- IF

7    THEY'RE NOT TAKING THEIR MEDICATION, THEY MAY -- AND HE'S BEEN

8    DIAGNOSED WITH PARANOID SCHIZOPHRENIA, BASED ON THE NOTES THAT

9    I RECEIVED -- THEY BECOME PARANOID AND THEY, YOU KNOW, CAN GET

10   VERY HOSTILE OR, YOU KNOW, HAVE PROBLEMS ON LINE, AND WE DON'T

11   WANT THAT FOR HIM.  WE DON'T WANT THAT FOR HIM AT ALL.

12   **Q**    WHY WHEN YOU SAW HIM HE WAS ON MENTAL HEALTH

13   LOCKDOWN?

14   **A**    THAT'S WHY HE WAS PUT ON -- YES, IT'S CALLED MENTAL

15   HEALTH LOCKDOWN, BUT IT'S A SAFETY MEASURE FOR HIMSELF AND

16   OTHERS.

17   **Q**    SO BETWEEN THIS NOTE, THIS SECOND VISIT ON

18   AUGUST 11TH AND YOUR FIRST VISIT ON JULY 7TH -- I HAVE A

19   DOCUMENT.  CAN YOU IDENTIFY THIS FOR ME AND TELL ME WHEN --

20   WHAT THIS IS, FIRST OF ALL?

21   **A**    IT WAS THE DAY AFTER I SAW HIM.  THEY FOUND HIM

22   DOWN -- HE HAD FLOODED THE CELL, BUT THEY DIDN'T KNOW WHAT IT

23   WAS ON THE FLOOR, WHAT IT WAS, SOME KIND OF LIQUID.  BUT THEY

24   FOUND HIM SITTING ON THE FLOOR.

25   **Q**    SO THIS SAYS THIS WAS AUGUST 9TH --

1      **A**      JULY 9TH.

2      **Q**      I'M SORRY, JULY 9TH, EXCUSE ME.  AND THAT WOULD HAVE

3    BEEN ON THE EIGHTH DAY AFTER HE WAS ADMITTED TO JAIL.  WHAT

4    DOES EXPLANATION OF EMERGENCY READ?

5      **A**      IN CELL ON THE FLOOR.  NOT ORIENTED TIMES THREE.

6      **Q**      NOT ORIENTED TIMES THREE, WHAT DOES THAT MEAN?

7      **A**      TO PLACE, TIME AND SELF.

8      **Q**      SO HE -- HE WAS ASKED SOME QUESTIONS AND HE DIDN'T

9    KNOW --

10     **A**      HE WAS DISORIENTED.

11     **Q**      HE WAS DISORIENTED, OKAY.

12     **A**      HE WAS SITTING IN A PILE OF WATER OR URINE.  THEY

13   DIDN'T KNOW WHAT IT WAS.

14     **Q**      AND WHERE IT SAYS INMATE'S SIGNATURE, THAT'S AN "X"

15   --

16     **A**      IT'S AN "X."  I DON'T KNOW IF HE DIDN'T SIGN IT,

17   MAYBE THEY PUT THE "X" FOR HIM TO SIGN IT.  I DON'T KNOW.

18   THIS IS A MEDICAL EMERGENCY FORM BY NURSING STAFF.

19     **Q**      AND SO THIS PERSON WHO SIGNED IT HERE, DO YOU KNOW

20   WHO THAT IS?

21     **A**      THAT'S A NURSE, AN LPN AT THE JAIL.  AND THEY CHOOSE

22   TO MONITOR HIM IN THE TANK.  THEY GAVE HIM HIS MEDICINE AND HE

23   TOOK IT.

24     **Q**      ARE YOU ABLE TO READ WHAT IT SAYS UNDER PHYSICAL

25   ASSESSMENT?

1      **A**    WHAT PAGE -- 138.  LET ME GO TO THAT.

2      **Q**    OH, SURE.

3      **A**    MAYBE I CAN READ THAT BETTER.  IT SAYS -- I-M IS --

4    SORRY.  I-M IS INMATE BROUGHT TO MEDICAL VIA WHEELCHAIR.  I

5    DON'T KNOW WHAT "PERLA NOTED."  I DON'T KNOW WHAT THAT MEANS.

6    I DON'T KNOW WHAT THAT IS.  IT'S A MEDICAL TERM, I THINK.

7      **Q**    OKAY.

8      **A**    HE'S -- HE DOES -- HE IS ORIENTED TO STIMULATION,

9    POSSIBLE INCONTINENCE, MEANING THEY DIDN'T KNOW WHETHER IT WAS

10   URINE, BUT CELL IS FLOODED WITH UNKNOWN LIQUID WHERE HE WAS

11   FOUND.  HIS WEIGHT, THEY -- NO, THE INITIAL TIME THAT THEY

12   EVALUATED HIM WAS 2206.  HIS BLOOD PRESSURE AT THAT TIME WAS

13   158 OVER 91.  HIS PULSE RATE WAS 105.  HIS RESPIRATIONS WERE

14   18 AND HIS ACCU-CHEK WAS 123.

15     **Q**    AND IT SAYS UNDER NARRATIVE TREATMENT, I THINK YOU

16   SAID, MONITOR IN TANK AND MEDICATION GIVEN?

17     **A**    RIGHT.

18     **Q**    WHAT DOES THIS AT THE BOTTOM INDICATE.  THERE ARE

19   THESE THREE OPTIONS HERE.

20     **A**    THEY DIDN'T BILL HIM FOR THIS EMERGENCY.

21     **Q**    AND WHAT DOES A TRUE EMERGENCY INDICATE?

22     **A**    JUST THAT THEY DIDN'T BILL HIM.  IT SAYS,

23   NON-BILLABLE, JUST MEANING THEY DIDN'T CHARGE HIM.

24     **Q**    BECAUSE THIS --

25     **A**    HE DIDN'T DECLARE IT HIMSELF.

1      Q     -- WASN'T HIS FAULT.  OKAY.  SO SUBSEQUENTLY YOU

2  SAID FROM YOUR NOTE ON JULY 18TH THAT MR. GEORGE HAD REFUSED A

3  VISIT FROM THE NURSE PRACTITIONER.  SO THE NEXT TIME YOU SAW

4  HIM WAS AUGUST 11TH FOR THE RECHECK.  WE TALKED ABOUT THAT.

5      **A**     UH-HUH.

6      **Q**     AND DID YOU SEE MR. GEORGE AGAIN AFTER THAT SECOND

7  VISIT TOWARDS THE MIDDLE OF AUGUST?

8      **A**     I ATTEMPTED TO, BUT HE HAD ALREADY BEEN TRANSFERRED

9  BACK TO THE HOSPITAL.

10     **Q**     AND WHEN WAS HE TRANSFERRED BACK TO THE HOSPITAL?

11     **A**     AUGUST 25TH.

12     **Q**     AUGUST 25TH.

13     **A**     UH-HUH.

14     **Q**     OKAY.

15            **MS. FERNANDEZ:**  I HAVE NO FURTHER QUESTIONS FOR YOU.

16  THANK YOU, MS. BURNS.

17            **THE WITNESS:**  THANK YOU.

18            **THE COURT:**  ALL RIGHT.  CROSS-EXAMINATION.

19  **CROSS-EXAMINATION**

20  **BY MR. HILBURN:**

21     **Q**     GOOD AFTERNOON, MS. BURNS.

22     **A**     GOOD AFTERNOON.

23     **Q**     A FEW MINUTES AGO, YOU WERE ASKED A QUESTION ABOUT

24  SOME DEPOSITION TESTIMONY YOU GAVE.  DO YOU REMEMBER THOSE

25  QUESTIONS?

1        **A**     ABOUT WHETHER I KNEW MR. GEORGE?

2        **Q**     YES.

3        **A**     YES.

4        **Q**     DO YOU RECALL THAT DEPOSITION ABOUT A YEAR AGO?

5        **A**     I DO, BUT I DIDN'T -- TO BE HONEST, I DIDN'T

6   REMEMBER WHO IT WAS ABOUT UNTIL SHE SHOWED ME.

7        **Q**     DID THAT DEPOSITION INVOLVE MR. TRUSSELL GEORGE?

8        **A**     NO.  NO.

9        **Q**     IN THE DEPOSITION, I THINK YOU INDICATED YOU

10  REMEMBERED WHO TRUSSELL GEORGE WAS; IS THAT RIGHT?

11       **A**     I DID.

12       **Q**     BUT BEFORE THAT DEPOSITION OR BEFORE THOSE QUESTIONS

13  WERE ASKED OF YOU IN THAT DEPOSITION, HAD YOU HAD A CHANCE TO

14  REVIEW ANY MEDICAL RECORDS OF TRUSSELL GEORGE?

15       **A**     NO, NO, NO.

16       **Q**     AFTER THAT DEPOSITION, HAVE YOU HAD A CHANCE TO

17  REVIEW THE MEDICAL RECORDS FOR MR. GEORGE?

18       **A**     ONLY WHEN I WAS SUBPOENAED AND RECEIVED THIS PACKET

19  FROM THEM, AND THEN I TRIED TO DO A TIMELINE FOR MYSELF TO

20  HELP MYSELF REMEMBER SOME THINGS MORE CLEARLY.

21       **Q**     AND HAS REVIEWING THOSE RECORDS HELPED REFRESH YOUR

22  RECOLLECTION?

23       **A**     YES.  YES.

24       **Q**     WITH RESPECT TO EXHIBIT 17 THAT WE'VE BEEN TALKING

25  ABOUT, I'M GOING TO SHOW YOU THE FIRST PAGE OF THAT EXHIBIT.

1      **A**    OKAY.

2      **Q**    CAN YOU SEE IT THERE, MS. BURNS?

3      **A**    WELL, I CAN SEE IT HERE.  IS IT OKAY IF I LOOK AT

4    THIS ONE?

5      **Q**    CAN YOU SEE IT THERE, MS. BURNS, YEAH, THE FIRST

6    PAGE?

7      **A**    YES.   YES.

8      **Q**    IT HAS -- FOR THE RECORD, IT'S TG000105, DO YOU SEE

9    THAT?

10      **A**    YES, YES.

11      **Q**    AND IT APPEARS TO HAVE MR. GEORGE'S NAME AT THE TOP,

12    CORRECT?

13      **A**    YES.

14      **Q**    AND THEN THERE'S A CAPTION HERE THAT SAYS, "COMPLETE

15    INTAKE PACKET," IS THAT RIGHT?

16      **A**    YES.

17      **Q**    AND THEN THERE'S A NOTATION HERE THAT SAYS PAGE 1 OF

18    EIGHT, DOESN'T IT?

19      **A**    YES, YES.

20      **Q**    CAN YOU TELL US WHAT THIS FORM IS?  WHAT DOES THIS

21    MEAN AND WHAT DOES 1 OF 8 MEAN; WHAT ARE WE LOOKING AT HERE?

22      **A**    ONE OF EIGHT, I WOULD THINK THAT MEANT THAT THERE

23    SHOULD BE EIGHT PAGES TO THAT, BUT DEPENDING ON HOW YOU PRINT

24    THESE THINGS OUT -- I KNOW THAT THE SIZE OF THE TYPE THAT YOU

25    CHOOSE AND WHAT MACHINE YOU'RE ON, IT COMES OUT DIFFERENT

1  WAYS.  BUT, ANYWAY, IT'S AN INTAKE PACKET OF HIM BEING

2  MEDICALLY PROCESSED BY NURSING STAFF.

3      **Q**    AT WHAT POINT IN TIME IS THIS DONE WHEN SOMEONE IS

4  BROUGHT TO EAST BATON ROUGE PARISH PRISON?

5      **A**    IT WAS DONE THE NEXT DAY AFTER HE CAME.  AND NOW

6  IT'S DONE EITHER THE SAME DAY OR THE VERY NEXT DAY, BUT

7  GENERALLY THE SAME DAY.

8      **Q**    AND IN THIS CASE, WHO COMPLETES THIS QUESTIONNAIRE,

9  THIS INTAKE PACKET?

10     **A**    A LICENSED PRACTICAL NURSE, THE NURSING STAFF.

11     **Q**    AFTER THE INITIAL INTAKE PACKET IS COMPLETED, WHAT

12  HAPPENS NEXT WITH SOMEONE LIKE MR. GEORGE WITH RESPECT TO

13  MEDICAL CARE?

14     **A**    HE WILL SEE A DOCTOR, GENERALLY WITHIN A COUPLE OF

15  WEEKS, MAYBE LESS, AND IF HE HAS ANY MENTAL HEALTH -- THEY

16  OFFER HIM -- IF HE SAYS THAT HE TAKES MEDICATION, THEY WILL

17  GET A CONSENT FORM SIGNED BY HIM FOR WHEREVER HE GETS HIS

18  MEDICATION OR WHOEVER IS THE PROVIDER OF THAT MEDICATION, AND

19  THEY FAX THAT INFORMATION.

20     **Q**    AND IS ALL OF THAT THE POLICY OF THE EAST BATON

21  ROUGE PARISH PRISON'S MEDICAL UNIT?

22     **A**    YES.

23     **Q**    AND THIS APPLIES TO ALL PRISONERS --

24     **A**    YES.

25     **Q**    -- AFTER INTAKE; IS THAT RIGHT?

1      **A**    YES.

2      **Q**    WITH RESPECT TO SOME OF THE NOTES WE REFERRED TO

3  TODAY, IN YOUR NOTES DO YOU DOCUMENT THINGS THAT YOU'D

4  CONSIDER SIGNIFICANT?

5      **A**    I DO.   TRY TO, YES.

6      **Q**    IF MR. GEORGE, FOR INSTANCE, APPEARED DIRTY OR

7  SMELLY OR UNKEMPT, WOULD YOU NOTE THAT IN YOUR RECORDS?

8      **A**    YES, ABSOLUTELY.   THOSE ARE THE KINDS OF THINGS THAT

9  I'M LOOKING FOR, ESPECIALLY WORKING WITH MENTAL ILL --

10 ILLNESS, MENTALLY ILL PEOPLE.

11     **Q**    WOULD YOUR OTHER PEOPLE IN THE MEDICAL STAFF THAT

12 WORK WITH YOU ALSO DO THE SAME?

13     **A**    YES.

14     **Q**    THAT'S THE POLICY, RIGHT?

15     **A**    YES.

16     **Q**    AFTER REVIEWING THE RECORDS, DID YOU SEE ANYWHERE IN

17 HIS RECORDS IN EITHER 2013 OR 2014 THAT INDICATED THAT

18 MR. GEORGE WAS -- I'M GOING TO USE THE WORDS "DIRTY, SMELLY,

19 UNKEMPT OR DROOLING"?

20     **A**    NO.

21     **Q**    FOR INSTANCE, I'D LIKE TO -- TO PLEASE LOOK AT --

22 THIS IS EXHIBIT 17, PAGE 119.

23     **A**    OKAY.

24     **Q**    TELL ME, MS. BURNS, CAN YOU SEE THAT?

25     **A**    ON HERE.   YES.

1    **Q**    I'D LIKE YOU TO LOOK, FOR INSTANCE, AS AN EXAMPLE,

2    IT SAYS, "DATE, 08/11/14, DO YOU SEE THAT?

3    **A**    YES.

4    **Q**    CAN YOU READ THE FIRST SENTENCE, SAY, DOWN HERE, THE

5    WORD "HOLD," WHAT DOES IT SAY ABOUT MR. GEORGE?

6    **A**    IT SAYS, "SOCIAL WORKER MET WITH TG THIS DATE FOR

7    RECHECK.  HE APPEARS FAIRLY NEAT, CLEAN AND COOPERATIVE,

8    DESPITE THE FACT HE'S BEEN ON LOCKDOWN SINCE HE WAS FIRST

9    ARRESTED.  REMANDED ON A PROBATION HOLD."

10   **Q**    AND I'D LIKE YOU TO PLEASE LOOK AT THE NEXT PAGE

11   OVER, PAGE 120.  CAN YOU SEE THAT, MS. BURNS?  I'M GOING TO

12   SEE IF I CAN ZOOM IT IN FOR THE JURY.  AND IF YOU WILL,

13   READ THE -- LET ME ASK YOU THIS:  IS THIS A CONTINUATION OF

14   THE AUGUST 11, 2014 NOTE YOU JUST READ FROM?

15   **A**    IT APPEARS TO BE, YES.  YES.  THERE'S MY SIGNATURE.

16   YES, YES.

17   **Q**    PART OF WHAT YOU DO IN YOUR EVALUATIONS INCLUDE

18   NOTING WHETHER OR NOT HE APPEARED TO BE COHERENT OR

19   INCOHERENT, DELUSIONAL, ET CETERA?

20   **A**    YES, YES.

21   **Q**    COULD YOU READ THE LAST LINE OR SECTION IN HERE THAT

22   TALKS ABOUT MOOD/AFFECT.

23   **A**    "HIS MOOD AND AFFECT WERE FAIRLY STABLE.  HE BECAME

24   ANIMATED WHEN DISCUSSING HIS LEGAL SITUATION.  THOUGHT PROCESS

25   IS COHERENT AND FAIRLY ORGANIZED."

1    **Q**    THANK YOU.  DID YOU -- I FORGOT TO MENTION THIS

2   EARLIER, BUT DID YOU NOTE ANYWHERE IN THE RECORDS IN 2013 OR

3   2014 THAT MR. GEORGE WAS EXHIBITING WHAT SOME PEOPLE MAY REFER

4   TO AS DROOPY EYES?

5    **A**    NO.  I NEVER SAW HIM, ACCORDING TO WHAT I REVIEWED,

6   IN THAT CONDITION.

7    **Q**    AFTER LOOKING AT THE RECORDS FOR 2013 AND 2014, DID

8   YOU SEE ANY INDICATION THAT MR. GEORGE WAS A CANDIDATE FOR

9   FORCED MEDICATION?

10    **A**    WELL, HE COMPLIED FOR THE MOST PART OR DIDN'T -- I

11   MEAN, YOU KNOW, THAT'S NOT SOMETHING THAT WE DO AT THE JAIL,

12   BUT HE DID NOT SEEM -- NO.  THE ANSWER TO THE QUESTION IS NO,

13   BASED ON WHAT I SAW.

14    **Q**    OKAY.  DID YOU SEE ANYTHING REFLECTED THAT SHOWED

15   THERE WAS A NEED FOR FORCED MEDICATION WITH MR. GEORGE --

16    **A**    NO, NOT BASED ON WHAT I --

17    **Q**    -- IN EITHER 2013 OR 2014?

18    **A**    NO, NOT WHAT I SAW.

19    **Q**    WITH RESPECT TO THE CLEANLINESS OF EAST BATON ROUGE

20   PARISH PRISON, YOU'VE BEEN THERE 15, 16 YEARS; IS THAT RIGHT?

21    **A**    YES.

22    **Q**    WHO CLEANS THE JAIL AREAS?

23    **A**    THE TRUSTEES.  THEY DO HAVE HALLMEN, WHO ARE PEOPLE

24   THAT ARE NOT TRUSTEES, BUT ARE -- ARE ALLOWED TO CLEAN THE

25   HALLWAYS AND AREAS OF CERTAIN PARTS OF THE JAIL.

1          Q     AND HOW OFTEN DO THEY CLEAN THAT JAIL?

2          A     EVERY DAY.

3          Q     AND AS FAR AS YOU KNOW, THEY USE REGULAR CLEANING

4     SUPPLIES AND SUCH AS THAT?

5          A     YES.   YES.

6               **MR. HILBURN:**  MS. BURNS, THAT'S ALL THE QUESTIONS I

7     HAVE.   THANK YOU.

8               **THE WITNESS:**  OKAY.

9               **THE COURT:**  ANY REDIRECT?

10              **MS. FERNANDEZ:**  YES, PLEASE.

11    REDIRECT

12    BY MS. FERNANDEZ:

13         Q     JUST A FEW MORE, MS. BURNS.

14         A     WHAT PAGE?   WHAT PAGE?

15         Q     ALL RIGHT.   SO WE DISCUSSED TWO DIFFERENT STAYS AT

16    THE JAIL BY MR. GEORGE.

17         A     YES, MA'AM.

18         Q     THE FIRST ONE BEING, YOU SAID, JULY 29TH, 2013

19    THROUGH AUGUST 23RD, 2013 OR SO; THE SECOND BEING JULY 1ST,

20    2014 THROUGH AUGUST 25TH, 2014; DOES THAT SOUND RIGHT, BASED

21    ON WHAT WE JUST TALKED ABOUT?

22         A     THE FIRST ONE, I DIDN'T THINK -- WHAT DID YOU SAY

23    FOR THE FIRST ONE?   BECAUSE I DIDN'T THINK IT WAS AS LONG.

24         Q     JULY 29TH.

25         A     UH-HUH.

1    **Q**    AND I BELIEVE HE WAS RELEASED ON AUGUST 23RD.

2    **A**    OKAY.  I DON'T REMEMBER EXACTLY WHEN HE WAS

3    RELEASED, BUT I THOUGHT IT WAS -- THE SECOND ONE DEFINITELY

4    SOUNDS RIGHT.  I JUST DON'T REMEMBER EXACTLY WHEN HE WAS

5    RELEASED ON THE FIRST ONE.

6    **Q**    AND ON BOTH OF THOSE STAYS, YOU SAW MR. GEORGE TWO

7    TIMES THE FIRST STAY AND TWO TIMES THE SECOND STAY; IS THAT

8    RIGHT?

9    **A**    RIGHT, RIGHT.

10   **Q**    SO JUST ON TWO OCCASIONS.  DO YOU RECALL HOW LONG

11   THOSE VISITS WERE EACH TIME?

12   **A**    NO, NOT EXACTLY.

13   **Q**    LESS THAN AN HOUR?

14   **A**    I DON'T KNOW.  I MEAN, SOMETIMES I DO SPEND MORE

15   TIME.  I REALLY DON'T KNOW.  TO BE HONEST, I DON'T KNOW.

16   **Q**    I'D LIKE TO TAKE YOU BACK TO THE DOCUMENT THAT

17   MR. HILBURN SHOWED YOU, THE INTAKE DOCUMENT FROM 2014.

18   **A**    OKAY.

19   **Q**    AND I'LL DIRECT YOU TO THE PAGE IN ONE MOMENT.  IT

20   LOOKS LIKE IT'S THE VERY BEGINNING, 105.

21   **A**    OKAY.

22   **Q**    IT APPEARS TO BE AN EIGHT-PAGE DOCUMENT.  AND, I'M

23   SORRY, WHAT DATE WAS THIS FILLED OUT?

24   **A**    IT APPEARS JULY 2ND, 2014.

25   **Q**    IT WAS FILLED OUT THE DAY AFTER MR. GEORGE WAS

1  ADMITTED --

2      **A**    RIGHT.

3      **Q**    -- FOR A SECOND INCARCERATION?

4      **A**    RIGHT.

5      **Q**    SO IF YOU WOULD LOOK AT PAGE 3 OF THIS INTAKE

6  DOCUMENT, WHICH WAS NOT FILLED OUT BY YOU, RIGHT?

7      **A**    NO.

8      **Q**    WHO COMPLETES THIS?

9      **A**    THESE ARE FILLED OUT BY THE NURSING STAFF.

10     **Q**    NURSING STAFF.  THOSE ARE THE FIRST PEOPLE FROM

11 MEDICAL STAFF THAT SEE AN INMATE?

12     **A**    RIGHT, RIGHT.

13     **Q**    ON PAGE 3, IT LOOKS LIKE MR. GEORGE WAS ASKED SOME

14 QUESTIONS ABOUT MENTAL AND SUBSTANCE ABUSE, AND HE INDICATED

15 THAT HE WASN'T ON ANY MEDICATION, DIDN'T HAVE ANY KIND OF

16 MENTAL HEALTH DIAGNOSIS, AM I READING THAT CORRECTLY?

17     **A**    RIGHT, THAT'S WHAT IT APPEARS TO BE.

18     **Q**    SO HE SELF-REPORTED THAT HE DID NOT --

19     **A**    EXACTLY.

20     **Q**    WHAT ABOUT ON PAGE 5?

21     **A**    NOW, WAIT.  I'M LOOKING FOR THE MEDICATION PART ON

22 THIS ONE.

23     **Q**    OKAY.

24     **A**    IT SAYS HE DOESN'T HAVE A MENTAL ILLNESS, THOUGH,

25 BUT HE DID SAY THAT HE LIVED AT A GROUP HOME IN JACKSON, WHICH

1  IS KIND OF A --

2       **Q**    WHERE IS THAT?

3       **A**    THE FIRST PAGE WHERE IT LISTS THE ADDRESS.  AND HE

4  DOES SAY THAT HE IS ON MEDICATIONS ON THIS ONE.

5       **Q**    OH, OKAY, YES.  REFER TO BLUE SHEET.

6       **A**    RIGHT.

7       **Q**    BUT THEN HE SAID HE DIDN'T HAVE A MENTAL ILLNESS?

8       **A**    RIGHT.

9       **Q**    OKAY.  AND WHERE IS THIS BLUE PAGE THAT WOULD

10 CONTAIN THE MEDICATIONS THAT HE'S SUPPOSED TO BE ON?

11      **A**    IT'S NOT -- IT'S NOT IN THIS.  I DON'T --

12      **Q**    SO IT WASN'T INCLUDED WITH THIS --

13      **A**    NO.

14      **Q**    -- SET OF DOCUMENTS?

15      **A**    NO, AND I DON'T REMEMBER -- I DON'T RECALL SEEING

16 IT.  THAT'S WHY I CONTACTED MS. BISHOP, TO FIND OUT ABOUT THE

17 MEDICATIONS.

18      **Q**    OKAY.  SO, AND THAT'S WHEN HE STARTED ON

19 MEDICATIONS --

20      **A**    RIGHT.

21      **Q**    -- OVER A WEEK LATER?

22      **A**    RIGHT.

23      **Q**    IS THERE ANYTHING ELSE THAT YOU'VE NOTICED MISSING

24 FROM THIS PACKET OF DOCUMENTS BESIDES DR. BLANCHE'S NOTES AND

25 THE MEDICATION RECORD REFERENCED ON THIS INTAKE FORM?

1    **A**    YOU MEAN THE BLUE SHEET?

2    **Q**    YES.

3    **A**    OR --

4    **Q**    YES, THE BLUE SHEET.

5    **A**    NO, NOT THAT I KNOW OF, BUT I DON'T -- YOU KNOW --

6    NO, NOT THAT I WOULD KNOW OF, BUT I DON'T SEE DR. BLANCHE'S

7    NOTES.

8         **MS. FERNANDEZ:**  NO FURTHER QUESTIONS.  THANK YOU.

9         **THE COURT:**  ALL RIGHT.  THANK YOU, MA'AM.  YOU MAY

10   STEP DOWN.

11        DO YOU HAVE QUESTIONS?

12        **MR. HILBURN:**  YOUR HONOR, I'D ASK THAT MS. BURNS NOT

13   BE RELEASED FROM SUBPOENA AT THIS TIME.  I THINK WE NEED TO

14   ADDRESS A MATTER WITH THE COURT.

15        **THE COURT:**  ALL RIGHT.  THEN WHY DON'T WE PUT THE

16   HEADPHONES ON.

17        *(REPORTER'S NOTE:  AT THIS TIME THE FOLLOWING MATTER*

18   *WAS HELD AT THE BENCH.)*

19        **MR. HILBURN:**  YOUR HONOR, IT CAME TO MY ATTENTION AS

20   MS. BURNS WAS WALKING UP TO TESTIFY THAT APPARENTLY SHE TOLD,

21   I GUESS, OUR PARALEGAL THAT SHE RECOGNIZES MR. BAKER, WHO SITS

22   ON THE FRONT ROW, FAR RIGHT, FROM CHURCH.  BUT WHEN THEY --

23   SHE SAW HIM PASS IN THE HALL, SHE'S NOT SURE IF HE RECOGNIZES

24   HER OR KNOWS WHO SHE IS.  I WANTED YOU TO BE AWARE OF THAT AND

25   ALL COUNSEL BE AWARE OF THAT.

1      **THE COURT:**   I APPRECIATE YOU BRINGING THAT TO MY
2    ATTENTION.   ANY SUGGESTIONS FROM EITHER SIDE ABOUT HOW TO
3    HANDLE THIS?

4      **MR. HILBURN:**   PERHAPS BRING MR. BAKER OUT AND ASK
5    HIM IF HE KNOWS MS. BURNS OUTSIDE THE PRESENCE OF THE OTHER
6    JURORS, MAYBE.

7      **THE COURT:**   AND MAYBE SO AS NOT TO NECESSARILY HAVE
8    A SELF-FULFILLING PROPHECY, I SUGGEST THAT MAYBE WE SHOULD
9    WAIT AFTER ANOTHER WITNESS OR TWO HAS TESTIFIED, THEN HAVE HIM
10   COME UP AND SAY:   HAVE YOU RECOGNIZED ANYBODY THAT'S TESTIFIED
11   SO FAR?   ANY OBJECTIONS FROM THE PLAINTIFF ON THAT?

12     **MR. LOSPENNATO:**   NO, I THINK THAT'S A GOOD IDEA,
13   YOUR HONOR.

14     **THE COURT:**   ALL RIGHT.   LET'S HANDLE IT THAT WAY,
15   THEN.   THANK YOU FOR BRINGING THAT TO MY ATTENTION,
16   MR. HILBURN.

17     **REPORTER'S NOTE:**   (WHEREUPON THE BENCH CONFERENCE
18   WAS CONCLUDED.)

19     **THE COURT:**   MS. BURNS, YOU MAY STAND DOWN.   THANK
20   YOU SO MUCH.   YOU DO NOT WANT TO RELEASE HER, CORRECT?

21     **MR. HILBURN:**   SHE IS RELEASED.

22     **THE COURT:**   OH, SHE IS RELEASED.   OKAY.   THANK YOU
23   SO MUCH, MS. BURNS.

24     INTO THE MIC, PLEASE.   INTO THE MIC.   NO, NO, YOU
25   CAN STAND -- UNLESS YOU WANT IT ON THE HEADPHONES.

1            **MR. LOSPENNATO:**  (ON THE HEADPHONES)

2            WE SHOULDN'T RELEASE HER COMPLETELY UNTIL WE KNOW --

3            **THE COURT:**  HOLD ON.  HOLD ON.

4            **MR. LOSPENNATO:**  WE MAY WANT TO RECALL HER.

5            **THE COURT:**  HOLD ON ONE SECOND.  WHEN I SAY MIC I

6    MEAN THE MIC AT THE PODIUM.  IF ANYBODY WANTS THE HEADPHONES,

7    JUST SAY HEADPHONES.

8            **MR. LOSPENNATO:**  I'M SORRY.

9            **THE COURT:**  THAT'S ALL RIGHT.  MS. BURNS, DON'T GO

10   QUITE YET.

11           **MR. LOSPENNATO:**  I DON'T WANT TO RELEASE HER FROM

12   THE SUBPOENA.  I DON'T KNOW -- WE'LL MAKE ARRANGEMENTS -- IF

13   WE THINK WE NEED HER AT THE END OF THE DAY, WE'LL LET YOU

14   KNOW.  BUT AT THIS POINT, I DON'T WANT TO RELEASE HER

15   COMPLETELY, JUST IN CASE I MIGHT WANT TO RECALL HER.

16           **THE COURT:**  I UNDERSTAND.  ALL RIGHT.  MS. BURNS,

17   YOU'RE FREE TO GO, BUT I ASSUME PEOPLE HAVE A CELL PHONE

18   NUMBER IF THEY NEED TO GET YOU BACK.  THANK YOU, MA'AM.

19           OKAY.  WHO IS YOUR NEXT WITNESS?

20           **MR. LOSPENNATO:**  BRAD MCCONVILLE.

21           **THE COURT:**  OKAY.  COME FORWARD, SIR, AND BE SWORN.

22           **(WHEREUPON, BRAD MCCONVILLE, HAVING BEEN DULY SWORN,**

23   **TESTIFIED AS FOLLOWS.)**

24   **DIRECT**

25   **BY MR. LOSPENNATO:**

1    **Q**    GOOD AFTERNOON, DR. MCCONVILLE.

2    **A**    GOOD AFTERNOON.

3    **Q**    WOULD YOU STATE YOUR NAME AND YOUR PLACE OF BUSINESS

4    FOR THE RECORD, PLEASE?

5    **A**    YES.   MY NAME IS JAMES BRAD MCCONVILLE.   I'M A

6    PHYSICIAN, PRACTICING INTERNAL MEDICINE PSYCHIATRY AND

7    FORENSIC PSYCHIATRY, AND I WORK FOR TULANE SCHOOL OF MEDICINE

8    IN NEW ORLEANS, LOUISIANA.

9    **Q**    AND DO YOU ALSO WORK AT EAST LOUISIANA MENTAL HEALTH

10   SYSTEM?

11   **A**    YES, I'M A FORENSIC PSYCHIATRIST AT EASTERN

12   LOUISIANA MENTAL HEALTH SYSTEM AS WELL.

13   **Q**    AND HOW LONG HAVE YOU BEEN THERE?

14   **A**    I'VE BEEN WORKING THERE SINCE 2010.   IN 2010, 2011,

15   I COMPLETED A FELLOWSHIP IN FORENSIC PSYCHIATRY.   THAT WAS --

16   PART OF THAT WAS AT THE FORENSIC HOSPITAL, AND I REMAINED ON

17   THE STAFF AFTER I COMPLETED MY FELLOWSHIP IN JULY OF 2011.

18   **Q**    ARE YOU FULL-TIME OR PART-TIME AT ELMHS?

19   **A**    I'M A -- I WORK FULL-TIME, BUT I'M ONLY -- I'M ONLY

20   PART-TIME AT ELMHS.   I HAVE OTHER FORENSIC CONTRACTS THAT I DO

21   AS WELL.   SO I WORK ONE DAY A WEEK AT THE FORENSIC HOSPITAL AS

22   AN INPATIENT PHYSICIAN.

23   **Q**    JUST AS A -- SORT OF JUST TO GIVE A BIGGER PICTURE

24   OF ELMHS, ARE YOU FAMILIAR WITH THE STAFFING AT ELMHS IN TERMS

25   OF PSYCHIATRISTS?

1  **A** I DON'T KNOW THE -- I DON'T KNOW THE SPECIFIC

2 PATIENT-TO-STAFF RATIO.  I KNOW IN SORT OF GENERAL TERMS HOW

3 MANY PSYCHIATRISTS WE HAVE.

4   **Q** AND HOW MANY IS THAT?

5   **A** AROUND 20.

6   **Q** AND HOW MANY OF THOSE ARE FULL-TIME?

7   **A** I'M TRYING TO COUNT.  PERHAPS FIVE.

8   **Q** OKAY.  WHAT ABOUT PSYCHOLOGISTS?

9   **A** THE PSYCHOLOGISTS, I DON'T KNOW HOW MANY WE HAVE.

10 WE HAVE A TOUGH TIME KEEPING PSYCHOLOGISTS.  SO IT FLUCTUATES.

11 I KNOW THAT WE'RE GENERALLY NEEDING A PSYCHOLOGIST OR TWO FOR

12 THE WORK THAT WE HAVE.

13   **Q** CORRECT ME IF I'M WRONG, YOU HAVE FULL-TIME NURSING

14 STAFF THERE:  DIETICIANS, OCCUPATIONAL THERAPISTS,

15 RECREATIONAL THERAPISTS AND SOCIAL WORKERS AT ELMHS?

16   **A** YES, I BELIEVE SO.

17   **Q** AND IS IT TRUE THAT EVERY RESIDENT AT ELMHS HAS A

18 TREATMENT PLAN AND RECEIVES ACTIVE THERAPY?

19   **A** YES, EVERY PATIENT IN THE HOSPITAL, JUST LIKE ANY

20 JOINT COMMISSION ACCREDITED HOSPITAL, HAS TO HAVE TREATMENT

21 PLANS.

22   **Q** AND WHAT'S THE FUNCTION OF A TREATMENT PLAN?

23   **A** WELL, THE TREATMENT PLAN IS TO ENSURE THAT HOSPITALS

24 ARE PROGRESSING TOWARDS THE GOALS OF HOSPITALIZATION.  IN THE

25 CASE OF PATIENTS WITH MENTAL ILLNESS, YOU'RE ATTEMPTING TO

1   PROGRESS THEM TOWARDS RECOVERY OR AT LEAST SIGNIFICANT

2   IMPROVEMENT IN THEIR PRIMARY MENTAL ILLNESS, SCHIZOPHRENIA,

3   BIPOLAR DISORDER, MAJOR DEPRESSION.  YOUR GOAL IS TO, YOU

4   KNOW, RECUPERATE PATIENTS, GET THEM TO A HIGHER FUNCTIONAL

5   LEVEL SO THAT THEY CAN BE REINTRODUCED TO THE COMMUNITY AND

6   ABSTINENCE FROM DRUGS AND ALCOHOL, THOSE KIND -- THOSE KIND OF

7   GOALS.

8       Q    SO THERE'S A SUBSTANCE ABUSE PROGRAM AT ELMHS AS

9   WELL?

10      A    THEY DO HAVE SUBSTANCE ABUSE PROGRAMS.  IT'S MORE

11  ROBUST IN THE UNITS WHICH ARE CLOSER TO BEING DISCHARGED, THE

12  DISCHARGE UNITS.

13      Q    WHICH UNITS ARE THOSE?

14      A    IN THE FORENSIC DIVISION, THE UNIT THAT PROBABLY HAS

15  THE MOST DISCHARGES IS THE CRU UNIT.

16      Q    CRU, WHAT DOES THAT STAND FOR, DO YOU KNOW?

17      A    I THINK IT STANDS FOR CROSSROADS RECOVERY UNIT.

18  IT'S AN OLD TERM.

19      Q    DO PATIENTS RECEIVE PSYCHOTHERAPY THERE?

20      A    INDIVIDUAL PSYCHOTHERAPY?  I KNOW THAT THERE ARE

21  SOME PATIENTS THAT RECEIVE INDIVIDUAL THERAPY, AT LEAST AT

22  TIMES, BUT THE VAST MAJORITY OF PATIENTS ARE NOT RECEIVING

23  INDIVIDUAL PSYCHOTHERAPY, AND I DON'T THINK MANY HOSPITALS,

24  LIKE JACKSON, LIKE FORENSIC, WOULD HAVE -- OFFER THAT.

25      Q    WHAT UNIT DO YOU CURRENTLY WORK IN NOW?

1        **A**    I WORK ON THE ITU.

2        **Q**    AND WHAT IS THAT?

3        **A**    INTERMEDIATE TREATMENT UNIT.  IT'S A MIDDLE GROUND

4    UNIT IN THE FORENSIC DIVISION OF THE HOSPITAL, SO IT'S -- THE

5    SIMPLE WAY TO SAY IT IS, IT'S NOT THE ADMISSION UNIT; PATIENTS

6    DIDN'T JUST GET THERE, BUT IT'S NOT THE DISCHARGE UNIT.

7    THEY'RE NOT QUITE READY TO GO.  SO THERE'S A PRETTY HIGH LEVEL

8    OF ILLNESS.  THERE'S A PRETTY HIGH -- SIGNIFICANT AMOUNT OF

9    ACTIVE TREATMENT.  PATIENTS HAVE BEEN THERE IN THE FORENSIC

10   HOSPITAL ANYWHERE FROM A MONTH TO 30 YEARS.  IT'S QUITE A

11   RANGE.

12       **Q**    HAVE YOU WORKED ON OTHER UNITS AT --

13       **A**    I HAVE WORKED ON OTHER UNITS, BUT SINCE 2011, I'VE

14   MOSTLY BEEN ON THE ITU.

15       **Q**    WHAT OTHER UNITS HAVE YOU WORKED IN?

16       **A**    I'VE WORKED ON OAKCREST UNIT, WHICH IS AN ADMISSION

17   UNIT.  I'VE WORKED ON THE CRU UNIT ALSO.

18       **Q**    WHAT IS THAT?

19       **A**    THE CROSSROADS.

20       **Q**    OH, CROSSROADS, YES.

21       **A**    YES.

22       **Q**    IS THAT LIKE A GROUP -- MORE SORT OF LIKE AN

23   ON-THE-GROUNDS GROUP HOME SETTING?

24       **A**    IT'S ACTUALLY NOT A GROUP HOME.  NO, IT'S AN

25   IN-PATIENT UNIT.  IT JUST HAS A LITTLE BIT MORE FREEDOM FOR

1 THE PATIENTS.  THEY'RE ABLE TO GO OUTSIDE MORE OFTEN.  THEY

2 REQUIRE LESS SUPERVISION, SO THEY HAVE LESS STAFF MONITORING

3 THEM.  AND, HOPEFULLY, THEY'RE DOING A BIT BETTER THAN THE

4 PATIENTS ON THE ASSA OR THE IT UNITS.  THOSE ARE THE HIGHER

5 SECURITY LEVEL UNITS.

6     **Q**    AND ASSA IS -- THAT'S THE FORENSIC UNIT?

7     **A**    THAT'S THE MAXIMUM SECURITY UNIT AT THE FORENSIC

8 HOSPITAL.

9     **Q**    ARE YOU FAMILIAR WITH TRUSSELL GEORGE?

10     **A**    YES.

11     **Q**    AND HOW ARE YOU FAMILIAR WITH HIM?

12     **A**    MR. GEORGE WAS MY PATIENT ON THE ITU BETWEEN

13 SEPTEMBER OF 2014 AND APPROXIMATELY JANUARY OF 2016.

14     **Q**    SO HE'S NO LONGER YOUR PATIENT?

15     **A**    NO.  AFTER A YEAR AND A HALF ABOUT, WE WERE FINALLY

16 ABLE TO TRANSFER HIM TO THE SECURE FORENSIC FACILITY ON THE

17 GROUNDS OF -- ON THE GROUNDS OF THE FORENSIC CAMPUS, AND I

18 HAVE NOT SEEN HIM BACK YET.  SO I BELIEVE HE'S STILL THERE,

19 BUT I'M NOT CERTAIN.

20     **Q**    SO MR. GEORGE HAS A MENTAL ILLNESS; ISN'T THAT

21 CORRECT?

22     **A**    YES, IT IS.

23     **Q**    AND HE ALSO HAS A DEVELOPMENTAL DISABILITY; IS THAT

24 RIGHT?

25     **A**    YES, IT IS CORRECT.

1    **Q**    WHEN YOU WERE WORKING WITH MR. GEORGE, HOW DO THOSE

2    THINGS INTERACT, THE TWO DIAGNOSES, WITH THE DEVELOPMENTAL

3    DISABILITY AND THE MENTAL ILLNESS?   HOW DO THEY RELATE TO EACH

4    OTHER IN TERMS OF TREATMENT?

5    **A**    WELL, HAVING SCHIZOPHRENIA ALONE IS QUITE A BIG

6    RANGE.   THERE ARE PEOPLE WITH SCHIZOPHRENIA THAT RESPOND WELL

7    TO TREATMENT AND THERE ARE PATIENTS WITH SCHIZOPHRENIA, WHICH

8    IS MUCH MORE SEVERE, MUCH MORE PERVASIVE, MORE REFRACTORY AND

9    MORE DEBILITATING.   SO SCHIZOPHRENIA ALONE IS A RANGE.   HE HAS

10   A SEVERE FORM OF SCHIZOPHRENIA.   HE ALSO HAS AN IQ THAT WE'VE

11   ESTIMATED IN THE LOW 50S AND LIFE-LONG INTELLECTUAL

12   DISABILITY.

13   AND IN HIS CASE, THE COMBINATION OF REALLY RESISTANT

14   REFRACTORY SEVERE MENTAL ILLNESS AND A LOW INTELLECTUAL

15   FUNCTIONING HAS MADE IT DIFFICULT FOR HIM TO FUNCTION IN MANY

16   AREAS OF LIFE AND TO PROGRESS MEANINGFULLY WITH REGARDS TO HIS

17   ILLNESS.

18   ONE OF THE THINGS THAT HAPPENS WITH HIM IS THAT

19   HE -- HE HAS SUCH PERSISTENT DELUSIONS AND THEN HE ALSO HAS

20   THE IQ PROBLEM, WHICH CAUSES HIM -- GIVES HIM A TOUGH TIME

21   UNDERSTANDING THINGS, SUCH AS LEGAL MATTERS AND DISCHARGE

22   PLANNING, THAT HE -- IT'S SORT OF A DOUBLE -- DOUBLE HIT THAT

23   MAKES IT MORE CHALLENGING FOR HIM TO FUNCTION IN THE HOSPITAL

24   AND ANYWHERE IN LIFE.

25   **Q**    WOULD YOU DESCRIBE HIM IN TERMS OF MENTAL HEALTH

1   TREATMENT AS SOMEWHAT FRAGILE?

2       **A**    WELL, HE WAS FRAGILE TO CERTAIN MEDICATION CHANGES

3   HE DEVELOPED SIDE EFFECTS TO.  BUT AS FAR AS HIS ILLNESS BEING

4   FRAGILE, I WOULDN'T DESCRIBE HIM AS SUCH.  I'D JUST DESCRIBE

5   HIM AS VERY REFRACTORY AND CHALLENGING.

6       **Q**    WHAT DOES REFRACTORY MEAN IN THIS CONTEXT?

7       **A**    A LOT OF PATIENTS WITH MENTAL ILLNESS, WE CAN START

8   THEM ON FIRST MED OR THE SECOND MEDICATION AND NOT ONLY WILL

9   THEY RESPOND REALLY WELL, BUT THEY'LL GO INTO REMISSION AND BE

10  FREE FROM THE CORE SYMPTOMS OF SCHIZOPHRENIA, WHICH ARE

11  HALLUCINATIONS, DELUSIONS, DISORGANIZED THOUGHTS, DISORGANIZED

12  BEHAVIOR, WHAT WE CALL NEGATIVE SYMPTOMS.

13      IN THE CASE OF MR. GEORGE, HIS SYMPTOMS DEFINITELY

14  GET BETTER, BUT THEY REQUIRE A COUPLE OF DIFFERENT MEDICATIONS

15  IN COMBINATION, AND THEY DON'T GET ALL THE WAY BETTER.  HE

16  CONTINUES TO HAVE PRETTY CONVINCING SYMPTOMS, AND THAT WAS

17  WHAT I NOTICED IN MY 14, 15 MONTHS OF TREATING HIM.

18      **Q**    AND HOW IMPORTANT FOR MR. GEORGE'S TREATMENT IS

19  MEDICATION?

20      **A**    WELL, IT'S CRITICAL FOR PATIENTS WITH SCHIZOPHRENIA

21  AS A GENERAL RULE.  FOR HIM, HE FUNCTIONS POORLY WITHOUT

22  MEDICATION.  AND ALTHOUGH THE SYMPTOMS DON'T GO AWAY

23  COMPLETELY, WHEN YOU LAND ON A GOOD COMBINATION, HE DOES SEEM

24  TO DO BETTER AND FUNCTIONS MARGINALLY BETTER THAN WHEN HE'S ON

25  NO MEDICATIONS, WHICH I ALSO OBSERVED BECAUSE THERE WERE

1   PERIODS WHERE HE STOPPED TAKING MEDICATIONS WHILE UNDER MY

2   CARE.

3        **Q**     FOR HOW LONG OF A PERIOD OF TIME WOULD HE BE ABLE TO

4   GO WITHOUT TAKING MEDICATIONS WHEN HE WAS AT ELMHS?

5        **A**     WELL, HE COULD GO WITHOUT MEDICATIONS INDEFINITELY.

6   THEY'RE NOT LIFE SUSTAINING, BUT HE HAS MORE PROBLEMS, HE'S

7   MORE CONVINCED OF HIS DELUSIONAL THOUGHTS THAT THE TELEVISION

8   IS TALKING TO HIM, THAT PEOPLE ARE PLOTTING AGAINST HIM.   HE

9   CAN BECOME MORE AGGRESSIVE AND MORE DIFFICULT TO MANAGE.

10       **Q**     MAYBE I WORDED IT POORLY.   SO IF MR. GEORGE, WHEN HE

11  WAS AT ELMHS, STOPPED TAKING HIS MEDICATION, HOW QUICKLY WOULD

12  PEOPLE BE ON TO THAT?

13       **A**     I THINK THAT'S A TOUGH QUESTION.   I THINK THAT WE

14  KNOW IN GENERAL WHEN PATIENTS WHO ARE VERY SICK STOP TAKING

15  THEIR MEDICATIONS, SOONER OR LATER, THEY'RE GOING TO BECOME

16  SICKER.   IT'S NOT EASY TO PREDICT HOW LONG IT'S GOING TO TAKE.

17  BUT THE NURSING STAFF WOULD ALERT ME AS SOON AS HE STOPPED

18  TAKING HIS MEDICATIONS, JUST OUT OF CONCERN THAT HE WAS GOING

19  TO DECOMPENSATE TO THE POINT WHERE HE WOULD HAVE TO GO BACK TO

20  A HIGHER SECURITY LEVEL, WHICH WOULD BE A SETBACK FOR HIM IN

21  OUR GOALS OF GETTING HIM TO A GROUP HOME.

22       **Q**     SO YOU HAVE NURSING STAFF HERE, SO WHEN THERE'S A

23  CHANGE LIKE THAT, WHEN A PERSON STOPS TAKING THEIR MEDICATION,

24  THEY GET THAT INFORMATION TO YOU AS QUICKLY AS POSSIBLE; IS

25  THAT CORRECT?

1     **A**     YEAH, THEY WOULD INFORM ME OF BOTH PERIODS OF

2  MEDICATION REFUSAL AND PERIODS OF WHAT THEY PERCEIVED TO BE

3  WORSENING IN HIS SYMPTOMS.

4     **Q**     WHEN YOU GET THAT INFORMATION, WHAT DO YOU DO WITH

5  IT, IN MR. GEORGE'S CASE IN PARTICULAR?

6     **A**     WELL, IN MR. GEORGE'S CASE, I WOULD BRING HIM IN,

7  EVALUATE HIM, A COUPLE OF DECISIONS TO MAKE.  ONE IS, IS THE

8  MEDICATION JUST NOT WORKING AND I NEED TO TRY SOMETHING

9  DIFFERENT?  DO I NEED TO TAKE HIM OFF ONE OF THESE?  DO I ADD

10 A MEDICATION?  SO IT'S -- THE WORK OF A PSYCHIATRIST, IT'S

11 KIND OF ART.  YOU HAVE TO TRY TO FIGURE OUT THE NUANCE OF

12 INDIVIDUAL SYMPTOMS AND WHAT MEDS MIGHT TARGET THAT AND WHAT

13 MEDS MIGHT WORK WELL WITH OTHER MEDS.  SO THAT'S PART OF IT,

14 IS FIGURING OUT WHAT MED CHANGES NEED TO HAPPEN.

15        THE OTHER PART OF IT IS CONVINCING MR. GEORGE THAT

16 THE MEDICATIONS ARE SOMETHING HE ACTUALLY NEEDS AND TRYING TO

17 WORK WITH HIM ON THE SIDE EFFECTS THAT HE MAY BE EXPERIENCING

18 SO THAT I CAN COME UP WITH A MEDICATION REGIMEN THAT HE

19 ACTUALLY TOLERATES WELL AND DOESN'T MIND TAKING, WHICH MANY

20 TIMES WE'RE SUCCESSFUL AND SOMETIMES WE'RE NOT SUCCESSFUL.

21    **Q**     SO HOW FREQUENTLY WOULD YOU BE IN CONTACT WITH

22 MR. GEORGE WHEN YOU WERE WORKING WITH HIM?

23    **A**     WELL, THE FIRST MONTH OR SO, HE HAD JUST BEEN

24 READMITTED TO THE FORENSIC HOSPITAL.  SO I SAW HIM EVERY WEEK.

25 AND THEN AFTER HE HAD BEEN IN THE HOSPITAL FOR A FEW MONTHS, I

1    SAW HIM MINIMALLY ONCE A MONTH.  HOWEVER, THERE WERE SOME

2    PERIODS WHERE HE WAS SICK, I WAS READING MY NOTES, AND I SAW

3    HIM A LITTLE MORE OFTEN THAN THAT.  BUT AT LEAST ONCE A MONTH

4    AND SOMETIMES MORE OFTEN.

5         **Q**     AND WHEN YOU WEREN'T SEEING HIM, WHO ELSE WAS IN

6    CONTACT WITH MR. GEORGE DURING THAT TIME?

7         **A**     THE NURSING STAFF, THE SOCIAL WORKER ON THE TEAM,

8    THE CGTS, THE CORRECTIONAL TECHNICIANS, OTHER MEMBERS OF THE

9    TREATMENT TEAM.  HE WORKED WITH RECREATIONAL THERAPISTS, OTHER

10   STAFF MEMBERS.

11        **Q**     AND, AGAIN, JUST TO SORT OF GIVE THE JURY A SENSE OF

12   THE KIND OF INTERACTIONS THAT THE STAFF HAD WITH MR. GEORGE

13   WHEN HE WAS AT -- WHEN HE WAS AT ELMHS, DURING THE COURSE OF

14   ANY DAY, HOW -- HOW FREQUENTLY WOULD HE BE INTERACTING WITH

15   STAFF, THE SOCIAL WORKERS, THE NURSES AND OTHER INDIVIDUALS

16   WHO WORK IN ELMHS, DO YOU KNOW?

17        **A**     I THINK THAT'S A TOUGH QUESTION TO ASK.  HE'S -- YOU

18   KNOW, HE'S ON A UNIT WHERE HE'S BEING MONITORED ALL THE TIME,

19   MAYBE NOT WITH CONTINUOUS EYE CONTACT, UNLESS THERE WAS A

20   PERIOD WHERE HE WAS DOING VERY POORLY; WE WOULD TRY TO GIVE

21   HIM AS MUCH FREEDOM AS POSSIBLE.  BUT HE WOULD BE -- HE WAS ON

22   A UNIT IN WHICH THERE WERE AROUND 20 OTHER -- 20 OTHER

23   PATIENTS, TWENTY SOMETHING -- ODD-SOMETHING PATIENTS.  AND HE

24   INTERACTED WITH THEM, YOU KNOW, OFTEN AND THE STAFF MONITORING

25   HIM OFTEN.  SOCIAL WORKERS WOULD SEE HIM VERY FREQUENTLY, A

1    COUPLE OF TIMES A WEEK, AT LEAST.

2              BUT IT'S SORT OF AN OFTEN AS-NEEDED BASIS AND ALSO

3    IN TREATMENT TEAM.  OF COURSE, THE NURSES SEE HIM, IN HIS

4    CASE, A COUPLE OF TIMES A DAY, A MINIMUM JUST TO GIVE HIM

5    MEDICATIONS.  SO THERE'S VARIOUS LEVELS OF CONTACT WITH THE

6    PATIENT ON A PSYCHIATRIC UNIT.

7         **Q**    DID MR. GEORGE HAVE A TREATMENT TEAM?

8         **A**    YES.

9         **Q**    AND HOW FREQUENTLY DID THE TEAM MEET TO DISCUSS HIS

10   NEEDS AND HIS CASE?

11        **A**    THE SAME AMOUNT OF FREQUENCY WITH WHICH I MET WITH

12   HIM, WHICH WAS ONCE A MONTH, AND SOMETIMES MORE OFTEN IF

13   NEEDED TO.

14        **Q**    WHEN YOU STOPPED WORKING WITH MR. GEORGE IN JANUARY

15   OF 2015 -- '16, I'M SORRY, HOW WAS HE DOING AT THAT TIME?

16        **A**    HE ALWAYS WAXED AND WANED.  HE ALWAYS HAD PERIODS

17   WHERE HIS BEHAVIOR WAS MORE MANAGEABLE, WHERE HE WOULD NOT

18   NECESSARILY ACT ON THE DELUSIONS, WHERE HE WAS TOLERATING HIS

19   MEDICATIONS BETTER.  AND DURING THOSE TIMES, HE WAS STILL

20   SICK, BUT HE WOULD -- YOU KNOW, HE WOULDN'T BE A PROBLEM.  HE

21   WOULDN'T BE A PROBLEM.

22             OTHER TIMES, HE WAS VERY INFLUENCED BY HIS

23   DELUSIONS, WOULD ATTACK STAFF MEMBERS.  HE EVEN GOT INTO AN

24   ALTERCATION, FELL AND BROKE HIS JAW, WHICH WE HAD TO HAVE

25   SURGICALLY REPAIRED.  HE HAD INCIDENTS LIKE THAT A LOT.

1      BUT DURING THE TIME WHEN HE WENT TO SFF, I'D SEEN

2  HIM SEVERAL TIMES WHEN HE HAD REACHED THAT BALANCING POINT

3  WHERE I FELT PRETTY GOOD THAT THIS WAS ABOUT AS GOOD AS HE

4  COULD BE, GIVEN HIS DEFICITS, INCLUDING CHRONIC NEUROLOGIC

5  PROBLEMS THAT HE'S HAD AT PROGRESSIVE.

6      I FELT THAT THIS WAS THE BEST POSSIBLE CHANCE AT

7  GOING TO SFF, SO WHEN THE CALL CAME UP AND THEY SAID THEY

8  WOULD TAKE HIM, I THOUGHT THAT THAT WAS AS GOOD AS ANY A TIME

9  AND WE WOULD GIVE IT A SHOT AND HOPE FOR THE BEST.

10      **Q**    SFF?

11      **A**    THE SECURE FORENSIC FACILITY, WHICH IS THE GROUP

12  HOME -- THE SECURE GROUP HOME ON THE GROUNDS OF THE FORENSIC

13  CAMPUS.

14      **Q**    SO HE WENT THERE IN JANUARY 2016; IS THAT RIGHT?

15      **A**    YES.   SO IN -- I WAS ABLE TO BYPASS THE CRU UNIT,

16  WHICH MR. GEORGE WAS COMPLETELY PARANOID OF AND DID NOT WANT

17  TO GO TO, AND GET HIM STRAIGHT TO THE GROUP HOME.   AND PART OF

18  THE REASON WAS BECAUSE THIS TRIAL COURT JUDGE SEEMED TO BE

19  VERY INTERESTED IN GETTING HIM INTO THE LESS RESTRICTIVE UNIT,

20  WHICH WAS A GOAL OF OURS AS WELL, SO YES, WE WERE ABLE TO GET

21  HIM INTO THE SFF.

22      **Q**    HOW DID YOU DO THAT?   HOW DID YOU CONVINCE HIM THAT

23  THAT WAS SOMETHING THAT HE WANTED TO DO?

24      **A**    HOW DID I CONVINCE MR. GEORGE?

25      **Q**    YES.

1    **A**    ONE OF THE THINGS WE DID WAS JUST CONTINUE TO TALK

2   TO HIM ABOUT HIS GOALS OF BEING, YOU KNOW, HAVING MORE

3   FREEDOM.  HE CONSTANTLY WANTS TO GO HOME.  I MEAN, THAT'S SORT

4   OF HIS -- THAT'S ONE OF HIS BARRIERS IS THAT HE DOESN'T HAVE A

5   REASONABLE EXPECTATION ABOUT WHAT THE NEXT POSSIBLE STEP IS.

6        BUT WE ALSO ENLISTED HIS PATIENT ADVOCATE, KATY

7   MARTINEZ, AND SHE CAME AND MET WITH US AS WELL AND SORT OF

8   HELP -- SHE, YOU KNOW, KNOWS HIM A LONG TIME AND WAS ABLE TO

9   HELP CONVINCE HIM THAT LET'S GIVE THIS A TRY AND TRY FOR THIS

10  GROUP HOME.

11       MY MESSAGE TO HIS FAMILY AND TO HIS ADVOCATE AND TO

12  MR. GEORGE HIMSELF WAS THAT THIS IS THE PROCESS IN THE

13  FORENSIC HOSPITAL.  SO IF YOU DO WELL AT THE FORENSIC GROUP

14  HOME, MAYBE A NON-FORENSIC GROUP HOME IN THE COMMUNITY IS A

15  REASONABLE THING IN THE FUTURE.  IF YOU DO WELL IN THIS STEP,

16  MAYBE THE NEXT STEP IS A POSSIBILITY.  SO I THINK THAT

17  ULTIMATELY HE BOUGHT IN ENOUGH TO THAT TO GO OVER THERE AND

18  GET ADMITTED.

19       **MR. LOSPENNATO:**  I HAVE NO OTHER QUESTIONS.

20       **THE COURT:**  THANK YOU.  WE'RE GOING TO TAKE A TEN-

21  MINUTE BREAK.

22       **REPORTER'S NOTE:**  (WHEREUPON THE JURY EXITED THE

23  COURT ROOM.)

24

25       **THE COURT:**  ARE YOU GOING TO TAKE HIM NOW?

1    **MR. HILBURN:** YOUR HONOR, I DON'T THINK THERE'S ANY

2    QUESTIONS, ANY CROSS-EXAM FOR DR. MCCONVILLE, SO THE RECORD IS

3    CLEAR, MAYBE WE CAN GET THAT ON THERE AND HE CAN BE RELEASED.

4    **THE COURT:** OKAY. WELL, GOOD. ARE WE ON THE RECORD

5    NOW? OKAY. SO THAT WAS ON THE RECORD. DR. MCCONVILLE, THANK

6    YOU. YOU ARE RELEASED AND YOU MAY GO.

7    ALL RIGHT, WE'RE TAKING TEN MINUTES.

8    **REPORTER'S NOTE:** (WHEREUPON THE COURT WAS IN

9    RECESS.) (TRAIL RESUMED AND ALL PARTIES WERE PRESENT.)

10   **THE COURT:** OKAY. BE SEATED, PLEASE.

11   MR. HARRIS, OUR COURT SECURITY OFFICER, BROUGHT TO

12   MY ATTENTION AS SOON AS WE TOOK OUR BREAK THAT MR. BAKER HAD

13   BROUGHT IT TO HIS ATTENTION AS THEY WENT BACK INTO THE ROOM

14   THAT HE NOW RECOGNIZED MS. BURNS AND HE HAD NOT RECOGNIZED HER

15   NAME WHEN WE WENT THROUGH THE VOIR DIRE PROCESS, BUT HE

16   RECOGNIZED HER FACE NOW. AND SO I'D ASK THE PARTIES HOW THEY

17   WANT TO GO FORWARD. PLAINTIFFS?

18   **MR. LOSPENNATO:** I'D LIKE TO CONSULT WITH MY

19   CO-COUNSEL BRIEFLY ON THIS.

20   **THE COURT:** SURE. SURE, THAT'S FINE.

21   **MR. LOSPENNATO:** YOUR HONOR, WE'D LIKE TO HAVE THE

22   JUROR VOIR DIRED AS TO ANY POTENTIAL BIAS AND MAKE OUR

23   DECISION AFTER THAT.

24   **THE COURT:** SURE, THAT MAKES SENSE. ANY OBJECTIONS?

25   **MR. HILBURN:** NO, SIR, YOUR HONOR. I THINK THAT'S A

1  GOOD IDEA.

2  **THE COURT:**  WHY DON'T, MR. HARRIS, YOU ASK MR. BAKER

3  JUST TO COME OUT.

4  MR. BAKER, COME FORWARD AROUND TO THE PODIUM, IF YOU

5  DON'T MIND AND JUST ASK YOU SOME QUESTIONS.  FIRST, I

6  APPRECIATE YOU BRINGING TO THE ATTENTION OF OUR COURT SECURITY

7  OFFICER THAT YOU RECOGNIZED MS. BURNS.  CAN YOU TELL US THE

8  NATURE OF YOUR CONNECTION WITH HER?

9  **JUROR BAKER:**  YES, SIR, YOUR HONOR, SHE GOES TO MY

10  CHURCH, AND I RECOGNIZE HER AS BEING A MEMBER, ACTUALLY, OF MY

11  SUNDAY SCHOOL CLASS.  WHEN YOU ANNOUNCED THE LIST OF

12  WITNESSES, I DIDN'T RECOGNIZE HER BY NAME.  I DIDN'T KNOW HER

13  LAST NAME, BUT I DO RECOGNIZE HER AS SOMEBODY I'M FAMILIAR

14  WITH.

15  **THE COURT:**  ALL RIGHT.  AND SHE'S IN YOUR SUNDAY

16  SCHOOL CLASS?

17  **JUROR BAKER:**  THAT IS CORRECT.

18  **THE COURT:**  HOW LONG HAVE Y'ALL BEEN IN SUNDAY

19  SCHOOL CLASS TOGETHER?

20  **JUROR BAKER:**  WE HAVE BEEN IN THAT SUNDAY SCHOOL

21  CLASS TOGETHER PROBABLY THREE YEARS WITH INTERMITTENT

22  ATTENDANCE.

23  **THE COURT:**  ALL RIGHT.  WOULD THIS -- IS THERE ANY

24  CONNECTION OUTSIDE SUNDAY SCHOOL CLASS AND CHURCH?

25  **JUROR BAKER:**  NO, SIR.

1 **THE COURT:** WOULD THIS CONNECTION THAT YOU'VE

2 DESCRIBED MAKE IT -- GIVEN THAT SHE'S A WITNESS IN THE CASE,

3 WOULD IT MAKE IT DIFFICULT FOR YOU TO BE FAIR TO BOTH SIDES,

4 IN YOUR VIEW?

5 **JUROR BAKER:** I DO NOT THINK IT WOULD MAKE IT

6 DIFFICULT.

7 **THE COURT:** ALL RIGHT. WELL, THEN, WITH THAT, WHAT

8 I'M GOING TO ASK YOU TO DO, MR. BAKER IS -- WELL, DO YOU GUYS

9 HAVE ANY OTHER QUESTIONS YOU'D LIKE TO ASK? AND IF SO, JUST

10 RAISE YOUR HAND AND WE'LL GET ON THE HEADSET.

11 MR. LOSPENNATO, ANY ADDITIONAL QUESTIONS?

12 **MR. LOSPENNATO:** I HAVE NO QUESTIONS.

13 **THE COURT:** MR. HILBURN?

14 **MR. HILBURN:** NO, SIR.

15 **THE COURT:** OKAY. IF YOU WOULD, JUST GO BACK TO THE

16 JURY ROOM, AND I'M GOING TO LET THE LAWYERS TALK TO ME ABOUT

17 IT AND WE'LL FIGURE OUT WHAT TO DO. THANK YOU SO MUCH FOR

18 BRINGING THAT TO OUR ATTENTION.

19 **JUROR BAKER:** YES, SIR.

20 **THE COURT:** YOU WANT TO CONSULT WITH YOUR GROUP?

21 **MR. LOSPENNATO:** YEAH. YES, YOUR HONOR.

22 YOUR HONOR, WE'D LIKE TO STRIKE THE JUROR.

23 **THE COURT:** ALL RIGHT. MR. HILBURN, YOU WANT TO

24 RESPOND?

25 **MR. HILBURN:** YES, YOUR HONOR.

1          YOUR HONOR, BASED ON HIS RESPONSES AND ACCORDING TO

2    MS. BURNS, WHEN THEY PASSED, HE PASSED HER IN THE HALL, HE

3    LOOKED AT HER AND DIDN'T RECOGNIZE HER, SHE RECOGNIZED HIM,

4    THE INTERMITTENT NATURE OF THE CONTACT.   PLUS, YOUR HONOR,

5    I'VE TRIED CASES ALL OVER THE STATE IN SMALL TOWNS.   I'VE HAD

6    THE PREACHER WITH HALF OF HIS CONGREGATION IN THE JURY BOX AND

7    THE COURTS HAVE HELD THAT THAT'S NOT PER SE A CONFLICT.

8          THE FACT THAT THEY GO TO -- A LOT OF PEOPLE GO TO

9    CHURCHES TOGETHER AND IN THIS CASE, I DON'T THINK THE EVIDENCE

10   WOULD WARRANT TAKING HIM OFF THE JURY.

11        THE COURT:   THANK YOU.   I'M GOING TO EXCUSE HIM.

12   AND HERE'S -- LET ME PUT ON THE RECORD WHY I'M DOING IT.   I

13   HAVE TRIED CASES.   I TRIED ONE IN ST. JAMES PARISH WHERE THE

14   DEFENDANT WAS MONSANTO AND I ENDED UP WITH MONSANTO EMPLOYEES

15   ON MY JURY, AND THE LOUISIANA FIFTH CIRCUIT AFFIRMED.   SO I

16   KNOW THAT IT'S BROADLY DISCRETIONARY AND CIRCUMSTANCES CHANGE

17   SUCH THAT SOMETIMES YOU JUST HAVE TO BE STRICTER ABOUT

18   RELEASING PEOPLE GIVEN -- ESPECIALLY IN SMALL COMMUNITIES.

19        BUT HERE WE HAVE EIGHT JURORS, AND I SELECTED EIGHT

20   BECAUSE I FIGURED WE WERE GOING TO GO FOUR DAYS AND THESE

21   KINDS OF THINGS HAPPEN UNLESS WE STILL HAVE A -- WELL, WE

22   ACTUALLY -- YEAH, WE STILL HAVE SEVEN WITH THIS CHANGE.   AND

23   MY CONCERN, FRANKLY, IS IS THAT IT'S ONE THING TO SEE EACH

24   OTHER IN CHURCH; IT'S ANOTHER THING TO BE IN A SUNDAY SCHOOL

25   CLASS TOGETHER, WHERE PEOPLE CAN AND OFTEN DO SHARE, YOU KNOW,

1   PERSONAL AND MATTERS OF FAITH.  AND I JUST THINK THAT WOULD --

2   DESPITE HIS BEST EFFORTS AND I CERTAINLY BELIEVE HIM WHEN HE

3   SAYS THAT HE DOESN'T THINK HE -- IT WOULD AFFECT HIS ABILITY

4   TO BE FAIR, I JUST DON'T THINK THAT IT'S POSSIBLE, REALLY, TO

5   DIVORCE THAT RELATIONSHIP THAT HE'S GOT.  SO I'M GOING TO

6   EXCUSE MR. BAKER, AND WE'RE GOING TO GO WITH SEVEN JURORS.

7            SO LET'S GO AHEAD AND TAKE CARE OF THAT NOW.  IF YOU

8   WOULD BRING MR. BAKER FORWARD AND WE'LL DO THAT.  AND AS WE'RE

9   DOING THAT, I'M LOOKING AT THE WITNESS LIST FOR THE PLAINTIFF,

10  AND I SEE THREE ADDITIONAL WITNESSES LEFT:  DR. VOSBURG,

11  MS. WALKER, AND MS. HOPE.

12           **MR. LOSPENNATO:**  YOU CAN REDUCE THAT TO ONE.  WE

13  STRUCK THE OTHER TWO.

14           **THE COURT:**  OH, WONDERFUL.  OKAY.  SO WHO IS OUR

15  LAST WITNESS?

16           **MR. LOSPENNATO:**  OUR LAST WITNESS IS STEPHANIE HOPE.

17           **THE COURT:**  OKAY.  WELL, GOOD.  WELL, THEN, THE

18  PLAINTIFFS WILL -- WE'LL FINISH THE PLAINTIFF'S CASE TODAY.

19  DO YOU HAVE SOMEBODY LINED UP, MR. HILBURN, TO GO?

20           **MR. HILBURN:**  NO, YOUR HONOR, I WANTED TO BRING

21  IT -- FEEL OBLIGATED TO BRING IT TO YOUR ATTENTION THAT EARLY

22  IN THE TRIAL YOU SAID YOU MAY HAVE SOME QUESTIONS FOR

23  MR. TUBBS, MR. BRADY OR DR. VOSBURG, AND BEFORE PLAINTIFF

24  RESTS, I WAS -- AND SO THE RECORD DOESN'T GET MESSED UP, I WAS

25  GOING TO SUGGEST, OUTSIDE THE PRESENCE OF THE JURY, THEY

1  ANSWER ANY QUESTIONS YOU MAY HAVE.

2  **THE COURT:**  TERRIFIC, THAT WOULD BE GREAT.

3  **MR. HILBURN:**  SO THEY HAVE MS. HOPE AND THEN YOU CAN

4  MAYBE FINISH UP WITH THESE.

5  **THE COURT:**  I THINK THAT'S AN EXCELLENT SUGGESTION.

6  ALL RIGHT.  LET'S GO.  WELL, WE'RE JUST GOING TO

7  DEAL WITH MR. BAKER FIRST, SO I DON'T THINK WE NEED TO RISE.

8  OKAY.  MR. BAKER, THIS IS KIND OF AN UNUSUAL

9  CIRCUMSTANCE AND, ACTUALLY, BEFORE WE BROUGHT YOU OUT HERE,

10  MS. BURNS HAD BROUGHT IT TO THE ATTENTION OF MR. HILBURN THAT

11  SHE RECOGNIZED YOU, AND SO THIS IS TOTALLY INADVERTENT AND

12  TOTALLY INNOCENT.  NONETHELESS, JUST TO MAKE SURE THAT WE

13  CROSS T'S AND DOT I'S, I'VE GIVEN THE PARTIES AN OPPORTUNITY

14  TO EXPRESS THEIR POSITION ON WHETHER YOU SHOULD REMAIN ON THE

15  JURY, GIVEN THE RELATIONSHIP THAT YOU HAVE WITH THIS IMPORTANT

16  WITNESS.  AND BASED ON MY DISCUSSION WITH THE PARTIES, WE'RE

17  GOING TO RELEASE YOU AS A JUROR.

18  I KNOW YOU'RE PROBABLY DISAPPOINTED BECAUSE YOU'RE

19  KIND OF INVESTED IN THE CASE AT THIS POINT AND INTERESTED IN

20  IT, BUT THAT'S THE WAY THINGS GO SOMETIMES.  SO I APPRECIATE

21  YOU BEING SO FORTHRIGHT, BUT WE ARE GOING TO RELEASE YOU.  AND

22  THANK YOU VERY, VERY MUCH FOR YOUR SERVICE.

23  **JUROR BAKER:**  YOU'RE VERY WELCOME.

24  **THE COURT:**  THANK YOU, SIR.  DO YOU HAVE ANYTHING

25  BACK IN THE JURY ROOM THAT MR. HARRIS CAN GET FOR YOU?

1          **JUROR BAKER:**  I'D LIKE TO REMOVE MY PERSONAL NOTES

2     ON THIS CASE.

3          **THE COURT:**  WHAT I'M -- WHAT WE'RE GOING TO DO IS

4     THIS:  I'M GOING TO ASK MR. HARRIS TO REMOVE AND SECURE YOUR

5     PERSONAL NOTES AND WHAT HAPPENS AFTER THE TRIAL IS THEY'RE

6     DESTROYED.  SO NONE OF THE OTHER JURORS WILL SEE YOUR NOTES

7     AND THEY WILL BE DESTROYED AS SOON AS THE TRIAL IS OVER.

8          **JUROR BAKER:**  THANK YOU, SIR.

9          **THE COURT:**  THANK YOU SO MUCH, MR. BAKER.

10         ALL RIGHT.  MR. HARRIS, IF YOU CAN GO AHEAD AND DO

11    THAT NOW.

12         IS MS. HOPE IN THE -- YEAH, WHY DON'T YOU GO AHEAD

13    AND GET HER SO THAT WHEN WE TAKE CARE OF THIS LAST ITEM, WE

14    CAN GET STARTED WITH MS. HOPE.  AND AS SOON AS YOU PUT THAT

15    ASIDE -- THERE WE GO.  GREAT.  YOU CAN GO AHEAD AND BRING THE

16    JURY BACK, MR. HARRIS.

17         *REPORTER'S NOTE:*  (AT WHICH TIME THE JURY RETURNED

18    TO THE COURT ROOM.)

19         **THE COURT:**  OKAY.  YOU MAY BE SEATED.

20         OKAY, FOLKS, WE'RE GOING TO PROCEED WITH THE TRIAL,

21    BUT I JUST WANTED YOU TO KNOW, YOU'VE PROBABLY NOTICED THAT

22    ONE OF YOUR FELLOW JURORS IS NOT WITH YOU.  SOMETIMES WHAT

23    HAPPENS IS DURING THE COURSE OF A TRIAL, SOME -- AND I'M NOT

24    GOING TO TALK ABOUT THE SPECIFICS OF IT, BUT SOMETHING HAPPENS

25    THAT MAKES IT APPARENT THAT THE JUROR, TOTALLY INNOCENTLY,

1   TOTALLY INADVERTENTLY, HAS SOME CONNECTION WITH SOME OF THE

2   PARTIES OR WITNESSES THAT THEN COMES TO THE ATTENTION OF

3   EVERYONE, AND THAT'S WHAT HAPPENED HERE.  AND SO WHAT WE'RE

4   GOING TO DO, WE'VE EXCUSED MR. BAKER WITH OUR THANKS.  WE'RE

5   GOING TO PROCEED WITH SEVEN JURORS.

6          SO MR. LOSPENNATO, YOU MAY CALL YOUR NEXT WITNESS.

7          **MR. LOSPENNATO:**  THANK YOU, YOUR HONOR.  YOUR HONOR,

8   I'M CALLING STEPHANIE HOPE.

9          **THE COURT:**  ALL RIGHT.  MS. HOPE.  COME FORWARD AND

10  BE SWORN.

11          **(WHEREUPON, STEPHANIE HOPE, HAVING BEEN DULY SWORN,**

12  **TESTIFIED AS FOLLOWS.)**

13  **DIRECT**

14  **BY MR. LOSPENNATO:**

15      **Q**    MA'AM, WOULD YOU STATE YOUR NAME AND YOUR BUSINESS

16  ADDRESS FOR THE RECORD?

17      **A**    STEPHANIE HOPE.  THE ADDRESS IS 8280 YMCA PLAZA

18  DRIVE, BUILDING NUMBER 9 IN BATON ROUGE, LOUISIANA 70810.

19      **Q**    AND YOU -- WHO DO YOU WORK FOR?

20      **A**    I AM THE DIRECTOR OF OPERATIONS FOR PROGRESSIVE

21  HEALTH CARE PROVIDERS.

22      **Q**    AND IN THAT POSITION, WHAT ARE YOUR

23  RESPONSIBILITIES?

24      **A**    I HAVE 30 GROUP HOMES ACROSS THE STATE OF LOUISIANA.

25  I PROVIDE SERVICES TO 212 INDIVIDUALS WITH DEVELOPMENTAL

1    DISABILITIES.   GROUP HOMES HAVE BETWEEN SIX AND EIGHT PEOPLE

2    WHO -- WHO LIVE IN THEM, DEPENDING ON THE SIZE OF THE HOME.

3        Q    AND ARE THOSE THE SAME RESPONSIBILITIES YOU HELD IN

4    2013 AND '14?

5        A    YES.

6        Q    ARE YOU FAMILIAR WITH TRUSSELL GEORGE?

7        A    YES, I AM.

8        Q    AND HOW LONG HAVE YOU KNOWN HIM?

9        A    TRUSSELL WAS ADMITTED TO ONE OF MY GROUP HOMES HERE

10   IN BATON ROUGE IN DECEMBER OF 2008, SO THE ENTIRE TIME

11   TRUSSELL LIVED WITH US AT PROGRESSIVE.

12       Q    AND HOW DO YOU KNOW HIM?   COULD YOU DESCRIBE YOUR

13   INTERACTIONS?   MAYBE HOW DID YOU FIRST MEET MR. GEORGE?

14       A    WHEN INDIVIDUALS ARE ADMITTED TO OUR PROGRAM, THEY

15   COME TO OUR OFFICE FIRST.   THERE ARE A NUMBER OF ASSESSMENTS

16   THAT WE HAVE TO DO WITH THEM.   AND IN THE BEGINNING, I DON'T,

17   WITH MY POSITION, GO OUT AND INTERVIEW PEOPLE FOR PLACEMENT,

18   BUT I SEE EVERY ADMISSION PACKET.   AND I READ HIS PACKET.

19           THE OFFICE FOR CITIZENS WITH DEVELOPMENTAL

20   DISABILITIES SENDS US PACKETS.   THEY APPROVE FOLKS FOR OUR

21   KINDS OF SERVICES.   AND SO WE GOT A CALL ABOUT TRUSSELL AND

22   SENT A GROUP OUT TO INTERVIEW HIM, AND WE DECIDED TO ADMIT

23   HIM.   SO HE WAS IN OUR CONFERENCE ROOM, AND I TYPICALLY GO IN

24   AND INTRODUCE MYSELF TO THE NEW FOLKS.   AND I CAME OUT AND I

25   THOUGHT:   WHY DID WE ADMIT HIM?   TRUSSELL IS KIND OF A BIG

1    GUY, IMPOSING AND A LITTLE LEERY.  BUT THE STAFF PEOPLE WHO

2    HAD INTERVIEWED TRUSSELL SAID, "WELL, JUST SPEND SOME TIME

3    WITH HIM."  SO OVER THE COURSE OF THE NEXT, I GUESS, COUPLE OF

4    YEARS, THAT'S WHAT I DID, SPENT TIME WITH TRUSSELL.

5         **Q**    AND CAN YOU DESCRIBE HIM FROM YOUR PERSPECTIVE

6    DURING THAT PERIOD OF TIME?

7         **A**    IN ORDER FOR AN INDIVIDUAL TO COME TO A FACILITY

8    LIKE OURS, THEY HAVE TO HAVE A DIAGNOSIS OF MENTAL

9    RETARDATION.  TRUSSELL IS MILDLY MENTALLY RETARDED, AND WE

10   SERVE ALL DIFFERENT KINDS OF INDIVIDUALS WITH VARYING DEGREES

11   OF DISABILITY, IF YOU WILL.  SOME ARE NOT COMMUNICATIVE.

12   TRUSSELL WAS ONE OF THE FEW PEOPLE THAT WE'VE PROVIDED

13   SERVICES TO WHO WAS INTERESTED IN GETTING TO KNOW THE PEOPLE

14   WHO WERE WORKING WITH HIM.

15         AND SO -- TRUSSELL WAS A SMOKER.  I'M A SMOKER.  AND

16   SO IN THE BEGINNING, IT WAS, "COME ON, TRUSSELL, LET'S GO HAVE

17   A CIGARETTE."  AND STANDING OUT IN THE PARKING LOT, TALKING TO

18   TRUSSELL, GETTING TO KNOW ABOUT HIM AND HIS LIFE AND -- WAS

19   SURPRISED TO LEARN THAT TRUSSELL HAD CHILDREN AND JUST THOSE

20   TYPES OF THINGS.

21         AT THE TIME, MY HUSBAND WAS SUFFERING FROM A

22   TERMINAL CANCER.  AND SO WORD HAD GOTTEN OUT ABOUT THAT, AND

23   TRUSSELL WOULD -- EVERY TIME HE SAW ME, WOULD ASK ME ABOUT MY

24   HUSBAND AND HOW HE WAS DOING AND THAT THAT PRETTY MUCH SUCKED.

25   AND I WOULD AGREE WITH HIM AND THEN WE WOULD MOVE ON TO THE

1  NEXT TOPIC OF CONVERSATION.

2           SO IT WAS -- IT WAS A REAL -- I DON'T WANT TO SAY IT

3  WAS LIKE A REAL GETTING TO KNOW SOMEBODY, BUT IN MY JOB, I

4  DON'T KNOW EVERY PERSON THAT WE PROVIDE SERVICES TO.  SO IT

5  WAS GOOD TO GET TO KNOW TRUSSELL AND HAVE REAL CONVERSATIONS

6  WITH HIM.

7      Q    OVER THE YEARS, DID YOU HAVE OTHER KINDS OF

8  INTERACTIONS WITH HIM, MORE FORMAL INTERACTIONS, FOR EXAMPLE,

9  LIKE ATTEND MEETINGS OR COURT HEARINGS OR ANYTHING LIKE THAT?

10     A    THE FIRST FORMAL INTERACTION I HAD THERE WAS

11 TRUSSELL WAS ARRESTED IN 2013 AND SPENT SOME TIME IN -- IN

12 JAIL.  I WENT TO COURT TO BASICALLY ASK THE JUDGE IF HE WOULD

13 RELEASE TRUSSELL BACK TO PROGRESSIVE.  AND THAT WAS -- THAT

14 WAS MY FIRST FORMAL.

15     Q    AND BEFORE THAT -- SO HOW FREQUENTLY WOULD YOU SEE

16 MR. GEORGE?

17     A    IT DEPENDED ON WHAT TRUSSELL HAD GOING ON AND, QUITE

18 HONESTLY, WHAT I HAD GOING ON.  I VISIT ALL OF MY GROUP HOMES,

19 NOT AS FREQUENTLY AS I WOULD LIKE, BUT I'M DIRECTLY

20 RESPONSIBLE FOR ALL OF THOSE IN ADDITION TO EVERYTHING ELSE

21 THAT I HAVE TO DO.  SO I WOULD SEE TRUSSELL IN HIS HOME

22 ENVIRONMENT MAYBE EVERY THREE, FOUR MONTHS, SEE TRUSSELL AT

23 THE OFFICE A GOOD BIT.  WHEN A STAFF PERSON WOULD BE COMING BY

24 THE OFFICE TO DO SOMETHING, THEN TRUSSELL WOULD ASK IF HE

25 WOULD COME AND TYPICALLY -- SO SOME MONTHS, I WOULD SEE HIM

1    ONCE A WEEK.  I DON'T THINK A MONTH WENT BY WHEN I DIDN'T SEE

2    TRUSSELL.

3         Q    OVER THE TIME THAT HE WAS WITH YOU, WAS HE IN MORE

4    THAN -- WAS HE IN ONLY ONE GROUP HOME OR WAS HE --

5         A    NO, HE WAS IN THREE.

6         Q    CAN YOU DESCRIBE THE FIRST PLACE HE WAS IN?

7         A    SURE.  THE FIRST GROUP HOME HE WENT TO IS CALLED OUR

8    LAKESIDE GROUP HOME, HOME TO EIGHT MALES WITH HISTORIES VERY

9    SIMILAR TO TRUSSELL.  THE MEN WHO LIVED THERE WERE MILD TO

10   MODERATE -- MODERATELY MENTALLY RETARDED.  MOST OF THEM HAD

11   SOME CRIMINAL ACTIVITY.  SEVERAL OF THEM HAD SOME MENTAL

12   ILLNESS.  SO YOU CAN KIND OF IMAGINE THE CHAOS THAT WOULD

13   SOMETIMES OCCUR WITH THE -- WITH THE FOLKS JUST BECAUSE YOU'VE

14   GOT EIGHT PEOPLE LIVING IN A HOME WITH THOSE TYPES OF

15   PROBLEMS.

16        TRUSSELL SPENT SOME TIME IN PSYCHIATRIC HOSPITALS

17   FROM TIME TO TIME, JUST TO HELP MANAGE THAT MENTAL ILLNESS.

18   AND DURING ONE OF THOSE HOSPITALIZATIONS, TRUSSELL WAS COMING

19   BACK, HE ASKED IF HE COULD GO TO ANOTHER GROUP HOME.  IT'S A

20   -- IT'S CALLED THE D'HEMECOURT GROUP HOME.  THERE'S SIX

21   INDIVIDUALS LIVE THERE.

22        THE FUNCTIONING OF SOME OF THE INDIVIDUALS IN THAT

23   HOME WAS A LOT LOWER THAN TRUSSELL, BUT IT'S A QUIET HOME AND

24   WE KIND OF WONDERED:  WELL, WITH SOME OF THE CHAOS THAT GOES

25   WITH LIVING WITH EIGHT PEOPLE WHO HAVE VERY SIMILAR PROBLEMS,

1    MAYBE THAT MIGHT BE HELPFUL FOR TRUSSELL IF IT WAS A LOT

2    QUIETER ENVIRONMENT.  I BELIEVE HE HAD HIS OWN ROOM AT

3    D'HEMECOURT.  SO HE WOULDN'T BE SHARING A BEDROOM WITH ANOTHER

4    ADULT MALE.  SO HE WENT TO THE D'HEMECOURT AFTER THAT.

5         Q    SO HOW LONG WAS HE IN THE FIRST GROUP HOME, THE

6    LAKE --

7         A    THE LAKESIDE?  I ACTUALLY DON'T RECALL.  I KNOW HE

8    SPENT THE MAJORITY OF HIS TIME AT THE D'HEMECOURT HOME.

9         Q    SO FOR AT LEAST THE FIRST COUPLE OF YEARS, PERHAPS,

10   HE WAS IN THE FIRST GROUP HOME?

11        A    A YEAR OR TWO, MAYBE, AND THEN OVER TO D'HEMECOURT.

12   AND MY DATES COULD BE WRONG.  I HONESTLY --

13        Q    HOW MANY -- YOU MENTIONED THAT THERE COULD BE CHAOS

14   IN THERE, IN THE FIRST GROUP HOME.  WHAT KIND OF PROBLEMS DID

15   THAT CREATE FOR MR. GEORGE?

16        A    TRUSSELL KIND OF LIKED THINGS QUIET.  HE -- VERY

17   CONCERNED WITH HOW HE LOOKED AND WHAT HIS APPEARANCE WAS AND

18   HOW OTHERS MIGHT PERCEIVE HIM BASED ON THE PEOPLE THAT HE WAS

19   WITH AND SO HE KIND OF HAD A POINT.  I THINK IF I WERE AT THE

20   MALL AND SAW A GROUP OF EIGHT MEN, OBVIOUSLY, WITH FOLKS WHO

21   HAD STAFF WITH THEM, THAT I MIGHT BE A LITTLE LEERY OF THAT.

22             AND THEN IF -- IF YOU HAD TWO INDIVIDUALS WHO GOT IN

23   A FIGHT OR WHO WERE ARGUING AND YELLING WITH ONE ANOTHER,

24   WHICH IS GOING TO HAPPEN IN A GROUP HOME SITUATION, THEN IT

25   MADE TRUSSELL VERY UNCOMFORTABLE.  I GET THAT -- I DON'T KNOW

1    WHAT ELSE TO SAY ABOUT --

2        **Q**   SURE.   OKAY.   SO HE REQUESTED -- HE ACTUALLY

3    REQUESTED TO MOVE TO D'HEMECOURT?

4        **A**   YEAH.

5        **Q**   AND, OBVIOUSLY, YOU GRANTED THAT REQUEST?

6        **A**   YEAH.

7        **Q**   IS THAT THE KIND OF THING, YOU KNOW, THAT'S COMMON,

8    THAT YOU'LL -- A PERSON WILL ASK:  I WANT TO GO TO ANOTHER

9    GROUP HOME AND --

10       **A**   WE -- INDIVIDUALS WITH DISABILITIES HAVE THE SAME

11   RIGHTS THAT EVERYBODY ELSE HAS.  I THINK SOMETIMES THAT THAT

12   IS FORGOTTEN ALONG THE WAY.  SO IF SOMEBODY REQUESTS TO LIVE

13   SOMEWHERE ELSE, THEN -- AND IF I HAVE A VACANCY THERE OR IF

14   SOMEBODY IN THAT HOME WANTS TO MOVE TO ANOTHER, WE TRY REALLY,

15   REALLY HARD TO ACCOMMODATE THAT.  IF FOLKS ARE MORE

16   COMFORTABLE IN THEIR LIVING ENVIRONMENT, THEN THEY'RE GOING TO

17   BE MORE SUCCESSFUL WITH OUR PROGRAM.

18       **Q**   I'D LIKE YOU TO BACK UP A SECOND.  COULD YOU

19   DESCRIBE THE PROGRAM?  WHEN YOU SAY "THE PROGRAM," SO WHAT ARE

20   WE TALKING ABOUT?

21       **A**   A TYPICAL GROUP HOME, IT'S GOING TO HAVE, LIKE I

22   SAID EARLIER, SIX TO EIGHT ADULT PEOPLE LIVING IN THERE, AND

23   IT DEPENDS ON THE SIZE OF THE HOME AND HOW MANY BEDROOMS THAT

24   WE HAVE.

25            AN INDIVIDUAL COMES TO US -- WE GET A PACKET FROM

1    THE OFFICE FOR CITIZENS WITH DEVELOPMENTAL DISABILITIES, AND

2    WE'LL GO INTERVIEW THEM.   WE HAVE VERY SPECIFIC -- THEY'RE

3    CALLED PERSON CENTER PLANS THAT WE WRITE FOR EACH OF OUR

4    INDIVIDUALS.   WE'RE ALSO KNOWN AS WHAT'S CALLED AN ACTIVE

5    TREATMENT FACILITY.   SO EVERYBODY WHO COMES TO US, WE IDENTIFY

6    WHAT THEIR SPECIFIC NEEDS ARE AND THEN MEET WITH THEM TO COME

7    UP WITH THINGS THAT THEY WANT TO ACHIEVE OVER THE UPCOMING

8    YEAR.

9        WE WORK WITH PEOPLE WITH MONEY MANAGEMENT SKILLS,

10   HOW TO SET AN ALARM CLOCK, HOW TO RUN A WASHING MACHINE, IF

11   THOSE ARE THE THINGS THAT THEY IDENTIFY THAT THEY WANT TO

12   LEARN OR THAT WE IDENTIFY THAT THERE'S A NEED THERE THAT WILL

13   HOPEFULLY GET THEM OUT OF A GROUP HOME INTO A MORE INDEPENDENT

14   ENVIRONMENT.

15       HONESTLY I HAVE -- I HAVE BEEN INVOLVED IN WORKING

16   WITH FOLKS IN RESIDENTIAL TREATMENT SINCE 1987, AND WHILE

17   THESE ENVIRONMENTS ARE BETTER THAN AN INSTITUTIONAL SETTING,

18   IT'S NOT PERFECT.   YOU GET SIX GROWNUPS WHO DON'T HAVE

19   DISABILITIES IN A HOUSE LIVING WITH EACH OTHER, YOU'RE GOING

20   TO HAVE PROBLEMS.   AND I THINK SOMETIMES JUST OUR ENVIRONMENT

21   ITSELF CAUSES SOME OF THE PROBLEMS THAT WE DEAL WITH.   I MEAN,

22   PEOPLE ARE GOING TO ARGUE.

23       WE HAVE DIETICIANS WHO SET MENUS.   WELL, YOU KNOW

24   WHAT, MAYBE I DON'T WANT SOUP AND SANDWICHES FOR WHATEVER MEAL

25   THIS IS OR I DON'T WANT CEREAL FOR BREAKFAST.   WELL, I GET TO

1    MAKE THAT DECISION AT MY HOUSE, AND THE PEOPLE IN OUR GROUP

2    HOMES MAY ONLY HAVE ONE OR TWO CHOICES TO PICK FROM.  IS IT

3    FAIR, YEAH, I CAN SIT HERE ALL DAY AND SAY NO, IT'S NOT, BUT I

4    DON'T KNOW WHAT THE BETTER ALTERNATIVE IS.  AND SO THAT'S KIND

5    OF THE SITUATION THAT WE OPERATE UNDER.

6         AND THEN YOU CAN THINK ABOUT WHAT IF YOU'RE LIVING

7    IN A HOME AND MY DISABILITIES MAY BE PRETTY MILD, BUT I HAVE

8    SOMEBODY ELSE LIVING IN THIS HOME WHO HAS -- WHO HAS A DUAL

9    DIAGNOSIS, MEANING MAY HAVE MENTAL RETARDATION AND THEN

10   THEY'VE GOT A MENTAL HEALTH DIAGNOSIS, AND HE GETS UPSET AND

11   HE LIKES TO PUNCH A HOLE IN THE WALL.  WELL, THAT'S NOT,

12   QUOTE, UNQUOTE, "NORMAL" FOR MOST PEOPLE.  PEOPLE AT MY HOUSE

13   AREN'T PUNCHING HOLES IN THE WALLS.  BUT IT JUST -- IT CAUSES

14   ISSUES FOR EVERYBODY LIVING IN THE HOME.

15        AND THAT'S JUST THE DAY-TO-DAY.  AND THERE ARE SOME

16   DAYS THAT EVERYTHING IS PERFECT AND NOTHING BAD HAPPENS AND

17   EVERYBODY IS HAPPY, AND THEN THERE ARE DAYS WHEN NOBODY IS

18   HAPPY AND SO IT'S JUST -- WE TRY TO KEEP PEOPLE HAPPY UNDER

19   THE CONSTRAINTS THAT WE HAVE.

20        Q    AND YOU MANAGE 33 OF THESE HOMES?

21        A    YES.  THIRTY, SORRY.  THIRTY.

22        Q    SO THERE'S BEEN A LOT OF DISCUSSION ON MR. GEORGE'S

23   BEHAVIORAL SUPPORT PLAN.  IS THAT SOMETHING THAT IS COMMON IN

24   A GROUP HOME SETTING?

25        A    YES.  ANYBODY -- AND WE'RE LICENSED BY THE

1  DEPARTMENT FOR -- DEPARTMENT OF HEALTH AND HOSPITALS FOR WHAT

2  WE DO.   AND SO THEY -- I HAVE A BIG BOOK OF REQUIREMENTS THAT

3  I HAVE TO FOLLOW IN ORDER TO KEEP MY HOMES LICENSED.   AND

4  ANYBODY WHO IS ON ANY TYPE OF WHAT'S CALLED A "PSYCHOTROPIC

5  MEDICATION" TO HELP MANAGE THEIR MENTAL ILLNESS HAS TO HAVE A

6  BEHAVIOR SUPPORT PLAN.   AND SO OUR FOLKS SEE PSYCHIATRISTS,

7  AND PSYCHOLOGISTS ACTUALLY WRITES THE BEHAVIOR SUPPORT PLAN

8  FOR US TO USE WITH OUR INDIVIDUALS.

9  **Q**   SO LET'S TURN TO TRUSSELL AGAIN AND TALK A LITTLE

10 BIT ABOUT HIS PROGRAM.   SO IN THE FIRST COUPLE OF YEARS, HE

11 WAS IN THE LAKESIDE GROUP HOME.   WHAT DID HIS DAY LOOK LIKE

12 PRETTY MUCH AT THAT POINT?

13 **A**   YOU HAVE SOMEBODY TELLING YOU WHEN TO GET UP.

14 TRUSSELL HAD -- MONDAY THROUGH FRIDAY, WE HAVE DAY PROGRAMS

15 THAT OUR INDIVIDUALS ATTEND.   SOME TEACH VOCATIONAL SKILLS,

16 OTHERS -- DEPENDING ON THE NEED OF THE INDIVIDUALS.   I MEAN,

17 OBVIOUSLY, WE HAVE PEOPLE WHO WILL NEVER BE ABLE TO WORK.   SO

18 HAD HIS DAY PROGRAM.   HE WOULD COME BACK TO THE HOME.   THEY'D

19 HAVE A SNACK.   THEY WOULD -- MEDICATION TIME.   TRUSSELL HAD

20 ACTIVE TREATMENT PROGRAMS THAT HE HAD TO WORK ON AT THE HOME

21 IN THE EVENINGS, WHICH WOULD GUIDE HIM TOWARDS, HOPEFULLY,

22 BEING MORE INDEPENDENT AND HELPING HIM MAINTAIN HIS MENTAL

23 ILLNESS.

24       EAT DINNER, TAKE A SHOWER, WATCH TV, GO TO BED.   I

25 MEAN, IN ALL THIS TIME, YOU'VE GOT, OBVIOUSLY, STAFF THAT I

1    HIRE TO WORK -- TO WORK IN THE HOMES TELLING HIM WHAT HE NEEDS
2    TO BE DOING.

3        Q    DURING THAT TIME, WAS -- HOW FREQUENTLY WAS
4    MR. GEORGE HOSPITALIZED?

5        A    TRUSSELL WOULD GO FROM THREE MONTHS AND THEN MAYBE
6    HAVE SOME HOSPITALIZATION.   SOMETIMES HE MIGHT GO LONGER THAN
7    THAT.   ONE OF TRUSSELL'S DIAGNOSES IS SCHIZOPHRENIA, AND
8    THAT'S A PRETTY SERIOUS MENTAL ILLNESS TO TRY AND HAVE TO
9    MAINTAIN ON TOP OF THE FACT THAT HE'S ALSO MILDLY MENTALLY
10   RETARDED.

11       BUT WE GOT TRUSSELL TO THE POINT WHERE HE TRUSTED US
12   ENOUGH TO SAY, "I'M HEARING THINGS THAT OTHER PEOPLE AREN'T
13   HEARING," OR "I'M SEEING SOMETHING" OR AT THE VERY LEAST, "I
14   THINK IT MIGHT BE TIME FOR ME TO GO TO THE HOSPITAL," WHICH
15   MEANS TO US THAT, YEP, TRUSSELL'S SCHIZOPHRENIA IS KIND OF
16   KICKING IN AND HE MAY NEED A MEDICATION ADJUSTMENT.

17       NOW, IN MY OPINION, AND JUST WORKING WITH THE
18   NUMBERS OF FOLKS THAT WE WORK WITH, NOT ALL OF OUR PEOPLE ARE
19   ABLE TO SAY, "I REALLY NEED SOME HELP RIGHT NOW," AND TRUSSELL
20   WAS ABLE TO DO THAT.   OTHER PEOPLE WOULD JUST ACT OUT
21   BEHAVIORALLY, AND WE WOULD HAVE TO FIGURE OUT IF THERE WAS
22   SOMETHING MEDICAL GOING ON, IF THEY WERE HURTING OR IF IT WAS
23   MENTAL-ILLNESS RELATED, BUT TRUSSELL COULD TELL US.

24       Q    DID THINGS CHANGE AT ALL WHEN HE WENT TO THE
25   D'HEMECOURT GROUP HOME?

1     **A**    NO.   I MEAN, NOT ANYTHING THAT WAS OUT OF THE

2 ORDINARY FROM ANYBODY ELSE.   NO MORE -- NO.   IT WAS THE SAME

3 TRUSSELL.

4     **Q**    RIGHT.   AND SO THE FREQUENCY OF HOSPITALIZATIONS,

5 DID THEY MAINTAIN PRETTY MUCH THE SAME RATE?

6     **A**    NO.   WHEN YOU'RE ABLE TO PROVIDE SERVICES TO AN

7 INDIVIDUAL FOR AN EXTENDED PERIOD OF TIME, YOU CAN -- YOU CAN

8 SEE PATTERNS THAT EMERGE, AND A LOT OF FOLKS THAT WE SERVE

9 WITH PRETTY SERIOUS MENTAL ILLNESS, IT'S REALLY CYCLICAL AND

10 WITH SOME FOLKS, IT MAY BE EVERY SIX MONTHS, WE'VE GOT TO --

11 WE'VE GOT TO GIVE THEM SOME BETTER ASSISTANCE THAN WHAT WE'RE

12 ABLE TO DO IN THE GROUP HOME.

13     TRUSSELL WAS ONE OF THOSE THAT WAS -- IT WAS MORE

14 FREQUENT THAN THAT, SO MAYBE ON A QUARTERLY BASIS, HE WOULD

15 HAVE TO GO IN FOR THE PSYCH HOSPITAL, BUT YOU'VE GOT TO HAVE

16 SOMEBODY IN THERE LONG-TERM ENOUGH TO BE ABLE TO LOOK AT THAT

17 KIND OF DATA IN ORDER TO COME UP WITH THAT.   AND THEN THAT'S

18 ALSO HELPFUL INFORMATION FOR US AS WE'RE TRYING TO PROVIDE

19 SERVICES.

20     **Q**    SO --

21     **A**    QUARTERLY FOR TRUS -- YEAH, HOSPITALIZATIONS, YEAH.

22     **Q**    ABOUT QUARTERLY?

23     **A**    YEAH.

24     **Q**    AND HOW LONG WOULD THOSE HOSPITALIZATIONS LAST?

25     **A**    SOMETIMES ONLY TWO TO THREE DAYS.   OTHER TIMES, IT

1    MAY BE UP TO TEN.  IT REALLY DEPENDED ON WHAT HIS NEED WAS.

2         **Q**    LET ME DRAW YOUR ATTENTION NOW TO 2013.  AT THAT

3    POINT IN TIME, WOULD THE FREQUENCY OF HOSPITALIZATIONS, DID

4    THEY INCREASE OR WERE THEY PRETTY MUCH THE SAME?

5         **A**    BEFORE HE WAS INCARCERATED, IT WAS PRETTY MUCH THE

6    SAME.

7         **Q**    SO LET'S TALK ABOUT THE INCARCERATION.  HOW DID YOU

8    FIND OUT THAT TRUSSELL WAS GOING TO BE INCARCERATED?

9         **A**    I GOT A PHONE CALL FROM ONE OF MY STAFF WHO SAID

10   THAT TRUSSELL WAS GOING TO BE TAKEN TO JAIL AND I WAS LIKE,

11   WHY?  BECAUSE I KNEW HE HADN'T DONE ANYTHING.  WE -- WE HAVE

12   INDIVIDUALS WHO COME FROM THE FORENSICS DEPARTMENT -- AND YOU

13   HAVE TO BREAK THE LAW IN ORDER TO DO THAT.

14             I SAID, "WELL, SO WHAT DID HE DO?"

15             AND HE WAS LIKE, "WELL, I'M NOT REAL SURE."

16             "NO, THAT DOESN'T ADD UP.  I NEED TO KNOW WHAT

17   HAPPENED."

18             "WELL, HE WAS ARGUING WITH STAFF, SO WE CALLED THE

19   PROBATION OFFICER AND THEY WERE -- AND WE WERE TOLD TO BRING

20   HIM IN."

21             I WAS LIKE, "HE WAS ARGUING WITH A STAFF PERSON AND

22   YOU TOLD" -- SO THAT WAS MY INFORMATION AT THE TIME.

23        **Q**    AND AT THAT POINT, WHAT DID YOU DO?  WHAT ROLE DID

24   YOU PLAY IN THAT WHOLE PROCESS?

25        **A**    I CALLED MY STAFF IN AND ASKED THEM HAD THEY LOST

1  THEIR MINDS, THAT -- TALKED TO MY -- TALKED TO THE STAFF ABOUT

2  WHAT THEY HAD DONE, WHY THEY HAD DONE IT AND HOW WAS THAT OUT

3  OF THE ORDINARY FROM ANY OTHER INDIVIDUAL WHO WAS LIVING AT

4  THE D'HEMECOURT HOME WHO MIGHT NOT WANT CHICKEN AND RICE FOR

5  SUPER.  I DON'T KNOW.  SOMETIMES PEOPLE OFFER EXCUSES WHEN

6  THEY DON'T MAKE THE GREATEST DECISIONS.

7      Q    SO WHAT DID THEY TELL YOU IN TERMS OF HIS BEHAVIOR?

8      A    THAT HE WAS ARGUING AND BEING NON -- OUR BIG WORD IS

9  "NONCOMPLIANT."  HE WASN'T FOLLOWING STAFF'S INSTRUCTIONS.

10     Q    AND FROM YOUR PERSPECTIVE, IS THAT A PROBLEM?

11     A    NO, NOT FROM MY PERSPECTIVE.

12     Q    I MEAN, IT'S SOMETHING THAT HAS TO BE ADDRESSED,

13 ISN'T IT?

14     A    WELL, SURE.  AND I HAVE TONS OF BEHAVIOR MANAGEMENT

15 PROGRAMS WHERE YOU DEAL WITH NONCOMPLIANT BEHAVIOR.  CURSING,

16 THINGS THAT I DON'T TYPICALLY SEE AS SIGNIFICANT BEHAVIORAL

17 ISSUES CAN SOMETIMES WHEN YOU'RE -- WHEN YOU'RE A STAFF PERSON

18 IN A HOME AND YOU'RE DEALING WITH FIVE OR SIX PEOPLE WHO ARE

19 ALL BEING NONCOMPLIANT AND CURSING AT THE SAME TIME, IT CAN

20 BECOME A REALLY BIG DEAL.

21     MY RELATIONSHIP WITH TRUSSELL WAS, I THINK, A LOT

22 EASIER THAN THE STAFF'S BECAUSE I WASN'T TELLING TRUSSELL THAT

23 HE NEEDED TO GET UP OR HE NEEDED TO GO TAKE A SHOWER OR HE

24 NEEDED TO CHANGE HIS CLOTHES OR WHATEVER IT WAS THAT WAS ON

25 HIS DAILY SCHEDULE FOR HIM TO DO.  SO IT WAS EASIER FOR ME.

1    **Q**    SO YOU MENTIONED -- WE TALKED A LITTLE BIT ABOUT THE

2    BEHAVIORAL SUPPORT PLAN.  HOW WAS THAT DEVELOPED IN THE FIRST

3    PLACE?

4    **A**    FOR OUR NEW -- FOR OUR NEW INDIVIDUALS, WE TAKE

5    WHAT'S CALLED BASELINE DATA.  AND OBVIOUSLY, WE HAD A HISTORY

6    TO GO ON WITH TRUSSELL.  HE HAD SPENT SOME TIME RECEIVING

7    MENTAL HEALTH -- MENTAL HEALTH TREATMENT.  SO WE -- SPECIFIC

8    BEHAVIORS ARE IDENTIFIED, AND SO WE KEEP TRACK OF HOW OFTEN

9    THOSE SPECIFIC BEHAVIORS OCCUR.  THAT INFORMATION IS THEN

10    GIVEN TO THE PSYCHOLOGIST, WHO TAKES THAT INFORMATION AND A

11    SPECIFIC BEHAVIOR PLAN IS WRITTEN ALONG -- SO IF TRUSSELL DOES

12    X, Y OR Z, THEN THIS IS HOW YOU RESPOND TO HIM.

13    AND THEN IN THE MEANTIME, WHEN TRUSSELL IS NOT DOING

14    X, Y AND Z, THEN HERE'S SOME SPECIFIC INFORMATION AND BEHAVIOR

15    MANAGEMENT STUFF THAT YOU CAN TALK ABOUT, SO HOPEFULLY THE

16    NEXT TIME TRUSSELL GETS FRUSTRATED, HE'S NOT GOING TO CURSE AT

17    YOU.  HE'S GOING TO GO SIT IN HIS ROOM BY HIMSELF AND GET HIS

18    THOUGHTS TOGETHER.  SO THAT'S KIND OF HOW THAT WORKS.

19    **Q**    NOW, IS THAT REVIEWED?

20    **A**    YES, IT IS REVIEWED MONTHLY BY THE QMRP WHO IS

21    ASSIGNED TO TRUSSELL.  IT IS -- AND IF DURING A THREE-MONTH

22    PERIOD, WE SEE WHERE THINGS ARE NOT WORKING, THEN WE GO BACK

23    TO THE PSYCHOLOGIST, THE PLAN IS TWEAKED, BECAUSE YOU'VE GOT

24    TO HAVE A COUPLE OF MONTHS OF TRYING SOMETHING TO SEE IF IT'S

25    GOING TO WORK.  AND THEN ON AN ANNUAL BASIS THEREAFTER,

1    TRUSSELL WOULD RECEIVE A NEW PLAN, WHICH MAY BE COMPLETELY

2    UPDATED OR IT MAY BE VERY SIMILAR TO THE ONE THAT HE HAD.

3         **Q**    SO DID MR. TUBBS KNOW ABOUT TRUSSELL'S BEHAVIOR

4    SUPPORT PLAN?

5         **A**    I WOULD ASSUME SO.

6         **Q**    HOW ABOUT MR. BRADY?

7         **A**    I WOULD ASSUME SO.   THEY HAD ACCESS TO ALL OF OUR

8    RECORDS.

9         **Q**    AND IF THEY HAD REQUESTED THE RECORDS SPECIFICALLY,

10   WOULD YOU GIVE IT TO THEM?

11        **A**    ABSOLUTELY.

12        **Q**    AND IF MR. BRADY OR MR. TUBBS HAD COME TO YOU AND

13   SAID:  WE'RE REALLY CONCERNED ABOUT HIS BEHAVIOR, WHAT WOULD

14   YOU -- WHAT WOULD YOU HAVE DONE?

15        **A**    I DIDN'T SEE TRUSSELL'S BEHAVIOR AS A BIG DEAL.  I

16   HAVE -- I HAD INDIVIDUALS WHO HAD BIG DEAL BEHAVIORS, AND PART

17   OF THIS IS JUST -- THIS IS WHAT WE DO FOR A LIVING.   AND THEY

18   GET -- I JUST -- I THOUGHT SOME OF THE CONCERNS ABOUT BEING

19   NONCOMPLIANT AND WE'RE GOING TO ARGUE WITH STAFF, IT SEEMED

20   LIKE REAL LIFE STUFF TO ME THAT HAPPENS IN ANYBODY'S HOUSE.

21   IT HAPPENS IN MY HOUSE.

22             IT JUST -- IT DID NOT SEEM -- IT DIDN'T SEEM SERIOUS

23   TO ME.   IT WAS JUST -- NOT THAT THEY'RE PICKING ON TRUSSELL,

24   BUT SOMETIMES WHEN YOU'RE SITTING BACK WATCHING THINGS HAPPEN

25   TO SOMEBODY ELSE, THAT'S KIND OF WHERE YOU GO.  WHY IN THE

1  WORLD WOULD YOU INCARCERATE TRUSSELL FOR THIS?

2      **Q**    BUT IN TERMS OF --

3      **A**    I'M SORRY.

4      **Q**    LET'S ASSUME THAT THEY BROUGHT TO YOUR ATTENTION

5  SOMETHING THAT WAS SERIOUS IN TERMS OF BEHAVIOR OR THAT THERE

6  WAS A SIGNIFICANT CHANGE IN MR. GEORGE'S BEHAVIOR, WHAT WOULD

7  YOU DO IN THAT CONTEXT?

8      **A**    IF SOMEBODY SAID THERE'S A SIGNIFICANT CHANGE IN

9  TRUSSELL'S BEHAVIOR, THEN IS IT HIS MENTAL ILLNESS INVOLVED,

10  AND THEN IT WOULD BE A HOSPITALIZATION BECAUSE THAT'S WHAT --

11  THAT'S WHAT WE DID WITH TRUSSELL.  IF SOMETHING WAS OUT OF THE

12  ORDINARY, IT WAS WITH TRUSSELL, THEN IT WAS:  LET'S SIT DOWN

13  AND FIGURE OUT WHAT'S GOING ON WITH HIM.  DOES HE NEED TO GO

14  TO THE PSYCH HOSPITAL?  OR ARE YOU JUST FRUSTRATED BECAUSE

15  YOU'RE IN THE GROUP HOME AND YOU WANT TO BE AT HOME?  AND

16  THAT'S -- THAT'S WHAT WE DO.

17          AND I MAY SEE IT AS A NO-BRAINER, OBVIOUSLY, BECAUSE

18  THAT'S WHAT WE DO EVERY SINGLE DAY, BUT THAT'S WHAT WE DO.

19  WHAT'S CAUSING IT AND THEN HOW DO WE HELP HIM FIX THAT.

20      **Q**    IS THERE A PROCESS FOR THAT KIND OF DISCUSSION; TEAM

21  MEETING, SOMETHING ALONG THOSE LINES?

22      **A**    YEAH, IF -- IF -- WE HAVE A -- OBVIOUSLY, WE HAVE

23  NURSING STAFF THAT WE EMPLOY.  TRUSSELL HAD A NURSE WHO WAS

24  ASSIGNED TO HIM SO THERE WAS -- THEY WEREN'T THREE OR FOUR

25  DIFFERENT NURSES WORKING WITH TRUSSELL.  IT WAS JUST ONE.  HE

1   HAD HIS QMRP, WHO IS KIND OF LIKE A CASE MANAGER WHO WORKED

2   WITH TRUSSELL, HIS DIRECT CARE STAFF, AN ADMINISTRATOR AND DAY

3   PROGRAM.  SO ALL THOSE PEOPLE WOULD GET TOGETHER AND MEET ON

4   BEHALF OF TRUSSELL TO COME UP -- AND WITH TRUSSELL, TOO, HE

5   WOULD BE INVOLVED IN THESE MEETINGS -- TO COME UP WITH A PLAN

6   TO ADDRESS WHATEVER WAS GOING ON.

7       Q    AND THROUGHOUT THIS TIME, SAY, EARLY JULY 2013, DID

8   YOU EVER HEAR FROM -- DIRECTLY FROM EITHER MR. TUBBS OR

9   MR. BRADY REGARDING THEIR CONCERNS ABOUT TRUSSELL AND MAYBE

10  THEIR DESIRE TO BRING HIM INTO COURT OR ARREST HIM?

11      A    NO.

12      Q    WERE YOU EVER COPIED ON ANY CORRESPONDENCE THAT

13  MR. TUBBS OR MR. BRADY HAD REGARDING NOTIFYING THE COURT ABOUT

14  MR. -- MR. GEORGE?

15      A    I RECEIVED A FAX WITH INFORMATION ABOUT WHAT NEEDED

16  TO BE REPORTED TO THEM.  OTHER THAN THAT, I DON'T RECALL ANY

17  OTHER CORRESPONDENCE THAT I GOT FROM THEM.

18      Q    DO YOU RECALL GETTING A LETTER THAT INDICATED THAT

19  THEY INTENDED TO ARREST HIM AND BRING HIM TO THE EAST BATON

20  ROUGE PARISH PRISON?

21      A    NO.

22      Q    SO YOU LEARNED THAT THEY WERE GOING TO ARREST

23  TRUSSELL OR HAD ARRESTED -- WAS IT THAT THEY HAD ARRESTED HIM

24  OR THAT THEY WERE ABOUT TO?

25      A    NO, THAT HE HAD ALREADY BEEN -- HE WAS BEING

1    ARRESTED.

2        **Q**    OKAY.  AND DID YOU SEE TRUSSELL AFTER THAT?

3        **A**    YES.

4        **Q**    AND WHEN DID YOU SEE HIM?

5        **A**    I SAW TRUSSELL IN COURT.

6        **Q**    AND WHEN WAS THAT?

7        **A**    IT WAS THE -- 30 DAYS AFTER HIS ORIGINAL

8    INCARCERATION, I BELIEVE.  IT WAS A COURT HEARING TO TRY AND

9    FIGURE OUT WHAT WAS GOING TO HAPPEN TO TRUSSELL:  WERE THEY

10   GOING TO RELEASE HIM OR WAS HE GOING TO STAY?

11       **Q**    HOW DID TRUSSELL LOOK AT THAT HEARING?

12       **A**    TRUSSELL -- HE LOOKED THIN.  HE LOOKED DISHEVELED.

13   TRUSSELL DIDN'T KNOW WHO I WAS, WHICH WAS VERY -- BECAUSE I

14   WAS EXCITED TO SEE HIM BECAUSE I THOUGHT, WELL, MAYBE WE CAN

15   GET HIM OUT OF HERE AND GET HIM WHERE HE NEEDS TO BE, BUT HE

16   DIDN'T KNOW WHO I WAS.  THERE WAS NO -- WHEN HE LOOKED AT ME

17   AND MADE EYE CONTACT WITH ME, THERE WAS NO RECOGNITION THERE

18   WHATSOEVER, WHICH WAS VERY DISTURBING FOR ME.  HE JUST --

19   TRUSSELL LOOKED BAD, JUST DISHEVELED, JUST ANXIOUS, NOT GOOD.

20       **Q**    WHAT HAPPENED AT THE COURT HEARING?

21       **A**    I TALKED TO THE JUDGE.  I'M NOT SURE WHAT THEY CALL

22   IT, BUT WE WERE ABLE TO COME UP TO WHERE THE JUDGE SITS TO

23   HAVE A CONVERSATION OFF THE -- I GUESS OFF-THE-RECORD, I DON'T

24   KNOW THAT ANY NOTES WERE TAKEN, AND I JUST TOLD HIM I WAS

25   DIRECTOR OF OPERATIONS OF THE GROUP HOME WHERE TRUSSELL LIVED.

1   I BELIEVED THAT TRUSSELL HAD BEEN INCARCERATED BECAUSE MY

2   STAFF WERE INCOMPETENT, THEY HAD CALLED THE PROBATION OFFICER

3   WHEN THERE REALLY WASN'T A NEED TO CALL THE PROBATION OFFICER.

4   THOSE WERE TRUSSELL'S NORMAL BEHAVIORS, AND HE WAS

5   INCARCERATED AND THAT TRUSSELL WAS MENTALLY ILL AND HE NEEDED

6   TREATMENT AND, IN MY OPINION, JAIL WASN'T WHERE HE NEEDED TO

7   BE.

8        Q    AND WAS HE RELEASED THAT DAY?

9        A    THE JUDGE RELEASED HIM THAT DAY.

10       Q    AND WHAT HAPPENED AFTER THAT?

11       A    I INSTRUCTED MY STAFF WHO WERE PICKING TRUSSELL UP

12   AT THE JAIL.   THEY PICKED TRUSSELL UP, TOOK HIM TO GET SOME

13   DINNER AND THEN TOOK HIM TO THE PSYCH HOSPITAL.

14       Q    AND DO YOU RECALL HOW LONG HE WAS THERE AFTER --

15   AFTER THAT?

16       A    I THINK TRUSSELL WAS IN THE HOSPITAL FOR A COUPLE OF

17   WEEKS AFTER THAT.

18       Q    SO HOW DID THINGS GO AFTER HE CAME BACK?   DID HE

19   COME BACK -- HE CAME BACK TO THE GROUP HOME?

20       A    ACTUALLY, HE CAME BACK TO THE GROUP HOME.   HE WAS

21   ACTUALLY ADMITTED AT THE STERN GROUP HOME.   WE KNEW THAT

22   TRUSSELL HAD GONE A WHILE WITHOUT MEDICATIONS WHILE HE WAS

23   INCARCERATED.   I HAD INSTRUCTED MY STAFF BECAUSE WE JUST --

24   EVERYBODY KNEW HOW FRAGILE TRUSSELL WAS -- WHEN HE WAS

25   ARRESTED, TO TAKE HIS MAR, WHICH IS A MEDICATION

1   ADMINISTRATION RECORD THAT WE KEEP SO EVERY DOSE OF MEDICINE

2   THAT'S PRESCRIBED BY THE DOCTOR, MY STAFF GIVE AND THEN SIGN,

3   AND EVEN IF IT'S JUST A TYLENOL FOR A HEADACHE, THAT'S

4   OBVIOUSLY SOMETHING WE DOCUMENT.   TAKE HIS MAR AND TAKE HIS

5   MEDS TO THE JAIL.   WELL, APPARENTLY THE JAIL COULD NOT

6   ACCEPT -- I'M SORRY.

7        **Q**    JUST TO CLARIFY.

8        **A**    I'M SORRY.

9        **Q**    WAS THIS AT THE BEGINNING -- HOW SOON AFTER -- WHEN

10  WAS THAT?

11       **A**    THE DAY THAT TRUSSELL WAS ARRESTED, I SENT STAFF TO

12  THE JAIL WITH THE MEDICATION.   WE KNEW -- BECAUSE I HAD

13  SAID -- I SAID THAT WE KNEW TRUSSELL HADN'T BEEN ON

14  MEDICATION.   WELL, AND HE MAY HAVE BEEN GIVEN MEDICATION IN

15  THE JAIL.   IT WASN'T THE MEDICATION HAD BEEN -- WE HAD

16  PRESCRIBED.   MY STAFF WERE TURNED AROUND.   THEY WOULDN'T

17  ACCEPT IT.   SO I KNEW TRUSSELL NEEDED SOME PSYCH INTERVENTIONS

18  BEFORE HE COULD EVER COME BACK TO THE GROUP HOME.   IT WOULDN'T

19  BE SAFE FOR HIM, IT WOULDN'T BE SAFE FOR THE OTHER GUYS LIVING

20  THERE.

21            SO TRUSSELL -- WE PICKED HIM UP -- OR I DIDN'T.   MY

22  STAFF PICKED HIM UP, TOOK HIM TO BURGER KING TO GET A WHOPPER,

23  BECAUSE THAT'S WHAT HE WANTED, AND THEN TOOK HIM TO THE PSYCH

24  HOSPITAL.   WE HAD KIND OF -- IN HOPES THAT THE JUDGE WOULD

25  RELEASE HIM, WE HAD WORKED TO KIND OF LINE ALL OF THIS UP

1  AHEAD OF TIME.

2      **Q**    SO HOW DID THINGS GO AFTER THAT WHEN HE CAME BACK TO

3  THE GROUP HOME?

4      **A**    I CAN HONESTLY SAY TRUSSELL WAS NEVER THE SAME.  I

5  HAD -- I PERSONALLY TOOK TRUSSELL TO COURT ONE OTHER TIME

6  AFTER THAT.  TRUSSELL WAS HOPING TO BE RELEASED SO HE COULD GO

7  HOME AND LIVE.  THERE WERE TALKS ABOUT BOB AND THE TV, STAFF

8  TRYING TO POISON HIM.  TRUSSELL GOT TO WHERE HE WOULDN'T EVEN

9  ACCEPT A CIGARETTE FROM ME BECAUSE HE WAS AFRAID THAT I HAD

10 PUT SOMETHING IN IT THAT WAS GOING TO HARM HIM.  AND THAT WAS

11 PRETTY MUCH TRUSSELL DAY-TO-DAY AFTER THAT.

12     **Q**    AND WHEN DID MR. GEORGE LEAVE THE GROUP HOME?

13     **A**    FOR GOOD?

14     **Q**    UH-HUH.

15     **A**    I BELIEVE JULY 2014, IF I'M REMEMBERING CORRECTLY.

16     **Q**    WOULD MAY 2014 --

17     **A**    THAT MAY HAVE BEEN.

18     **Q**    IN ANY EVENT, HAVE YOU SEEN TRUSSELL SINCE THEN?

19     **A**    NO.

20     **Q**    QUESTION, IF TRUSSELL WERE RELEASED FROM THE

21 HOSPITAL AND STABILIZED, WOULD YOU TAKE HIM BACK AGAIN?

22     **A**    IF HE WAS THE TRUSSELL PRIOR TO INCARCERATION, THEN,

23 YES, I WOULD, WITHOUT A DOUBT.

24          **MR. LOSPENNATO:**  I HAVE NO OTHER QUESTIONS.

25          **THE COURT:**   CROSS-EXAMINATION?

1              **MR. HILBURN:** YES, YOUR HONOR.

2     **CROSS-EXAMINATION**

3     **BY MR. HILBURN:**

4         **Q**    GOOD AFTERNOON, MS. HOPE.  I'M JAMES HILBURN.  I'M

5     ONE OF THE ATTORNEYS FOR THE DEFENDANTS IN THIS CASE.  DO YOU

6     HAVE A MEDICAL BACKGROUND?

7         **A**    I'VE WORKED IN MENTAL HEALTH FOR -- MEDICAL, NO.

8     SORRY.

9         **Q**    BECAUSE A MOMENT AGO, YOU EXPRESSED AN OPINION, I

10    TAKE IT, ABOUT WHETHER OR NOT MR. GEORGE MAY NEED CERTAIN

11    MEDICAL TREATMENT.  WOULD YOU AGREE THAT THE DOCTORS AND OTHER

12    PEOPLE, MEDICAL PROFESSIONALS THAT HAVE BEEN SEEING HIM AND

13    EVALUATING HIM, WOULD BE IN A BETTER POSITION TO MAKE THAT

14    DECISION THAN YOU?

15        **A**    NO, I WOULD NOT.

16        **Q**    BEFORE YOU TESTIFIED TODAY, DID YOU REVIEW ANY

17    DOCUMENTS?

18        **A**    YES, I DID.

19        **Q**    WHAT DID YOU REVIEW?

20        **A**    I REVIEWED MY BILLING RECORDS.  IT'S IMPOSSIBLE WITH

21    WHAT I DO TO KIND OF RELY ON MY MEMORY FROM SPECIFIC DATES OF

22    WHEN SOMEBODY WENT TO THE HOSPITAL AND THEN BACK TO THE GROUP

23    HOME AND WENT TO THE HOSPITAL, SO I HAVE BILLING DOCUMENTS AT

24    HOME -- AT HOME -- I FEEL LIKE IT'S AT HOME -- BILLING

25    DOCUMENTS AT MY OFFICE THAT SHOW IF TRUSSELL WAS IN THE

1 FACILITY.  AND THEN I HAVE ANOTHER CODE THAT WE USE IF HE WAS

2 HOSPITALIZED AND THEN I HAVE ANOTHER CODE IF HE WAS AT HOME ON

3 A HOME VISIT.  SO I REVIEWED THOSE DOCUMENTS.

4     **Q**    OKAY.  PROGRESSIVE KEEPS OTHER RECORDS OF

5 MR. GEORGE'S VARIOUS STAYS AT THEIR GROUP HOMES; IS THAT TRUE?

6     **A**    UH-HUH.

7     **Q**    YOU NEED TO ANSWER OUT LOUD.

8     **A**    OH, I'M SORRY.  YES, THEY DO.  I APOLOGIZE.

9     **Q**    THANK YOU.  A LOT OF PEOPLE DO THAT.

10     DID YOU HAPPEN TO REVIEW THOSE RECORDS REGARDING

11 MR. GEORGE PRIOR TO YOUR TESTIMONY TODAY?

12     **A**    I REVIEWED HIS PERSON CENTERED PLAN FROM 2008 FROM

13 WHEN HE WAS ADMITTED, WHICH IS OUR ANNUAL PLAN.  I WANTED TO

14 LOOK AT WHAT HIS DIAGNOSES WERE.  I KNEW SCHIZOPHRENIA.  I

15 COULDN'T REMEMBER WHAT DEGREE OF MENTAL RETARDATION HE HAD, SO

16 I LOOKED AT THOSE.

17     **Q**    SO IT'S MY UNDERSTANDING THAT YOU LOOKED AT THE

18 BILLING RECORDS AND YOU LOOKED AT A PLAN FROM BACK IN 2008; IS

19 THAT CORRECT?

20     **A**    YES, YES.

21     **Q**    CAN YOU THINK OF ANY OTHER RECORDS THAT PROGRESSIVE

22 HAS THAT YOU MAY HAVE LOOKED AT BEFORE YOU TESTIFIED TODAY?

23     **A**    I HAVE --

24     **Q**    OR IS THAT IT?

25     **A**    NO, THAT'S ALL THAT I REVIEWED.

1       **Q**    IS IT FAIR TO SAY THAT PROGRESSIVE, UNDER THEIR

2   CONTRACT WITH THE STATE OF LOUISIANA TO TAKE IN MR. GEORGE,

3   HAS AN OBLIGATION TO COMMUNICATE VARIOUS THINGS TO, SAY, THE

4   PROBATION OFFICER AND TO THE DISTRICT FORENSIC COORDINATOR?

5       **A**    YES.

6       **Q**    DO YOU KNOW MR. SCOTT TUBBS?

7       **A**    I HAVE MET HIM TWICE, I THINK.

8       **Q**    DO YOU SEE HIM IN THE COURTROOM TODAY?

9       **A**    YEAH.  AND I'M GOING TO BE -- CAN I BE VERY HONEST

10  AND SAY THAT I KNOW THAT SCOTT TUBBS AND ERIC BRADY WERE

11  INVOLVED WITH TRUSSELL, BUT I GET THE TWO CONFUSED.  I DIDN'T

12  HAVE A LOT OF INTERACTION WITH THEM.

13      **Q**    I WAS GOING TO ASK YOU IF YOU COULD TELL ME, POINT

14  OUT WHICH ONE IS SCOTT TUBBS AND WHICH ONE IS ERIC BRADY.

15      **A**    I THINK SCOTT TUBBS IS THE SECOND PERSON HERE AND

16  ERIC BRADY IS THE THIRD.

17      **Q**    ARE YOU SURE OF THAT?

18      **A**    NOPE.

19      **Q**    IS IT YOUR UNDERSTANDING THAT THE RECORDS THAT

20  PROGRESSIVE MAINTAINS AND, IN PARTICULAR, THE RECORDS FOR

21  MR. TRUSSELL GEORGE, ARE ACCURATE?

22      **A**    I WOULD THINK THAT THEY'RE ACCURATE, YES.

23      **Q**    WOULD YOU HAVE ANY REASON TO DISAGREE WITH ANY

24  RECORDS THAT PROGRESSIVE MAY MAINTAIN WITH RESPECT TO

25  MR. GEORGE?

1          **A**    I DON'T THINK SO.

2          **Q**    WHAT IS QMRP?  FIRST OF ALL, WHAT DOES IT STAND FOR

3     AND WHAT IS THAT?  THAT TERM HAS BEEN USED BEFORE, QMRP.

4          **A**    QMRP STANDS FOR QUALIFIED MENTAL RETARDATION

5     PROFESSIONAL.

6          **Q**    IN MAY, JUNE AND JULY OF 2013, WHERE WAS MR. GEORGE

7     HOUSED?

8          **A**    MAY, JUNE AND JULY OF '13?

9          **Q**    YES, MA'AM.

10         **A**    I THINK THAT WAS THE PERIOD OF TIME WHEN HE WAS IN

11    JAIL.  I DON'T KNOW.

12         **Q**    DON'T KNOW.  WHO WAS HIS QMRP DURING THAT TIME

13    PERIOD?

14         **A**    TASHONDA VONS -- TASHONDA VONS (SIC.)

15         **Q**    AND DOES MS. VONS STILL WORK FOR PROGRESSIVE?

16         **A**    NO.

17         **Q**    AND HOW LONG HAS SHE BEEN GONE FROM PROGRESSIVE?

18         **A**    I COULDN'T GIVE YOU AN EXACT DATE.

19         **Q**    DO YOU KNOW WHAT COMMUNICATIONS MS. VONS HAD WITH

20    EITHER MR. BRADY OR MR. TUBBS BACK IN MAY, JUNE, JULY OF 2013?

21         **A**    NOPE.

22         **Q**    IN MAY, JUNE, JULY OF 2013, WHAT ISSUES WAS

23    MR. GEORGE HAVING, SAY, WITH THE PROGRESSIVE STAFF, DO YOU

24    KNOW?

25         **A**    I KNOW THERE WERE ARGUMENTS FROM TIME TO TIME, THERE

1    WERE SOME NON-COMPLIANCE ISSUES WITH TRUSSELL AS FAR AS NOT

2    WANTING TO FOLLOW STAFF INSTRUCTIONS, THAT TYPE OF THING.

3         **Q**    I UNDERSTAND.   THAT'S VERY BROAD AND THAT SEEMS TO

4    BE VERY COMMON, BUT DURING THIS TIME FRAME THAT WE'RE

5    CONCERNED WITH, WHAT DO YOU RECALL SPECIFICALLY ABOUT THE

6    PROBLEMS HE WAS HAVING WITH THE STAFF?

7         **A**    I DON'T RECALL TRUSSELL HAVING MAJOR PROBLEMS WITH

8    THE STAFF.

9         **Q**    FORGET MAJOR PROBLEMS.

10        **A**    OKAY.

11        **Q**    DO YOU KNOW OF ANY PROBLEMS THAT HE WAS HAVING WITH

12   THE STAFF DURING THE TIME PERIOD OF MAY, JUNE, JULY 2013?

13        **A**    NO.

14        **Q**    BUT YOU HAVE RECORDS THAT ARE AVAILABLE TO YOU THAT

15   YOU COULD HAVE READ BEFORE YOUR TESTIMONY TODAY TO DISCUSS

16   WITH THE JURY THE PROBLEMS THAT MR. GEORGE WAS HAVING WITH THE

17   STAFF; IS THAT RIGHT?

18        **A**    I SUPPOSE I COULD HAVE.

19        **Q**    DO YOU RECALL THE PROGRESSIVE RECORDS INDICATE THAT

20   IN THIS TIME PERIOD OF 2013, THAT MR. GEORGE GOT INTO AN

21   ARGUMENT WITH ONE OF HIS HOUSEMATES AT THE GROUP HOME WHICH HE

22   WAS ASSIGNED?

23        **A**    NO.

24        **Q**    DO YOU KNOW IF THE PROGRESSIVE RECORDS SHOW THAT

25   MR. GEORGE GOT INTO AN ALTERCATION WITH THAT MAN AND ACTUALLY

1    PUNCHED HIM, HIT HIM?

2         **A**    THE -- I DO REMEMBER THE CASE THAT YOU'RE SPEAKING

3    ABOUT.  IF IT'S THE ONE THAT -- IF IT IS THE ONE THAT HAS COME

4    TO MY MIND, THERE WAS AN ALLEGATION THAT TRUSSELL DID HIT AN

5    INDIVIDUAL THAT LIVED IN THE GROUP HOME WITH HIM AND ACTUALLY

6    KNOCKED HIM DOWN.  THE INDIVIDUAL THEN LATER SAID THAT THAT

7    DIDN'T HAPPEN.  AND I DON'T KNOW IF THAT'S THE SAME INCIDENT.

8    THAT'S THE INCIDENT THAT COMES TO MY MIND.  THEY'RE JUST --

9    THERE WEREN'T A LOT OF INCIDENTS THAT INVOLVED TRUSSELL.

10        **Q**    ARE YOU AWARE IF THAT MAN THAT WAS STRUCK HAD TO GO

11   TO THE HOSPITAL AT THAT TIME?

12        **A**    IF HE HIT THE FLOOR, HE MAY HAVE GONE TO THE

13   HOSPITAL.

14        **Q**    IS PROGRESSIVE PAID BY THE STATE OF LOUISIANA WHILE

15   MR. TRUSSELL GEORGE IS BEING HOUSED AT ONE OF ITS FACILITIES?

16        **A**    WE ARE PAID BY MEDICAID.

17        **Q**    AND THAT'S BASICALLY THE STATE OF LOUISIANA, RIGHT?

18        **A**    AND SOME FEDERAL MONIES, YES.

19        **Q**    IF MR. GEORGE IS REMOVED FROM A PROGRESSIVE

20   FACILITY, DOES PROGRESSIVE CONTINUE TO BE PAID AFTER HE'S

21   REMOVED --

22        **A**    NO.

23        **Q**    -- BY THE STATE OF LOUISIANA?

24        **A**    NO.

25        **Q**    I'D LIKE TO SHOW YOU -- THIS IS PLAINTIFF'S EXHIBIT

1   NUMBER 10.   MS. HOPE, DO YOU SEE AT THE BOTTOM, IT INDICATES

2   PLAINTIFF'S EXHIBIT -- OR EXHIBIT NUMBER 10?

3       **A**   YES, SIR.

4       **Q**   LET ME SHOW YOU.   I'M GOING TO SLIDE IT DOWN SO THE

5   RECORD IS CLEAR.   I'M GOING TO ZOOM IN A LITTLE BIT.   CAN YOU

6   TELL -- CAN YOU READ INTO THE RECORD THE DATE OF THIS LETTER?

7       **A**   JULY 29TH, 2013.

8       **Q**   AND WHO IS THE LETTER ADDRESSED TO?

9       **A**   PROGRESSIVE.

10      **Q**   AND WHO IS IT FROM?

11      **A**   SCOTT TUBBS.

12      **Q**   AND WHO IS IT REFERRING TO?

13      **A**   TRUSSELL.

14      **Q**   AND FOR THE CONVENIENCE OF ANYBODY THAT MAY HAVE TO

15  READ THIS RECORD, COULD YOU READ THAT SHORT PARAGRAPH THAT

16  APPEARS TO BE AUTHORED BY MR. SCOTT TUBBS?

17      **A**   YOU'RE GOING TO HAVE TO MOVE THE LETTER OVER TO THE

18  RIGHT JUST A LITTLE BIT BECAUSE PART OF IT'S CUT OFF.

19      **Q**   I'M SORRY.

20      **A**   "THIS LETTER IS TO INFORM YOUR --"

21      **Q**   LET ME SEE IF I CAN GET IT FOR YOU A LITTLE

22  BETTER --

23      **A**   "THIS LETTER IS TO INFORM YOUR OFFICE THAT THE

24  SUBJECT TRUSSELL GEORGE, WILL BE ARRESTED BY OUR OFFICE TODAY.

25  HE HAS BROKEN HIS CONDITIONS OF PROBATION FOR THE THIRD TIME

1    BY BEING AGGRESSIVE WITH STAFF.  HE WILL BE ARRESTED AND

2    DETAINED IN THE EAST BATON ROUGE PARISH PRISON.  IF YOU HAVE

3    ANY QUESTIONS, PLEASE CALL ME AT 225" -- THAT LOOKS LIKE

4    "281-5143.  SCOTT TUBBS."

5        Q    IF PROGRESSIVE DOES MAINTAIN ACCURATE RECORDS AND

6    COMPLETE RECORDS, THIS LETTER SHOULD BE IN PROGRESSIVE'S FILE,

7    RIGHT?

8        A    YES, IT SHOULD.  I WAS LOOKING FOR A FAX NUMBER ON

9    THE -- JUST TO MAKE SURE IT CAME TO THE RIGHT FAX.  FROM,

10   TO -- IT SAYS TO 504 -- (504)522-5507.  OH, OKAY, I'M SORRY.

11   763-68 -- THAT'S NOT OUR FAX NUMBER.

12       Q    THOSE ARE SOME FAXES BACK AND FORTH.

13       A    OH, OKAY.

14       Q    BUT LET ME ASK YOU THIS --

15       A    BUT IF THAT'S NOT MY FAX -- I'M SORRY.

16       Q    THANK YOU, MS. HOPE.  DO YOU HAVE ANY REASON TO

17   DOUBT THAT MR. TUBBS HAND DELIVERED THIS LETTER HERE TO THE

18   PROGRESSIVE STAFF WHEN THEY BROUGHT MR. GEORGE TO HIS OFFICE

19   THAT DATE --

20       A    I'M --

21       Q    -- AND AT A REQUEST OF THE PROGRESSIVE STAFF?

22       A    I'M NOT AWARE OF THAT.

23       Q    BUT DO YOU HAVE ANY REASON TO DENY OR DISPUTE THAT

24   THAT IS HOW THIS LETTER WAS TRANSMITTED TO PROGRESSIVE?

25       A    NO, I DON'T HAVE ANY REASON TO DENY THAT.

1      **MR. HILBURN:** THANK YOU, MS. HOPE. THAT'S ALL I

2   HAVE.

3      **THE COURT:** REDIRECT?

4   **REDIRECT**

5   **BY MR. LOSPENNATO:**

6      **Q** THE INCIDENT THAT WAS REFERRED TO BY COUNSEL, DO YOU

7   REMEMBER WHEN THAT OCCURRED?

8      **A** I'M SORRY, THERE WERE A COUPLE OF INCIDENTS THAT HE

9   TALKED ABOUT.

10     **Q** I'M SORRY. THE INCIDENT ABOUT WHERE THE -- WHERE

11  ANOTHER RESIDENT WAS BROUGHT TO THE HOSPITAL BECAUSE HE HAD

12  FALLEN.

13     **A** THAT INCIDENT WAS -- IF I'M REMEMBERING CORRECTLY,

14  THAT INCIDENT OCCURRED AFTER TRUSSELL HAD BEEN INCARCERATED,

15  WENT TO THE PSYCH HOSPITAL AND THEN CAME BACK TO PROGRESSIVE.

16     **Q** SO IT HAPPENED PROBABLY IN 2014?

17     **A** YEAH, IT'S NOT PRIOR -- YEAH, 2014.

18     **Q** AND YOU LEARNED OF THAT INCIDENT, DID YOU NOT?

19     **A** UH-HUH.

20     **Q** AND DID YOU INVESTIGATE IT?

21     **A** YES, I DID.

22     **Q** AND WHAT DETERMINATION DID YOU MAKE AFTER

23  INVESTIGATING IT?

24     **A** WE COULDN'T VALIDATE -- THE INDIVIDUAL WHO

25  ORIGINALLY SAID TRUSSELL PUSHED HIM DOWN, CAME BACK AND SAID

1   TRUSSELL DID NOT PUSH HIM DOWN.   TRUSSELL ADAMANTLY CLAIMED

2   THE ENTIRE TIME THAT THE INDIVIDUAL TRIPPED AND FELL, WHICH

3   ALSO HAPPENS.

4       **Q**   NOW, I KNOW THAT TRUSSELL HAS A MENTAL ILLNESS AND

5   SOMETIMES MAYBE HE'S DELUSIONAL, BUT IS HE CREDIBLE?   IS HE

6   HONEST?

7       **A**   YEAH, I --

8           **MR. HILBURN:**   OBJECTION, YOUR HONOR.   THAT'S A 404B

9   QUESTION.

10           **THE COURT:**   I'M NOT SURE I UNDERSTAND THE OBJECTION.

11           **MR. HILBURN:**   CHARACTER EVIDENCE, YOUR HONOR.

12           **THE COURT:**   I'M GOING TO OVERRULE THE OBJECTION.

13   YOU CAN ANSWER.

14           **THE WITNESS:**   WHEN YOU'RE RUNNING GROUP HOMES,

15   UNFORTUNATELY, SOMETIMES YOU HIRE PEOPLE WHO DON'T ALWAYS DO

16   WHAT THEY'RE SUPPOSED TO DO.   THERE WERE TIMES WHEN I WOULD

17   TALK TO TRUSSELL TO KIND OF FIND OUT WHAT'S GOING ON IN THE

18   GROUP HOME TO SEE IF STAFF WERE DOING WHAT THEY WERE SUPPOSED

19   TO DO.   I FOUND TRUSSELL TO BE CREDIBLE.

20           AND SPENDING TIME WITH TRUSSELL, YOU KIND OF -- YOU

21   KNEW WHEN HIS MENTAL ILLNESS WAS CREEPING IN AND SOME OF THE

22   HALLUCINATIONS.   BUT THERE WAS ALSO -- TRUSSELL DIDN'T LIE

23   ABOUT THINGS, WHICH IS VERY UNCOMMON IN MY FIELD.   PEOPLE --

24   THE INDIVIDUALS THAT WE PROVIDE SERVICES TO LIE A LOT ABOUT A

25   LOT OF DIFFERENT THINGS WHEN IT DOESN'T EVEN MAKE SENSE TO LIE

1   ABOUT IT.  BUT BEING SERIOUS WITH TRUSSELL, TRUSSELL WOULD

2   TELL YOU THE TRUTH.  AND EVEN IF THE TRUTH WASN'T EXACTLY WHAT

3   YOU WANTED TO HEAR, HE WOULD BE HONEST WITH US.

4   **BY MR. LOSPENNATO:**

5       **Q**    NOW, DRAWING YOUR ATTENTION TO THE LETTER THAT

6   WAS -- THAT YOU WERE SHOWN, IT POINTS OUT THAT THE REASON FOR

7   ARRESTING HIM WAS THAT HE WAS BEING AGGRESSIVE WITH STAFF FOR

8   THE THIRD TIME.  WHAT WOULD THAT INFORMATION MEAN TO YOU, THAT

9   TRUSSELL WAS AGGRESSIVE WITH STAFF FOR THE THIRD TIME?

10      **A**    THAT WOULDN'T MEAN VERY MUCH TO ME.  THERE ARE LOTS

11  OF DIFFERENT TYPES OF AGGRESSION.  I DIDN'T RECALL TRUSSELL

12  BEING PHYSICALLY AGGRESSIVE WITH STAFF.  HE MAY HAVE BEEN

13  VERBALLY AGGRESSIVE WITH STAFF, WHICH WOULD HAVE INVOLVED

14  RAISING HIS VOICE, YELLING, MAYBE SOME -- CURSING.  THAT'S --

15  THAT'S WHAT THAT WOULD MEAN TO ME.

16      **Q**    AND YOU RECALL IT TALKED ABOUT A BEHAVIORAL

17  MANAGEMENT PLAN FOR TRUSSELL.  DO YOU RECALL WHETHER THAT KIND

18  OF BEHAVIOR WAS ADDRESSED IN THE PLAN?

19      **A**    YES.

20      **Q**    SO FOR A PLAN TO ADDRESS THAT KIND OF BEHAVIOR, I

21  ASSUME THAT IT WOULD BE SOMETHING THAT'S EXHIBITED ON A

22  REGULAR BASIS, OTHERWISE, WHY PUT IT IN A PLAN; ISN'T THAT

23  RIGHT?

24      **A**    IT WOULD BE SOMETHING -- THAT WOULD BE SOMETHING

25  THAT TRUSSELL EXHIBITED ON A REGULAR BASIS, YES.

1            **MR. LOSPENNATO:**  I HAVE NO OTHER QUESTIONS.

2            **THE COURT:**  THANK YOU, MA'AM.  YOU MAY STAND DOWN.

3            ANY ADDITIONAL WITNESSES FOR THE PLAINTIFF?

4            **MR. LOSPENNATO:**  NO, YOUR HONOR.  WE CLOSE OUR CASE

5 WITH THE RIGHT OF, OBVIOUSLY, RECALLING PEOPLE FOR REBUTTAL

6 AFTER THE DEFENDANT'S CASE.

7            **THE COURT:**  ALL RIGHT, THANK YOU.  THEN PLAINTIFF

8 RESTS.  AND WITH THAT, LADIES AND GENTLEMEN, WE WOULD NORMALLY

9 BEGIN THE DEFENDANT'S CASE, BUT IT'S A LITTLE BIT AFTER 4:00

10 THIS AFTERNOON, AND I'LL GIVE YOU A REPRIEVE OF SORTS AND ASK

11 YOU TO PLEASE BE BACK HERE AT 9:00 A.M. SHARP.

12            ALL RISE FOR THE JURY.

13            *REPORTER'S NOTE:  (AT WHICH TIME THE JURY EXITED THE*

14 *COURT ROOM.)*

15            **THE COURT:**  ALL RIGHT.  YOU MAY BE SEATED.

16            AT THIS POINT, MR. HILBURN, I'LL TAKE YOU UP ON YOUR

17 GOOD SUGGESTION AND LET MR. TUBBS COME FORWARD AND JUST ANSWER

18 A FEW QUESTIONS THAT I HAVE.  AND ONCE I GET DONE --

19            MR. TUBBS COME AROUND AND JUST BE IN THE WITNESS

20 STAND, AND I'LL JUST REMIND YOU YOU'RE STILL UNDER OATH.  AND

21 THEN I'LL DO THE SAME FOR MR. BRADY.  AFTER I'M FINISHED WITH

22 MY QUESTIONS, WHICH WON'T BE MANY, I'LL GIVE BOTH SIDES AN

23 OPPORTUNITY TO FOLLOW UP FOR THE RECORD WITH ANY QUESTIONS

24 THAT THEY HAVE.

25 **EXAMINATION**

1  BY THE COURT:

2      **Q**    OKAY.  MR. TUBBS, I WAS LISTENING TO YOUR TESTIMONY

3  AND SEVERAL THINGS OCCURRED TO ME THAT I KIND OF WANTED TO GET

4  CLEAR.  SO YOU HAVE A SITUATION LIKE THE ONE THAT EXISTED IN,

5  I THINK, JUNE OF 2013, WHERE YOU HAVE AN INDIVIDUAL, HE HAS

6  BEEN FOUND NOT GUILTY BY REASON OF INSANITY.  HE IS UNDER

7  CONDITIONAL RELEASE.  YOU'RE AWARE -- YOU ARE AWARE OF THE

8  CONDITIONS, CORRECT?

9      **A**    CORRECT.

10     **Q**    AND THEN IT'S BROUGHT TO YOUR ATTENTION THAT HE HAS

11 DONE THE THINGS THAT LED YOU ULTIMATELY TO HAVE HIM ARRESTED.

12 NOW, WHAT I'M TRYING TO FIGURE OUT IS WHAT WERE YOUR OPTIONS

13 AT THAT POINT?  WHAT DIFFERENT THINGS COULD YOU HAVE DONE

14 BESIDES ARREST HIM, IF ANYTHING?

15     **A**    JACKSON HOSPITAL.

16     **Q**    I'M SORRY?

17     **A**    PUT HIM IN JACKSON HOSPITAL.

18     **Q**    NOW I HEARD SOME OF THE QUESTIONS THAT THE

19 PLAINTIFF'S LAWYER ASKED ABOUT PUTTING HIM INTO OTHER

20 HOSPITALS AND I HEARD TESTIMONY THAT HE WAS PUT, FROM TIME TO

21 TIME, IN OTHER HOSPITALS.  WAS THAT AN OPTION FOR YOU?

22     **A**    AT THAT TIME WHEN HE'S THREATENING VIOLENCE TOWARDS

23 STAFF, NO.  JACKSON HOSPITAL WOULD BE -- IN MY OPINION, WOULD

24 BE THE ONLY PLACE THAT COULD HANDLE HIM AT THAT POINT.

25     **Q**    ALL RIGHT.  IF HIS -- WHAT CIRCUMSTANCES WOULD THERE

1  BE WHERE YOU WOULD SAY HE NEEDS TO BE REMOVED FROM THE GROUP

2  HOME, BUT I FIND IT APPROPRIATE TO GET HIM SENT TO A HOSPITAL

3  OTHER THAN ELMHS?

4  **A**    IF ERIC AND I DISCUSSED WHAT HIS PROBLEM WAS AND

5  USUALLY IF WE WERE GOING TO PULL HIM OUT OF THAT GROUP HOME

6  AND PUT HIM IN A HOSPITAL-TYPE SETTING OR WHERE HE COULD JUST

7  RECEIVE MENTAL HEALTH TREATMENT, IT WOULD HAVE TO BE STRICTLY

8  A MENTAL HEALTH DECOMPENSATION.

9  **Q**    WHAT DOES THAT MEAN?

10  **A**    WHERE HE WOULD DECOMPENSATE.  HIS MENTAL HEALTH

11  PROBLEMS WOULD -- YOU KNOW, HE WOULD HEAR VOICES, HE WOULD

12  JUST GET SICK MENTALLY.  IT WOULDN'T BE AN AGGRESSIVE -- IF HE

13  WAS BEING AGGRESSIVE, THEN I WOULD NOT CONSIDER HIM TO BE

14  PLACED IN A OUR LADY OF THE LAKE HOSPITAL OR SOMETHING LIKE

15  THAT.  IT WOULD BE A PLACE LIKE JACKSON HOSPITAL THAT COULD

16  DEAL WITH HIS AGGRESSION.

17  **Q**    ALL RIGHT.  NOW, WHAT ABOUT, I HEARD THE QUESTION

18  ASKED ABOUT PINEVILLE.  ARE THERE OTHER STATE INSTITUTIONS

19  COMPARABLE TO ELMHS THAT COULD HANDLE SOMEBODY THAT WAS

20  AGGRESSIVE AND HAD THESE ISSUES?

21  **A**    I ONLY HAVE KNOWLEDGE OF THE JACKSON HOSPITAL

22  BECAUSE I DEAL WITH THEM ON A FAIRLY REGULAR BASIS.  THE OTHER

23  STATE HOSPITALS THAT ARE OUT OF EAST BATON ROUGE PARISH AND

24  THE SURROUNDING AREA, I DON'T KNOW WHAT THEY'RE -- I DON'T

25  KNOW ABOUT THEM.

1      **Q**    ALL RIGHT.  IN TERMS OF PLACING SOMEBODY LIKE

2  MR. GEORGE IN A PLACE LIKE OUR LADY OF THE LAKE, WHAT OTHER

3  HOSPITALS HAVE YOU PLACED SIMILAR FOLKS IN WHEN THEY DID

4  NOT -- WHEN THEY WERE NOT ACTING AGGRESSIVE, BUT YOU FELT THEY

5  NEEDED TO BE IN A HOSPITAL SETTING FOR -- THE TERM YOU USED

6  WAS "DECOMPENSATION"?

7      **A**    GREENWELL SPRINGS WAS ONE OF THE MAIN ONES THAT WE

8  WOULD USE, BUT IT'S NOT AVAILABLE ANYMORE.

9      **Q**    WHAT HAPPENED TO GREENWELL SPRINGS?

10      **A**    THEY CLOSED.

11      **Q**    WHEN DID THEY CLOSE?  WERE THEY AROUND IN '13 AND

12  '14?

13      **A**    NO.

14      **Q**    OKAY.  WHAT OTHERS BESIDES GREENWELL SPRINGS THAT

15  WOULD BE IN A POSITION TO HANDLE IN WHICH YOU HAVE PLACED

16  OTHER FOLKS LIKE THIS?

17      **A**    WE WOULD BRING THEM TO AN EMERGENCY ROOM AT ANY

18  HOSPITAL, USUALLY OUR LADY OF THE LAKE, AND THEN THEY WOULD

19  GET SENT TO THE PSYCH WARD ON A PHYSICIAN'S EMERGENCY

20  CERTIFICATE.

21      **Q**    THEN WITH RESPECT TO YOUR DECISION AND THAT OF

22  MR. BRADY THAT HIS AGGRESSIVE BEHAVIOR WARRANTED ARREST -- LET

23  ME ASK YOU THIS, THERE WERE NO BEDS, IS THAT WHY HE DID NOT GO

24  TO ELMHS?

25      **A**    THAT'S CORRECT.

1     **Q**   SO BY YOUR WAY OF THINKING, THERE WERE TWO CHOICES:

2  FIRST ELMHS, IF THERE WAS A BED AVAILABLE, BUT IF NOT, YOUR

3  ONLY OTHER CHOICE, THE WAY YOU SAW IT, WAS THE PARISH PRISON?

4     **A**   CORRECT.  UNTIL WE COULD GO IN FRONT OF THE JUDGE

5  AND THE JUDGE COULD MAKE A DECISION ON WHAT TO DO WITH HIM.

6     **Q**   ALL RIGHT.  SO OKAY, SO LET'S FAST FORWARD TO THEN

7  TO '14, WAS IT THE SAME SITUATION THEN?

8     **A**   I HAD NO -- I WASN'T INVOLVED IN THAT SITUATION.

9     **Q**   YOU WERE NOT INVOLVED IN '14.  OKAY.

10     **THE COURT:**  ALL RIGHT.  WOULD YOU PLAINTIFFS LIKE TO

11  FOLLOW UP WITH ANY QUESTIONS BASED ON MY QUESTIONS?  I DON'T

12  WANT YOU TO START OVER, BUT ANYTHING BASED ON MY QUESTIONS

13  THAT YOU WOULD LIKE TO FOLLOW UP ON?

14     **MR. LOSPENNATO:**  LET ME JUST ASK ONE QUESTION.

15  **EXAMINATION**

16  **BY MR. LOSPENNATO:**

17     **Q**   MR. TUBBS, DO YOU KNOW WHAT A PEC IS?

18     **A**   PHYSICIANS EMERGENCY CERTIFICATE.

19     **Q**   OKAY.  WHAT IS THE CRITERIA FOR ADMITTING SOMEBODY

20  ON A PEC?

21     **A**   IF THEY'RE A DANGER TO THEMSELVES OR OTHERS.

22     **MR. LOSPENNATO:**  THANK YOU.  I HAVE NO OTHER

23  QUESTIONS.

24     **THE COURT:**  ALL RIGHT.  MR. HILBURN, WOULD YOU LIKE

25  TO -- OR MR. CODY, WOULD YOU LIKE TO FOLLOW UP?

1  EXAMINATION

2  BY MR. CODY:

3      Q    MR. TUBBS, THE JUDGE ASKED YOU A MINUTE AGO ABOUT

4  PINEVILLE.  I KNOW YOU SAID YOU'VE NEVER TAKEN ANYBODY TO

5  PINEVILLE; IS THAT CORRECT?

6      A    CORRECT.

7      Q    BUT THE HOSPITAL IN PINEVILLE, TO YOUR KNOWLEDGE, IS

8  IT GENERALLY A CIVIL INTERMEDIATE HOSPITAL?

9      A    I REALLY DON'T KNOW.

10     Q    BUT YOU'VE NEVER HAD AN OCCASION OF HEARING OF

11 SOMEBODY -- OF A PROBATION OFFICER TAKING AN NGRI PERSON TO

12 PINEVILLE, I SUPPOSE?

13     A    NO.

14     Q    AND A MOMENT AGO, MR. LOSPENNATO ASKED YOU ABOUT A

15 PEC.  WHAT -- AND YOUR APPRECIATION OF THAT, I MEAN, A DOCTOR

16 WOULD HAVE TO -- OR DO YOU KNOW WHAT IT WOULD TAKE TO GET A

17 PEC?

18     A    YEAH, YOU -- A DOCTOR DOES THEIR EVALUATION.

19     Q    AND AT THE TIME IN 2013, THE ARREST YOU WERE

20 INVOLVED IN, I MEAN, TIME WAS OF THE ESSENCE, I SUPPOSE?

21     A    SURE.

22     Q    AND FIRST AND FOREMOST, DID YOU WANT TO GET THE

23 COURT INVOLVED?

24     A    YES.

25     Q    WHEN YOU PLACED HIM IN JAIL IN 2013, DID YOU HAVE

1  ANY CONTROL OVER WHEN HE WOULD GO BEFORE THE JUDGE?

2      **A**    NO.

3          **MR. CODY:**   THAT'S ALL I HAVE.   THANK YOU, JUDGE.

4          **THE COURT:**   THANK YOU, MR. TUBBS.   WE COULD GO ON

5  ALL AFTERNOON, I WOULD EXPECT.   THANK YOU, SIR.

6          MR. BRADY, IF YOU COULD COME FORWARD.   AND AGAIN,

7  I'LL REMIND YOU THAT YOU ARE STILL UNDER OATH.

8          **THE WITNESS:**   YES.

9  EXAMINATION

10  BY THE COURT:

11     **Q**    OKAY.   I DON'T WANT TO BEAT THE HORSE UNTIL IT'S

12  BLOODY, SO I'M GOING TO ASK YOU THIS WAY.   YOU HEARD THE

13  QUESTIONS THAT I ASKED MR. TUBBS?

14     **A**    YES.

15     **Q**    DID YOU AGREE WITH HIS ANSWERS OR YOU WANT TO AMEND

16  OR SUPPLEMENT?

17     **A**    NO.   HE -- YOU KNOW, YOU KNOW, BASED UPON THE LETTER

18  AND THE CONVERSATION -- LOOKING AT THE LETTER AND REFLECTING

19  ON THE CONVERSATION, WHEN MR. TUBBS CALLED, WE HAD BEEN TRYING

20  TO GET A HEARING.   AS A MATTER OF FACT, MR. TUBBS SUBMITTED

21  SOMETHING TO THE COURT BECAUSE THERE WERE ONGOING ISSUES WITH

22  MR. GEORGE.   AND I THINK THE -- THE LAST INCIDENT KIND OF

23  COMPLICATED ISSUES TO THE POINT THAT --

24     **Q**    WAS THAT THE 14TH -- ARE WE -- I'M SORRY --

25     **A**    THIRTEEN.

1    **Q**    -- ARE WE 2014 OR 2013?

2    **A**    THIRTEEN, THIRTEEN.  COMPLICATED ISSUES TO THE POINT

3    WHERE, YOU KNOW, HE FELT, BASED UPON THE INFORMATION THAT HE

4    HAD GOT FROM THE GROUP HOME, THAT HE REALLY NEEDED TO TAKE

5    SOME ACTION.  AND SO WE DISCUSSED THAT, DISCUSSED IT WITH OUR

6    TEAM, AND IT WAS DECIDED TO BRING MR. GEORGE INTO CUSTODY.

7    AND FOR THE RECORD, OUR OFFICE WAS AWARE THAT -- WE SUBMITTED

8    A RECOMMENDATION TO THE COURT TO HAVE THIS BROUGHT TO THE

9    ATTENTION OF THE JUDGE.

10    **Q**    AND MR. TUBBS HAD SAID HIS FIRST CHOICE WOULD HAVE

11    BEEN ELMHS, AND IT WAS ONLY BECAUSE THERE WERE NO BEDS

12    AVAILABLE THAT HE WAS PLACED IN THE PARISH PRISON, YOU AGREE

13    WITH THAT?

14    **A**    THAT'S CORRECT.

15    **Q**    ALL RIGHT.  AND I'M GOING TO ASK YOU THE QUESTION

16    ABOUT THE HOSPITAL IN PINEVILLE.  ARE YOU FAMILIAR WITH IT?

17    **A**    YEAH, THAT'S A FACILITY FOR CIVIL PATIENTS.

18    MR. GEORGE IS NGBRI, NOT GUILTY BY REASON OF INSANITY.

19    **Q**    HE WOULD NOT QUALIFY FOR THAT?

20    **A**    THAT'S CORRECT.

21    **Q**    AND ARE THERE ANY OTHER HOSPITALS TO WHOM HE COULD

22    HAVE BEEN OR TO WHICH HE COULD HAVE BEEN TAKEN?

23    **A**    I BELIEVE SO, IF HE -- IF HIS -- IF HE DIDN'T

24    EXHAUST HIS MEDICAID DAYS.  MR. GEORGE HAD BEEN GONE TO -- HAD

25    BEEN HOSPITALIZED AT MULTIPLE PSYCHIATRIC HOSPITALIZATIONS.

1  **Q**    ALL RIGHT.  SO IF HE HAD HAD MEDICAID DAYS

2  AVAILABLE, WHAT WOULD HAVE BEEN THE CHOICES AVAILABLE FOR

3  MR. GEORGE?

4  **A**    WELL, AS MR. TUBBS POINTED OUT, A DOCTOR COULD HAVE

5  EVALUATED HIM FOR A PHYSICIAN'S EMERGENCY CERTIFICATE AND THAT

6  COULD HAVE GOTTEN HIM INTO A HOSPITAL.  BUT UNDER THE

7  CIRCUMSTANCES, THE CONVERSATION WAS THAT MR. GEORGE WAS VERY

8  AGGRESSIVE.  AND IN CIRCUMSTANCES LIKE THAT -- YOU KNOW, THE

9  MISSION OF THE HOSPITAL WITH COMMUNITY FORENSIC SERVICES IS TO

10  PROTECT THE PUBLIC, AND THAT KIND OF BECAME THE SAME SITUATION

11  WITH MR. TUBBS.  WE DON'T WANT ANYBODY TO BE HURT IN THE

12  PUBLIC.

13  **Q**    SO LET ME GET THIS STRAIGHT.  AN OPTION, HAD HIS

14  MEDICAID NOT RUN OUT, WOULD HAVE BEEN HAVE HIM TAKEN TO OUR

15  LADY OF THE LAKE, LET A PHYSICIAN EVALUATE HIM FOR A PEC?

16  **A**    I THINK THAT WOULD HAVE BEEN -- THAT COULD HAVE BEEN

17  AN OPTION WHEN YOU LOOK -- WHEN YOU REFLECT ON THE QUESTION,

18  WHAT ELSE COULD HAVE BEEN DONE?  HIS MEDICAID DAYS WERE

19  EXHAUSTED.

20  **Q**    ALL RIGHT.  AND SO, I MEAN, THIS IS PROBABLY GOING

21  TO BE A REALLY STUPID QUESTION, BUT IF HE'S UNDER THE

22  CUSTODY -- HE'S NOT IN CUSTODY, BUT HE IS CERTAINLY UNDER THE

23  SUPERVISION OF THE STATE, CORRECT?

24  **A**    YES.

25  **Q**    AND SO THERE'S NO PROVISION FOR GETTING HIM PRIVATE

1   CARE WITHOUT MEDICAID?

2       **A**    WELL, HE'S ONE OF OUR GUYS, MEANING HE'S NOT GUILTY

3   BY REASON OF INSANITY.  THE FIRST PRIORITY WHEN SCOTT AND I

4   TALKED WAS ABOUT GETTING HIM INTO THE HOSPITAL, BUT THERE ARE

5   NO BEDS.  AND SO BECAUSE MR. GEORGE WAS AGGRESSIVE, YOUR

6   HONOR, BASED ON MR. TUBBS' DISCRETION AND THE CONVERSATION WE

7   HAD AND THE CONVERSATION I HAD WITH COMMUNITY OF FORENSIC

8   SERVICES, HE HAD TO BE REMOVED.

9       **Q**    I GOT THAT PART OF IT, BUT THE PART I'M ASKING ABOUT

10  IS THIS:  IS THERE ANY PROVISION FOR SOMEBODY WHO IS EITHER,

11  "A," NOT ON MEDICAID, NOT ELIGIBLE FOR MEDICAID, DOESN'T HAVE

12  ANY MONEY OR "B," HAS RUN OUT OF MEDICAID, SUCH THAT IN THIS

13  KIND OF SITUATION, A PRIVATE HOSPITAL, LIKE THE LAKE, WOULD

14  HAVE TO SEE HIM AND EVALUATE HIM FOR A PEC?

15      **A**    I SUPPOSE THEY COULD DO SOME PRO BONO WORK IF

16  SOMEONE IS COMING IN THERE AGGRESSIVE AND THEY HAD TO MAKE --

17  THEY COULD HAVE MADE THE DECISION, BUT UNDER THE

18  CIRCUMSTANCES, WE'RE TALKING ABOUT PUBLIC SAFETY, YOUR HONOR.

19  AND THE CONVERSATION THAT MR. TUBBS SHARED WITH ME AND I

20  SHARED WITH OUR TEAM, SOME ACTION NEEDED TO BE TAKEN.

21      AND SO BASED ON THE CONVERSATIONS HE HAD WITH

22  PROGRESSIVE AND THE THINGS THAT WERE GOING ON AND WITH US NOT

23  BEING ABLE TO GET HIM INTO OUR ELMHS HOSPITAL UP IN JACKSON,

24  LOUISIANA, HE WAS TAKEN INTO CUSTODY.

25      **Q**    BUT ANY TIME YOU'VE GOT TO BRING SOMEBODY FOR

1    EVALUATION FOR A PEC, THAT ASSUMES THAT HE'S EITHER, "A," A

2    DANGER TO HIMSELF OR, "B," A DANGER TO THE PUBLIC, CORRECT?

3        **A**    YES, SIR.

4        **Q**    ALL RIGHT.

5            **THE COURT:**   ANY FOLLOW-UP QUESTIONS, FIRST FROM THE

6    PLAINTIFF ON THE QUESTIONS THAT I ASKED?

7            **MR. LOSPENNATO:**   YES, YOUR HONOR.   I JUST WANT TO

8    CLARIFY A POINT.

9    **EXAMINATION**

10   **BY MR. LOSPENNATO:**

11       **Q**    THERE ARE TWO PERIODS OF TIME.   LET'S TALK ABOUT

12   FIRST THE PRE-JULY 29TH, 2013 PERIOD.   IT IS TRUE, ISN'T IT

13   NOT, THAT HE HAD NOT EXHAUSTED HIS MEDICAID AT THAT POINT?

14       **A**    WELL, IN MAY 2013, WE BROUGHT HIM TO EAU.

15       **Q**    I'M SORRY, BUT THAT'S 2014.

16       **A**    NO, THAT WAS '13.

17           **THE COURT:**   THE RECORD IS GOING TO BE WHAT THE

18   RECORD IS GOING TO BE, BUT YOUR IMPRESSION IS THAT HE HAD RUN

19   OUT OF HIS MEDICARE IN 2013?

20           **THE WITNESS:**   THAT WAS MY IMPRESSION.

21           **THE COURT:**   IS THERE -- IS THERE DOCUMENTATION?

22           **MR. LOSPENNATO:**   THAT'S FALSE.   HE WAS BROUGHT TO

23   EAU IN MAY 2014.   HE HAD NOT EXHAUSTED HIS MEDICAID DAYS BY

24   JULY 29TH, 2013 WHEN HE WAS FIRST ARRESTED.   HE SPENT A LOT OF

25   DAYS AFTER HE WAS RELEASED IN THE HOSPITAL -- HE WAS IN

1 │ SEVERAL FACILITIES, MAYBE SIX OR SEVEN FACILITIES.  AND AT

2 │ THAT POINT HE HAD EXHAUSTED HIS DAYS.  BUT, OF COURSE, BY THAT

3 │ TIME HE WAS AT ELMHS AND THE SECOND –– HIS SECOND

4 │ INCARCERATION WAS FROM THE HOSPITAL SETTING.  SO –– SO I JUST

5 │ THINK THAT MR. BRADY IS JUST WRONG ON THAT.

6 │          **THE COURT:**  OKAY.  WELL, WE'RE NOT GOING TO GET INTO

7 │ A SQUABBLE.  WE JUST –– THE RECORDS WILL SHOW WHAT THE RECORDS

8 │ SHOW.  THANK YOU, MR. BRADY.

9 │          NOW, MR. HILBURN OR MR. CODY, ANY FOLLOW-UP?

10 │ **EXAMINATION**

11 │ **BY MR. HILBURN:**

12 │     **Q**     MR. BRADY, AT THE TIME THE DECISION WAS MADE TO

13 │ PLACE MR. GEORGE AT THE EAST BATON ROUGE PARISH PRISON, WERE

14 │ YOU AND MR. TUBBS AWARE OF THE CARE THAT MR. –– MENTAL HEALTH

15 │ CARE AND GENERAL HEALTH CARE THAT MR. GEORGE WAS GOING TO

16 │ RECEIVE AT EAST BATON ROUGE PARISH PRISON?

17 │     **A**     YES.

18 │          **MR. HILBURN:**  THANK YOU.

19 │          **THE COURT:**  OKAY.  THANK YOU, SIR.  YOU MAY STAND

20 │ DOWN.

21 │          ANY ADDITIONAL BUSINESS THAT WE CAN TAKE CARE OF

22 │ THIS AFTERNOON?

23 │          **MR. LOSPENNATO:**  NONE FROM PLAINTIFFS, YOUR HONOR.

24 │          **MR. HILBURN:**  YOUR HONOR, IT'S BEEN BROUGHT TO MY

25 │ ATTENTION THAT PLAINTIFF'S EXHIBIT NUMBER 17, WHICH ARE

1    BASICALLY A LOT OF RECORDS FOR MR. GEORGE, HAVE NOT HAD THE

2    PERSONAL IDENTIFIERS REDACTED.   AND I SUGGEST WE SUBMIT -- WE

3    SUBSTITUTE A REDACTED COPY FOR THE UNREDACTED RECORDS BEFORE

4    IT GOES BACK TO THE JURY.

5         **THE COURT:**   I ABSOLUTELY AGREE.   ANY OBJECTIONS FROM

6    THE PLAINTIFF?

7         **MR. LOSPENNATO:**   WELL, I'M NOT SURE EXACTLY WHAT --

8         **THE COURT:**   I'M ASSUMING HE MEANS ADDRESSES AND --

9         **MR. LOSPENNATO:**   OH, OKAY.

10        **THE COURT:**   NO OBJECTION FROM --

11        **MR. LOSPENNATO:**   THE PLAINTIFF HAS NO OBJECTION.

12        **THE COURT:**   NO OBJECTION FROM THE PLAINTIFF.   YEAH,

13   AND Y'ALL GET TOGETHER AND FIGURE OUT HOW YOU'RE GOING TO DO

14   THAT LOGISTICALLY, BUT PLEASE MAKE SURE THAT'S DONE BEFORE THE

15   RECORDS GO TO THE JURY.

16        WHAT ELSE?   WE DO NEED THE EXHIBITS FROM THE

17   PLAINTIFF IN ELECTRONIC FORMAT.   AND YOU'LL START YOUR CASE

18   TOMORROW MORNING AT 9:00, MR. HILBURN?

19        **MR. HILBURN:**   YES, SIR, YOUR HONOR.

20        **THE COURT:**   WHAT DO YOU ANTICIPATE IN TERMS OF TIME?

21        **MR. HILBURN:**   WE'LL FINISH -- WE'LL DEFINITELY

22   FINISH THE EVIDENTIARY PORTION OF THE CASE TOMORROW.

23        **THE COURT:**   OKAY.   THAT SOUNDS GOOD.   WELL, THEN, WE

24   WILL STAND ADJOURNED FOR THE DAY.

25        **MR. LOSPENNATO:**   YOUR HONOR, ONE THING.   I'M SORRY.

1  INSTRUCTIONS FOR THE JURY --

2              **THE COURT:**  YES, WHEN WILL WE HAVE THEM?  TOMORROW

3  MORNING.

4              **MR. LOSPENNATO:**  THANK YOU, YOUR HONOR.

5              **THE COURT:**  THAT MEANS THAT -- WELL, IT JUST DEPENDS

6  HOW THE EVIDENCE GOES.  I DON'T ANTICIPATE GOING TO THE JURY

7  TOMORROW, BUT WHAT WE WILL HOPEFULLY BE ABLE TO DO IS TO MAYBE

8  EVEN HAVE A CHARGE CONFERENCE AT NOON OR AT THE AFTERNOON

9  BREAK OR PUSH COMES TO ABSOLUTE SHOVE, AT THE END OF BUSINESS

10  TOMORROW.

11              **MR. LOSPENNATO:**  THANK YOU, YOUR HONOR.

12                    C E R T I F I C A T E

13              I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

14  FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

15  NUMBERED MATTER.

16  S:/GINA DELATTE-RICHARD

17  GINA DELATTE-RICHARD, CCR

18  OFFICIAL COURT REPORTER

19

20

21

22

23

24

25