TRUSSELL GEORGE

**CIVIL ACTION**

VERSUS

**NO. 14-CV-00338-JWD-RLB**

LOUISIANA DEPARTMENT OF PUBLIC
SAFETY AND CORRECTIONS, JAMES M.
LEBLANC, Secretary of the Louisiana Department
of Public Safety and Corrections, in his official
capacity, WHALEN GIBBS, Assistant Secretary of
the Louisiana Department of Public Safety and
Corrections, in his official and individual capacities,
SCOTT TUBBS, Probation and Parole Agent, in his
official and individual capacities, GERALD STARKS,
Director of the Division of Probation and Parole,
in his official and individual capacities, KATHY
KLIEBERT, Secretary of the Louisiana Department
of Health and Hospitals, in her official capacity,
LOUISIANA DEPARTMENT OF HEALTH AND
HOSPITALS, ERIC BRADY, District Forensic
Coordinator, in his official and individual capacities, and
CHARLES P. VOSBURG, Consulting Psychologist for
the Department of Health and Hospitals, in his official
and individual capacities.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**OVERVIEW** - 4

A.     INTRODUCTION - 4

B.     PROCEDURAL HISTORY - 5

C.     SUMMARY OF CONTENTIONS OF PARTIES - 7

D.     ISSUES BEFORE THE COURT - 11

E.     BACKGROUND AND PARTIES' FACTUAL ARGUMENTS - 12

F.     DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS' OVERSIGHT RESPONSIBILITIES FOR PERSONS ON CONDITIONAL RELEASE - 16

G.     LOUISIANA DEPARTMENT OF HEALTH'S OVERSIGHT RESPONSIBILITIES FOR PERSONS ON CONDITIONAL RELEASE - 17

H.     TRUSSELL GEORGE'S ARREST AND INCARCERATION IN JULY 2013 - 18

I.     EVENTS FOLLOWING AUGUST 23, 2013 RELEASE FROM EBRPP - 26

J.     TRUSSELL GEORGE'S DECEMBER 2013 TO DECEMBER 2014 CONDITIONAL RELEASE - 27

K.     TRUSSELL GEORGE'S ARREST AND INCARCERATION IN 2014 - 28

**FINDINGS OF FACT** – 32

A.     JULY 29, 2013 ARREST AND INCARCERATION – 33

B.     ADEQUACY OF MEDICAL CARE AT EBRPP – 39

C.     JULY 2014 ARREST AND INCARCERATION – 41

D.     POLICY, PROCEDURE OR PRACTICE, *VEL NON* - 42

E.     DISCRETE SUBSTANTIVE DUE PROCESS VIOLATIONS TO GEORGE, *VEL NON* - 44

**CONCLUSIONS OF LAW** - 45

**A.**      **JURISDICTION AND VENUE – 45**

**B.**      **PARTIES – 46**

**C.**      **ISSUES BEFORE THE COURT – 47**

**D.**      **STATUTORY RIGHTS OF THOSE FOUND NOT GUILTY BY REASON OF INSANITY - 47**

**E.**      **SUBSTANTIVE DUE PROCESS RIGHTS OF NGRI <u>ACQUITTEES</u> AND STANDARD FOR APPLYING THEM – 51**

**F.**      **APPLICATION OF LAW TO FACTS OF CASE – 66**

**G.**      **EXISTENCE AND CONSTITUTIONALITY OF ALLEGED POLICY, PRACTICE, AND PROCEDURE – 66**

**H.**      **ARREST AND INCARCERATION FOR VIOLATIONS OF CONDITIONS OF RELEASE WHEN NO CRIME WAS COMMITTED – 68**

**I.**      **PLAINTIFF'S CLAIMS SEEKING DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADA AND SECTION 504 – 75**

**CONCLUSION** - 78

## OVERVIEW

### A. INTRODUCTION

1. Plaintiff Trussell George ("Plaintiff" or "George") brings this action by and through his guardian ad litem Letetica Walker. (Mot. to Appoint a Guardian Ad Litem, Doc. 58 at 1; and Order, Doc. 63 at 1.) George is a person with a mental illness, who, on September 25, 2008, was found Not Guilty by Reason of Insanity ("NGRI") of possession of a firearm by a known felon. (Order, Pl.'s Trial Ex. 1 at TG000001.) On December 15, 2008, he was granted a Judgment of Supervised Probation and was conditionally released. (*Id. See also* Pl.'s Trial Exs. 4 at TG000005, 6 at TG000007, 24 at 1, ¶ 2.)

2. While on conditional release, George was arrested and placed in the East Baton Rouge Parish Prison ("EBRPP") on two separate occasions, July 29, 2013 and July 1, 2014.

3. Plaintiff's claims against various defendants ("Defendants") are for declaratory and prospective injunctive relief under 42 U.S.C. Section 1983, 29 U.S.C. Section 794(a) and 42 U.S.C. Section 12132 pursuant to 28 U.S.C. Section 2202 and Federal Rule of Civil Procedure 65. (Pl.'s Second Amended Complaint, Doc. 42 at 18–23.) He claims that the arrests and detentions were wrongful and violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the above statutes. (Pl.'s Request for Finding of Fact and Rulings of Law, Doc. 151 at 1–2, 32–33.)

4. For the reasons which follow, the requested relief is denied.

## B. PROCEDURAL HISTORY

5. By way of a complaint (Complaint, Doc. 1) and two amended complaints (Pl.'s First Amended Complaint, Doc. 24 and Doc. 42),[1] Plaintiff sued two agencies of the State of Louisiana, the Louisiana Department of Public Safety and Corrections ("LDPSC") and the Louisiana Department of Health ("LDH"),[2] along with seven individuals in their official capacities: James M. LeBlanc ("LeBlanc"), Rebekah E. Gee ("Gee"), Whalen Gibbs ("Gibbs"), Gerald Starks ("Starks"), Scott Tubbs ("Tubbs"), Eric Brady ("Brady") and Charles Vosburg ("Vosburg"), (collectively, "Defendants").[3]

6. The suit originally asked for compensatory and punitive damages as well as declaratory and injunctive relief under 42 U.S.C. Section 1983; 29 U.S.C. Section 794(a), Section 504 of the Rehabilitation Act of 1973 ("Section 504" or the "RA"); and 42 U.S.C. Section 12132, Title II of the Americans with Disabilities Act of 1990 ("ADA"). However, Plaintiff's claims against Gibbs, Starks, Vosburg, Brady and Tubbs in their individual capacities were dismissed on June 25, 2016, (Mot. to Voluntarily Dismiss Claims for Damages Against Defs.' [sic] Whalen Gibbs, Geral [sic] Starks, Charles Vosburg, Eric Brady, and Scott Tubbs in their Individual Capacities, Docs. 129 at 1; Minute Entry, Doc. 138 at 2), leaving only the official capacity claims against all Defendants. (Trial Tr. vol. 1, Doc. 148 at 26:17–27:19.)

---

[1] Because an amended complaint supplants and replaces prior complaints, *Eubanks v. Parker Cty. Commr's Court*, 1995 WL 10513, at *2 (5th Cir. Jan. 3, 1995); *Hall v. Louisiana*, 983 F. Supp. 2d 820, 832 (M.D. La. 2013), the Court considers Plaintiff's Second Amended Complaint (Doc. 42, *in globo*) to be the operative pleading in this action.
[2] Since the filing of these complaints, the Louisiana Department of Health and Hospitals has been re-designated the Louisiana Department of Health. *See* La. Rev. Stat. Ann. § 36:251.
[3] Where appropriate, a public official's successor is automatically substituted as a party consistent with Federal Rule of Civil Procedure 25(d).

7. Motions for summary judgment were filed by both Plaintiff (Pls.' Mot. For Partial Summ. J., Doc. 76 at 3.) and Defendants (Defs.' Mot. For Summ. J., Doc. 74 at 4,) and both were denied. (Order, Doc. 112 at 1; Order and Ruling on Mots. For Summ. J., Doc. 124 at 30.) As a part of the rulings, the Court found that two of the involved statutes, La. Code Crim. Proc. arts. 658 and 899, were facially constitutional but that there were fact questions precluding summary judgment. (Doc. 124 at 3, 22–26.)

8. The Court also found there were questions of fact which needed to be resolved in order to determine George's claims arising under the ADA and Section 504. (*Id.* at 28-30.)

9. On June 27 through June 29, 2016, the case was tried simultaneously to a jury and the Court. (Minute Entry, Doc. 138–139, *in globo*; Minute Entry, Doc. 145, *in globo*; Trial Tr. vol. 1, Doc. 148, *in globo*; Trial Tr. vol. 2, Doc. 149, *in globo*; and Trial Tr. vol. 3, Doc. 150, *in globo*.) At the conclusion of the trial, that portion of the case tried to the jury was submitted to it for decision. The jury rendered a verdict for LDPSC and LDH on the claims arising under Section 504 and the ADA. (Jury Verdict Form, Doc. 144 at 2–3.) Specifically, the jury found that these defendants had not discriminated against Plaintiff under Section 504 and the ADA and had not failed to make reasonable accommodations to Plaintiff's disabilities under either statute. (*Id.*)

10. As to that portion of the case tried to the Court, the Court took the matter under advisement and the parties were ordered to file proposed findings of fact and conclusions of law within 30 days of the filing of the trial transcript. (Doc. 150 at 192:22-193:1). The parties' proposed findings and conclusions were filed as Docs. 151 and 152, respectively. (Pl.'s Request for Finding of Fact and Rulings of Law, Doc. 151 at 51; Defs.' Proposed Findings

of Fact and Conclusions of Law, Doc. 152 at 13.) The Court then requested the parties' responses to certain specific questions. (Doc. 159.) They responded in Docs. 160 (Plaintiff's Memorandum of Law ("P Mem.")) and 161 (Defendants' Answers to Questions Raised ("D Mem.").) Plaintiff's response also asked the Court to "consider his renewed motion for judgment as a matter of law" with respect to his Section 504 and ADA claims. (Doc. 160 at 23.) The Court heard oral argument on September 20, 2017. (Doc. 164). Following oral argument, Plaintiff filed a Supplemental Memorandum discussing whether a settlement agreement in another case moots or bars his claims[4] (Doc. 167), and Defendants filed a Memorandum in Opposition to Plaintiff's Renewed Motion for Judgment as a Matter of Law (Doc. 168).

## C. SUMMARY OF CONTENTIONS OF PARTIES

11. Plaintiff contends that Defendants' "policies, practices and procedures . . . caused him to be arrested and incarcerated on two separate occasions . . . [in] violat[ion] of his rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and subjected him to intentional discrimination in violation of Section 504 of the Rehabilitation Act of 1973 . . . and Title II of the Americans with Disabilities Act of 1990." (Doc. 42 at 2, ¶ 1.)

12. The "policies, practices and procedures" about which Plaintiff specifically complains are those "which cause persons who have been found NGRI and are able to be released on specified conditions without danger to themselves or others to be confined in correctional

---

[4] Because the Court denies George's claims on the merits, *see infra*, it does not discuss this issue.

facilities for the sole reason that they are alleged to have violated a condition of their release . . . ." (Doc. 42 at 19, ¶ 91; 20–21, ¶ 97; 21, ¶ 101; 22, ¶ 106; and 23, ¶ 109.)

13. In addition, Plaintiff claims "Defendants' actions . . . which caused Plaintiff to be confined in a correctional facility for the sole reason that he is alleged to have violated a condition of his release, violate his rights under the Due Process Clause to the United States Constitution." (Doc. 42 at 19, ¶ 93.)

14. In his post-trial briefing, Plaintiff broadens this contention. There, Plaintiff contends that "Defendants, acting under color of state law and pursuant to state policies and practices, deprived [Plaintiff] of his liberty by intentionally incarcerating him in the East Baton Rouge Parish prison twice, once in 2013 and again in 2014 (1) for allegedly violating a term of his conditional release, even though there was no allegation, nor probable cause to believe, that he had violated any criminal statute; (2) for behavior [] that was a clear manifestation of his mental illness; and (3) despite the fact that he clearly needed treatment in a state or private mental health institution." (Doc. 151 at 1.)

15. In his Second Amended Complaint, Plaintiff asks for both declaratory and injunctive relief. As to the former, he asks the Court to declare "that Defendants' policies, practices and procedures of arresting and incarcerating individuals in state correctional facilities who have been placed on conditional discharge following a finding of NGRI, solely because they are alleged to have violated a condition of their discharge, violate Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, Section 504 of the Rehabilitation Act of 1973, and Title II of the American with Disabilities Act of 1990." (Doc. 42 at 23-24; *see also* Doc. 151 at 1–2.)

16. In addition, Plaintiff asks for an injunction "prohibiting Defendants from arresting and incarcerating individuals in state correctional facilities who have been placed on conditional discharge following a finding of NGRI, solely because they are alleged to have violated a condition of their discharge." (Doc. 42 at 23, ¶ B.)

17. The Court notes that the relief requested in Plaintiff's post-trial briefing is in some respects broader and in others more specific than in his Second Amended Complaint, namely requesting an injunction requiring:

    a. "So long as Mr. George remains on conditional discharge, Defendants are prohibited from arresting and incarcerating him in any correctional facility because there is an allegation that he violated a condition of his discharge in the absence of a reasonable belief that he has committed a criminal offense." (Doc. 151 at 50, ¶ 193.)

    b. "[T]he Defendants [are barred] from arresting and incarcerating [Plaintiff] solely because he has violated a term of his conditional release." (*Id.* at 2.)

    c. "If Mr. George is alleged to have violated a condition of his discharge, but he is not charged with a new criminal offense, Defendants' sole recourse is to have him voluntarily admitted to ELMHS or another a suitable mental health treatment facility pursuant to La. R.S. 28:52, or by emergency certificate to such a facility pursuant to La. R.S. 28:53, with subsequent notice to the court. La. Code Crim. P. art. 658(B)(4)." (*Id.* at 50, ¶ 194.)

    d. "Defendants shall, within 30 days of the date of this order, promulgate and implement written policies and procedures that prohibit its agents, employees, contractors, or assigns from arresting and incarcerating any individuals in

correctional facilities who have been placed on conditional discharge following a finding of NGRI, solely because they are alleged to have violated a condition of their discharge. Such policies and procedures shall also provide that if an individual who has been placed on conditional discharge following a finding of NGRI is alleged to have violated a condition of his discharge, but that individual has not been charged with a new criminal offense, Defendants' sole recourse is to have him voluntarily admitted to ELMHS or another [] suitable mental health treatment facility pursuant to La. R.S. 28:52, or by emergency certificate to such a facility pursuant to La. R.S. 28:53, with subsequent notice to the court. La. Code Crim. P. art 658(B)(4)." (*Id*. at 50-51, ¶ 195.)

18. In Plaintiffs' briefing, Plaintiff also seems to raise complaints broader than that needed to support the relief he requests, namely the length of time George was incarcerated, the quality of care he received while in jail, and the issue of George's lengthy incarcerations without a hearing. (*See, e.g*. Doc. 151 at 15-18, ¶¶ 59-68; 37, ¶ 151.) In response to the Court's inquiry on this issue, counsel for Plaintiff reassured the Court that the constitutional issue in this case is limited to the issue of whether the arrest and incarceration of George solely for violations of conditions of release in the absence of a criminal arrest violated George's substantive due process rights, and do not include the issues of length of incarceration before release, length of incarceration without or before a hearing, and adequacy of medical care and other issues. (Doc. 163 at 1.)

19. The Court notes that although the Second Amended Complaint also asks the Court to declare La. Code Crim. Proc. arts. 658(B) and 899 facially unconstitutional (Doc. 42 at 24), the

Court previously denied that challenge. (Doc. 124 at 18-19, 22-24.) Plaintiff's demand for compensatory and punitive damages was voluntarily dismissed. (Docs. 129 at 1; 138 at 2; 148 at 26:19–27:4.)

20. Defendants, on the other hand, contend that, at all times, they acted reasonably and within the bounds of the law and that Defendants' conduct as well as their policies, procedures and practices did not violate the Constitution, Section 504, or the ADA. (Doc. 152 at 10–12, ¶ 89, ¶ 97–99, ¶ 105–106.)

21. According to Defendants, Plaintiff's arrests and incarcerations were provoked by Plaintiff's aggressive, assaultive and dangerous behavior and were supported by probable cause that he was violating or about to violate the terms and conditions of his release. (*Id.* at 5, 10-12.)

22. In addition, Defendants contend that George's arrests and incarcerations until he could have a hearing and be placed in a suitable psychiatric facility were made because he was a danger to himself and others and thus were justified under both Louisiana's statutory scheme and the Constitution. (*Id.* at 10–12.)

23. Defendants urge the Court to find, as the jury did, that there was no discrimination against Plaintiff under either the ADA or Section 504. (*Id.* at 12, ¶¶ 104–105.)

24. Finally, Defendants claim that the facts adduced at trial justify neither a declaratory judgment nor injunction under any law and therefore ask this Court to reject all of Plaintiff's remaining claims against Defendants.

### D.   ISSUES BEFORE THE COURT

25. In order to resolve this dispute, the Court must resolve the following issues:

a.   Did Defendants have in place policies, practices, or procedures causing or allowing NGRI acquittees to be arrested and incarcerated at a correctional facility solely for a violation (or anticipated violation) of the conditions of the acquittee's release, even when no crime had been committed?

b.   Were George's arrests or incarcerations made pursuant to this policy?

c.   Even if there were no such policies, procedures or practices, under the specific facts of this case, did George's arrests and subsequent incarcerations at a correctional facility, solely because of a violation of his conditions of release, in the absence of a criminal arrest, violate his substantive due process rights under the United States Constitution and/or his statutory rights under Section 504 and the ADA?

**E.   BACKGROUND AND PARTIES' FACTUAL ARGUMENTS**

26. Plaintiff is a person with mental illness who, on September 25, 2008, was found NGRI of a criminal offense, specifically the offense of being a felon in possession of a firearm. (Trial Stipulations, Pl.'s Trial Ex. 24 at 2, Trial Stipulation No. 5; *see also* Pl.'s Trial Ex. 4 at TG000005; & Pl.'s Trial Ex. 6 at TG000007.)

27. On December 15, 2008, the Nineteenth Judicial District Court in East Baton Rouge, Louisiana, the court with jurisdiction over his criminal charges, ordered that George be conditionally released from inpatient hospitalization and into the community pursuant to La. Code Crim. Proc. art. 657.1, for a period of five years. (Pl.'s Trial Ex. 1 at TG000001; Pl.'s Trial Ex. 24 at 1, No. 2.)

28. In issuing the 2008 conditional release order, the Nineteenth Judicial District Court found that George was not in need of further inpatient treatment, provided that he receive adequate

outpatient treatment, supervision, and monitoring. (Pl.'s Trial Ex. 1 at TG000001; Pl.'s Trial Ex. 24 at 1, No. 3.)

29. However, this release was conditioned on Plaintiff following certain requirements. The most important of these, for purposes of the issues in this case, states, in pertinent part:

> Any physically assaultive/aggressive behaviors shall be reported to the District Forensic Coordinator or State Probation Officer. Violations of this condition may result in immediate return to custody or intensified treatment if recommended by the District Forensic Coordinator or Probation Officer.

(Pl.'s Trial Ex. 1 at TG000002, ¶ K; *see also* Pl.'s Trial Ex. 24 at 1, No. 3.)

30. The following additional condition was imposed by law:

> It shall be a condition of every such probation that the person released shall be recommitted if he becomes dangerous to others or to himself for reasons of his mental illness, substance abuse, or intellectual disability.

La. Code. Crim. Proc. art. 658(A) (2014).

31. From December 2008 to May 2014, as required under the terms of his conditional release, George resided in group homes operated by Progressive Health Care Providers (PHP), located in Baton Rouge, Louisiana. (Pl.'s Trial Ex. 24 at 2, No. 4; Martinez Test., Doc. 148 at 30:18–31:2, 35:13–36:22, 45:5–15; Hope Test., Doc. 149 at 175:3–11.)

32. "While living in group homes, George was under the joint supervision of the [Division of Probation and Parole ("DPP")] of the [LDPSC] and [Community Forensic Services ("CFS")] of the [LDH] . . . " (Pl.'s Trial Ex. 24 at 2, No. 5.) The details of the respective duties of these two state agencies towards George and other NGRI acquittees is discussed in more detail *infra*.

33. Although the location of the group home changed after 2008, George resided in a group home setting as required by his conditional release order until May 2014. (*Id.* at 2, No. 4; Martinez Test., Doc. 148 at 30:18–31:2, 35:13–36:22, 45:5–15; Hope Test., Doc. 149 at 175:3–11.)

34. The group homes in which George was placed were Intermediate Care Facilities for People with Developmental Disabilities ("ICF-DD"). (Martinez Test., Doc. 148 at 29:24–30:13.)

35. Intermediate Care Facilities for People with Developmental Disabilities ("ICFs-DD") are funded through the Medicaid program and operated by the Defendant LDH. (Hope Test., Doc. 149 at 201:14–24.)

36. Medicaid is a federally mandated program that provides federal financial assistance to states, including Louisiana, so that that they can provide medical care to poor and disabled individuals. *See* 42 U.S.C. Section 1396b(a), 1396d(b); *see generally Curtis v. Taylor,* 625 F.2d 645 (5th Cir. 1980).

37. ICFs-DD are one of a number of residential services options operated under the auspices of the LDH. (*See* La. Rev. Stat. Ann. § 28:451.1–455.2 (2005)). They provide various services for those who reside there.

38. Due to his mental illness, George would occasionally engage in verbal aggression, non-compliance and threatening behavior at the group home and at the day program he attended during the week. His Behavioral Support Plan noted these outbursts, and the threatening episodes would usually occur when his medication was not correct. (Hope Test., Doc. 149 at 188:1–189:21; Pl.'s Ex. 17, TG000151–53.)

39. Therefore, medication management was a critical service for George. As Ms. Martinez stated:

> A.  Trussell is very different off medication. When he's not taking medication, he's very delusional, very nervous, agitated, untrustworthy, very disheveled, not – not the Trussell that I've known for -- for the years that I've known him.
>
> Q.  When you say, 'delusional,' can you give me an example of how that would manifest itself?
>
> A.  Trussell would talk a lot about god and the devil and Bob and –
>
> Q.  Bob?
>
> A.  Bob. When -- when Trussell -- the times that I've seen Trussell in what I say is a delusional manner, he talks about Bob. And Bob is a person that is in his life that fights Satan and fights the devil and steals money and tries to kill people.

(Martinez Test., Trial Tr. vol. 1, 34:14–35:3.)

40. Prior to July 2013, Mr. George occasionally–two or three times a year–would be voluntarily admitted (sometimes at his request) to a hospital to have his medication adjusted. (*See* Martinez Test., Doc. 148 at 35:4–25.)

41. As previously mentioned, while living in group homes, George was under the joint supervision of the DPP of the LDPSC and of the CFS of LDH. (Pl.'s Trial Ex. 24 at 2, No. 5; *see also* La. Code Crim. Proc. art. 658(B) (2014).)

42. Defendants LDPSC and LDH received federal financial assistance and are public entities as defined by 42 U.S.C. Section 12131(1)(B). (Pl.'s Trial Ex. 24 at 4, No. 16.)

**F. DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS' OVERSIGHT RESPONSIBILITIES FOR PERSONS ON CONDITIONAL RELEASE**

43. Defendant LDPSC is the state agency responsible for monitoring and providing services to persons placed on conditional release or probation pursuant to La. Code. Crim. Proc. art. 657. DPP is the division within LDPSC that carries out this duty and which supervised George's conditional release. (*Id.* at 2, No. 6.)

44. Specifically, it is the responsibility of the DPP to ensure that the general and special conditions of the ordered supervision are followed for each acquittee (also sometimes referred to as "supervisee"). Its employees make personal contact with the supervisees pursuant to DPP's policies and when otherwise necessary. The agency is responsible for monitoring supervisees for compliance with conditions, addressing any issues required by the courts, consulting with the forensic coordinator, drug testing supervisees, and arresting supervisees. (*Id.* at 2, No. 7.)

45. At the time of trial, Defendant LeBlanc was Secretary of LDPSC. Pursuant to La. R.S. 36:403, he was responsible for the administration, control, and operation of the functions, programs, and affairs of the LDPSC. (*Id.* at 3, No. 8.)

46. Defendant Gibbs was the Assistant Secretary of LDPSC and, as such, he directed the operations of DPP. Pursuant to La. R.S. 15:574.11(A), DPP provides for the investigation and supervision of adjudicated adult offenders. Also, pursuant to La. Code Crim. Proc. art. 658(B)(1), the DPP is charged with supervising individuals who have been placed on conditional release following a finding of NGRI. (*Id.* at 3, No. 9.)

47. Defendant Starks was the Director of the DPP. As such, he assisted in the administration, development, and implementation of policies of the DPP. (*Id.* at 3, No. 10.)

48. Defendant Tubbs was a Probation and Parole Officer of DPP. (*Id.* at 3, No. 11; *see also* Doc. 148 at 64:14–19.)

49. Tubbs specialized in supervising mentally ill people for about seven years at the time of trial, including those acquitted as NGRI. (Doc. 148 at 64:20–65:14.)

50. Tubbs had the responsibility to monitor the conditional release of George. (*Id.* at 65:13–17.)

## G.  LOUISIANA DEPARTMENT OF HEALTH'S OVERSIGHT RESPONSIBILITIES FOR PERSONS ON CONDITIONAL RELEASE

51. Defendant LDH is a state agency that operates the CFS program and Eastern Louisiana Mental Health System ("ELMHS") in Jackson, Louisiana. (Pl.'s Trial Ex. 24 at 4, No. 13.)

52. Defendant LDH receives federal financial assistance. (*Id.* at 4, No. 16.)

53. Defendant Gee was the Secretary of the LDH.  Pursuant to La. R.S. 36:254, the Secretary of the LDH was responsible for the oversight, supervision and control of LDH and its divisions and was ultimately responsible for ensuring that LDH's services for people with disabilities were provided in conformance with federal law. (*Id.* at 3, No. 12.)

54. Defendant Brady was employed by LDH as a District Forensic Coordinator ("DFC") within the CFS program. (*Id.* at 4, No. 14; *see also* Doc. 151 at 9, ¶ 33 & Doc. 152 at 3, ¶ 15.) As such, Brady worked under the direction and supervision of the Secretary of the LDH. (Pl.'s Trial Ex. 24 at 3, No. 12.)

55. Brady had responsibility for monitoring individuals who were found NGRI and placed on conditional discharge and for implementing certain policies and procedures of LDH with respect to such persons. (Brady Test., Doc. 148 at 92:8–11, 99:12–101:15.)

56. One of Brady's functions as a DFC was to facilitate inpatient hospitalization when other avenues for treatment failed. (Brady Test., Doc. 148, 102:10–104:15.)

57. Brady visited George to perform "six-month evaluations" and provided reports regarding George's compliance with the terms of his conditional release and recommending whether George should continue on conditional release. (*See* Brady Test., Doc. 148 at 107–108, *in globo*.)

58. Defendant Vosburg was a clinical psychologist and a consultant for CFS and LDH. (Pl.'s Trial Ex. 24 at 4, No. 15; Defs.' Trial Ex. 8, *in globo*.)

59. Vosburg had responsibility for evaluating and providing mental health services, in accordance with the policies and procedures of LDH, to individuals placed on conditional discharge and persons found NGRI who had been placed at ELMHS. He provided recommendations as to placement, graduation/termination, revocation, and treatment. (*See* Pl.'s Trial Exs. 4 at TG000005, ¶ 2; 5 at TG000006; 6 at TG000007; 8 at TG000010; 9 at TG000011; 13 at TG000017; and 14 at TG000019.)

60. Vosburg had evaluation and oversight responsibilities regarding George's conditional release since 2009 and over the course of that time had evaluated George on at least eight occasions. (Brady Test., Doc. 148 at 107:20–108:5; Pl.'s Trial Exs. 4 at TG000005; 5 at TG000006; 6 at TG000007; 8 at TG000010; 9 at TG000011; 13 at TG000011; and 14 at TG000019; Defs.' Trial Ex. 8, *in globo*.)

**H. TRUSSELL GEORGE'S ARREST AND INCARCERATION IN JULY 2013**

61. On May 24, 2013, Brady submitted an episode report to the state district court indicating that staff at Progressive Health Care had reported to him that George "had two episodes of verbal aggression and verbal threats within the last two (2) weeks to have one of his family

members attack one of their direct care staff members." (Pl.'s Trial Ex. 8 at TG000010; *see also* Defs.' Trial Ex. 3 at 0001.)

62. In this report, Brady also noted that, although George had been recently hospitalized for approximately two weeks at Beacon Behavioral Hospital in Lutcher, Louisiana, and had received a medication adjustment, "his behavior seemingly has escalated towards direct care personnel." (Pl.'s Trial Ex. 8 at TG000010; Defs.' Trial Ex. 3 at 0001.).

63. This report also stated that Brady "spoke to his probation officer [Defendant Tubbs] on 5/23/13 who [would] be petitioning this honorable court for a status review to discuss these recent events and plan of action to address these concerns." (Pl.'s Trial Ex. 8 at TG000010; Defs.' Trial Ex. 3 at 0001.)

64. On June 10, 2013, Tubbs sent a letter to the state district court advising "that in the last 4 weeks [George] has been verbally aggressive with staff over food" and requested that a review hearing be scheduled to address George's violations of the group home's rules. (Pl.'s Trial Ex. 9 at TG000011; Defs.' Trial Ex. 4 at 0001; Tubbs Test., Doc. 148 at 74:23–75:5.)

65. For reasons not explained in the evidence, the State District Court did not respond to that request for a hearing.

> Q.      And you don't know if a court ever set a date for a hearing on these issues, did it?
>
> A.      I don't believe they did on that letter.

(Tubbs Test., Doc. 148 at 75:24–76:1.)

66. In addition, staff personnel at the group home advised Tubbs that they did not want George at their group home because he kept causing problems. (*Id.* at 82:8-10).

67. "On or about 7-15-13, [George] got aggressive with a staff member at his day program and they had to send him to the mental hospital due to his attitude. He was released from the hospital on 7-25-13." (Defs.' Trial Ex. 5 at 1–2.) According to Tubbs' testimony at trial, he was told that George had assaulted or physically harmed a staff member. (Tubbs Test., Doc. 148 at 78:2–79:25.)

68. On July 25, 2013, the day of George's release from the mental hospital, Tubbs met with George and felt something "wasn't right" and that "the medicine that they adjusted wasn't working for him." (*Id.* at 80:7–9.)

69. "On [July 27, 2013], [George] told staff that he was going to do something to them if they did not bring him to get his hair cut. Then [he] told another client that he was going to kill them." (Defs.' Trial Ex. 5 at 1–2.)[5]

70. At this point, Tubbs conferred with Brady, who in turn consulted with Vosburg. (Tubbs Test., Doc. 148 at 84:2–5; 124:17–23.) Tubbs told Brady that George was being "very aggressive." (*Id.* at 124:24–125:23.)

71. At this point Brady inquired whether there were any beds available at ELMHS and was told there were none. He informed Tubbs of this fact. (Tubbs Test., Doc. 148 at 84:6–10. *See also* Brady Test., Doc. 148 at 122:4-18; 124:22-23; 126:3-13).

72. Tubbs also consulted with his supervisor regarding the decision of whether to arrest George. (Tubbs Test., Doc. 148 at 84:2–24.)

73. Brady, Tubbs and Vosburg jointly decided to have George arrested and placed in the EBRPP. (Brady Test., Doc. 148 at 124:12–125:23.)

---

[5] In his trial testimony, Tubbs testified that this incident occurred on July 25, 2017. (Doc. 148 at 80:10–13.) This discrepancy is not important to the Court's analysis.

> Q.    So the decision to arrest Mr. George in July 2013 was made
>       collectively by [Brady], Dr. Vosburg and Mr. Tubbs; is that
>       correct?
>
> A.    Yes, Ma'm [sic].

(*Id.* at 125:20–23.)

74. On July 29, 2013, Tubbs wrote a letter to Progressive stating that "[George] has broken his conditions of probation for the 3rd time by being aggressive with staff." (Pl.'s Ex. 10 at TG000012.). Employees of George's day program drove George to Tubbs' office, where Tubbs decided to arrest him and have him incarcerated in EBRPP. (Tubbs Test., Doc. 148 at 81:20–82:24.)

75. Tubbs' "Detainer Notification, Affidavit of Probable Cause, and Motion for Hearing" to Revoke Probation[6] sets forth the basis for Plaintiff's arrest on July 29, 2013:

> Around June 1st 2013, he was aggressive with staff because he could not get a hamburger for dinner one night. Staff gave him a sandwich and he got in the face of a staff member and started yelling "you better get me a hamburger".
>
> On or about 7-15-13, he got aggressive with a staff member at his day program and they had to send him to the mental hospital due to his attitude. He was released from the hospital on 7-25-13.
>
> On 7-27-13, the subject told staff that he was going to do something to them if they did not bring him to get his hair cut. Then told another client that he was going to kill them.

(Pl.'s Trial Ex. 11 at TG000014; Defs.'s Trial Ex. 5 at 1–2.)

76. Tubbs testified that he did not decide to arrest George because he suspected George of having committed a crime;[7] indeed, no criminal charges were ever filed against George for

---

[6] As is discussed, *infra*, this affidavit and motion were not executed and filed until August 12, 2013.
[7] Nonetheless, in Pl.'s Trial Ex. 19 at TG000206–207, Tubbs classified George's conduct as a "Level 3 violation – Misdemeanor activity (serious violent)." Tubbs continued, "[George] threatened staff and other clients with violence

any of the activities that gave rise to his arrest. (Tubbs Test., Doc. 148 at 82:14–17.) Tubbs testified that the decision to arrest George was in accordance with LDPSC policy. (*Id*. at 84:17–20.)

77. Rather, the decision to arrest George was made because of the consensus reached among Tubbs, Brady and Vosburg that George was "a danger to himself or others." (Brady Test., Doc. 148 at 124:24–125:23.) Brady considered the behaviors that George was exhibiting at the time of his arrest to be a violation of his conditional release. (*Id.* at 121:24–122:1.)

78. According to Brady, George was "transported to the EBR Parish Jail on 7/29/13 secondary to aggressive and verbally threatening behaviors towards his peers." (Pl.'s Trial Ex. 15 at TG000039.) He states that Vosburg, George's "forensic consultant[,] recommended that he be brought to [ELMHS] for long-term treatment and evaluation services." (*Id.*)

79. On July 29, 2013, the date of George's arrest, Tubbs also "[c]alled Judge Moore['s] section and they got my letter but no court date has been set as of today." (Pl.'s Trial Ex. 19 at TG000206.) The letter Tubbs is referring to is presumably the June 10, 2013 letter sent to Judge Moore asking the Court to "set a review hearing to address his expiration date and violations." (Pl.'s Trial Ex. 9 at 1.) For whatever reason, this information was not elicited from Tubbs during his testimony. As mentioned above, Tubbs' June 10 request for a hearing was never responded to and Tubbs waited until August 12, 2013 to file a written motion to revoke George's probation.

---

for the 3d [sic] time. The group home wanted him out due to his behavior." Tubbs classified his response to George's conduct as "Level 3 Action – Arrest/Detain with Custodial Treatment… Warrant/Motion and Order to Revoke."

80. Plaintiff contends that his behavior at the time of his July 29, 2013 arrest was not substantially different than what he had displayed in the past and did not give probable cause for his arrest and confinement.

81. Defendants counter that his conduct, beginning in May 2013 and escalating up until the time of his arrest on July 29, 2013, was substantially worse and had not been resolved by the May and July hospitalizations. Thus, argue Defendants, George's conduct gave Tubbs probable cause for his arrest.

82. Another main point of contention in the case revolves around why George was taken to EBRPP rather than ELMHS or, alternatively, to a private psychiatric facility as had been done many times in the past, including from July 15 to July 25, 2013.

83. Plaintiff argues that Tubbs and Brady were well aware that George had received treatment at a number of mental health facilities in the community over the years, including at Greenwell Springs, Cypress Hospital, Our Lady of the Lake Hospital, and Beacon Behavioral Health. (Doc. 151 at 15, ¶ 56) (citing Tubbs Test., Doc. 148 at 78–80, *in globo*.)

84. Further, argues Plaintiff, Tubbs and Brady were well aware of Mr. George's need for psychiatric medication. (Doc. 151 at 14, ¶ 53.) As Tubbs testified:

> Q.   And you knew that the symptoms of Mr. George's illness, like his hallucinations and aggressive behaviors, became worse when he missed his medication; isn't that right?
> A.   Yes.

(Tubbs Test., Doc. 148 at 89:21–24; *see also* Brady Test., Doc. 148 at 100:20–101:25.)

85. Tubbs and Brady were also well aware that these hospitalizations were used to manage his behaviors and adjust his medication. (Doc. 151 at 14, ¶ 54.) Tubbs testified:

Q. And the purpose of those hospital stays was also to control Mr. George's hallucinations; is that right?

A. Yes.

Q. And in your experience, if Mr. George missed even one or two doses of his medication, you believe that he wasn't able to control the voices in his head?

A. It was pretty obvious, yes, when he got off his medicines.

(Tubbs Test., Doc. 148 at 69:20–70:2; Brady Test., Doc. 149 at 17:16–25.)

86. Plaintiff stresses that, at the time of George's arrest, Tubbs and Brady were well aware that there was a direct relationship between the medication George was taking for his mental illness and the behavior that led to his arrest. (Doc. 151 at 14-15, ¶ 55) (citing Tubbs Test., Doc. 148 at 80–81, *in globo*, 89–90, *in globo*.)

87. Defendants reply that they tried to place George at ELMHS but there were simply no beds available at that time. (Brady Test., Doc. 148 at 122:4–18.)

88. Brady testified that, following his incarceration at EBRPP and up until his release on August 23, 2013, they continued to check on the availability of beds at ELMHS and "there [were] no beds available, otherwise we would have had him in the hospital." (Brady Test., Doc. 148 at 127:21–22.)[8]

89. Neither Tubbs nor Brady checked to see if beds were available at another facility. (Tubbs Test., Doc. 148 at 86:13–24, 89:4–12; Brady Test., Doc. 148 at 123:6–11.)

90. Defendants offer several reasons for this. First, in response to direct questioning of the Court outside the presence of the jury, both Tubbs and Brady testified that when a NGRI acquittee threatens violence, they believed they had only two choices: to admit him to

---

[8] While the questioning refers to George being released on August 21, 2013, the actual date of release was, according to the stipulation of the parties, August 23, 2013. (Pl.'s Trial Ex. 24 at 4, No. 17.) This discrepancy plays no role in the Court's analysis.

ELMHS, if a bed was available, or place him in jail until a bed could be found there. (Tubbs Test., Doc. 149 at 208:18–211:5; Brady Test., Doc. 149 at 214:10–14.)

> Q. So by your way of thinking, there were two choices: first ELMHS, if there was a bed available, but if not, your only other choice was the parish prison?
>
> A. Correct. Until we could go in front of the judge and the judge could make a decision on what to do with him.

(Tubbs Test., Doc. 149 at 211:1–5.)

91. Furthermore, said Tubbs, "At that time when he's threatening violence towards staff . . . Jackson Hospital would be - - in my opinion, would be the only place that could handle him at that point." (*Id.* at 208:22–24.) Tubbs believed that George's behavior was such that he needed more than a medication adjustment at this time. (Tubbs Test., Doc. 148 at 89:8–12.)

92. In addition, Tubbs testified that he didn't consider another hospital for George because that hospital wouldn't be able to transfer George to court "to address the violation of his conditions of probation." (Tubbs Test., Doc. 148 at 87:5–88:18.)

93. Defendants also argue that, even if Tubbs or Brady had tried to get George admitted to a private hospital, it is unlikely they would have been successful "since nobody wants ELMHS's patients, particularly those having forensic involvement, because they worry about their ability to manage them from a security standpoint." (Doc. 152 at 7, ¶ 62) (citing Kelly Test., Doc. 149 at 75:3–8.)

94. As for transferring Mr. George to Central State Hospital, another state facility, Defendants contend it usually has a long waiting list since they have other referring facilities besides ELMHS and it takes a long time to get someone admitted there. (*Id.* at 7, ¶ 61) (citing Kelly Test., Doc. 149 at 74:18–24.)

95. Finally, Tubbs testified that, on arresting George, he contacted Lisa Burns, the social worker at EBRPP, and informed her that George was being arrested. Based on this discussion, it was his understanding that Burns would follow up and provide him with mental health treatment and medication management. (*Id.* at 4, ¶ 25) (citing Tubbs Test., Doc. 148 at 83:14–17.) This was also Brady's belief. (Brady Test., Doc. 149 at 218:12–17.)

96. Plaintiff faults Tubbs and Brady for not checking on Plaintiff while in EBRPP. (Doc. 151 at 15, ¶ 60.) Defendants respond that Tubbs was not required to check on George after placing him in jail. (Doc. 152 at 4, ¶ 29) (citing Tubbs Test., Doc. 148 at 89:8–12.) Brady testified by the time he went to check on him, George had already been discharged. (Brady Test., Doc. 149 at 14:12–15:16.)

97. For reasons not explained in the record, Tubbs waited until August 12, 2013, 15 days after George had been incarcerated at EBRPP, before moving for revocation and requesting a hearing. (Pl.'s Trial Ex. 11; Defs.'s Trial Ex. 5; Tubbs Test., Doc. 148 at 77:24–78:8.)

98. It appears from the record that George was released after a hearing before Judge Moore on August 23, 2013, not in response to Tubbs' motion but "only after the [George's lawyer] filed a petition for habeas corpus on his behalf in the Nineteenth Judicial District Court of East Baton Rouge." (Doc. 42 at 14, ¶ 57.) Defendants admit that, "[a]s a result of the [habeas corpus] hearing, Judge Chip Moore lifted the probation hold and ordered Mr. George to continue mental health treatment." (Doc. 161 at 6.)

## I. EVENTS FOLLOWING AUGUST 23, 2013 RELEASE FROM EBRPP

99. After his release of August 23, 2013, George was taken directly to Baton Rouge General Hospital and involuntarily committed. (Brady Test., Doc. 149 at 16:11–14.)

100. At that time, he was grossly psychotic and off his medication. (*Id.* at 16:5–6.)

101. Plaintiff alleges that by the time George was released from the EBRPP on August 23, 2013, he had suffered a significant decline in his mental health and never fully recovered to his pre incarceration condition. (Martinez Test., Doc. 148 at 43:1–4, 44:1–18; Hope Test., Doc. 149 at 192:7–19; Smith Test., Doc. 149 at 37:11–17.)

102. Between the time of his discharge on August 23, 2013, and the events of July 1, 2014, the second incident sued upon, George was hospitalized on four occasions, three at private hospitals and finally back at ELMHS. (Brady Test., Doc. 149 at 16:11–18, 17:16–19, 18:1–23.)

**J.  TRUSSELL GEORGE'S DECEMBER 2013 TO DECEMBER 2014 CONDITIONAL RELEASE**

103. In December 2013, prior to the expiration of Mr. George's five-year conditional release period, LDH's District Forensic Coordinator, Brady, requested that George's conditional release be extended an additional year. (Pl.'s Trial Ex. 12 at TG000015-16.)

104. On April 25, 2014, Vosburg did a comprehensive examination and review of prior records for purposes of a risk assessment. (Defs.'s Trial Ex. 8 at 0002.)  In it, he concluded that "there is a high probability of non-compliance with treatment and remediation attempts without continuation of supervision under probationary requirements." (*Id.* at 0010.)

105. On May 14, 2014, the Nineteenth Judicial District Court extended Mr. George's conditional release to December 14, 2014. (Pl.'s Trial Ex. 24 at 4, No. 18.)

## K.   TRUSSELL GEORGE'S ARREST AND INCARCERATION IN 2014

106. Within a week after the May 14, 2014 hearing, Brady arranged for Mr. George to be involuntarily hospitalized at ELMHS. (Brady Test., Doc. 149 at 18:1–21; Pl.'s Trial Ex. 13 at TG000017.)

107. According to Dr. Brad McConville, one of George's treating psychiatrists at ELMHS, ELMHS has approximately 20 psychiatrists, five of whom are full-time. They also have psychologists, full-time nursing staff, dieticians, occupational therapists, recreational therapists and social workers. (McConville Test., Doc. 149 at 155:1–16.)

108. During the summer of 2014, George was at the East Acute Unit (EAU) at ELMHS. At this time, psychiatrist Dr. Clay Kelly oversaw George's care at ELMHS while George's regular psychiatrist, Dr. Ahmad, was on vacation. (Kelly Test., Doc. 149 at 68:1–25.)

109. On June 3, 2014, Kelly issued an order to transfer George to the Cedarview unit, an "intermediate treatment unit in the civil division." (Kelly Test., Doc. 149 at 68:20–69:3; Defs.'s Trial Ex. 9 at 1604.)

110. Cedarview was a "slightly less restrictive unit than East Acute Unit," and Kelly thought that the transfer to the Cedarview unit was a reasonable step for George. (Kelly Test., Doc. 149 at 70:1–6.)  According to Kelly, the whole nature of acute treatment is that, once patients are reasonably stabilized, they are moved to a less restrictive environment. (Kelly Test., Doc. 149 at 72:11–14.)

111. Dr. Ahmad had wanted to transfer rather than release George because he did not believe that George was ready to be returned to a group home. (Kelly Test., Doc. 149 at 69:22–24.)

112. But when Dr. Kelly proposed this move to George on July 1, 2014, George refused to go. (Kelly Test., Doc. 149 at 69:4–72:18–24.)

113. Kelly asked Vosburg to come to the July 1, 2014, meeting with George to discuss moving him to the Cedarview unit and to help explain the plan to gradually step him down out of the acute unit to a less restrictive environment. (Kelly Test., Doc. 149 at 77:10–16.)

114. At the July 1, 2014 meeting, Vosburg informed George that he had the option of moving to a different unit within the ELMHS system but, if he refused the transfer, they could not force him to go the suggested unit. In that event, Vosburg told George, the next logical step would be to place him at the Forensics Unit at ELMHS. (Pl.'s Trial Ex. 13; Kelly Test., Doc. 149 at 79:2-20.)

115. Vosburg further informed George that, if he refused transfer to a different unit, there might not be a bed available at the Forensics unit. In that case, Mr. George would have to wait in jail until a bed became available. (Pl.'s Trial Ex. 13 at TG000017.)

116. George immediately resisted the proposed transfer. (Kelly Test., Doc. 149 at 79:13–17.) He became "very angry" (Pl.'s Trial Ex. 13 at TG000017), and even asked to be sent to jail because he did not want to go to the Cedarview unit. (Kelly Test., Doc. 149 at 78:13–15.) George started yelling at Drs. Kelly and Vosburg, using threatening language toward them. (Kelly Test., Doc. 149 at 79:21–24.)

117. Security guards were called to restrain George in the hallway while Vosburg was escorted off of the unit for his own protection. (Kelly Test., Doc. 149 at 80:1–6.)

118. Kelly contacted the probation officer assigned to George and asked him to remove George from the unit, although Kelly did not instruct the probation officer to take George to jail.

(Kelly Test., Doc. 149 at 80:13–21.) Vosburg did recommend that George be incarcerated at EBRPP. (Pl.'s Trial Ex. 14.)

119. As a consequence of this confrontation, George was arrested and transported to EBRPP by a representative of the DPP for violating the terms of his conditional discharge. (Pl.'s Trial Ex. 13, 14.)

120. Brady was not present during the evaluation of George on July 1, 2014, and found out about the arrest from Vosburg after it had occurred. (Brady Test., Doc. 149 at 18:22-19:7.)

121. According to the Narrative Report created by Bobby Castello dated July 1, 2014, Castello "[r]eceived a call from Dr. Vosburg at the Feliciana Forensic Facility who told me subject… has been violent and disruptive and has not been taking his medicine. Dr. Vosburg wanted subject removed from the facility and brought before Judge Moore for revocation. Myself and Agent Hooge proceeded to ELMHS, arrested subject and transported him to the EBRPP without incident. Eric Brady, DFC, called and told me he would get a court date and let me know when it would be." (Pl.'s Trial Ex. 19 at TG000204.) That court date did not occur until August 22, 2014. (*See id.* at TG000203.)

122. According to Brady's Conditional Release Monthly Review Report of July 1, 2014, Brady stated he would "submit [an] episode report and set [a] motion order to court as well as contact probation officer to assist with transportation to jail." (Pl.'s Trial Ex. 15 at TG000027.)

123. Kelly's decision concerning George on July 1, 2014, was made in light of his history of charges of violence, his previous threatening behavior, and the difficulty George had managing his impulses and rage over the years. (Kelly Test., Doc. 149 at 86:18–22.)

124. Dr. Kelly was also concerned for the safety of the other patients should Mr. George remain on the unit. (Kelly Test., Doc. 149 at 87:7–15.)

125. McConville, another psychiatrist who had treated George, testified that George's violent conduct on July 1, 2014, was not unique. "Other times, he was very influenced by his delusions, would attack staff members. He even got into an altercation, fell and broke his jaw, which had to be surgically repaired. He had incidents like that a lot." (McConville Test., Doc. 149 at 164:22–25.)

126. At this point the Cedarview unit would not have accepted George because of his level of anger and rage. (Kelly Test., Doc. 149 at 81:5–7.)

127. Kelly testified he did not try to give George any acute treatment such as an injection because he felt George was choosing not to comply with his recommended treatment. (Kelly Test., Doc. 149 at 81:22–82:11.)

128. The decision to remove George from ELMHS on July 1, 2014, was made by Vosburg and Kelly, although Brady did not disagree with that decision. (Brady Test., Doc. 149 at 19:22–20:6.)

129. According to Brady's Episode Report, "I consulted with Dr. Vosburg on 7/1/14 after his evaluation with George. He recommended revoking his probation and having probation officer remove him from EAU and placing him in [EBRPP] where he remains at this time. Our office is requesting a revocation hearing to have his probation revoked and then transfer[] Mr. George back to the Forensic Hospital for longer-term treatment and hospitalization." (Pl.'s Trial Ex. 14.)

130. On August 22, 2014, 52 days after he was incarcerated, George was taken to state court. At the conclusion of the hearing, "Judge Moore remanded subject back to the Forensic Facility and said he wanted a report from the doctors in a couple weeks and if subject was doing well he could be transferred back to the group home. If subject was not doing well he would continue to reside at the Forensic Facility for further treatment." (Pl.'s Trial Ex. 19 at TG000203.)

131. Three days later, on August 25, 2014, George was released from EBRPP and placed back at ELMHS. (Pl.'s Trial Ex. 24 at 4, No. 19.)

132. George was not charged with any crime immediately prior to or during the 55 days he was incarcerated between July 1 and August 25, 2014. (*Id.* at 4, No. 20.)

133. At a hearing before state court Judge Richard "Chip" Moore on September 23, 2014, "[s]everal Doctors testified and patient was returned back to the hospital for treatment." (Pl.'s Trial Ex. 1 at TG000024.) Judge Moore ordered George to remain at ELMHS and his placement reviewed at a hearing scheduled for December 11, 2014. (Pl.'s Trial Ex. 24 at 5, No. 21.)

**FINDINGS OF FACT**

134. In making its findings of fact and conclusions of law, the Court has considered the record as a whole. The Court has observed the demeanor of witnesses and has carefully weighed their testimony and credibility in determining the facts of this case and drawing conclusions from those facts. All findings of fact contained in this ruling that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusions of law more appropriately considered a finding of fact shall be so classified.

135. It is important at the outset of these findings to emphasize that the only relevant factual questions are those which inform the issues in this case:

    a.  Did Defendants have in place policies, practices, or procedures causing or allowing NGRI acquittees to be arrested and incarcerated at a correctional facility solely for a violation (or anticipated violation) of the conditions of the acquittee's release, even when no crime had been committed?

    b.  Were George's arrests or incarcerations made pursuant to this policy?

    c.  Even if there were no such policies, procedures or practices, under the specific facts of this case, did George's arrests and subsequent incarcerations at a correctional facility, solely because of a violation of his conditions of release, in the absence of a criminal arrest, violate his substantive due process rights under the United States Constitution and/or his statutory rights under Section 504 and the ADA?

136. Thus, while the Court has considered and comments on other issues presented at trial, its conclusions and ruling are based only on those facts relevant to these issues.

## A. JULY 29, 2013 ARREST AND INCARCERATION

137. At the time of the events sued upon, George was a person with a mental illness who had been found NGRI and was on conditional release subject to his abiding by the conditions set forth in a conditional release order of the Nineteenth Judicial District Court of the State of Louisiana. (Order, Pl.'s Trial Ex. 1 at TG000001.)

138. From the time of his conditional release in 2009 until May 2014, George resided primarily in group homes (known more technically as Intermediate Care Facilities for the Developmentally Disabled) but was occasionally admitted to private hospitals when his

behavior and need for medication adjustment warranted. (Trial Stipulations, Pl.'s Trial Ex. 24, Trial Stipulation 4; Martinez Test., Trial Tr. vol. 1, Doc. 148 at 35:4–21.)

139. Despite being hospitalized in May 2013, George's aggressive conduct escalated in frequency and severity during May and June. On May 24, 2013, Brady submitted an episode report to the state district court indicating that staff at Progressive Health Care had reported to him that George "had two episodes of verbal aggression and verbal threats within the last two (2) weeks to have one of his family members attack one of their direct care staff members." (Pl.'s Trial Ex. 8 at 1; Defs.' Trial Ex. 3 at 1.)

140. In this report, Brady also noted that, although George had been recently hospitalized for approximately two weeks at Beacon Behavioral Hospital in Lutcher, Louisiana, and had received a medication adjustment, "his behavior seemingly has escalated towards direct care personnel." (Pl.'s Trial Ex. 8 at 1; Defs.' Trial Ex. 3 at 1.)

141. Because of George's escalating behavior, Tubbs wrote Judge Richard "Chip" Moore on June 10, 2013, to report his behavior and ask the court to "set a review hearing to address his expiration date and violations." (Pl.'s Trial Ex. 9 at TG000011; Defs.' Trial Ex. 4 at 0001; Tubbs Test., Doc. 148 at 75:1–9.) The Court never responded to this request. (Tubbs Test., Doc. 148 at 75:24–76:1.)

142. Because of continued aggressive behavior in July, George was hospitalized from July 15 until July 25, 2013. (Defs.' Trial Ex. 5 at 1.) But despite this hospitalization, Brady felt George's medication was not working and felt something "wasn't right" and that "the medicine they adjusted wasn't working for him." (Brady Test., Doc. 148 at 80:4–9.)

143. This concern was vindicated when "[o]n July 27, 2013, [George] told staff that he was going to do something to them if they did not bring him to get his hair cut. Then [he] told another client he was going to kill them." (Defs.' Trial Ex. 5 at 1.) Tubbs was told by staff at the group home that George assaulted or physically harmed a staff member. (Tubbs Test., Doc. 148 at 79:2-14.) Although not noted in his records, the Court accepts this testimony as credible.

144. While Tubbs testified that he arrested George even though George had committed no crime, (Tubbs Test., Doc. 148 at 82), the evidence shows that George's behavior was arguably criminal. La. Rev. Stat. Ann. §§ 14:33, 35, 36, 38. Indeed, Tubbs himself classified George's conduct as a "Level 3 violation – Misdemeanor activity (serious violent)." Tubbs continued, "[George] threatened staff and other clients with violence for the 3d [sic] time. The group home wanted him out due to his behavior." Tubbs classified his response to George's conduct as "Level 3 Action – Arrest/Detain with Custodial Treatment… Warrant/Motion and Order to Revoke." (Pl.'s Trial Ex. 19 at TG000206–207.)

145. George's conduct during these months reasonably led Defendants Tubbs, Brady, and Vosburg to believe they had probable cause to arrest George for the violation or imminent violation of his terms of conditional release, specifically, these two terms:

    a. Any physically assaultive/aggressive behaviors shall be reported to the District Forensic Coordinator or State Probation Officer. Violations of this condition may result in immediate return to custody or intensified treatment if recommended by the District Forensic Coordinator or Probation Officer. (Pl.'s Trial Ex. 1 at TG000002, ¶ K; *see also* Pl.'s Trial Ex. 24 at 1, No. 3.)

    b. It shall be a condition of every such probation that the person released shall be recommitted if he becomes dangerous to others or to himself

for reasons of his mental illness, substance abuse, or intellectual disability. La. Code. Crim. Proc. art. 658(A).

146. In accordance with the policies, practices and procedures of both LADPSC and LDH (Tubbs Test., Doc. 148 at 84:17-20), after consultation with Vosburg and Brady (Brady Test. Doc. 148 at 125:20-23), because they believed George had violated conditions of his release, (Brady Test., Doc. 148 at 121:24-122:1), and because they believed George presented a danger to himself and others, (Brady Test., Doc. 148 at 124:17-23), Tubbs effected George's arrest on July 29, 2013.

147. However, despite the requirement of La. Code Crim. Proc. art. 658(B)(6) that the arrest of an acquittee be preceded by a motion of the court or District Attorney or probation officer, no such motion was filed, and no request was made to revoke George's conditional release until August 12, 2013, 14 days after his arrest and incarceration, when Tubbs filed his "Detainer Notification, Affidavit of Probable Cause and Motion for Hearing to Revoke Probation." (Defs.' Trial Ex. 5 at 1-2; Pl.'s Trial Ex. 19 at TG000206.)

148. Despite the requirement of La. Code Crim. Proc. art. 658(B)(6) that a hearing take place "immediately" following the arrest to "consider the violations listed . . . ," there is no evidence in the record that such a hearing ever took place following George's July 29, 2013, arrest. The hearing which occurred on August 23, 2013 was a response, not to a motion or request by state actors, but to Plaintiff's petition for habeas corpus.

149. And although a warrantless arrest is authorized by La. Code Crim. Proc. arts. 658(B)(1) and 899(B), there is no evidence in the record that the procedure required by these statutes was followed, *i.e.*, that "a written report showing in what manner the defendant violated, or was

about to violate, a condition of his probation" was "immediately" submitted. Rather, that report was not submitted until August 12, 2013. (Defs.' Trial Ex. 5.)

150. The only evidence in the record regarding any contact with the court about George's arrest on the day of his arrest shows that Tubbs "[c]alled Judge Moore['s] section and they got my letter [presumably, his letter of June 10, 2013] but no court date has been set as of today." (Pl.'s Trial Ex. 19 at TG000206.)

151. While not found in record evidence, Plaintiff's Second Amended Complaint alleges it was his counsel's petition for habeas corpus that effected George's August 23, 2013, release. (Second Amended Complaint, Doc. 42 at 14, ¶ 57.) Defendants agree George's attorney filed a petition for habeas corpus "which appears to have been filed the same day as the hearing. As a result of the hearing, Judge Chip Moore lifted the probation hold and ordered Mr. George to continue mental health treatment." (Doc. 161 at 6.)

152. Hope's testimony shows that there was a court hearing on that day where she talked to the judge, "I guess off-the-record . . . ." (Hope Test., Doc. 149 at 192-93.)

153. Initially, Vosburg, Brady and Tubbs intended that, following his arrest, George be admitted to ELMHS. However, after inquiring, Brady was told that there was no bed available there. (Tubbs Test., Doc. 148 at 86:13–24; Brady Test., Doc. 148 at 122:4–127:23.) Brady also testified, and the Court accepts this testimony as true, that during the entire period of George's 2013 incarceration, Brady continued to inquire as to the availability of a bed at ELMHS but was told each time that there was none. (Brady Test., Doc. 148 at 127:1-22.)

154. Tubbs testified that he did not attempt to get George admitted to a private hospital because he felt he could not do so without an order of the Court. (Tubbs Test., Doc. 149 at 208:2–

211:5.) Unexplained in the record is how he was able to admit George to private hospitals, seemingly without a court order, on numerous previous occasions, including in May and June 2013 and on August 23, 2013, when George was released from EBRPP and immediately admitted to Baton Rouge General Hospital.

155. Tubbs also said that he did not try to get George into a private hospital because, given the level of George's aggressive conduct, ELMHS was the only facility that could handle Plaintiff at that time. (Tubbs Test., Doc. 149 at 208:2–24.)  However, this seems to be belied by Brady's Episode Report of March 2010 to Judge Moore that, following similar conduct in May–July 2013,[9] George was not placed in ELMHS nor was he arrested and incarcerated. Rather, "[t]hey were able to transport him to Our Lady of the Lake Hospital for emergency evaluation. He was later transferred to Cypress Hospital for inpatient acute psychiatric hospitalization where he remains at this time." (Pl.'s Trial Ex. 5.) Furthermore, Brady and Tubbs were able to have George admitted to private hospitals in both May and July 2015, and, indeed on August 23, 2013, although his conduct during that time was similar to that which provoked his arrest and incarceration.

156. Tubbs stated in his deposition that he didn't try to get George into a private hospital because such a hospital could not transport him to court "to address the violations of his conditions of probation." (Tubbs Test., Doc. 148 at 87:19–88:14.)  This assertion seems disingenuous at best since there is no evidence to suggest that LDPSC could not have arranged for such transportation (*Id.* at 88:15–18) and, furthermore, Tubbs waited 14 days before moving the court for a hearing.

---

[9] George "shoved male staff[,] not causing physical harm;" threatened "homicidal ideations" [sic] towards staff members and "accused a male staff member of trying to poison him." (Pl.'s Trial Ex. 5 at TG000006.)

157. In view of the many occasions in which Brady and Tubbs had been able to place George in a private facility, Tubbs' statement that such a facility would not likely have taken George because of concerns about their "ability to manage [him] from… a security standpoint" (Kelly Test., Doc. 149 at 75:6–8; *see also* Tubbs Test., Doc. 149 at 208:2–24) is likewise suspect.

158. On the other hand, Plaintiff offered no direct evidence that if Tubbs and Brady had tried to place George in a private or other state hospital on July 29, 2013, they would have been successful.

**B.   ADEQUACY OF MEDICAL CARE AT EBRPP**

159. The Court finds that while EBRPP provided some medical and psychiatric care for George (*See, e.g.* Burns Test., Doc. 149 at 106:13–25), this care was not comparable with the care he would have received at ELMHS or a private hospital.

160. Indeed, there are important differences between the care available there and that available at ELMHS.

161.  When George entered EBRPP, he was not allowed to bring his medicines with him and new medicines needed to be ordered. This resulted in George being without his medicines from around July 31 until August 10, 2013. (Burns Test., Doc. 149 at 112:8–115:16, 119:1–18.) [10]

162.  Furthermore, jails cannot force inmates to take medications. (Brady Test., Doc. 149 at 15:20–24.) By contrast, ELMHS is "a psychiatric hospital with the ability to force medications on its patients." (*Id.* at 19:8–10.)

---

[10] In George's case, the staff at Progressive attempted to bring him his medications on the date of his July 2013 arrest, but "staff were turned around." (Hope Test., Doc. 149 at 194:16.)

163. This resulted, for instance, in George receiving only a percentage of his medications while in EBRPP. Specifically, George received his Zantac only 46% of the time in the morning and 88% at night (Burns Test., Doc. 149 at 115:4–16); Depakote (a mood stabilizer) 8% in the morning and 76% at night (*Id.* at 124:7–13); Cogentin (to treat side effects of anti-psychotic drugs), 8% in the morning and 67% at night (*Id.* at 124:16–125:1); and Clonazepam (an anti-anxiety drug) 4% in the morning and 29 % at night. (*Id.* at 125:2–7.)

164. Furthermore, there were many services available at ELMHS not available at EBRPP. Kelly testified that these services included, for instance, treatment track groups (probably a focus track) led by social workers. (Kelly Test., Doc. 149 at 103:1–21.)

165. While in EBRPP, George was relegated to solitary confinement for his own safety. (Brady Test., Doc. 149 at 14:5–11, 20:21–21:1–7.) ELMHS staff, on the other hand, would have given George "as much freedom as possible," and he would have been allowed to interact with the 20 other patients on the unit. (McConville Test., Doc. 149 at 163:11–164:13.)

166. The Court finds that Plaintiff's condition worsened during his stay at EBRPP. While there was some evidence that his condition was made permanently worse, the Court finds it unnecessary to decide this issue since Plaintiff's claims for damages were dismissed.

167. As to Plaintiff's claims under the ADA and Section 504, the jury found that Defendants had not discriminated against George based on his disabilities or failed to provide him with a reasonable modification appropriate for his disabilities. (Doc. 144 at 1-2.) As is discussed in the Conclusions of Law section, under the standard the Court is bound to apply in evaluating these jury findings, the Court concludes that there was no error in either finding.

## C.  JULY 2014 ARREST AND INCARCERATION

168.  At the time of George's July 1, 2014, arrest, he was in the Acute Unit ward at ELMHS.

169.  Ironically, the dispute arose as George's psychiatrist (Kelly) and psychologist (Vosburg) were attempting to convince George to allow him to be transferred to a less restrictive unit.

170.  The Court finds that Kelly and Vosburg, both trained, knowledgeable and experienced with psychiatric patients generally, and with George specifically, reasonably felt physically threatened by George. Kelly described the situation as follows:

> They had to restrain him in the hallway and because of the threats he was yelling at Dr. Vosburg in particular, we - - we - - I talked to one of the CGTS to escort Dr. Vosburg off the unit for his own protection. And at that point, I didn't feel it was safe to leave Mr. George on our unit because I wasn't just concerned about Dr. Vosburg, I was concerned about my other civil patients on the unit that could be endangered by his, you know, behavior.

(Kelly Test., Doc. 149 at 80:2-11.)

171.  George's probation officer was called and, although it was that officer's decision to take him to jail, Dr. Kelly stated that he could be moved into the Forensic Division if he had had a bed but he told the officer "I doubted [] if they did." (Kelly Test., Doc. 149 at 80:23-24.)

172.  It appears that the probation officers who made this arrest were agents Bobby Castello and "Hooge," not Defendants Tubbs or Brady. (Pl.'s Trial Ex. 19 at TG000204; Brady Test., Doc. 149 at 18:22-19:7.) Plaintiff has not challenged the conduct of Castello and Hooge.

173.  The Court finds that there was reasonable and probable cause to believe that an emergency existed such that awaiting a court order to arrest George would have created an undue risk to Kelly, Vosburg and other ELMHS staff and patients and to George himself.

174. Under the circumstances, transfer of George to a private hospital was unnecessary, impractical and unwise.

175. However, for reasons unclear in the record, no one notified the court about George's arrest and incarceration or filed a written report or sought a hearing before the court to assess George's status until August 19, 2014. (Pl.'s Trial Ex. 19 at TG000203.)

176. It wasn't until August 22, 2014, that a hearing was held and on August 25, 2014, that George was finally released back to ELMHS, 55 days after his arrest. (*Id.*) While Kelly testified he "doubted" there were any beds in the Forensic Unit on the date George was arrested (Kelly Test., Doc. 149 at 80:23-24), the record is unclear when a bed became available.

### D. POLICY, PROCEDURE OR PRACTICE, *VEL NON*

177. Plaintiff correctly maintains (Pl.'s Request for Findings of Fact and Rulings of Law, Doc. 151 at 11, ¶ 43) that the decision to arrest and incarcerate NGRI acquittees is generally made jointly by employees of Defendants LDPSC and LDH. (Tubbs Test., Doc. 148 at 83:22–84:20; Brady Test., Doc. 148 at 93:20–94:8.)

178. But Plaintiff goes further, insisting that Defendants had a "practice and policy . . . to arrest and incarcerate individuals on conditional discharge who have violated a term of their conditional release." (Pl.'s Request for Findings of Fact and Rulings of Law, Doc. 151 at 10, ¶ 40) (citing Tubbs Test., Doc. 148 at 84:11 – 84:20.)

179. In support of its argument that such arrests are part of a policy, procedure and practice, Plaintiff points the Court (Pl.'s Request for Findings of Fact and Rulings of Law, Doc. 151 at 10, ¶ 40) to the testimony of Defendant Tubbs, where he states that "over the years, [he] *moved to revoke* somewhere around 12 to 18 of the Not Guilty By Reason of Insanity folks

that [he] supervise[s]" and that, of those, most of them were taken to the New Orleans Parish Prison. (Tubbs Test., Doc. 148 at 84:21 – 85:3 (emphasis added).)

180. First, the Court notes that, in these other instances, unlike the two incidents complained of, there was a *motion* to revoke the probation of the acquittee and, indeed, the conditional discharges had been *revoked*. (Tubbs Test., Doc. 148 at 85:20-25.)

181. In addition, Plaintiff offered no proof as to the specifics of the other arrests and incarcerations, including whether the acquittees had committed a crime and, if not, the seriousness of the conduct that provoked the arrest and whether it involved physically aggressive and assaultive behavior or a danger to the acquittee or others. In these important respects, Plaintiff has failed to prove any policy, practice or procedure.[11]

182. Plaintiff did establish that George's July 29, 2013, arrest was "in accordance with [LDPSC] departmental policy." (Tubbs Test., Doc. 148 at 84:17-20.) But the parameters of that policy were not established, and the Court is left to conclude that the policy involved the arrest and incarceration not, as Plaintiff contends, of *any* NGRI acquittee solely because he has violated *any* condition of release.

183. Rather, if the policy, practice, and procedure mirrors the circumstances of George's arrest and initial incarceration, and the Court so finds, then it allowed for the arrest and incarceration of an NGRI acquittee who has violated conditions of release prohibiting him from engaging in physically assaultive and aggressive behavior and presenting a danger to himself and others.

---

[11] While not relevant to the Court's decision, the Court also notes that there was no evidence as to how long the acquittees, in these other arrests and incarcerations remained incarcerated before a court hearing was held or how long these individuals remained incarcerated before being released to ELMHS or other psychiatric facility. There was no policy, practice or procedure demonstrated in this regard either.

184. The Court also notes that the arrest and incarceration of July 1, 2014, is, in some respects, different than the July 29, 2013, arrest. The former involved aggressive behavior and an arrest at a group home. The latter occurred at ELMHS.

185. As is discussed *infra*, the Court is troubled by the evidence indicating that, in one instance, George was jailed for 25 days until his lawyer got him released pursuant to a habeas corpus petition and, in the other, 52 days before a hearing and a total of 55 days before he was released back to ELMHS. But Plaintiff has made clear that "issues of length of incarceration before release [and] length of incarceration without or before a hearing" are not before the Court. (Doc. 163; *see also* Doc. 42 at 2; 6, ¶¶ 14–17; 9, ¶ 30; and 23–24, ¶¶ 87–94.) But even if the length of George's stay was an issue before the Court, these two instances do not prove a policy, procedure, or practice.

186. The Court is similarly troubled by the medical care George received at EBRPP which was incontestably inferior to that he would have received at ELMHS and appears to have done serious harm to George's psychiatric condition. However, for similar reasons, this is not before the Court and, in any event, was not proven to be part of a policy, practice, or procedure of the Defendants.

## E. DISCRETE SUBSTANTIVE DUE PROCESS VIOLATIONS TO GEORGE, *VEL NON*

187. In addition to Plaintiff's complaints about Defendants' policies, procedures, and practices, Plaintiff claims "Defendants' actions . . . which caused Plaintiff to be confined in a correctional facility for the sole reason that he is alleged to have violated a condition of his release, violate his rights under the Due Process Clause to the United States Constitution." (Doc. 42 at 19, ¶ 93.)

188. This substantive due process claim also challenges his arrest and incarceration for the "sole reason that he has violated a condition of his release," (*id*.) without regard to the length or circumstances of his extended incarceration or the quality of the medical care received there. (Doc. 163.)

189. In this regard, the Court finds that, on both occasions, George was arrested and removed from the group home because his aggressive behavior violated the terms of his conditions of release in that he was "physically assaultive and aggressive" and posed a danger to others. George's first incarceration at EBRPP was because Brady could not find a bed for him at ELMHS. His second, by non-Defendant agents, was presumably for a similar reason, *i.e.*, there were no beds in the Forensic Unit where George otherwise would have been placed.

190. As with the Court's previous finding regarding Plaintiff's charge of an unconditional policy, practice or procedure, the Court finds that George's arrest was not for his violation of "any" condition of his release but, importantly, because his behavior presented a danger to others.

191. The Court finds that Tubbs, Brady and Vosburg had reasonable and probable cause to believe that, for this reason, George had violated and was likely to continue to violate those specific conditions of his release.

## CONCLUSIONS OF LAW

### A. JURISDICTION AND VENUE

192. George is properly represented in this matter by his niece and guardian ad litem, Letetica Walker, pursuant to Federal Rules of Civil Procedure 17(b)(1) and 17(c)(2) and the laws of Louisiana governing competency. (Memo. in Support of Mot. to Appoint Guardian ad Litem, Doc. 58-1, *in globo*; Order Granting Motion, Doc. 63, *in globo.*)

193. Both are residents of Louisiana. Plaintiff is suing Defendants for claims arising under the Fourteenth Amendment to the United States Constitution; 42 U.S.C. § 1983; Section 504, 29 U.S.C. § 794(a); and Title II of the ADA, 42 U.S.C. § 12132. Defendants are state agencies and their officers. Thus, this Court's subject matter jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343.

194. George is seeking declaratory relief pursuant to 28 U.S.C. § 2202 and prospective injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

195. Venue in the Middle District of Louisiana is proper under 28 U.S.C. § 1391(b)(1) and (2).

196. George's claims for declaratory and injunctive relief are justiciable under Article III of the Constitution since they allege facts which raise the issue of whether the alleged violations of George's due process rights are "capable of repetition, yet evading review." *Catholic Leadership Coal. Of Texas v. Reisman*, 764 F.3d 409, 422 (5th Cir. 2014); *Moore v. Hosemann*, 591 F.3d 741, 744 (5th Cir. 2009); *Cooper v. Kliebert*, 2014 WL 7334911 at *4 (M.D. La. Dec. 19, 2014).

### B. PARTIES

197. Plaintiff's constitutional claims for prospective relief are against state agencies and individuals sued in their official capacities only. (Docs. 129 and 138; Tr. Transcript, Doc. 148 at 26:19-27:17.) These claims are therefore not barred by the state's sovereign immunity. *Ex Parte Young*, 209 U.S. 123 (1908); *Cox v. City of Dallas*, 256 F.3d 281, 307–09 (5th Cir. 2001); *Cooper*, 2014 WL 7334911 at *2.

## C.  ISSUES BEFORE THE COURT

198.  As the Court has stated twice previously, following Plaintiff's dismissal of his Section 1983 damages claims and the Court's ruling on Plaintiff's facial constitutional challenge to La. Code Crim. Proc. arts. 658 and 899 (Doc. 124 at 3, 22-26), the constitutional issues in this action are narrowly limited to whether George's arrest and subsequent incarceration for violations of his release, in the absence of a criminal arrest, violated his constitutional right to due process.

## D.  STATUTORY RIGHTS OF THOSE FOUND NOT GUILTY BY REASON OF INSANITY

199.  Louisiana Revised Statute 14:14 states that an individual charged with a criminal offense is exempt from criminal responsibility for his behavior, and is thus not guilty by reason of insanity, when "the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question."

200.  Louisiana Revised Statute 28:2(20) defines a mentally ill person as "any person with a psychiatric disorder which has substantial adverse effects on his ability to function and who requires care and treatment."

201.  The statutory structure under which George was twice arrested and detained is found in La. Code Crim. Proc. arts. 654-658 and 899. A summary of those articles pertinent to the issues before the Court follows.

202.  La. Code Crim. Proc. art. 654 provides that if the defendant is found NGRI in a non-capital case, the court shall remand him to the parish jail or to a private mental institution approved by the court and "promptly hold a contradictory hearing" to determine whether he is a

danger to himself or others and therefore whether he can be released, with or without conditions, or must remain committed in the mental institution.

203. Specifically, art. 654 provides, in pertinent part: "If the court determines that the defendant can be discharged or released on probation without danger to others or to himself, the court shall either order his discharge, or order his release on probation subject to specified conditions for a fixed or an indeterminate period."

204. Louisiana Revised Statute 28:2(6) defines "dangerous to others" as "the condition of a person whose behavior or significant threats support a reasonable expectation that there is a substantial risk that he will inflict physical harm upon another person in the near future." Louisiana Revised Statute 28:2(7) defines "dangerous to self" as "the condition of a person whose behavior, significant threats or inaction supports a reasonable expectation that there is a substantial risk that he will inflict physical or severe emotional harm upon his own person."

205. In ordering a conditional release from a mental health facility, the court "shall subject a conditionally released insanity acquittee to such orders and conditions it deems will best meet the acquittee's need for treatment, supervision, and monitoring and will best serve the interests of justice and society." La. Code Crim. Proc. art. 657.1(B).

206. The acquittee on probation (also known as the "probationer") "shall be under the supervision of the division of probation and parole." La. Code Crim. Proc. art 658(B)(1).

207. In this case, George was released on specified conditions, which were in place at the time of both arrests and detentions in the EBRPP. Especially important in this case is the following condition:

Any physically assaultive/aggressive behaviors shall be reported to the District Forensic Coordinator or State Probation Officer. Violations of this condition may result in immediate return to custody or intensified treatment if recommended by the District Forensic Coordinator and State Probation Officer.

(Pl.'s Trial Ex. 1 at TG000002.)

208. In addition to whatever specific conditions are placed by the court, "[i]t shall be a condition of *every* such probation that the person released shall be recommitted if he becomes dangerous to others or to himself for reasons of mental illness . . . " La. Code Crim. Proc. art. 658(A) (emphasis added).

209. Also of importance in this case is the following provision: "When the probationer violates or is about to violate the conditions of his probation, he may be arrested and detained in conformity with the applicable provisions of Article 899 of this Code." La. Code Crim. Proc. art. 658(B)(1).[12]

210. La. Code Crim. Proc. art. 899(B) states, in pertinent part: "If a probation officer has reasonable cause to believe that a [probationer] has violated or is about to violate a condition of his probation or that an emergency exists so that awaiting an order of the court would create an undue risk to the public or the probationer, the probation officer may arrest the [probationer] without a warrant . . . . The probation officer shall immediately notify the proper court of the arrest and shall submit a written report showing what manner the [probationer] violated, or was about to violate, a condition of his probation."

---

[12] This Court has previously held in this matter that neither La. Code Crim. Proc. art. 658(B) nor La. Code Crim. Proc. art. 899 are unconstitutional on their face. (See Doc. 124 at 22-24.)

211. La. Code Crim. Proc. art. 899(E) provides, in pertinent part: "Within ten days following the arrest of [a probationer] pursuant to the provisions of this Article, the Court shall determine if there is probable cause to detain him pending a final violation hearing . . . "

212. Presumably designed to work in conjunction with art. 658(B)(1), La. Code Crim. Proc. art. 658(B)(5) provides:

> The division of probation and parole or the Louisiana Department of Health through the conditional release program coordinator or a designee shall immediately notify the court of any substantive violations or imminent violations of the conditions of the person's probated release and shall present recommendations to the court regarding whether the court should revoke the probation and recommit the probationer to a state mental institution or other recommendations as may be appropriate.

213. Upon receiving the report recommending revocation or other disposition, the court may, on its own motion or that of the District Attorney or probation officer, "cause the person to be arrested, if he is not already in custody, and shall immediately hold a hearing to consider the violations listed . . . " La. Code Crim. Proc. art. 658(B)(6).

214. If the court determines that there has been a violation of a term of the conditional release or that the acquittee was about to violate the conditions of release, it may do any of the following:

> (1)     Reprimand and warn the probationer;
>
> (2)     Order that supervision be intensified;
>
> (3)     Modify or add additional conditions to the probation;
>
> (4)     Revoke the probation and recommit the probationer to a state mental institution, subject to consideration for discharge or release on probation only after one year has elapsed from the date of revocation and in accordance with the procedure prescribed in Articles 655 through 657 for a first application and hearing.

La. Code Crim. Proc. art. 658(C).

215. Although art. 658(C) does not list as one of its options the arrest and incarceration of the acquittee, art. 658(B)(1) specifically authorizes the arrest and detention of the probationer/acquittee in conformity with art. 899 "[w]hen the probationer violates or is about to violate the conditions of his probation." Art. 899, as mentioned above, authorizes the arrest of a probationer without a warrant if the probation officer "has reasonable cause to believe that a [probationer] has violated or is about to violate a condition of his probation."

216. Louisiana's statutory scheme also envisions a situation where (without mention of a violation or imminent violation of conditions of release), the probationer/acquittee "is in need of acute, *i.e.* short term, hospitalization and is not charged with a new criminal offense . . ." La. Code Crim. Proc. art. 658(B)(4). In such a circumstance, he "may be voluntarily admitted pursuant to R.S. 28:52 or admitted by emergency certificate pursuant to R.S. 28:53 to the Feleciana Forensic Facility or to another suitable treatment facility, with subsequent notice to the court."

217. While Plaintiff argues that this provision could have been utilized where the probationer/acquittee violated or was about to violate his terms of supervised released (P Brief, Doc. 151, ¶ 128), the provision does not explicitly state this.

### E. SUBSTANTIVE DUE PROCESS RIGHTS OF NGRI <u>ACQUITTEES</u> AND STANDARD FOR APPLYING THEM

218. In addition to its procedural protections, the Due Process Clause of the Fourteenth Amendment "contains a substantive component that bars certain arbitrary, wrongful government actions" that deprive a person of life, liberty, or property "'regardless of the

fairness of the procedures used to implement them.'" *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (quoting *Zinermon v. Burch*, 494 U.S. 113, 125 (1990)).

219. Among the liberty interests protected by this substantive portion of the Due Process Clause are certain fundamental rights such as the freedom from confinement or bodily restraint, which "has always been at the core of the liberty protected by the Due Process Clause from arbitrary action." *Id.*

220. A finding of NGRI means that the defense has proven by a preponderance of the evidence that the defendant was insane at the time the acts were committed and thus cannot be punished for such acts. *Jones v. United States,* 463 U.S. 354, 369 (1983).

221. On the other hand, this does not mean that the NGRI acquittee is free to resume his life unfettered by any restrictions. Society has an interest in insuring that an insanity acquittee poses no danger to himself or the public. *Id.* at 368.

222. "[T]he governing legal principle derived from *Foucha* and *Jones* is that a state may continue to confine an insanity acquittee only as long as the acquittee is both mentally ill and dangerous." *Poree v. Collins*, 866 F.3d 235, 248 (5th Cir. 2017) (citing *Jones*, 463 U.S. at 368-70; *Foucha*, 504 U.S. at 77-78).

223. Stated another way, "[t]ogether, *Jones* and *Foucha* establish that the state must prove two conditions to justify continued confinement of an NGRI acquittee: mental illness and dangerousness." *Id*.

224. Regardless of the purpose of confinement, however, the Supreme Court has repeatedly recognized that "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Jones*, 463 U.S. at 361. *See also Addington v. Texas*,

441 U.S. 418 (1979); *Jackson v. Indiana*, 406 U.S. 715 (1972); *Humphrey v. Cady*, 405 U.S. 504 (1972); *Specht v. Patterson*, 386 U.S. 605 (1967).

225. In the case of an NGRI acquittee, constitutionally permissible purposes for confinement include treating the mental illness and protecting the acquittee and society from his *potential* dangerousness. *Jones*, 463 U.S. at 368 (emphasis added).

226. While "the Supreme Court has not provided any yardstick for determining what probability of danger is sufficient [to satisfy the substantive due process standard for confinement] and that which falls short[,]" *Poree*, 866 F.3d at 249, the Fifth Circuit has approved of a Louisiana state court's continued confinement of an NGRI acquittee based on his "potential for both danger to himself and others," coupled with a finding of his mental illness, holding such confinement was not contrary to clearly established federal law. *Id.* at 249-251.[13]

227. In delineating the boundaries of the Fourteenth Amendment's due process protections for NGRI acquittees, courts have often looked to the protections given to individuals who have been civilly committed or to pretrial detainees. *See e.g., Poree*, 866 F.3d at 244-245 & n.31. (also observing that Louisiana's statutory scheme "likens conditional release [of an NGRI acquittee] to probation."). And there is reason for this favorable comparison since an NGRI acquittee, like a pretrial detainee or one civilly committed, has not been found legally responsible for the commission of a crime.

228. But there are important differences too. As stated by the District Court's decision in *Poree*:

> The Supreme Court has also recognized that different considerations
> underlie the commitment of insanity acquittees, holding that "insanity

---

[13] While not determinative in this case, the Fifth Circuit in *Poree* felt "compelled to note" that Louisiana's statutory requirement that confinement is justified only when there is a "reasonable expectation that there is a substantial risk" that the acquittee will cause harm, La. Rev. Stat. Ann. §§ 28:2(3) and (4), is a more demanding standard than that applied by the state court and approved of by the Fifth Circuit. 866 F.3d at 249-50.

acquittees constitute a special class that should be treated differently from other candidates for commitment." *Jones*, 463 U.S. [at] 370. For example, "the fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness." *Id.* at 364 (citing *Lynch v. Overholser*, 369 U.S. 705, 714 (1962) (that the accused was found to have committed a criminal act is "strong evidence that his continued liberty could imperil 'the preservation of the peace' ")). The Court has also indicated that concrete evidence that an individual committed a crime is "at least as persuasive as any predictions about dangerousness that might be made in a civil-commitment proceeding." *Jones*, 463 U.S. at 364–65.

Additionally, the U.S. Fifth Circuit has indicated that, although insanity acquittees are entitled to substantially the same procedural protections afforded civil committees, insanity acquittees can be viewed differently when being considered for release since the "prior antisocial conduct of an insanity acquittee justifies treating such a person differently ..." *Powell v. Florida*, 579 F.2d 324, 333 (5th Cir. 1978). *See also, Warren v. Harvey*, 632 F.2d 925, 931 (2nd Cir. 1980) (that insanity acquittees have been found, beyond a reasonable doubt, to have committed a criminal act indicates they have "proved themselves a danger to society at one time").

*Poree v. Kollins*, 2014 WL 346081 at *8 (E.D. La. Jan. 29, 2014), *aff'd*. 866 F.3d 235 (5th Cir. 2017).

229. On the issue of the legal standard by which to measure the alleged due process breach in this case, Plaintiff argues that "[t]he closest analogue to the liberty interests of NGRI acquittees arises in the civil commitment context." (Doc. 151, ¶ 133) (citing *Youngberg v. Romeo*, 457 U.S. 307 (1982) (finding a liberty interest in adequate medical care and treatment for the intellectually disabled); *Savidge v. Fincannon*, 836 F.2d 898 (5th Cir. 1988) (tracing the constitutional right to treatment); *Welsch v. Likins*, 373 F. Supp. 487, 491–500 (D. Minn. 1974), supplemented, 68 F.R.D. 589 (D. Minn. 1975), aff'd, 525 F.2d 987 (8th Cir. 1975)).

230. As such, argues Plaintiff, the standard of review for violations of the substantive due process rights of NGRI acquittees is distinct from the "deliberate indifference" standard that the

Supreme Court has applied to certain government actions. (P Brief, Doc. 151, ¶ 145.) Rather, the proper test involves balancing the individual's liberty interests against the legitimate interests of the state. (Doc. 151, ¶¶ 147, 149) (citing *Youngberg*, 457 U.S. at 324; *Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004)).

231. Plaintiff contends that, to properly apply the *Youngberg* balancing test, this Court should use a "least-restrictive-means analysis" as was used by the Eleventh Circuit in *Lynch v. Baxley*, 744 F.2d 1452 (11th Cir. 1984), which ruled that, while state and local governments had a compelling interest in safety of the individual and society, they must confine those awaiting civil commitments in the least restrictive setting, *i.e.*, in a public or private hospital instead of county jails. (Doc. 151, ¶¶ 132, 148) (citing *Lynch*, 744 F.2d at 1457-61).

232. Plaintiff points to the Ninth Circuit's decision in *Jones v. Blanas* for the proposition that "[w]ith respect to an individual confined awaiting adjudication under civil process, a presumption of punitive conditions arises where the individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held, or where the individual is detained under conditions more restrictive than those he or she would face upon commitment." (P Brief, Doc. 151, ¶ 150) (citing *Jones*, 393 F.3d at 934).

233. Plaintiff also urges the Court to look to similar due process considerations which arise in the criminal context during incompetency proceedings, citing *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1121–22 (9th Cir. 2003) ("[h]olding incapacitated criminal defendants in jail for weeks or months violates their due process rights because the nature and duration of their incarceration bears no reasonable relation to the evaluative and restorative purposes

for which courts commit those individuals"); *Trueblood v. Wash. State Dep't of Social and Health Svcs.*, 101 F. Supp. 3d 1010 (W.D. Wash. 2015), *rev'd on other grounds*, 2016 WL 2610233 (9th Cir. 2016); and *Terry ex rel. Terry v. Hill*, 232 F. Supp. 2d 934 (E.D. Ark. 2002). In these cases, argues Plaintiff, pretrial detainees awaiting competency restoration services have a liberty interest in proper mental health treatment to restore their competency. (P Brief, Doc. 151, ¶ 135.)

234. In these cases, courts have held state actors to a higher standard than a mere general "deliberate indifference" standard, instead conducting a balancing test between an incompetent detainee's liberty interests in freedom and restorative treatment versus the interests of the state. *See Jackson*, 406 U.S. at 738 (balancing nature and duration of confinement with care and treatment); *Mink*, 322 F.3d at 1121 n.11 (declining to rely solely on a deliberate indifference standard and instead balancing incompetent detainees' liberty interests in freedom and restorative treatment against state interests because "substantive due process may demand more than a lack of deliberate indifference"); *Terry*, 232 F. Supp. 2d at 943–44 (balancing state interests against incompetent pretrial detainees' interests in treatment and freedom and noting, in the alternative, that the failure to provide restorative treatment was deliberate indifference by the state agency).

235. But even if this Court should use the deliberate indifference standard, Plaintiff urges the Court in the alternative to apply an *objective* standard in doing so, citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). And while *Kingsley* did not hold this objective standard applicable to all substantive due process claims, Plaintiff asks this Court alternatively to adopt the *Kingsley* standard in this case, citing the Ninth Circuit's decision

in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (en banc), which expanded the *Kingsley* standard to include failure-to-provide-medical-care claims and suggested that the standard should also be applied to other substantive due process confinement claims. (Doc. 151, ¶ 158.)

236. Defendants have not provided the Court with their position regarding the applicable standard by which to measure a due process violation, arguing only that there is limited due process protection for a probationer in the revocation process. (D Brief, Doc. 152, ¶ 93) (citing *Morrissey v. Brewer,* 408 U.S. 471 (1972); *Gagnon v. Scarpelli,* 411 U.S. 778 (1973); *Pennsylvania Bd. of Probation and Parole v. Scott,* 524 U.S. 357 (1998)).

237. In this regard, Defendants point the Court to the following excerpt from *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987): "[I]t is always true of probationers (as we have said it to be true of parolees) that they do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." (internal quotation marks omitted). (Doc. 152, ¶ 95.)

238. Rather, Defendants focus their argument on George's arrest, contending it was statutorily permitted and constitutional. (Doc. 152, ¶¶ 96-100.) Defendants do not address the broader issue of the legal basis justifying their failure to place (and replace) George in ELMHS or his prolonged stays in EBRPP without a hearing.[14]

239. In deciding the proper standard to apply, the Court starts with the foundational proposition that the Fourteenth Amendment's substantive due process guarantee protects citizens from

---

[14] Defendants suggest they haven't done so because Plaintiff's claim tried to the Court was limited to the sole issue of whether declaratory and injunctive is justified based on the alleged unconstitutional policies, practices and procedures of Defendants in arresting and incarcerating NGRI acquittees for violations of conditions of release alone, when no crime has been committed. (Doc. 161 at 1-2, 9-10.) This contention was repeated in oral argument.

arbitrary, abusive, or oppressive use of governmental power. *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

240. In assessing whether a confinement violates the specific substantive due process rights of NGRI acquittees, the Supreme Court has held that "[d]ue process requires that the nature of the commitment bear some reasonable relation to the purpose for which the individual is committed." *Foucha*, 504 U.S. at 79 (citing *Jones*, 463 U.S. at 715; *Jackson*, 406 U.S. at 738).

241. This test is essentially identical to the substantive due process standard previously set by the Supreme Court in *Youngberg* for mentally retarded persons involuntarily committed: "In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" *Youngberg*, 457 U.S. at 320 (quoting *Poe v. Ullman*, 367 U.S 497, 542 (1961) (Harlan, J. dissenting)). Indeed, the Fifth Circuit has likened the substantive due process rights of one mentally ill who has been civilly committed to those of an NGRI acquittee. *See Poree*, 866 F.3d at 244-245.

242. As discussed in *Youngberg* and numerous subsequent cases, a court generally evaluates substantive due process challenges by pretrial detainees as follows:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

*See, e.g., Estate of Henson v. Wichita Cty.*, 795 F.3d 456, 467 (5th Cir. 2015) (citing *Bell v. Wolfish*, 441 U.S. 520, 539 (1979)).

243. The Court therefore believes *Youngberg* and its progeny are particularly instructive in evaluating the substantive due process issues in this case.

244. *Youngberg* held that "adequate food, shelter, clothing and medical care" are "essentials of the care that the State must provide." 457 U.S. at 324, *see also id.* at 315.

245. However, as later cases observe, "this is by no means the same as requiring the State to provide the best care possible or the optimum location to improve the client's physical, mental and emotional conditions." *Lelsz v. Kavanaugh*, 807 F.2d 1243, 1251 (5th Cir. 1987), *rehg. denied*, 815 F.2d 1034, *cert. dismissed*, 483 U.S. 1057 (1987).

246. But *Youngberg* tells us that "[mentally ill] [p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." 457 U.S. at 322.

247. In *Youngberg*, the Court rejected the state's argument that the Eighth Amendment subjective deliberate indifference or criminal recklessness standard should govern the due process rights of those who were civilly, as opposed to criminally, committed. *Id.* at 321-22, 325.

248. However, *Youngberg* also observed that the balancing of liberty and state interests required should not be left to the "unguided discretion" of a judge or jury. *Id.* at 321.

249. The *Youngberg* court decided that an official violates the substantive due process rights of a mentally ill civilly committed individual when his decision injures the individual's liberty interests and constitutes a "substantial departure from accepted professional judgment." *Id.*

at 323-24. Indeed, the Court ruled that "[l]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323. Therefore, in weighing a committed individual's liberty interests against unreasonable restraints, a court must show deference to the judgment exercised by a qualified professional, which is entitled to a presumption of correctness. *Id.* at 322, 324.

250. *Youngberg* also noted that, "[i]n an action for damages against a professional in his individual capacity, . . . the professional will not be liable if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good faith immunity would bar liability." *Id.* at 323.

251. This principle does not necessarily bar the grant of prospective injunctive or declaratory relief to remedy unconstitutional conditions or policies. *See Thomas S. By Brooks v. Morrow*, 601 F. Supp. 1055, 1059-60 (W.D.N.C. 1984) ("Lack of funding or of established alternatives is not a factor which may be considered in determining the scope of [constitutional rights analyzed in *Youngberg*]. Of course, that factor is critical in determining whether *damages* may be recovered by one who was denied his right to appropriate treatment . . . . Nor are budgetary constraints restrictive of a court's equitable authority and power in fashioning prospective relief after determining that this constitutional right has been violated." (emphasis in original)). *See also Udey v. Kastner*, 805 F.2d 1218, 1220 (5th Cir. 1986) ("[I]nadequate resources can never be an adequate justification for depriving any person of his constitutional rights." (quoting *Smith v.*

60

*Sullivan*, 553 F.2d 373, 378 (5th Cir. 1977)); *Scott v. Plante,* 691 F.2d 632, 637 (3rd Cir. 1982) ("Obviously the problem of hindsight interference with decisions made by hard-pressed professional staff members of state mental institutions is a more serious one than that of assisting them in directing prospective injunctive relief against appropriate state officials."); *Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989) ("In *Youngberg*, however, the Court indicated that budgetary constraints could cloak an individual with good-faith immunity. . . . Such immunity based on budgetary constraints does not, of course, excuse the constitutional violations themselves, or prevent court orders that require the government to correct deficiencies.").

252. *Youngberg* defined a "professional" as someone "competent, whether by education, training or experience to make the particular decision at issue." 457 U.S. at 323 n.30. It distinguished "employees without formal training but who are subject to the supervision of qualified persons," and who would make "day-to-day decisions regarding care." *Id.*; *see also Kyle K. v. Chapman*, 208 F.3d 940, 943 (11th Cir. 2000) (defendant "direct care" workers were nonprofessionals whose primary responsibility was carrying out the directions of officials who determine patient care; conversely, in *Youngberg* defendant directors exercised "varying degrees of supervisory authority over the treatment provided to the patient"); *cf. Patten v. Nichols*, 274 F.3d 829, 840 (4th Cir. 2001) ("*Youngberg* clearly establishes that a hospital's obligation to protect the safety of its patients is measured by the professional judgment standard, and there is no reason to think that the hospital generally will attend to its obligation to provide medical care under circumstances substantially

different from those under which the hospital attends to its obligation to protect the patient's safety.").

253. Sixteen years after *Youngberg,* the Supreme Court decided *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). Unlike *Youngberg*, *Lewis* involved the alleged reckless conduct of a deputy sheriff who instigated a high speed chase that led to a death. *Lewis*, 523 U.S. at 836-37. The decedent's estate sued the county, sheriff's department, and deputy, alleging deprivation of the decedent's substantive due process right to life. *Id.* at 837.

254. In determining what standard to apply, the Court emphasized that a cognizable substantive due process claim must allege official conduct that "shocks the conscience." *Id.* at 846. The Court also observed that negligent conduct would not give rise to a due process claim, while conduct "intended to injure" and unjustified by any government interest would. *Id.* at 848-49.

255. The Court observed that, for conduct falling between those extremes, "deliberate indifference" would satisfy the fault requirement for due process claims, whether brought by convicted prisoners or someone jailed and awaiting trial. *Id.* at 849-50.

256. The Court noted, however, that "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another," and that the term "deliberate indifference" implies a standard "sensibly employed only when actual deliberation is practical." *Id.* at 850-51. Emphasizing the need for "fast action" and the balancing of multiple conflicting duties, *id.* at 853, the Court held that, absent a "purpose to cause harm," officer actions during a high-speed chase do not give rise to a due process violation. *Id.* at 854.

257. In reaching its holding, the Court distinguished "the custodial situation of a prison," where deliberation was not only "practical" and "feasible" but also "obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Id.* at 851. The Court observed that the situation in *Youngberg* could be categorized on "much the same terms," as "[t]he combination of a patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare." *Id.* at 852 n.12.

258. More recently, the Fifth Circuit has stated that a pretrial detainee's Section 1983 action based on "episodic acts or omissions" in violation of Fourteenth Amendment rights must show subjective deliberate indifference, *i.e.*, that an official "knew of and disregarded a substantial risk of serious harm." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 419-20 (5th Cir. 2017). Official conduct must be "wanton" or "reckless" to meet this standard; "inept, erroneous, ineffective, or negligent" conduct does not suffice. *Id.* at 420.

259. Several district courts have also applied *Youngberg*, *Foucha*, *Jones*, and related cases in circumstances similar to those presented here. In *Ward v. Hellerstedt*, 2017 WL 1611761 (W.D. Tex., April 28, 2017), the Western District of Texas considered claims that NGRI acquittees were "languish[ing] in a jail setting for months on end with no treatment or evaluation," violating their interests in "freedom from incarceration" and "the receipt of restorative treatment." *Id.* at *2. The court observed that, with respect to NGRI acquittees, *Jones* and *Foucha* state that the purpose of an insanity acquittee's commitment is dual: "treatment *and* protection of society." *Id.* at *4. The court also noted that "continued detention based on dangerousness and mental illness is only constitutional when there has

been a sufficiently prompt full adversarial hearing where the State has proven by clear and convincing evidence that the individual is demonstrably dangerous to the community." *Id.*

260. In *Luna v. Van Zandt*, 554 F. Supp. 68 (S.D. Tex. 1982), the Southern District of Texas considered the constitutionality of a protective custody statute which, according to the plaintiff, permitted "involuntary detention without a probable cause hearing" and without "provid[ing] notice of the grounds and authority authorizing protective custody." *Id.* at 71.

261. The court ruled that individuals may be detained absent prior notice and opportunity for a hearing in "extraordinary situations;" the statute at issue was constitutional in this respect because it permitted the detention of individuals "who allegedly pose an immediate threat of harm to self, others, or society." *Id.* at 72.

262. However, the court determined that the statutory scheme requiring detainees to wait 14 days or longer for a preliminary "probable cause hearing" was unconstitutional. *Id.* at 72-73, 75-76.

263. According to the court, "[t]he threat of immediate harm to self or others clearly justifies the initial detention. Once the proposed patient is rendered secure and is placed under custody, however, this immediate threat of harm dissipates. His continued confinement can no longer be justified on that basis." *Id.* at 72-73. In other words, after the individual had been "secured," a hearing was necessary in order to ensure that the nature of the commitment continued to bear some reasonable relationship to the purpose for which the individual remained committed. *See id.*

264. In *Neiberger v. Hawkins*, 239 F. Supp. 2d 1140 (D. Colo. 2002), the District of Colorado attempted to reconcile *Youngberg*'s balancing and professional judgment standard with the general standards discussed in *Lewis* and its progeny. *Id.* at 1149-51.

265. The court observed that a person's substantive due process rights are violated by the "arbitrary, abusive, or oppressive use of governmental power," *i.e.*, "egregious" conduct that "shocks the conscience." *Id.* at 1149 (citing *Lewis*, 523 U.S. at 846).

266. According to *Neiberger*, when a plaintiff alleges conduct that is worse than negligent but not intentional, *Lewis* "directs the inquiry to the official's opportunity for deliberation." *Id.* (citing *Lewis*, 523 U.S. at 850-55).

267. In cases involving individuals not committed for punishment, *Neiberger* also rejects the general Eighth Amendment "deliberate indifference" standard in favor of the *Youngberg* standard. *Id.* at 1149. As *Neiberger* observes, the individuals in *Youngberg* merited "greater constitutional vigilance from their caretakers than . . . ordinary prisoners," but *Youngberg* was also wary "of placing too onerous a burden on these officials." *Id.* at 1150 (citing *Shaw by Strain v. Strackhouse*, 920 F.2d 1135, 1144-45 (3d Cir. 1990)).

268. In *Neiberger*'s view, *Youngberg*'s "professional judgment" standard constituted a "middle[]ground" between a very deferential "deliberate indifference" standard and more searching "compelling" or "substantial necessity" tests. *See id.* (citing *Shaw*, 920 F.2d at 1145).

269. *Youngberg* and its progeny remain good law. Moreover, as discussed above, these cases account for numerous factors that are unique or particularly relevant to decisions made about the care and detention of NGRI individuals, namely (1) their placement in state

65

custody and resulting inability to provide for their own wellbeing; (2) the fact that they have not been found legally responsible for criminal conduct and have a greater liberty interest than an individual convicted of a crime; (3) their typical placement with individuals who receive training and exercise informed, professional judgment about their care; and (4) officials' general ability to make deliberate, unhurried decisions about their care.

270. The Court is therefore persuaded, at least as an initial matter, to use *Youngberg*'s balancing and professional judgment standards to determine whether Defendants' conduct "shocks the conscience," as is required to give rise to a due process claim.

271. Because there is a reasonable argument, however, that one of the aforementioned "deliberate indifference" standards applies, the court will also consider the application of these standards in the alternative. *See*, *e.g., Terry*, 232 F. Supp. 2d at 943-44 (balancing state interests against incompetent pretrial detainees' interests in treatment and freedom and noting, in the alternative, that the failure to provide restorative treatment was deliberate indifference by the state agency).

### F.   APPLICATION OF LAW TO FACTS OF CASE

272. The Court will address each issue separately.

### G.   EXISTENCE AND CONSTITUTIONALITY OF ALLEGED POLICY, PRACTICE, AND PROCEDURE

273. Plaintiff's central argument is that Defendants maintained a "policy, practice and procedure" of arresting and incarcerating NGRI acquittees for violating their conditions of release when no crime had been committed. (Doc. 42, ¶¶ 1, 77, 78, 80, 86, 91, 93-94.) He argues that a policy has been proven primarily by two facts: first, the two incidents in which George himself was arrested and incarcerated; and second, the testimony of Tubbs that there

were some 12 to 18 other incidents in which Tubbs arrested and incarcerated NGRI acquittees. He also attempts to support his argument by maintaining that Defendants "haven't claimed that Mr. George's experiences were unique" (Doc. 160 at 18), and that "[t]here is no evidence before this Court that by incarcerating Mr. George for 25 and 55 days that defendants were following a practice unique to Mr. George." (*Id.* at 13.)

274. In support of his argument that he has factually proved a policy, practice or procedure, Plaintiff cites a record in another case dealing with persons found incompetent to stand trial, *Advocacy Center for Elderly and Disabled v. Louisiana Dep't of Health and Hospitals*, 731 F. Supp. 2d 603, 627 (E.D. La. 2010). (Doc. 160 at 13). Plaintiff also points the Court to a decision of this Court denying a motion to dismiss. *See generally Cooper*, 2014 WL 7334911. Yet neither of these cases provides the *factual* support for the argument made here.

275. While the Court certainly has concerns with the extended incarcerations of George without a hearing, it is Plaintiff's burden to prove his allegations, including the allegation that there was a "policy, procedure and practice." It is not the Defendants' burden to show these two incidents were unique.

276. As noted above, the Court finds that two arrests do not establish a "policy, practice or procedure." While the two share the common fact that George was arrested and incarcerated for violating a condition of his release (being physically assaultive and aggressive and presenting a danger to others), the two incidents are also significantly different. The first involved his conduct while on release in a group home and at his day program while the

second occurred at ELMHS. More importantly, however, even if identical, the number of incidents is insufficient to establish a policy, procedure or practice.

277. Tubbs' testimony that "over the years, [he] moved to revoke somewhere around 12 to 18 of the Not Guilty by Reason of Insanity folks that [he] supervised," (Tubbs Test., Doc. 148 at 84:17-86:12), likewise does not establish the policy or procedure Plaintiff claims. First, Tubbs testified that he *moved* to revoke these NGRI acquittees and did not, as Plaintiff's claimed practice would require, simply arrest and incarcerate them on his own. Rather, the testimony suggests that Tubbs invoked the authority of the court. Second, his testimony gives no information as to the circumstances surrounding the conduct that gave rise to the arrest, including whether or not the acquittees had committed a crime.

278. However, even if Plaintiff had proved a policy, procedure, or practice of arresting an NGRI acquittee for violations of conditions of release when no crime had been committed, the Court finds that this policy alone does not violate the Constitution for the reasons given below.

## H. ARREST AND INCARCERATION FOR VIOLATIONS OF CONDITIONS OF RELEASE WHEN NO CRIME WAS COMMITTED

279. Plaintiff argues that, while the state may detain pretrial criminal defendants who are a danger to others or to the community, the Supreme Court has explicitly approved of this practice only in narrow circumstances to prevent "the most serious of crimes" and only where a court makes an initial determination of probable cause for the detention followed by a "prompt" detention hearing to prove by clear and convincing evidence that no other less restrictive condition could ensure the safety of the community. (Doc. 151, ¶ 141) (citing *Foucha*, 504 U.S. at 81–82; *United States v. Salerno*, 481 U.S. 739 (1987)).

280. Plaintiff argues that, even without a policy, practice or procedure, he has proven that his arrest and incarceration on two occasions violated his substantive due process rights.

281. Indeed, says Plaintiff, even where it is appropriate to revoke probation and return him to confinement, the law requires the detention to be in a public or private mental hospital, not a jail. (Doc. 151, ¶ 152) (citing La. Code Crim. Proc. art. 654.)

282. Plaintiff claims that Defendants chose to have George arrested and placed in East Baton Rouge Parish Prison on two separate occasions, despite the fact that less restrictive alternatives were available. Such alternatives included treating George at a private mental hospital. According to Plaintiff, a reasonable officer in the same circumstances would have appreciated the risk of placing a severely ill man in a parish prison setting not intended to provide the level of mental health treatment necessary. (Doc. 151, ¶ 162.)

283. In post-trial briefing, Plaintiff characterized his claims as whether it was constitutional to confine him in a parish prison *for six weeks*. (Doc. 151, ¶¶ 151, 153 (emphasis added).) However, as noted previously, Plaintiff has since acknowledged that his constitutional claims are "limited to the issue of whether the arrest and incarceration of George solely for violation of conditions of his release in the absence of a criminal arrest violated George's substantive due process rights." (Doc. 163 at 1.) Plaintiff's constitutional claims do not include "issues of length of incarceration before release, length of incarceration without or before a hearing, adequacy of medical care, and other issues." (*Id.*)

284. Defendants, on the other hand, argue that "when an arrest is made by state officers acting pursuant to state authority, 'the requisite standard of probable cause for a lawful arrest is

determined by state law, provided such law meets federal constitutional standards.'" (Doc. 152, ¶ 96) (citing *United States v. Ullrich*, 580 F.2d 765, 769 (5th Cir. 1978)).

285. Defendants insist that La. Code Crim. Proc. art. 658(B) specifically authorizes the arrest and detention of an NGRI acquittee in conformity with the applicable provisions of La. Code Crim. Proc. art. 899, and La. Code Crim. Proc. art. 899(B) provides that a probation officer may arrest a defendant without a warrant if the officer "has reasonable cause to believe that a defendant violated or is about to violate a condition of his probation" and therefore such an arrest does not violate the Fourth Amendment. (Doc. 152, ¶ 97.)

286. The term "reasonable cause" is also cited in La. Code Crim. Proc. art. 213, which sets forth generally the instances in which a peace officer may lawfully arrest someone without a warrant. "In interpreting the meaning of 'reasonable cause' in . . .  Code of Criminal Procedure Art. 213, reasonable cause has been equated with probable cause." (Doc. 152, ¶ 98) (citing *Lawrence v. Henderson*, 344 F. Supp. 1287, 1292 n.15 (E.D. La. 1972) *aff'd*, 478 F.2d 705 (5th Cir. 1973)).

287. Defendants maintain that reasonable cause under Louisiana law has been "judicially recognized as equivalent to probable cause." (Doc. 152, ¶ 99) (citing, *inter alia*, *Haith v. City of Shreveport*, 2005 WL 2140583, at *4 (W.D. La. Sept. 1, 2005); *Sebald v. City of New Orleans*, 2005 WL 1400428, at *4 (E.D. La. June 6, 2005)).

288. Because Defendants had probable cause to arrest Plaintiff for violating the conditions of his conditional release order for exhibiting violent and threatening behavior at the time of both arrests, Defendants contend that Plaintiff's arrest and incarceration were both consistent with Louisiana and constitutional law. (D Brief, Doc. 152, ¶ 100.)

289. First, the Court previously held that the two key provisions of Louisiana's challenged statutory scheme, La. Code Crim. Proc. arts. 658 and 899, are facially constitutional. (Doc. 124 at 3, 22-26.) As the Court observed, "court after court has refused to declare as unconstitutional statutes that authorize the arrest of a person found NGRI upon his or her violations of the conditions of his or her release, assuming any such recommission is ultimately reviewable by a court of law." (*Id.* at 23-24) (citing *Archuleta v. Hedrick*, 365 F.3d 644, 648 (8th Cir. 2004); *Phelps v. United States*, 831 F.2d 897, 898 (9th Cir. 1987); *Cochran v. Dysart*, 965 F.2d 649, 649 (8th Cir. 1992); *Grass v. Reitz*, 643 F.3d 579 (8th Cir. 2011)); *see also Ward*, 2017 WL 1611761 at *4 ("A determination that an insanity acquittee is dangerous, without more, would therefore be insufficient to make constitutional an insanity acquittee's *indefinite* incarceration in a county jail. Moreover, continued detention based on dangerousness and mental illness is only constitutional when there has been a *sufficiently prompt full adversarial hearing . . .*" (emphasis added, spelling altered)); *cf. Lynch v. Baxley*, 386 F. Supp. 378, 387 (M.D. Ala. 1974) (three-judge panel) (Alabama statutes providing for emergency detention in county jail or state mental hospitals were facially unconstitutional because they authorized "ex parte and summary deprivation of liberty without any of the rudimentary protections long recognized as required by the due process of law;" emergency detention absent a hearing was constitutional "only for the length of time required to arrange a probable cause hearing," and in no event for more than seven days).

290. While Plaintiff's current constitutional challenge is not styled as such, it is in a very real way a continuing facial challenge since it claims principally that *any* arrest and incarceration

of an NGRI acquittee for violating his conditions of release when the acquittee has not been accused of committing a crime is unconstitutional, regardless of the circumstances. (Pl.'s Second Amd. Compl., Doc. 42 at 18-19; Doc. 160 at 1-4; Doc. 163 at 1). Counsel for Plaintiff conceded as much at oral argument.

291. As previously discussed, however, even though George was not legally responsible for the acts he committed, the Supreme Court has emphasized that an NGRI acquittee is not free to resume his life unfettered by any restrictions. Society has an interest in insuring that an insanity acquittee poses no danger to himself or the public. *Jones*, 463 U.S. at 368. This interest is typically stronger in the case of an NGRI than other persons subject to non-punitive commitment, as an NGRI has been found beyond a reasonable doubt to have committed a criminal act. *Id.* at 364.

292. Moreover, the Fifth Circuit has reaffirmed the state's interest in taking reasonable steps to protect society and the acquittee himself from the acquittee's "potential dangerousness." *Poree*, 866 F.3d at 248 ("[T]he governing legal principle derived from *Foucha* and *Jones* is that a state may continue to confine an insanity acquittee only so long as the acquittee is both mentally ill and dangerous. . . . [I]n *Jones* the Court indicated that the dangerousness finding is predictive in nature and that the government is permitted to protect against the 'potential dangerousness' of [NGRI] acquittees.").

293. In light of these authorities, the Court reiterates that Louisiana's statutory scheme, which allows for the arrest and short-term detention of an NGRI acquittee in jail for violation of conditions of release, with no or less-than-optimal medical care, is facially constitutional.

294. Such a detention, as in this case, can easily be "reasonably related to a legitimate governmental objective," *Estate of Henson*, 795 F.3d at 467 (citing *Bell*, 441 U.S. at 539), *i.e.*, protection against the real or potential dangerousness of the individual towards himself or others. *Poree*, 866 F.3d at 248.

295. And while the Court agrees that "continued detention based on dangerousness and mental illness is only constitutional when there has been a sufficiently prompt and full adversarial hearing where the State has proved by clear and convincing evidence that the individual is demonstrably dangerous to the community," *Ward*, 2017 WL 1611761 at *4, Louisiana's statutory scheme provides for such a hearing. La. Code Crim. Proc. arts. 658(B)(6) and 899(B), (E).

296. For the same reason, George's as-applied claim that his due process rights were violated by his arrest and detention, solely based on his violation of his conditions of release and in the absence of a criminal charge, is also denied.

297. The Court has found as a matter of fact that, at the time of both arrests, George presented both a real and potential danger to those around him.

298. Therefore, Plaintiff's placement in jail on both occasions was constitutional, as it bore a reasonable relationship to the state's legitimate interest in protecting others from George's dangerousness. *See Foucha*, 504 U.S. at 79; *see also Luna*, 554 F. Supp. at 72 ("The threat of immediate harm to self or others clearly justifies the initial detention.").[15]

---

[15] The Court emphasizes its concern regarding George's lengthy stays in EBRPP without a hearing or earlier placement in a mental hospital. The Court believes that "*continued* detention based on dangerousness and mental illness is only constitutional when there has been a sufficiently prompt and full adversarial hearing where the State has proved by clear and convincing evidence that the individual is demonstrably dangerous to the community." *Ward*, 2017 WL 1611761 at *4 (emphasis added); *see also Luna*, 554 F. Supp. at 71-76. There is the additional issue of whether such prolonged incarceration in the absence of adequate psychiatric care is punishment. But, as counsel for Defendants

299. As the Court also discussed above, at the times when Defendants were considering whether to jail George, there were reasons to believe that alternative placement was unavailable. While the Court questions whether Brady and Tubbs could have done more, mere negligence does not give rise to a constitutional violation. *Lewis*, 523 U.S. at 848-49 ("[T]he Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process."); *Neiberger*, 239 F. Supp. 2d at 1149 (citing *Lewis*, 523 U.S. at 848-49)).

300. Furthermore, under the *Youngberg* standard, the professional judgment of Tubbs, Brady and Vosburg,[16] based upon reasonable evaluation of the threat George posed and the alternatives available, is presumptively valid. Plaintiff has not overcome this presumption, nor does it appear that he could do so in light of the facts previously found by the Court based upon the evidence and testimony at trial. As *Youngberg* observes, "the Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." 457 U.S. at 321-22.

301. Although Plaintiff encourages the Court to graft a "least restrictive setting" component onto the *Youngberg* standard, the Fifth Circuit has rejected this approach in a similar factual setting, *Lelsz*, 807 F.2d at 1249 & n.8 (rejecting reading of *Youngberg* that "attempt[ed] to transform the state right of a least restrictive environment into a federal right"), and the Court therefore declines to adopt it.

---

understandably pointed out at oral argument, because the length of George's incarcerations and quality of medical care were not (and are not) issues before the Court, Defendants did not fully address these issues at trial or in briefing.

[16] The Court finds that all three were "professionals" as defined by *Youngberg*: someone "competent, whether by education, training or experience, to make the particular decision at issue." 457 U.S. at 323, n. 30.

302. In the alternative, for substantially the same reasons, the Court cannot conclude that Defendants' decision to jail George was objectively unreasonable under the circumstances or that the Defendants were actually aware of and disregarded a substantial risk of serious harm. *Kingsley*, 135 S. Ct. at 2470; *Alderson*, 848 F.3d at 419-20. This is especially true since George received some level of care, albeit far from ideal, at EBRPP. Instead, Defendants exercised reasonable judgment under the circumstances, evaluating both the threat that George posed and the alternatives available, and came to the objectively reasonable conclusion that short-term placement of George in the EBRPP was warranted.

303. For the foregoing reasons, the Court concludes that Plaintiff has not demonstrated legal justification for the issuance of the requested declaratory judgment and injunction as it pertains to his constitutional claims.

## I. PLAINTIFF'S CLAIMS SEEKING DECLARATORY AND INJUNCTIVE RELIEF UNDER THE ADA AND SECTION 504

304. In its verdict, the jury found that Defendants DHH and LDPSC had "not discriminate[d] against Plaintiff because of his disabilities" either under the ADA or Section 504. (Doc. 144 at 1-2.) They further found that these same Defendants had not "fail[ed] to provide Plaintiff with a reasonable modification appropriate for his disabilities." (*Id.*)

305. Nonetheless, Plaintiff seeks a declaratory judgment that Defendants' policies, practices, and procedures of arresting and incarcerating individuals in correctional facilities who have been placed on conditional discharge following a finding of NGRI based on a violation of a condition of their discharge violates Plaintiff's rights under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act of 1973 ("RA"). (*See* Doc. 42.)

306. Following initial post-trial briefing, the Court asked the parties to answer certain specific questions, including the following: "With respect to Plaintiff's claims under the ADA and RA, what effect or weight must/should the Court give to the jury's findings?" (Doc. 159 at 5.)

307. In response, Plaintiff "admits that, as long as the jury's findings stand, this Court is obliged to apply [the] law to the facts as the jury found them." (Doc. 160 at 160.) Defendants agree. (Doc. 161 at 11.)

308. However, under Federal Rule of Civil Procedure 50(b), Plaintiff renews its motion for judgment as a matter of law ("JMOL") made at the close of the evidence. (Doc. 160 at 23-24; Trial Tr., Doc. 150 at 62:21-63:20.) The motion was denied by the Court because of questions of fact on critical questions ultimately answered by the jury in its verdict. (*Id.* at 63:18-20.) Defendants oppose the motion, arguing principally that there was sufficient evidence to support the jury's verdict. (Doc. 168 at 4-9.)

309. Plaintiff correctly sets forth the standard the Court must follow in considering Plaintiff's renewed motion. (Doc. 160 at 23-24). A motion for JMOL raises only a question of law: "[w]hether there is any evidence which, if believed, would authorize a verdict against movant." *Marsh v. Illinois Cent. R. Co*., 175 F.2d 498, 500 (5th Cir. 1949). "A judgment as a matter of law is appropriate if the facts and inferences point so strongly and overwhelmingly in favor of one party that reasonable people could not arrive at a verdict to the contrary." *Buchanan v. City of San Antonio*, 85 F.3d 196, 198 (5th Cir. 1996). In considering a motion for JMOL, the court is not to re-weigh the evidence or assess the credibility of witnesses. *See Lytle v. Household Mfg., Inc*., 494 U.S. 545, 554 (1990).

Rather, the court must examine the entire record in the light most favorable to the non-movant and draw all inferences in the non-movant's favor. *Becker v. PaineWebber, Inc.*, 962 F.2d 524, 526 (5th Cir. 1992).

310. At trial, there was an abundance of evidence showing that first, George was arrested because he posed a potential danger to others. (*See, e.g.*, Brady Test., Doc. 148 at 124:24–125:23; Kelly Test., Doc. 149 at 79:21–24, 80:1-6; Pl.'s Trial Ex. 11 at TG000014; Defs.'s Trial Ex. 5 at 1–2.) Second, the uncontradicted testimony at trial was that George was placed at EBRPP because there were no beds available at ELMHS. (*See, e.g.*, Tubbs Test., Doc. 148 at 84:6–10; *see also* Brady Test., Doc. 148 at 122:4–18, 124:22-23, 126:3–13, 127:21–22). Finally, there was evidence presented to the jury that, while not identical to the care he would have received at ELMHS, nonetheless, he received the care of a psychiatrist and a social worker and received at least some of his psychiatric medicines while at EBRPP. (*See, e.g.*, Burns Test., Doc. 149 at 106:13–110:17, 145:4-9).

311. Considering the evidence in the light most favorable to the Defendants, a reasonable jury could conclude, as this one did, that George was not arrested and incarcerated (the alleged basis for Plaintiff's charge of discrimination) based on his disability, but rather, based on the potential danger he posed to others and himself. Further, a reasonable jury could conclude that the care he received at EBRPP, while not optimal, was not discriminatory and was a reasonable accommodation under the circumstances.

312. Accordingly, Plaintiff's renewed motion for judgment as a matter of law is denied.

313. Given the jury's findings, the Court concludes that Plaintiff has not demonstrated legal justification for the issuance of the requested declaratory judgment and injunction as it pertains to his ADA and Section 504 claims.

## CONCLUSION

In light of the foregoing findings of fact and conclusions of law, IT IS HEREBY ORDERED THAT Plaintiff's renewed motion for judgment as a matter of law is DENIED and Plaintiff's claims are DENIED in all respects. Judgment shall be entered in favor of Defendants and against Plaintiff by separate document in conformity with Rule 58.

Signed in Baton Rouge, Louisiana, on September 29, 2017.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**